**IN THE UNITED STATES COURT**
**OF APPEALS FOR THE FIFTH CIRCUIT**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; and HABITAT RECOVERY PROJECT, | |
| Petitioners, | |
| v. | Case No. _____ |
| U.S. DEPARTMENT OF TRANSPORTATION; MARITIME ADMINISTRATION; SEAN DUFFY, in his official capacity as SECRETARY OF TRANSPORTATION; CHARLES MAKINGS, in his official capacity as ACTING MARITIME ADMINISTRATOR, | **PETITION FOR REVIEW** |
| Respondents. | |

Pursuant to Administrative Procedure Act, 5 U.S.C. § 702, Deepwater Port Act, 33 U.S.C. § 1516 Federal Rules of Appellate Procedure 15(a), and Circuit Rule 15, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB and HABITAT RECOVERY PROJECT petition this Court for review of the U.S. Department of Transportation Maritime Administration's ("MARAD") issuance of a license for the Delfin LNG LLC ("Delfin") deepwater port terminal. In accordance with local Rule 15.1(b), a copy of the press release announcing the license issuance is attached as Exhibit A. The April 2024 letter to Delfin requesting an amended application is attached as Exhibit B. The Record of Decision for the 2017 conditional licensing decision of Delfin LNG is attached as Exhibit C, and the accompanying Final Environmental Impact Statement is incorporated by that Record of Decision.

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, parties that may have participated in the underlying procedure have been served a copy of this Petition. The Certificate of Service to these parties is attached as Exhibit D. Pursuant to Federal Rule of Appellate Procedure 15(c), attached as Exhibit E is a list of Respondents specifically identifying the Respondent's names and addresses.

Dated: May 19, 2025

Respectfully submitted,

*/s/ Lauren A. Parker*
Lauren A. Parker (DC1670885)
Jason R. Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

*/s/ Devorah Ancel*
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 103 W
Boulder, CO 80301
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org
*Counsel for Petitioners*
*Sierra Club and Habitat Recovery Project*

# EXHIBIT A

An official website of the United States government   Here's how you know ⌄

United States Department of Transportation

Maritime Industry Advisories | Find a U.S. Flag Vessel

Search

Home / Newsroom

IN THIS SECTION                                                                    +

# The Maritime Administration Issues the License for the Delfin LNG, LLC Deepwater Port Application

Friday, March 21, 2025

**WASHINGTON** – Today, the Maritime Administration issued a license authorizing to Delfin LNG, LLC, to own, construct, operate, and eventually decommission a deepwater port, to export Liquefied Natural Gas (LNG) from the United States.

The Delfin LNG, LLC deepwater port facility will transport LNG to the global market from the United States (U.S.) Federal waters, approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana.

The Maritime Administration and the U.S. Coast Guard worked with approximately 15 cooperating federal agencies along with the States of Texas and Louisiana to review the Delfin LNG, LLC application. These agencies submitted recommendations for environmental and other license conditions.

The Delfin LNG, LLC deepwater port license is being issued in accordance with President Trump's Executive Order titled, "Unleashing American Energy," signed January 20, 2025. This deepwater port project will be the first offshore LNG export project in the United States.

###

U.S. DEPARTMENT OF TRANSPORTATION

**Maritime Administration**

1200 NEW JERSEY AVENUE, SE

WASHINGTON, DC 20590

Subscribe To Email Updates

   

**About**

About MARAD

Newsroom

National Security

Economic Security

Maritime Workforce

Grants & Loans

Environment & Innovation

Data & Reports

**Resources**

U.S. Maritime Alerts

U.S. Maritime Advisories

FOIA

**Policies, Rights, Legal**

About DOT

Budget and Performance

Civil Rights

Information Quality

No FEAR Act

Office of the Inspector General

Privacy Policy

USA.gov

Web Policies and Notices

Web Standards

# EXHIBIT B



U.S. Department
of Transportation
**Maritime**
**Administration**



April 17, 2024

Mr. Dudley Poston
Chief Executive Officer
Delfin LNG, LLC
25 West Cedar Street, Suite 215
Pensacola, Florida 32502

Re:     Application of Delfin LNG, LLC for Deepwater Port License

Dear Mr. Poston:

This responds to Delfin LNG, LLC's (Delfin) request that the Maritime Administration
(MARAD) issue Delfin a license to own, construct, and operate a deepwater port off the coast of
Louisiana under the Record of Decision (ROD) issued March 13, 2017. MARAD will not issue
a license at this time as the ROD no longer supports the issuance of a license. In the seven years
since the ROD was issued, widespread changes were made to the project, including to the project
ownership, design, financing, and operations. These changes resulted in a revised proposal that
is not the same as that approved under the ROD, and as noted below, will require a thorough,
statutorily required, interagency and public review. To facilitate this review, Delfin will need to
update the application to reflect the changes and submit an amended version for review as set
forth below.

As noted above, the 2017 ROD approved Delfin's ownership, construction, and operation of a
deepwater port that would consist of four floating liquefied natural gas vessels (FLNGVs),
identical in design and function and with supporting pipelines and related infrastructure. In
accordance with its original application, Delfin was to own and operate the FLNGVs under the
license. Based on correspondence received from Delfin dated July 19 and September 6, 2023,
and as discussed in several meetings with the Delfin project team, Delfin now proposes to have
the FLNGVs, which are critical to port operations, potentially owned, financed, and operated by
third parties other than Delfin. This is a significant departure from what was contemplated in,
and approved under, the ROD, and will require additional evaluation and consideration.

The project's proposed financing is also different than what was proposed by Delfin and
reflected in the 2017 ROD. An equity portion of the project costs was to be provided by
Enbridge Holdings LNG LLC, along with participation by suitable and creditworthy Delfin

affiliates such as Enbridge Inc.[1]  Debt financing was from established sources including the Korea Development Bank, which had made a commitment of $1.5 billion.[2]  Enbridge, Inc. was also to serve as guarantor of Delfin's decommissioning obligations and was committed to guarantee the project's full decommissioning costs.[3]

Delfin's proposed equity and debt financing that was approved in the ROD (to support project construction, operations, and decommissioning) has changed significantly.  Specifically, Enbridge Holdings LNG LLC, and other then-identified Delfin affiliates, no longer appear to be actively involved with the equity financing of the project.  In addition, the Korea Development Bank no longer appears to be involved in providing debt financing.

In addition to financing and ownership changes to the project, Delfin's project update proposed design changes to the mooring system, power generation systems, and cooling systems.  These proposed design changes were not included in the Final Environmental Impact Statement and therefore require an updated environmental review, public engagement, and evaluation.

In light of the foregoing, Delfin must update the application to reflect the changes and submit an amended application for interagency review.  The amended application should include redlines indicating changes to the original application and provide clear and comprehensive documentation regarding the current project ownership, design, financing, and proposed operations, including detailed information regarding all parties involved in the design, construction, financing, and operation of the port.

The amended application will be distributed to interested Federal agencies and the Governors of Louisiana and Texas, the adjacent coastal states.  If MARAD and the USCG, in coordination with other Federal agencies, determine that the amended application is complete, a Notice of Amended Application will be published in the Federal Register.  A supplemental Environmental Assessment (EA) or Supplemental EIS (SEIS) and the amended application will be made available to the public on the project docket.  The public will be afforded an opportunity to comment on the supplemental EA or SEIS and the amended application.  After the conclusion of the comment period for the supplemental EA or SEIS, a final public hearing will be held in each adjacent coastal state.  A 45-day period will follow the public hearing during which the Governors may approve, approve with conditions, or disapprove the amended application, and the Environmental Protection Agency's Administrator will also be afforded an opportunity to inform the Maritime Administrator if the deepwater port as proposed would not conform with the applicable provisions of the Clean Air Act, the Clean Water Act, or the Marine Protection, Research and Sanctuaries Act.  MARAD will issue a new Record of Decision within 90 days after the final public hearing.

We look forward to working with Delfin should it decide to submit an amended application.

---

[1] *The Secretary's Decision on the Deepwater Port License Application of Delfin LNG, LLC*, Mar. 13, 2017, at 31-32, https://www.regulations.gov/document/USCG-2015-0472-0120.
[2] Id. at 31
[3] Id. at 33

Sincerely,

*William Paape*

William (Bill) Paape
Associate Administrator, Office of Ports & Waterways
Maritime Administration

Cc:    Rear Admiral Wayne R. Arguin Jr., USCG Assistant Commandant for Prevention Policy
Jeffery G. Lantz, Director of Commercial Regulations and Standards
Captain Jerry D. Butwid, USCG Chief, Operating and Environmental Standards
Chairman Willie L. Phillips, Federal Energy Regulatory Commission
William Daughdrill, Delfin Chief Operating Officer
Patrick Nevins, Latham Watkins, Outside Counsel
Janice Schneider, Latham Watkins, Outside Counsel
David Thompson, Blank Rome, Outside Counsel
Joan Bondareff, Blank Rome, Outside Counsel

# EXHIBIT C

# DEPARTMENT OF TRANSPORTATION
# UNITED STATES OF AMERICA



# THE SECRETARY'S DECISION ON
# THE DEEPWATER PORT LICENSE APPLICATION
# OF
# DELFIN LNG, LLC

Washington, D.C.
March 13, 2017

DEPARTMENT OF TRANSPORTATION
UNITED STATES OF AMERICA

THE SECRETARY'S DECISION ON
THE DEEPWATER PORT LICENSE APPLICATION
OF
DELFIN LNG, LLC

Washington, D.C.
March 13, 2017

## TABLE OF CONTENTS

LIST OF ACRONYMS............................................... 4
I.     INTRODUCTION ............................................ 6
II.    DECISION .............................................. 15
III.   DECISION-MAKING PROCESS ............................... 18
IV.    POLICY DETERMINATIONS ................................. 26
V.     CRITERIA FOR ISSUANCE ................................. 27
       1.  Financial Responsibility........................... 27
       2.  Compliance with Applicable Laws, Regulations, and
           License Conditions................................ 34
       3.  National Interest................................. 35
       4.  Navigation, Safety, and Use of the High Seas....... 38
       5.  Protecting and Enhancing the Environment........... 44
       6.  Advice of the Administrator of EPA................. 59
       7.  Consultations with the Secretaries of State, Defense,
           and Army.......................................... 61
       8.  Approval of Adjacent Coastal State Governors....... 62
       9.  Coastal Zone Management Act (CZMA)................. 63
VI.    CONCLUSION ............................................ 64

## LIST OF ACRONYMS

| Acronym | Definition |
| --- | --- |
| ACS | Adjacent Coastal States |
| The Act | Deepwater Port Act of 1974 |
| The applicant | Delfin LNG, LLC |
| Assessment | Environmental Impact Assessment |
| ATBA | Area-to-be-Avoided |
| BMP | Best Management Practices |
| BOEM | Bureau of Ocean Energy Management |
| Bscf/y | Billion standard cubic feet per year |
| CAA | Clean Air Act |
| CBD | Center for Biological Diversity |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act of 1972 |
| Delfin LNG | Delfin LNG, LLC |
| DOE | Department of Energy |
| DOI | U.S. Department of Interior |
| EEZ | Exclusive Economic Zone |
| EFH | Essential fish habitat |
| EIA | U.S. Energy Information Administration |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FERC | Federal Energy Regulatory Commission |
| FLNGV | Floating Liquefied Natural Gas Vessel |
| GHG | Greenhouse Gases |
| HIOS | High Island Offshore System pipeline |
| IMO | International Maritime Organization |
| JD | Jurisdictional Determination |
| LDEQ | Louisiana Department of Environmental Quality |
| License | License, Deepwater port license |
| LNG | Liquefied Natural Gas |
| M3 | Cubic meters |
| MARAD | Maritime Administration |
| mgd | Million gallons per day |
| MMPA | Marine Mammal Protection Act |
| MMtpa | Million metric tonnes per annum |
| NAA | No-Anchoring-Area |
| NEPA | National Environmental Policy Act |
| NOAA | National Oceanic and Atmospheric Administration |
| NGA | Natural Gas Act of 1938 |

| | |
|---|---|
| NMFS | National Marine Fisheries Service |
| OCS | Outer Continental Shelf (OCS) |
| OPA 90 | Oil Pollution Act of 1990 |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PMMP | Prevention, Monitoring, and Mitigation Plan |
| The Port | Delfin Deepwater Port |
| SHPO | State Historic Preservation Officer |
| Transco Station 44 | Transcontinental Gas Pipeline Company Station No. 44 |
| TYMS | Turret Yoke Mooring Systems |
| UNCLOS | U. N. Convention on the Law of the Sea |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USEPA | U.S. Environmental Protection Agency |
| USFWS | U.S. Fish and Wildlife Service |
| USCG | United States Coast Guard |
| UTOS | U-T Offshore System pipeline |
| WC | West Cameron |

# I. INTRODUCTION[1]

The Deepwater Port Act of 1974, as amended, in 1984, 1996, 2002, 2006, 2012 and 2014 (hereinafter, the Act)[2] declares it to be the intent of Congress to "...authorize and regulate the location, ownership, construction, and operation of deepwater ports in waters beyond the territorial limits of the United States."[3]  The term deepwater port includes offshore structures, other than a vessel, that are used as terminals to transport, store or further handle oil or natural gas to, or from, any State.[4]

---

[1] The application and related public comments and official actions may be viewed on the Federal Government's Docket Management System (Docket) at http://www.regulations.gov/ by entering the official docket number for Delfin LNG, USCG-2015-0472.

[2] In January 2002, the Act was amended by Public Law No. 107-295, the Maritime Transportation Security Act of 2002, which, at section 106, amended the Act to cover the importation, transportation and production of natural gas.  The Act was later amended by Public Law No. 109-241, the Coast Guard and Maritime Transportation Act of 2006, to address crew nationalities, vessel flag registries, and other requirements. The Act was subsequently amended in 2012 by Public Law No.112-213, the Coast Guard and Maritime Transportation Act of 2012, to permit the export of oil or natural gas from deepwater port facilities.  The most recent amendment occurred in 2014 by Public Law No. 133-281, the Howard Coble Coast Guard Authorization Act of 2014, to include crew nationalities and vessel flag registries for export activities.  The Act is codified at 33 U.S.C. §§ 1501 through 1524, and citations in this document are either to sections of the Act (which were numbered 2 through 25) or, whenever possible, to corresponding sections of the United States Code (U.S.C.) or to the Code of Federal Regulations (C.F.R.).

[3] 33 U.S.C. § 1501(a)(1).

[4] The term deepwater port is defined at 33 U.S.C. § 1502(9) to include only fixed or floating structures located beyond State seaward boundaries and deepwater port components located seaward of the high water mark.  However, the Delfin facility has onshore components *and* offshore components.  As used herein, the terms "deepwater port" and "Port" shall have the statutory meaning referenced above.

The components of the onshore facilities, which hereinafter are referred to as the Delfin Onshore Facility (DOF), fall under the jurisdiction of the Federal Energy Regulatory Commission (FERC), and are reviewed independently under the FERC statutory and regulatory authorities pursuant to Sections 7(b) and 7(c) of the Natural Gas Act of 1938 (NGA), as amended, and 18 C.F.R. Part 157.  The DOF is not a component of the offshore deepwater port, nor is it regulated by the Act.

This Record of Decision applies only to Port structures located beyond State seaward boundaries and associated components of the Port located seaward of the high water mark.  A high water mark is a point that represents the maximum rise of a body of water over land.  For the purposes of the Act, the high water mark is a line along the coast that describes or marks the maximum encroachment of the sea at high tide.

Recent developments in the exploration and production of natural gas in the United States have allowed the U.S. to enter the global market as a supplier of natural gas. Recent studies show the Nation has approximately 93 years of proved natural gas reserves and is well-positioned to contribute to meeting a growing international demand for natural gas. The export of natural gas will serve U.S. national security interests by providing greater diversification of global natural gas supplies, which, due to the stability of the U.S. supply chain, will result in an increased resilience to natural and man-made disruptive events. Exporting liquefied natural gas (LNG) will also give U.S. allies certainty that in the event natural gas supplies are interrupted, the U.S. can provide a consistently reliable alternative source.

The U.S. Energy Information Administration (EIA) notes that "[a]lthough both U.S. natural gas consumption and production have increased in recent years, natural gas production has grown slightly faster."[5] Data from the EIA shows that the United States experienced a five percent increase in annual domestic dry natural gas production for 2015 to 27,096 Bcf, which is a record level for the United States. As a result of this increased domestic production of natural gas, the United States will become a net exporter of natural gas after years of steadily increasing its natural gas production. Further, EIA notes that "[t]he United States is on track during the second half of 2017 to export more natural gas than it imports for the first time since 1957." EIA acknowledges that "although exports are increasing, there are still expected to be abundant natural gas supplies to meet domestic demand." [6]

Under the Act, persons seeking to own, construct and operate deepwater ports must submit a detailed application to the Secretary of Transportation, who, by a delegation most recently published in the Federal Register on August 17, 2012, delegated to the Maritime Administrator "the authority to issue, transfer, amend or reinstate a license (License) for the construction and operation of a deepwater

---

[5] EIA, U.S. Natural Gas Imports & Exports 2015, dated May 31, 2016.

[6] EIA, U.S. Natural Gas Exports to Exceed Imports for First Time in 60 Years, dated July 12, 2016.

port" as provided for in the Act.[7]  Because this is a
delegated authority, all references will continue to be to
the Secretary.  This delegation did not change the previous
delegation of License processing functions to the United
States Coast Guard (USCG), now part of the Department of
Homeland Security,[8] and to the Maritime Administration
(MARAD), made in 1997,[9] nor does it change the Secretary's
delegation of authority to the Administrator of the
Pipeline and Hazardous Materials Safety Administration
(PHMSA) for the establishment, enforcement and review of
regulations concerning the safe construction, operation or
maintenance of pipelines on Federal lands and the Outer
Continental Shelf (33 U.S.C. § 1520).

On May 8, 2015, Delfin LNG, LLC (hereinafter Delfin LNG or
the applicant), a limited liability company (LLC) organized
and existing under the laws of the State of Louisiana,
submitted to MARAD and to the USCG an application for a
License and all Federal authorizations required to own,
construct, operate and decommission a deepwater port, known
as the Delfin Deepwater Port (hereinafter, the Port).[10]

The offshore components of the Port are primarily located
in Federal waters within the Outer Continental Shelf (OCS)
West Cameron Area, West Addition Protraction Area (Gulf of
Mexico), approximately 37.4 to 40.8 nautical miles off the
coast of Cameron Parish, Louisiana, in water depths ranging
from approximately 64 to 72 feet (19.5 to 21.9 meters).
The Port will consist of four semi-permanently moored
Floating Liquefied Natural Gas Vessels (FLNGVs) located at:
#1 (29° 8' 13.1" N/93° 32' 2.2" W), #2 (29° 6' 13.6" N/93°
32' 42.4" W, #3 (29° 6' 40.7" N/93° 30' 10.1" W) and #4 (29°
4' 40.9" N / 93° 30' 51.8" W) located in West Cameron (WC)

---

[7] Vol. 77, Federal Register, No. 160, Friday, August 17, 2012, pp. 49964-49990 (77 FR
49964); 49 C.F.R. § 1.93(h).

[8] The USCG has the additional statutory responsibility to approve an operations manual
for a deepwater port. 33 U.S.C. § 1503(e)(1).  The USCG retained the statutory and
delegated authorities upon its transfer to the Department of Homeland Security
(Department of Homeland Security Delegation Number: 0170, Sec. 2. (75), March 3, 2003;
Public Law. 107-296, Section 888).

[9] Vol. 62, Federal Register, No. 48, Wednesday, March 12, 1997, pp. 11382-11383 (62 FR
11382).

[10] Vol. 80, Federal Register, No. 136, Thursday, July 16, 2015, pp. 42162-42165 (80 FR
42162).

319, 327, 328, 334 and 335 OCS lease blocks. The Port will reuse and repurpose two existing offshore natural gas pipelines: the former U-T Offshore System (UTOS) pipeline and the High Island Offshore System (HIOS) pipeline. Four new pipeline laterals connecting to the HIOS pipeline will be constructed to supply natural gas to the four semi-permanently moored FLNGVs. The feed gas will be supplied through these new pipeline laterals to each of the FLNGVs where it will be super-cooled to produce LNG. The LNG will be stored onboard the FLNGVs and transferred via ship-to-ship transfer to LNG trading carriers for export. Each of the FLNGVs will be semi-permanently moored to four new weathervaning Turret Yoke Mooring Systems (TYMSs).

The Delfin Onshore Facility (DOF) that will support the operation of the Port will be located in Cameron Parish, Louisiana and will consist of engineering, constructing and operating a natural gas compressor station, gas supply header and metering station at an existing natural gas facility. Operation of the DOF will require: (1) reactivation of approximately 1.1 miles of existing 42-inch pipeline, formerly owned by UTOS, which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the high water mark along the Cameron Parish Coast; (2) installation of 120,000 horsepower of new compression; (3) construction of 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construction of 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station.

The Port will use pipeline quality natural gas sourced from the existing interstate natural gas pipeline grid. This gas will be compressed at the DOF and sent to the existing, but currently idled, 42-inch UTOS pipeline. The gas will be transported through the UTOS pipeline and will bypass the existing manifold platform located at OCS lease block WC 167 approximately 24.7 nautical miles (28.4 statute miles) offshore in the Gulf of Mexico. The bypass of WC 167 entails the construction of a new pipeline segment, 700 feet in length, connecting on the seaward side to the existing 42-inch HIOS pipeline where the feed gas would then be transported further offshore using the HIOS pipeline portion leased by the applicant between WC 167 and High Island A264. The existing UTOS and HIOS pipelines transect OCS lease blocks WC 314, 318, 319, 327

and 335, and will transport feed gas from onshore to offshore (one-directional flow). The offshore terminal will be comprised of four new lateral pipelines attached to the HIOS pipeline, starting approximately 16.0 nautical miles (18.4 statute miles) south of the WC 167 platform. Each subsea lateral pipeline will be 30-inches in diameter and approximately 6,400 feet in length, extending from the HIOS pipeline to each of four TYMS structures where the FLNGVs will be semi-permanently moored.

The FLNGVs will receive the feed gas via the laterals and TYMSs and then cool the gas to produce LNG. The produced LNG will be stored in International Maritime Organization (IMO) type B, prismatic, independent LNG storage tanks aboard each of the FLNGVs. Each FLNGV will have a total LNG storage capacity of 210,000 cubic meters ($m^3$).

An offloading mooring system will be provided on each FLNGV to moor an LNG trading carrier side-by-side for cargo transfer of LNG through loading arms or cryogenic hoses using ship-to-ship transfer procedures. LNG carriers will be moored with pilot and tug assist. The FLNGVs will be equipped with fenders and quick-release hooks to facilitate mooring operations. The offloading system will be capable of accommodating standard LNG trading carriers with nominal cargo capacities up to 170,000 $m^3$. It is expected that the typical LNG cargo transfer operation will be carried out within 36 hours, including LNG trading carrier berthing, cargo transfer and sail-away. Approximately 31 LNG carriers are expected to visit each of the four FLNGVs per year for a total of up to 124 cargo transfer operations per year.

The FLNGVs will be self-propelled vessels and have the ability to disconnect from the TYMSs and set sail to avoid hurricanes or to facilitate required inspections, maintenance and repairs.

Each of the four FLNGVs will process approximately 146 billion standard cubic feet per year (Bscf/y) of natural gas, which would total 585 Bscf/y for all four FLNGVs. In the nominal design case, based on an estimated availability of 92 percent and allowance for consumption of feed gas during the liquefaction process, each FLNGV would produce approximately 3 million metric tonnes per annum (MMtpa) of LNG for export. Together, the four FLNGVs are designed to

have the capability to export approximately 12 MMtpa of LNG.

Full build out of the Port and associated onshore components is expected to take approximately 5 years from the commencement of construction. The DOF and pipeline construction are expected to take approximately eight months with commencement of construction anticipated no earlier than September 2017. The construction and commissioning of the FLNGVs and related TYMS structures are planned to occur over a period of 4 years (one new FLNGV built and commissioned at 12 month intervals). Port operations are expected to commence no earlier than July 2019 with the commissioning of the first FLNGV and TYMS. The Port is expected to be fully operational by July 2022. Delfin LNG has advised that the timeframe for full build-out of the Port will be contingent upon the company's ability to obtain all required State and Federal permits and secure and execute all financial commitments and commercial agreements with its anticipated debt and equity partners. All Port components will be designed, constructed and operated in accordance with applicable codes and standards and will have an expected operating life of approximately 30 years.

Delfin LNG, organized and existing under the laws of the State of Louisiana, was established to own, construct and operate the proposed Port. Delfin LNG is managed by a team of energy, business and finance professionals with experience developing domestic and international projects within the global oil and gas energy sector. Delfin LNG and its team of industry experts will provide the necessary financial, management and technical support to construct, operate and decommission the Port. Delfin LNG has met all citizenship requirements necessary to receive a License under 33 U.S.C. § 1503(g). Based on the information and representations provided by Delfin LNG, including its January 31, 2017, affidavit of U.S. citizenship, MARAD has determined that Delfin is a citizen of the United States within the meaning of 33 U.S.C. § 1502(4).

On June 29, 2015, the Delfin LNG deepwater port License application was deemed complete by MARAD and the USCG. On July 16, 2015, a Notice of Application was published in the

<u>Federal Register</u> summarizing the application and project design.[11]  Pursuant to Section 1508(a)(1) of Title 33, the States of Louisiana and Texas were designated as the Adjacent Coastal States (ACS).  Under procedures set forth in the Act, MARAD and the USCG had 240 days from the date of the Notice of Application to hold one or more public hearings in the ACS(s).[12]  Sections 1503(c)(8) and 1508(b)(1) of Title 33 provide that the Secretary may not issue a License without the approval of the Governor(s) of the ACS(s).  The Governor(s) of the ACS(s) must approve, approve with conditions, or disapprove the application within 45 days of the last public hearing.  If the Governor fails to transmit his or her approval, such approval is conclusively presumed under the Act.[13]  MARAD, by letter dated November 18, 2016, advised the Governors of Louisiana and Texas of the 45-day period during which the Governors could exercise their authority under the Act to approve, disapprove or approve with conditions the Delfin LNG deepwater port License application.[14]  The 45-day ACS comment period ended on January 30, 2017, without receipt of written comment from either the Governor of Louisiana or the Governor of Texas.  Therefore, in accordance with the Act, the ACS Governors of Louisiana and Texas are hereby presumed to have granted approval of the construction and operation of the Port.

In addition to the statutory requirements stipulated under the Act, the Delfin LNG application required review under the National Environmental Policy Act (NEPA).  A NEPA review is a Federal process that requires Federal agencies to integrate environmental values into their decision-making processes by considering the environmental impacts of proposed actions (and reasonable alternatives to those actions), which may significantly affect the quality of the natural and human environment.

---

[11] Vol. 80, Federal Register, No. 136, Thursday, July 16, 2015, pp. 42162-42165 (80 FR 42162).

[12] 33 U.S.C. § 1504(g).

[13] 33 U.S.C. § 1508(b)(1).

[14] Federal Docket Management System, USCG 2015-0472-0107.

The environmental review process, required by NEPA and the Act, began on July 29, 2015, with the publication in the Federal Register of a Notice of Intent to prepare an Environmental Impact Statement (EIS) and receive public comments regarding the scope of the proposed action and its potential environmental impacts.[15] During the scoping process, MARAD and the USCG conducted public meetings in Lake Charles, Louisiana on August 18, 2015, and Beaumont, Texas on August 19, 2015, to receive public comments and become better informed on issues to be addressed in the EIS. The public comments received at the scoping meetings were positive and the speakers expressed support for the jobs and resulting economic benefits that the Port will create. Transcripts of the scoping meetings are available on the public docket.[16] Two written comments were submitted by the public during the comment period. One comment supported the project based on economic development opportunities.[17] The second comment opposed the project, citing harmful environmental impacts and recommended the development of an EIS.[18]

The regulatory timeline for processing the application was suspended twice to ensure adequate time to review the License application and evaluate and address environmental impacts. The regulatory timeline was initially suspended on September 18, 2015, to permit a full review of an amendment to the License application submitted by the applicant on May 8, 2015.[19] The amendment proposed an increase in the liquefaction capacity of each FLNGV from 2 to 3 MMtpa and the construction of new FLNGVs instead of retrofitting existing vessels. Review of the amended application was completed and the regulatory clock was restarted on December 22, 2015.[20] A Notice of Receipt of Amended Application was published in the Federal Register

---

[15] Vol. 80, Federal Register, No. 145, Wednesday, July 29, 2015, pp. 45270-45274 (80 FR 45270).

[16] Federal Docket Management System, USCG 2015-0472-0016.

[17] Federal Docket Management System, USCG 2015-0472-0009.

[18] Federal Docket Management System, USCG 2015-0472-0013.

[19] Federal Docket Management System, USCG 2015-0472-0015.

[20] Federal Docket Management System, USCG 2015-0472-0066.

on December 24, 2015.[21]  The regulatory clock was suspended a second time on March 7, 2016, to provide time to address the data gaps pertaining primarily to air quality modeling.[22]  The data gaps were resolved and the necessary information was incorporated into the Draft EIS.  The regulatory clock was restarted on July 8, 2016.[23]

The Draft EIS was issued on July 15, 2016, and public meetings were held in Cameron, Louisiana on August 9, 2016, and Beaumont, Texas on August 10, 2016.[24]  Participants in the Draft EIS public meetings expressed support for the jobs and positive economic development that the Port will create.  Transcripts of the Draft EIS public meetings are available on the public docket.[25]  Five written comments were submitted by the public during the Draft EIS comment period.  Two comments expressed general opposition to the export of LNG and one comment supported the export of LNG.[26] The remaining two comments consisted of a letter urging selection of the No Action alternative and denial of the application based on several environmental concerns and another letter that responded to those concerns.[27]

The Notice of Availability of the Final EIS, Notice of Public Hearings, and Request for Comments was published in the <u>Federal Register</u> on November 28, 2016.[28]  MARAD and the USCG held the final licensing hearings on December 13, 2016, in Cameron, Louisiana and December 14, 2016, in Beaumont, Texas.  Attendees at the final licensing hearings expressed support for the new jobs and resulting economic

---

[21] Vol. 80, Federal Register, No. 247, Thursday, December 24, 2015, pp. 80455-80456 (80 FR 80455).

[22] Federal Docket Management System, USCG 2015-0472-0079.

[23] Federal Docket Management System, USCG 2015-0472-0085.

[24] Vol. 81, Federal Register, No. 136, Friday, July 15, 2016, pp. 46157-46159 (81 FR 46157).

[25] Federal Docket Management System, USCG 2015-0472-0101.

[26] Federal Docket Management System, USCG 2015-0472-0093, USCG 2015-0472-0096 and USCG 2015-0472-0097.

[27] Federal Docket Management System, USCG 2015-0472-0099 and USCG 2015-0472-0102.

[28] Vol. 81, Federal Register, No. 228, Monday, November 28, 2016, pp. 85678-85681 (81 FR 85678).

development that will be created by the Port.  Transcripts
of the final licensing hearings are available on the public
docket.[29]  One public comment was received during the final
comment period.  That comment suggested that the FLNGVs
should be built in the United States and crewed by U.S.
citizens or legal residents.[30]  Additional details regarding
the environmental review process for the Delfin LNG
application are discussed later in this Record of Decision.

The issue before me is whether to authorize the issuance of
a License to Delfin LNG, to deny the application or to
authorize issuance of a License subject to certain
conditions and criteria intended to protect and advance the
public interest.[31]  This document sets forth my decision on
the application submitted by Delfin LNG.  This is a
decision I am required by statute to make within 90 days
after the last public hearing, which was held on December
14, 2016.[32]

In reaching this decision, I am compelled to evaluate and
consider a broad range of expert advice and information
from other Federal agencies, the ACSs and the general
public.  Moreover, I am directed to make specific findings
that seek to protect, promote, and, in some cases,
reconcile national priorities in energy, the environment,
the economy and freedom of navigation on the high seas.  In
placing this responsibility on one Federal official,
Congress has sought to simplify a complex Federal and State
jurisdictional framework into a unified decision-based
process that includes consideration of a broad range of
information and policy perspectives.

## II.  DECISION

For the reasons set forth in this document, I have decided
to authorize the issuance of a License to Delfin LNG as it
meets the basic criteria in the Act, but only subject to

---

[29] Federal Docket Management System, USCG 2015-0472-0118.

[30] Federal Docket Management System, USCG 2015-0472-0112.

[31] 33 U.S.C. § 1503 and 33 U.S.C. § 1504 set forth specific procedures and standards by
which the Secretary must make a determination.

[32] 33 U.S.C. § 1504 (i)(4).

certain conditions designed to protect and advance the
national interest, ensure adequate demonstration of
financial capability to construct, operate and decommission
the Port, and make certain that the deepwater port will be
constructed and operated using best available technology so
as to prevent or minimize adverse impact on the marine
environment. Several of the conditions are self-evident:
the need for an operations manual, the need to submit
further technical information and detailed drawings
concerning the construction of the deepwater port and the
need to obtain all required Federal and State permits as
well as other conditions, which are the natural product of
the application process. I list some, but not all,
conditions in this Record of Decision and discuss only a
few of them in detail. The precise conditions required by
the cooperating Federal and State will be set forth in the
License upon its issuance.

I have determined that the cost of processing applicant
compliance with each of these conditions is a cost of
processing the application. To reach any other conclusion
would invite an applicant to evade the costs of processing
the application by delaying certain events and making them
conditions of the License rather than a *fait accompli* in
the License. Therefore, as the applicant meets each of
these conditions, it will continue to pay for the costs of
processing the License. In reaching this decision, I have
relied heavily, as the Act intends me to do, on the advice
and recommendations of other Federal and State agencies and
on the views of the public as they have been expressed
through the public comment and hearing process. The "one
window" application review process, created by Congress in
the Act to enable a comprehensive, coordinated and timely
decision, vests in me a special responsibility to adhere to
the expert advice I receive or to explain fully why I have
chosen an alternative course.[33]

The U.S. Environmental Protection Agency (USEPA), the
National Oceanic and Atmospheric Administration (NOAA), the
U.S. Army Corps of Engineers (USACE) and other Federal and
State agencies have made sound and constructive

---

[33] Joint Report, Committees on Commerce; Interior and Insular Affairs; and Public
Works, United States Senate, Deepwater Port Act of 1974, S.Rep. 93-1217, 93rd
Congress, 2nd Session (1974) (hereinafter, Joint Report) at 45.

recommendations to preserve the marine and coastal
environments in which this Port will be located and
operate.

I have given careful consideration to the specific concerns
expressed by members of the local coastal communities
regarding the proposed Port and the potential impact it may
have on local resources.  My agency has worked extensively
with the USCG, Delfin LNG and other Federal and State
agencies to conduct a comprehensive environmental and
cultural resources impact review of the potential impact of
the Port.  We have encouraged Delfin LNG to collaborate
with the States of Louisiana and Texas and the local
coastal communities to develop a comprehensive plan that
would avoid and/or mitigate impacts to the greatest extent
possible.  I am satisfied that this difficult task was
successfully accomplished. I would also like to acknowledge
the comments provided by the USEPA and the Center for
Biological Diversity (CBD).  We have considered their
comments as part of the decision-making process and
responded to their concerns in Section 5 of this Record of
Decision as well as in the Final EIS.

I have accepted most of the recommendations provided by the
cooperating Federal, State and local agencies and will be
incorporating them as conditions of the License and in the
operations manual that will govern the operation of the
Port.  Where I have imposed conditions, it has been
primarily because I have an obligation to ensure that the
Port is developed in a manner that meets important
transportation and environmental protection objectives,
that the efforts of the private sector to undertake this
project are not frustrated and that the Secretary of
Transportation, or her delegate, does not perform functions
that duplicate or conflict with those vested by Congress in
other Federal agencies.

In approving this application, and by delegation of the
Secretary, I am relying on my broad authority under the Act
to impose such conditions as are necessary to carry out the
applicable provisions of the Act.[34]  These conditions create
special obligations with which the applicant must agree to
comply.  For this reason, Delfin LNG may decide not to

---

[34] 33 U.S.C. § 1503(e)(1).

accept the License and undertake the project.  If not, then
I hope other potential applicants will step forward.  If
Delfin LNG does accept these conditions and goes forward
with the project, I am confident the Port will be developed
in a way that serves the national and public interest.

Finally, I note that the USCG was instrumental in
developing the environmental and marine navigation aspects
of this Record of Decision, among many other valuable
services rendered throughout the application process.

## III. DECISION-MAKING PROCESS

In reaching my decision, I have followed the procedures
prescribed by the Act, which are designed to ensure full
exposure to a broad range of relevant information and
expertise.  Also, my decision can only be fully understood
if it is placed within the context of the statutory
framework of the Act.

### *The Deepwater Port Act*

Originally enacted as Public Law No. 93-627 on January 3,
1975, and subsequently amended, the Act authorizes the
Secretary, and by delegation the Maritime Administrator, to
consider License applications for deepwater ports by:

1. Providing that no person may engage in the ownership,
   construction, or operation of a deepwater port except
   in accordance with a License issued pursuant to the
   Act (33 U.S.C. § 1503(a));

2. Confirming that the applicant is a citizen of the
   United States (33 U.S.C. § 1503(g));[35]

---

[35] 33 U.S.C. § 1502(4) defines "Citizen of the United States" as:

any person who is a United States citizen by law, birth, or naturalization, any
State, any agency of a State or a group of States, or any corporation,
partnership, or association organized under the laws of any State which has as
its president or other executive officer and as its chairman of the board of
directors, or holder of a similar office, a person who is a United States
citizen by law, birth or naturalization and which has no more of its directors
who are not United States citizens by law, birth or naturalization than
constitute a minority of the number required for a quorum necessary to conduct
the business of the board.

3. Prohibiting the transportation or transfer of any oil or natural gas between a deepwater port and the United States unless such port is licensed under the Act (33 U.S.C. § 1503(a));

4. Authorizing the Secretary of Transportation to issue, amend, transfer and reinstate Licenses for the ownership, construction and operation of deepwater ports (33 U.S.C. § 1503(b) and (f));

5. Allowing such Licenses to be effective unless suspended, revoked or surrendered (33 U.S.C. § 1503(h));

6. Setting forth prerequisites, conditions, application procedures, regulations and criteria for the issuance of Licenses for deepwater ports (33 U.S.C. § 1504(a) and (b));

7. Requiring public notice and hearings before Licenses are issued (33 U.S.C. § 1504(g));

8. Allowing ACSs to set reasonable fees for use of deepwater ports (33 U.S.C. § 1504(h)(2));

9. Setting forth criteria for determining what is an ACS (33 U.S.C. § 1502(1) and 33 U.S.C. § 1508);

10. Requiring the Secretary to prescribe procedures governing the environmental and navigational effect of such ports (33 U.S.C. § 1509);

11. Permitting the Secretary to suspend or revoke Licenses for noncompliance with the Act (33 U.S.C. § 1503(h));

12. Declaring that the laws of the United States and of the nearest ACS, as applicable, shall apply to such ports (33 U.S.C. § 1518);

13. Requiring the Secretary to issue regulations as necessary to assure the safe construction and operation of pipelines on the Outer Continental Shelf (33 U.S.C. § 1504(a) and 33 U.S.C. § 1520);

14. Establishing civil and criminal penalties for violations of the Act (33 U.S.C. § 1514(b)(3));

15. Requiring that communications and documents transferred between Federal officials and any person concerning such ports are available to the public (33 U.S.C. § 1513);

16. Allowing civil actions for equitable relief for violations of the Act (33 U.S.C. § 1514(c));

17. Prohibiting issuance of a License unless the ACS to which the port is to be connected by pipeline has developed, or is making reasonable progress toward developing, an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972 (CZMA) (33 U.S.C. § 1503(c)(9)); and

18. Directing the Secretary to promote the security of the United States by giving top priority to the processing of a License for LNG facilities that will be supplied with LNG by United States flag vessels and requiring applicants to provide information regarding the nationality of the flag state of vessels and the nationality of the officers and crew that will service the deepwater port facility (33 U.S.C. §§ 1503(i) and § 1504(c)(2)(K)).

## _Regulations_

This application has been processed and this decision is made in conformance with regulations promulgated under the Deepwater Port Act of 1974, as amended.  The regulations appear in the Code of Federal Regulations at 33 C.F.R. Parts 148, 149, and 150.[36]

In addition, it is important to note my authority to enforce the terms and conditions of a License under the law once a License is issued.  Failure of the applicant to comply may result in suspension or termination of the License pursuant to 33 U.S.C. § 1511.

The License, when issued subsequent to this Record of Decision, along with any required assurances, will be in a form and substance satisfactory to me, reflecting the

---

[36] Vol. 71, Federal Register, No. 189, Friday, September 29, 2006, pp. 57643-57694 (71 FR 57643).

terms, criteria and conditions set forth in this Record of
Decision.

### *Facts*

On May 8, 2015, Delfin LNG submitted to MARAD and to the
USCG an application for a License and all Federal
authorizations required to own, construct and operate the
Port.[37]  As mentioned above, the proposed Port would be
located in Federal waters approximately 37.4 to 40.8
nautical miles off the coast of Cameron Parish, Louisiana,
in water depths ranging from approximately 64 to 72 feet.

Under 33 U.S.C. § 1508(a)(1), the States of Louisiana and
Texas were designated as the ACSs.  ACS designation
entitles such States to certain rights and privileges,
including effective veto power over a deepwater port
License application by the Governors of any designated
ACSs.  At the conclusion of the statutory review period
(January 30, 2017), neither ACS Governor provided written
comment on the Delfin LNG application.  Therefore, in
accordance with the 33 U.S.C. § 1508(a)(1),33 U.S.C. §
1508(a)(1) the ACS Governors of Louisiana and Texas are
hereby presumed to have granted approval of the License
application.

On June 29, 2015, the Delfin LNG deepwater port License
application was deemed complete by MARAD and the USCG.  On
July 16, 2015, a Notice of Application was published in the
Federal Register summarizing the application and project
design.[38]  The application, inclusive of an environmental
report provided by Delfin LNG, was posted on the Federal
Docket Management System.[39]

The environmental review process, required by NEPA and the
Act, began on July 29, 2015, with the publication of a
Notice of Intent in the Federal Register to prepare an EIS
and receive public comments regarding the Port and its

---

[37] Vol. 80, Federal Register, No. 136, Thursday, July 16, 2015, pp. 42162-42165 (80 FR
42162).

[38] Vol. 80, Federal Register, No. 136, Thursday, July 16, 2015, pp. 42162-42165 (80 FR
42162).

[39] Federal Docket Management System, USCG-2015-0472-0001.

potential environmental impacts.[40]  During this process, MARAD and the USCG conducted public meetings in Lake Charles, Louisiana on August 18, 2015, and Beaumont, Texas on August 19, 2015, to receive public comment and discuss issues to be addressed in the Draft EIS.

The regulatory timeline for processing the application was suspended twice to ensure adequate time to review an amendment to the License application and address data gaps regarding the air quality modeling.  The regulatory timeline was initially suspended on September 18, 2015, to allow a full review of an amendment to the License application proposed by the applicant.[41]  The amendment proposed an increase in the liquefaction capacity for each FLNGV operating at the Port from 2 to 3 MMtpa and specified that the FLNGVs would be newly constructed instead of rebuilt vessels.  The review of the amended application was completed and the regulatory clock was restarted on December 22, 2015.[42]  A Notice of Receipt of Amended Application was published in the Federal Register on December 24, 2015.[43]  The regulatory clock was suspended a second time on March 7, 2016, to provide time to address data gaps pertaining to air quality modeling.[44]  The data gaps were fully reviewed and addressed in the Draft EIS. Thereafter, the regulatory clock was restarted on July 8, 2016.[45]  The Draft EIS was issued on July 15, 2016.[46] The Notice of Availability of the Final EIS, Notice of Public Hearings, and Request for Comments was published in the Federal Register on November 28, 2016.[47]  MARAD and the USCG

---

[40] Vol. 80, Federal Register, No. 145, Wednesday, July 29, 2015, pp. 45270-45274 (80 FR 45270).

[41] Federal Docket Management System, USCG 2015-0472-0015.

[42] Federal Docket Management System, USCG 2015-0472-0066.

[43] Vol. 80, Federal Register, No. 247, Thursday, December 24, 2015, pp. 80455-80456 (80 FR 80455).

[44] Federal Docket Management System, USCG 2015-0472-0079.

[45] Federal Docket Management System, USCG 2015-0472-0085.

[46] Vol. 81, Federal Register, No. 136, Friday, July 15, 2016, pp. 46157-46159 (81 FR 46157).

[47] Vol. 81, Federal Register, No. 228, Monday, November 28, 2016, pp. 85678-85681 (81 FR 85678).

held the final licensing hearings on December 13, 2016, in Cameron, Louisiana and December 14, 2016, in Beaumont, Texas. Additional details regarding the environmental review process for the Delfin LNG application are discussed later in Section 5 of this Record of Decision.

In addition to the public notification and scoping process, MARAD and the USCG consulted with other Federal and State agencies and participated in numerous interagency meetings and telephone calls to identify issues to be addressed in the EIS and considered during the formal decision process. Agency consultations included representatives from MARAD, USCG, FERC, USEPA, NOAA's National Marine Fisheries Service (NMFS), USACE and other Federal and State agency representatives.

On March 8, 2017, NMFS provided comment on the impacts of the Port on threatened and endangered species and designated critical habitat under the Endangered Species Act (ESA) Section 7 consultation process. In that letter, NMFS concurred with MARAD's determination of effects on listed species and designated critical habitat, and indicated that all potential project effects were found to be discountable or insignificant. Therefore, NMFS concluded that "the proposed action is not likely to adversely affect listed species under NMFS' purview and that consultation responsibilities under ESA for species under NMFS' purview is concluded."[48] Additional information regarding the NMFS consultation, including a summary of conservation and mitigation measures identified in the NMFS consultation response, is provided in Section 5 of this Record of Decision. All conservation and mitigation measures identified by NMFS, as well as other Federal and State agencies, will be outlined in detail in the License upon its issuance.

Section 4(c)(6) of the Act [33 U.S.C. § 1503(c)(6)] provides that the License may be issued if the Secretary has not been informed, within 45 days following the last public hearing on a proposed License for a designated application area, by the Administrator of the USEPA that the deepwater port will not conform with all applicable provisions of the Clean Air Act, as amended, the Federal

---

[48] Federal Docket Management System, USCG 2015-0472-0119.

Water Pollution Control Act, as amended, or the Marine Protection, Research and Sanctuaries Act, as amended.

I was informed by USEPA that, in general, MARAD and the USCG responded satisfactorily to USEPA's comments on the Draft EIS.[49] USEPA's initial comments, dated August 29, 2016, requested that additional information be added to include the analysis of alternatives, consultation and coordination with State agencies, cumulative impacts, greenhouse gas (GHG) emissions and environmental justice.[50]

In their final letter to MARAD dated January 12, 2017, USEPA Region 6 expressed continued concern that the Delfin LNG Final EIS did not provide adequate analysis and information regarding GHG emissions associated with the production, transport and combustion of the natural gas proposed to be exported.[51] Specifically, USEPA stated that "[s]ince EPA rated the draft EIS as 'insufficient information' and this recommendation was not incorporated, we remain concerned that the Final EIS does not provide adequate information required to render an informed decision."

In response to USEPA's final comment regarding GHG emissions, I find that the scope of the EIS for the Delfin LNG project meets the statutory requirement of NEPA and the Act. Specifically, the Final EIS evaluates the direct and indirect impacts of the proposed Port that are subject to MARAD's Federal action, which is the licensing of the construction, operation and decommissioning of the Port. In addition, reasonably foreseeable connected actions were analyzed in the Final EIS as required under NEPA, such as the Federal actions of cooperating agencies, including but not limited to, the FERC (for certification of the components of the DOF) and USEPA (for permit authorization under the Federal Water Pollution Control Act, as amended [Clean Water Act, CWA]) and the Clean Air Act [CAA]).

Delfin LNG proposes to receive natural gas through its interconnection with other existing U.S. natural gas

---

[49] Federal Docket Management System, USCG 2015-0472-0116.

[50] Federal Docket Management System, USCG 2015-0472-0100.

[51] Federal Docket Management System, USCG 2015-0472-0116.

pipelines that service markets throughout the Nation. While the Final EIS includes an estimate of GHG emissions related to the proposed construction, operation and decommissioning of the proposed Port, it does not analyze the upstream effects from potential induced production or downstream effects from the export of natural gas.

The factors described under the Council on Environmental Quality (CEQ) regulations for a meaningful analysis—including when, where and how natural gas development would occur as related to the proposed project—are unknown.[52] CEQ's final guidance on evaluating GHG impacts does not require NEPA analyses to include such unforeseeable effects.[53]

Regarding downstream GHG emissions from overseas transport, regasification and combustion of exported LNG, Delfin LNG has been approved by the Department of Energy (DOE) to export natural gas to Free Trade Agreement countries, and has an application pending before DOE to export LNG to Non-Free Trade Agreement countries. The necessary factors for a meaningful analysis, including the demand for LNG exported from the Port, the destination(s) of the exports, the transport routes and the ultimate end uses of the LNG are unknown, and, as such, the GHG emissions from the same are not reasonably foreseeable.[54]

---

[52] The USEPA suggested that the Final EIS consider the Department of Energy's Addendum (DOE Addendum) to Environmental Review Documents Concerning Exports of Natural Gas from the United States, wherein the agency provides additional information to the public regarding the potential environmental impacts of unconventional natural gas production activities. The Addendum provides GHG emissions information from the upstream natural gas industry as a whole, but DOE recognized that lacking an understanding of where and when additional gas production will arise, the environmental impacts resulting from production activity induced by LNG exports to non-FTA countries are not "reasonably foreseeable" within the meaning of the CEQ NEPA regulations (40 C.F.R. § 1508.7). See DOE Addendum at p. 2 (2014).

[53] Vol. 81, Federal Register, No. 151, Friday, August 5, 2016, pp. 51866-51867 (81 FR 51866).

[54] The USEPA suggested that the Final EIS consider the analysis prepared by the DOE's National Energy Technology Laboratory (NETL) in 2014 into the estimated "life cycle" of GHG emissions for exporting LNG from the U.S. In the life-cycle analysis, NETL identified two representative markets for U.S. exported LNG—Rotterdam, Netherlands, and Osaka, Japan—then compared the total GHGs that would be emitted to generate one megawatt hour (MWh) of electricity in each market, using: (1) LNG imported from the United States; (2) LNG imported from closer regional sources; (3) natural gas exported via pipeline from Russia; and (4) regional coal. In each scenario, NETL considered carbon dioxide and methane emissions from all stages of fuel production, from extraction to final combustion. NETL concluded that exporting U.S. LNG to produce

As discussed herein and under Section 4(c)(8) of the Act [33 U.S.C. § 1503(c)(8)], conditions issuance of a License on the approval(s) of the Governor of the "Adjacent Coastal State or States."

The States of Louisiana and Texas were designated as the ACSs for the Delfin LNG project.  Under 33 U.S.C. § 1508(b)(1):

> [i]f the Governor fails to transmit his approval or disapproval to the Secretary not later than 45 days after the last public hearing on applications for a particular application area, such approval shall be conclusively presumed.

As such, for the subject Delfin LNG deepwater port License application review process, the 45-day time limit ended on January 30, 2017, without receipt of expressed written comment from either the Governor of Louisiana or the Governor of Texas.  Therefore, in accordance with the Act, the ACS Governor of Louisiana and the ACS Governor of Texas are hereby presumed to have granted approval of the Port.

## IV. POLICY DETERMINATIONS

Having described the application and the process on which this decision is based, I now address whether the applicant has or will meet the statutory criteria for issuance of a License.  Section 4(c) of the Deepwater Port Act (33 U.S.C. § 1503(c)) provides nine conditions for issuance of a license, which I am required to make a determination on prior to reaching my decision.  These conditions are discussed in detail in Section 5 of this Record of Decision.

---

power in Europe and Asia will not increase GHG emissions compared to regional coal power, and that potential differences in GHG emissions relating to the use of U.S. LNG, regional LNG or Russian gas are largely limited to "transport distance" and are otherwise "indeterminate" due to uncertainty in the modeling data. Additionally, NETL concluded that no significant increase or decrease in net climate impact is anticipated from any of these scenarios (see NETL 2014, § 7 Summary and Study Limitations, p. 18). Because NETL analyzed representative approaches for U.S. LNG exports, the general conclusions regarding GHG emissions from such exports are expected to apply to this project.

In general, these determinations require that the I
evaluate the financial, technical and management capability
of the applicant and its owners to ensure that, if a
License is granted, the Licensee is able to comply with all
applicable laws, the Act's criteria, regulations and
License conditions, to meet any contingent liabilities, and
to fulfill its obligation to construct and operate the Port
in a timely and efficient manner.

Consequently, once Delfin LNG becomes the Licensee, it
takes on a special obligation to conform to the conditions
of the License, and I must be confident of its ability to
do so.

In making these statutory determinations, my task has been
complicated by the fact that some of the values involved
can be described and quantified with precision, while
others, equally important to their advocates, are more
qualitative.  It would be plain error, however, to ignore a
value simply because it cannot be reduced to numbers and I
have, accordingly, set forth my reasons and findings for
each of these requirements in the following sections,
drawing upon the substantial record.  I further have
described the specific conditions that are designed to
address my findings on each issue.

Below, I set forth the specific determinations I have made
on each of the nine statutory criteria.

## V.    CRITERIA FOR ISSUANCE

Section 4(c) of the Act [33 U.S.C. § 1503(c)] requires the
Secretary to make nine findings or determinations prior to
issuing a deepwater port License.  When issued, the License
will reflect the terms, conditions, and other requirements
discussed in this Record of Decision and in the License,
and will be in a form and substance satisfactory to me.
Additional construction and operating conditions will be
included in the License.  I will address each of the nine
factors in the order they appear in section 4(c).

### 1.    Financial Responsibility

Section 4(c)(1) of the Act, [33 U.S.C. § 1503(c)(1)],
requires I determine that Delfin LNG "is financially
responsible and will meet the requirements of section 1016
[33 U.S.C. § 2716] of the Oil Pollution Act of 1990" (OPA

90).  Determination of financial responsibility is based upon the following factors:

1) The applicant must be financially able to own, construct and operate the proposed Port; and

2) The applicant must meet all bonding requirements or provide other assurances that the Port and its components will be removed upon revocation or termination of the License.

### *General Obligations*

In granting the first deepwater port license, the Secretary provided insights into the general obligations of the licensee that are still valid today.  In the Louisiana Offshore Oil Port (LOOP) decision, he wrote:

> Perhaps the most important requirement for financial responsibility arises out of the obligations which flow from the rights and privileges under the license.  We cannot grant a license without recognition of the importance of the licensee going forward with the project.[55]

I agree with this assessment and as such, must be reasonably assured that Delfin LNG, its guarantor(s) and its affiliates have the financial resources and wherewithal required to complete the project.

As proposed, full construction and start-up of the Port will require significant investment by Delfin LNG and its financial supporters.  Delfin LNG has proposed a four-phased project development plan for full build-out of the Port.  Execution of the full project plan is estimated to occur over a period of approximately 5 years, beginning in 2017 and ending approximately in 2022.  Delfin LNG has advised that the timeframe for full build-out of the Port will be contingent upon the company's ability to obtain all required State and Federal permits and secure and execute all financial commitments and commercial agreements with its anticipated debt and equity partners.

---

[55] The Secretary's Record of Decision on the Deepwater Port License Application of LOOP Inc. (Dec. 17, 1976), p. 14.

As presented, Delfin LNG's four-phased plan focuses primarily on the start-up and roll-out of Phase I, and includes completion of the DOF, installation of the bypass pipeline connection between the UTOS and HIOS pipelines, and construction and installation of four subsea pipeline laterals, which will connect the FLNGVs to the HIOS pipeline. Also, roll-out of Phase I will include construction and commissioning of one of the four planned FLNGVs, and TYMSs that will provide mooring support to the FLNGVs.

All subsequent phases of project development, which include construction and commissioning of the remaining three (3) FLNGVs and associated TYMSs will be pursued, at a later date, as sufficient revenue is generated from Phase I operations and as other debt and equity sources are secured.

As such, the financial responsibility determination addressed herein, shall apply only to Delfin LNG's financial capability to complete Phase I of the project and its ability to meet the maximum oil spill liability requirements of OPA 90, currently set at $633.85 million for deepwater ports, and to satisfy requirements of section 4(e)(3) of the Act [33 U.S.C. § 1503(e)(3)] for the full removal and abandonment (decommissioning) of the Port. Results of this analysis are as follows:

### *Oil Spill Liability*

Under section 4(c)(1) of the Act [33 U.S.C. § 1503(c)(1)], "[t]he Secretary may issue a license…if he determines that the applicant is financially responsible and will meet the requirements of section 2716 of this title [33 U.S.C. § 2716 - Financial Responsibility]." I am responsible for ensuring that the responsible parties provide evidence of financial responsibility sufficient to meet the maximum amount of liability prescribed by OPA 90. The USCG is charged with administering and enforcing applicable requirements of OPA 90, including issuance of a Certificate of Financial Responsibility (COFR).

As designed, the proposed Port will consist of TYMS structures and other components that will house small amounts, less than 2,100 gallons, of diesel oil, hydraulic fluid and oil based lubricants to service and support

equipment used in the operation of the Port. 33 U.S.C. §
2716 requires deepwater port operators who maintain any
amount of oil or other substances covered under OPA 90 to
secure sufficient liability coverage for the maximum amount
required by OPA 90. The maximum amount of liability
coverage required for the Port is assessed at $633,850,000.

Accordingly, I have evaluated and assessed the financial
proposal of Delfin LNG and its plans to obtain the maximum
required oil spill liability coverage ($633,850,000) to
satisfy the requirements of 33 U.S.C. § 2716. This review
included an in-depth assessment of the financial resources
and technical expertise of Delfin LNG, its parent,
guarantor(s), and affiliates. Specifically, an evaluation
of the operating performance and capability of the proposed
insurance broker selected by Delfin LNG to provide oil
spill liability coverage for the Port was conducted.

Delfin LNG proposes, through its ultimate parent company,
Fairwood Peninsula Energy Corp. (Fairwood) and other
affiliates, to provide the required financing for the
estimated annual insurance premium of approximately $1.2 to
$1.5 million for the maximum required oil spill coverage
for the Port. The proposed insurance provider is one of
the largest insurance brokers in the world with specialized
experience providing oil spill liability coverage for
offshore facilities and vessels. Based upon the results of
this financial responsibility analysis, I hereby conclude
that Delfin LNG, through the support of its parent company
and affiliates, will possess sufficient resources to meet
the requirements of 33 U.S.C. § 2716.

Prior to issuance of the License and commencement of
construction, Delfin LNG will be required to provide MARAD
and USCG with final documented evidence, in a form
acceptable to me or my successor, which validates that
Delfin LNG has secured the maximum oil spill liability
coverage of $633,850,000. Any request made by Delfin LNG
for a reduction in the OPA 90 liability amount for
deepwater ports must be requested from the USCG and will be
subject to all applicable regulatory and administrative
procedure requirements. The FLNGVs and all LNG carriers
that call on the Port are required to maintain separate
tank vessel COFRs in order to comply with OPA 90.

### *Ownership, Construction and Operation*

As provided in section 4(c)(1) of the Act, [33 U.S.C. § 1503(c)(1)], the applicant must demonstrate, prior to License issuance, the financial ability to own, construct and operate the proposed Port. I must have reasonable assurance that this statutory requirement will be met and such evidence will be provided to me in advance of License issuance.

To validate this requirement, I conducted an extensive and comprehensive evaluation and assessment of the financial resources, operating performance and overall wherewithal of Delfin LNG, its parent, guarantor(s), affiliates and other proposed investors to finance construction and operation of the Port. My findings are as follows:

Delfin LNG is a Louisiana-based company that was established solely for the purpose of undertaking the ownership, construction and operation the proposed Port. The company is comprised of a diverse and experienced team of energy, business and financial professionals with over 30 years of combined experience developing domestic and international oil and gas projects within the global energy sector. Since Delfin LNG's establishment in 2013, the company has been marginally capitalized and will need to rely heavily upon the financial support and resources of its parent, guarantor(s) and other related investors.

To demonstrate financial responsibility, Delfin LNG has proposed to secure financing, through its parent (Fairwood) and other creditworthy financiers for a percentage of the costs to complete the DOF and associated pipelines. The proposed investors to provide such support are some of the largest banking and oil and gas companies that are publicly-traded with billions in combined total assets and a solid record of supporting energy infrastructure projects.

With respect to financing construction of the offshore Port, FLNGVs and TYMSs, Delfin LNG's financial plan proposes to secure a combination of debt and equity from a group of private financial investors. The debt portion of the financing will be secured from Korea Development Bank (KDB) and a syndicate of other financiers comprised of commercial banks, financial institutions, insurance companies and export credit agencies. KDB intends to arrange debt financing for this aspect of the project in the total estimated amount of $1,500 million. An equity

portion of the project costs will be provided by Enbridge Holdings LNG LLC (Enbridge Holdings), a shareholder of Fairwood and indirect affiliate of Delfin LNG.  Other suitable and creditworthy financial affiliates of Delfin LNG, such as Enbridge Inc., an indirect parent of Enbridge Holdings, will also provide assistance in development of the Delfin LNG project. As discussed in the following decommissioning section, Enbridge Inc. has also committed to serve as the financial guarantor for decommissioning of the Port at the end of its useful life.

Regarding Delfin LNG's operational plans, the company has advised that it intends to generate revenue through operation of the Port and onshore appurtenant facilities to receive, to compress and transport the natural gas to the FLNGVs and to provide liquefaction and LNG storage services as well as vessel loading services to its customers.  To demonstrate support of its plan, Delfin LNG provided MARAD with suitable evidence of preliminary draft agreements with large commodity firms for service at the Port.

Based upon the detailed analysis and assessment of Delfin LNG's financial proposal, the draft agreement and other preliminary evidence of financial support, it is concluded that Delfin LNG, through the direct and indirect support of its various financiers, has sufficiently demonstrated its ability to own, construct and operate Phase I of the proposed Port.  Therefore, for purposes of this Record of Decision, Delfin LNG hereby meets the financial responsibility requirements of the Act, subject to full satisfaction of the following conditions:

1. Prior to issuance of the License, Delfin LNG must provide evidence of its completed and finalized financing agreements, guarantees and other agreements proposed to support the construction and operation of the Port; or

2. As an alternative, Delfin LNG may provide draft financing agreements by other credit-worthy financial entities for my review and acceptance prior to final execution of the agreements.

Upon satisfaction of this requirement, and all other requirements and conditions outlined in this Record of Decision, I will issue the License.

## _Removal Requirements_

Section 4(e)(3) of the Act [33 U.S.C. § 1503(e)(3)], requires the applicant to furnish, prior to issuance of the License, a bond or other assurance(s) that components of the Port will be removed at the termination or revocation of the License. Delfin LNG's financial plan provides an estimate of costs for full removal and abandonment of the Port. These costs include abandonment of the UTOS, HIOS and subsea lateral pipelines as well as decommissioning and removal of the TYMS and other related offshore components. Delfin LNG's financial plan, however, does not include decommissioning of the FLNGVs, as these vessels will be demobilized under a separate operation upon decommissioning of the Port. Also, because the permitting and oversight of the DOF is outside the scope of this Record of Decision and falls under the jurisdiction of FERC, the decommissioning financial assessment provided herein only applies to the offshore components of the Port and not the DOF.

To demonstrate financial responsibility for removal of the Port, Delfin LNG provided a draft preliminary Letter of Intent agreeing to complete all necessary financial guarantee arrangements with its proposed guarantor, Enbridge Inc., for execution of a decommissioning guarantee in the amount of $37 million. Enbridge Inc.'s financial resources, operating performance and credit ratings were evaluated and assessed. Notably, Enbridge Inc. owns and operates Canada's largest natural gas distribution company and provides distribution services in Ontario, Quebec, New Brunswick and New York. The company employs nearly 11,000 people, primarily in Canada and the United States and recently became the largest North American energy infrastructure company with a total enterprise value of $165 billion. It is therefore reasonable to conclude that the proposed guarantor, Enbridge Inc., can and will provide Delfin LNG with sufficient financial, management and technical support to satisfy the applicable decommissioning requirements of the Act.

Prior to issuance of the License, I will require a final executed guarantee agreement from Enbridge, Inc., in a form and substance acceptable to me, as set forth in the preliminary draft Letter of Intent provided by Delfin LNG on behalf of Enbridge, Inc. As an alternative, Delfin LNG may arrange and complete necessary financing agreements from some other credit-worthy source(s) that is of

investment grade quality. Evidence of such financing
agreements must be provided in a form and substance
acceptable to me including all supporting financial
documentation such as, annual financial statements,
guarantee agreements and other relevant agreements.

Once all decommissioning requirements and all other
requirements and conditions outlined in this Record of
Decision are met, I will issue the License to Delfin LNG.
On an annual basis following License issuance, MARAD will
prepare an adjustment of the total estimated amount of the
decommissioning financial guarantee, in accordance with the
inflationary percentage rate of the Consumer Price Index
for All Consumers (CPI-U), established and published
annually by the U.S. Bureau of Labor Statistics. Finally,
since financial analysis will become obsolete over time,
Delfin LNG must provide annual financial statements, or
other financial evidence as MARAD may reasonably require,
for the purpose of confirming the continued financial
capability of Delfin LNG and its guarantor(s) to perform
under the proposed guarantees related to decommissioning of
the Port as well as all other related construction and
operation activities identified under the above relevant
sections of this Record of Decision.

## 2. Compliance with Applicable Laws, Regulations, and License Conditions

Section 4(c)(2) of the Act [33 U.S.C. § 1503(c)(2)] requires
that I find "…that the applicant *can and will comply* with
applicable laws, regulations, and License conditions"
(emphasis added).

The proposed Port is large in scope and incorporates the
construction and operation of both onshore and offshore
industrial components. The liquefaction of natural gas
onboard FLNGVs for storage and ship-to-ship transfer of LNG
is a first for the United States. As evidenced by the
number of cooperating agencies involved in processing
Delfin LNG's application, several of which that also have
responsibility to issue permits, approvals and
authorizations, Delfin LNG's ability to comply with all
applicable Federal and State laws, regulations, and License
conditions is critical.

The applicant, Delfin LNG, is a Louisiana-based company
established to own, construct and operate the proposed

Port.  Delfin LNG is managed by a team of energy, business and finance professionals with experience developing domestic and international projects within the global oil and gas energy sector.  Delfin LNG's affiliates offer a complement of experience in developing natural gas energy projects.  Specifically, Delfin's team of affiliates is comprised of industry leaders that possess years of experience developing floating liquefaction vessels; designing, constructing and operating natural gas transmission pipelines; and developing other such related energy infrastructure projects.  The combination of Delfin LNG's managerial, technical and practical expertise validates a conclusion that it both understands the legal requirements for constructing and operating the facility and the adverse ramifications that may result from failure to comply with all applicable laws, regulations and License conditions (e.g., suspension or revocation of its operating License).

To ensure compliance, the Act requires that Delfin agree in writing that: (A) there will be no substantial change from the plans, operational systems and methods, procedures and safeguards set forth in the License without prior approval in writing from the Secretary (as delegated to the Maritime Administrator); and (B) Delfin LNG will comply with any condition prescribed in its License (see section 4(e)(2) of the Act [33 U.S.C. § 1503(e)(2)]).  This agreement must be provided by Delfin LNG within 90 days of License issuance. Similar assurances, delivered within 90 days of issuance of the License, by the parent or affiliate companies (as applicable) for those License conditions, which they alone can satisfy, must also be provided.  A condition of the License will be that Delfin LNG is required to maintain and comply with all Federal and State Permits, Approvals and Authorizations throughout the life of the project.  Other conditions will also apply to this approval and will be specified in the License.

## 3.    National Interest

Section 4(c)(3) of the Act [33 U.S.C. § 1503(c)(3)] requires that the construction and operation of the Port is "in the national interest" and consistent with other policy goals and objectives including energy sufficiency and environmental quality.

In reaching this determination, I am obliged to reconcile the Nation's numerous, and sometimes conflicting, priorities with the consequences of constructing and operating an offshore LNG deepwater port. I am required to balance the Nation's energy requirements with our national commitment to energy independence and consider the impact of licensing the Port on our Nation's overall environmental, economic and security requirements.

The Coast Guard and Maritime Transportation Act of 2012 amended the Act to include the export of oil and natural gas from deepwater ports. Export activities benefit the Nation and its economy by opening new markets for domestically produced natural gas and expanding opportunities for global trade without infringing upon the Nation's overall energy sufficiency and independence. Exporting natural gas from the Port will neither impair the Nation's energy sufficiency nor its independence, as the U.S. Energy Information Administration (EIA) acknowledges that "although exports are increasing, there [is] still expected to be abundant natural gas supplies to meet domestic demand."[56]

The international demand for natural gas underscores the importance of the U.S. Gulf Coast to the natural gas industry, as 51% of total U.S. natural gas processing plant capacity is located along the coast. The project's offshore Gulf Coast location takes advantage of the existing onshore and offshore natural gas infrastructure, the availability of interconnections to interstate natural gas pipelines, an existing natural gas industry workforce and the ready availability of vessel support services.

Any security concerns regarding the concentration of local natural gas facilities in the area are mitigated by the Port's offshore location, which makes the Port a more difficult target for unscrupulous persons interested in disrupting our energy infrastructure or using the facility to harm the American public. Additionally, the offshore location of the Port helps to increase security, reduce congestion and enhance safety in ports throughout the Gulf Coast of Louisiana and Texas. Neither the Department of

---

[56] EIA, U.S. natural gas exports to exceed imports for first time in 60 years, dated July 12, 2016.

Defense nor the Department of State has indicated that this project presents any national security problems or concerns for their respective agency programs (see also Section 7 below).[57,58]

### *Nationality of Crews and Flag Nation of Vessels.*

The enactment of the Coast Guard and Maritime Transportation Act of 2006 (Public Law 109-241, Sec. 304) placed a firm emphasis on the safe and secure transport of LNG to and from our Nation's facilities by requiring deepwater port License applicants to provide "the nation of registry for, and the nationality or citizenship of officers and crew serving on board vessels transporting natural gas that are reasonably anticipated to be servicing the deepwater port."  Delfin LNG, in accordance with this law, must provide the nationality and citizenship information to me for review before a deepwater port License will be issued.

MARAD, in keeping with Congressional directives to take specific actions to ensure the future availability of able and credentialed United States mariners in the LNG industry, developed its U.S. Crewing Initiative, which accomplishes these tasks in different ways, inclusive of securing agreements from deepwater port applicants to undertake the following tasks: developing specialized classwork curricula for training cadets, engaging in outreach to recruit experienced sea veterans and hiring corporate crew members to secure experience in other maritime roles.  These actions are in line with MARAD's long-standing role in the promotion and development of the Nation's Merchant Marine.

Since 2007, approximately ten commitments have been established by deepwater port License applicants.  MARAD will endeavor to explore and facilitate similar opportunities with Delfin LNG for the operation of its facility should Delfin LNG express an interest to do so.

---

[57] Federal Docket Management System, USCG 2015-0472-0115.

[58] Federal Docket Management System, USCG 2015-0472-0117.

Public comments received during the NEPA process meetings and final licensing hearings reflected unanimous local support for the Port project. Numerous residents and business interests expressed support for the jobs that will be created by the Port and the resulting positive economic development opportunities. Section 4.18 of the Final EIS describes the socioeconomic impacts of the Port and includes a summary of the anticipated construction and permanent jobs created by the Port. Approximately 272 average monthly jobs will be created during the construction period with a peak workforce of 526 persons. Total estimated payroll for the construction jobs is estimated at approximately $28,000,000. Total permanent jobs created by the project are estimated to be approximately 489, with a total annual payroll of $52,000,000 per year.

In view of the above, I conclude that the construction and operation of the Port is in the national interest.

## 4. Navigation, Safety, and Use of the High Seas

Section 4(c)(4) of the Act [33 U.S.C. § 1503(c)(4)] lists criteria for the issuance of a License upon a finding that "…a deepwater port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention or customary international law."

As a declaration of policy, Congress stated in section 2(b) of the Act [33 U.S.C. § 1501(b)] "…that nothing in the Act shall be construed to affect the legal status of the high seas, the super adjacent airspace, or the seabed and subsoil, including the Continental Shelf."

The United Nations Convention on the Law of the Sea (UNCLOS)[59] Article 60 grants coastal States the exclusive

---

[59] Even though the United States is not a party to UNCLOS, as a matter of policy, the United States complies with most of its provisions as customary international law. United States Oceans Policy, Statement by the President, 19 Weekly Compilation of Presidential Documents 384 (March 10, 1983).

* * *
Today I am announcing three decisions to promote and protect the oceans interests of the United States in a manner consistent with those fair and balanced results in the Convention and international law.

right to construct, authorize and regulate installations
and structures in its Exclusive Economic Zone (EEZ),
including deepwater ports.[60]  Also, the freedom of all
nations to make reasonable use of waters beyond their
territorial boundaries is recognized by the 1958
International Convention on the High Seas, which defines
the term "high seas" to mean all parts of the sea that are
not included in the territorial sea or in the internal
waters of a state.[61]

---

First, the United States is prepared to accept and act in accordance with the balance
of interests relating to traditional uses of the oceans—such as navigation and
overflight.  In this respect, the United States will recognize the rights of other
states in the waters off their coasts, as reflected in the Convention, so long as the
rights and freedoms of the United States and others under international law are
recognized by such coastal states.

Second, the United States will exercise and assert its navigation and overflight
rights and freedoms on a worldwide basis in a manner that is consistent with the
balance of interests reflected in the convention.  The United States will not,
however, acquiesce in unilateral acts of other states designed to restrict the rights
and freedoms of the international community in navigation and overflight and other
related high seas uses.
* * *

[60] Title 33 U.S.C. section 1518 precedes the entry into force of UNCLOS article 60.  It
also precedes the designation of the Exclusive Economic Zone of the United States,
which grants us certain rights and jurisdiction under customary international law, as
stated in UNCLOS Part V.  While Article 60(7) indicates that a deepwater port does not
have the status of an island, has no territorial sea of its own, and its presence does
not affect the delimitation of the territorial sea, the exclusive economic zone or the
continental shelf, the United States interprets Article 12 to mean that any roadstead
located outside the territorial sea and used for the loading or unloading of ships is
included in the territorial sea.  See letter dated January 12, 2005, from Margaret F.
Hayes, Acting Deputy Assistant Secretary for Oceans and Fisheries, United States
Department of State, Bureau of Oceans and International Environmental and Scientific
Affairs to Rear Admiral Thomas H. Gilmour, United States Coast Guard.

[61] Prior to UNCLOS coming into force, a rule of reason was applied.  For example,
whether use of the high seas by a deepwater port is reasonable could be determined by
examining, among other things, the extent to which deepwater port facilities do not
unreasonably interfere with the high seas freedoms of other nations, including the
freedoms of navigation, fishing, laying submarine cables and pipelines, and
overflight.  In fact, a properly located deepwater port could enhance navigation and
safety by reducing the chances of vessel collision and pollution of the marine
environment in heavily congested areas.  Thus, under the reasonable uses test, one
would propose to exercise the international right of the United States to make a
permissible use of the high seas in a cautious and restrained manner.  The use by
foreign nations of the same ocean area can be accommodated if they reasonably respect
the rights and interests of the United States.  The amount of controversy would be
decreased where the deepwater port, although in international waters, had close
proximity to our shores, suggesting that there was little danger of interference with
actual use of the high seas by other nations.

Prior to the United States adopting the UNCLOS concept of the EEZ, under the Act, a distinction was made between foreign flag vessels using deepwater ports and those only navigating in the vicinity of the ports. At that time, for vessels calling at deepwater ports, the United States exercised the right and authority as the licensing state to condition the use of the ports on compliance with reasonable regulations, including acceptance of the general jurisdiction of the United States.[62] If such conditions were not accepted by a foreign state, use of the deepwater port must be denied to vessels registered in or flying the flag of that state.[63]

The Act addresses the issue of vessels calling at deepwater ports with respect to extended U.S. jurisdiction as follows:

> The DWPA at 33 U.S.C. § 1518(a)(3) requires the Secretary of State to notify the government of each foreign state having vessels under its authority or flying its flag that may call at a deepwater port, that the United States intends to exercise jurisdiction over such vessels. The notification must indicate that, absent the foreign State's objection, its vessels will be subject to U.S. jurisdiction whenever calling at the proposed Port or in an established safety zone (not greater than 500 meters) and using or interfering with the use of the deepwater port. Further, section 1518(c)(2) states that entry by a vessel into the port is prohibited unless the flag state does not object to the exercise of U.S. jurisdiction or a bilateral agreement between the flag State of the vessel and the United States permitting the exercise of jurisdiction is in force.[64]

Thus, any ship calling at a deepwater port in our EEZ would be subject to U.S. jurisdiction as if it were in the territorial sea. As the proposed Port will be in the EEZ, this principle applies here. Any ship flying the flag of a party to UNCLOS would be subject to Articles 12 and 60 and

---

[62] 33 U.S.C. § 1518(c).

[63] Id.

[64] January 12, 2005, letter from Margaret F. Hayes, op. cit.

would be bound to the same jurisdictional principles of 33 U.S.C. § 1518, thus obviating the need for further bilateral agreements. However, if a ship flying the flag of a non-party to UNCLOS were to call at the deepwater port, the State Department would only object to such calls if the non-party flag State had filed an objection with us.[65]

### *Navigation Safety.*

In accordance with section 10(d) of the Act (33 U.S.C. § 1509(d)), a zone of appropriate size around and including the deepwater port for the purpose of navigational safety must be established (safety zone). In such a zone, no installations, structures or uses will be permitted that are incompatible with the operation of the deepwater port. The required safety zone may be supplemented by establishment of other regulated navigational areas including no anchoring areas and areas to be avoided. Safety zones will be the minimum size necessary to ensure safety, but, pursuant to customary international law, will not exceed 500 meters in radius around the primary components of the Port. It is likely that four distinct safety zones will be established: one around each TYMS at the Port. In accordance with 33 C.F.R. § 150.915(a), safety zones are developed and designated through rulemaking. As has occurred with other licensed deepwater ports, prior to establishment of the required safety zone(s), the USCG will publish in the Federal Register a notice that affords prior public notice and comment, unless there is a good cause to expedite the process to protect life and property.

The Department of State has previously commented on establishment of offshore regulated navigational areas.[66] Under international law, navigation safety zones are governed by three principal sources: UNCLOS, specifically Articles 22, 60 and 211; the International Convention on the Safety of Life at Sea, 1974, Annex, Chapter V, primarily Regulation V/10; and the General Provisions on Ships' Routing, adopted by the IMO pursuant to Assembly

---

[65] Id.

[66] January 12, 2005, letter from Margaret F. Hayes, op. cit.

Resolution A.572 (14), as amended.[67]  The Convention on the
Continental Shelf of 1958 also provides for the
construction and operation of continental shelf
installations and the coastal States' establishment of
safety zones, which may extend to a distance of 500 meters
around such installations.[68]  Outside the 500-meter safety
zone, uniform international rules to ensure navigational
safety around the deepwater port can best be achieved by
seeking appropriate ships' routing measures through the
IMO.

Delfin LNG has proposed four circular Safety Zones that
would extend in all directions 500 meters (m) beyond a
point measured from the stern of a FLNGV as it weathervanes
in a complete circle around the TYMS.[69] The dimensions of
each safety zone would be set forth in regulations
promulgated at 33 C.F.R. Part 150, Subpart J (§§ 150.900-
150.940).

In addition to the Safety Zones, Delfin LNG has proposed a
combined No-Anchoring-Area (NAA) and an Area-to-be-Avoided
(ATBA) overlaying the Safety Zone and centered on each TYMS
with a radius of 0.8 nautical miles (1,416 meters or 4,646
feet). The NAA/ATBAs are intended to protect vessels in
transit and sub-surface deepwater port components.

Following issuance of this Record of Decision, and prior to
commencing Port operations, the Coast Guard will coordinate

---

[67] Id.

[68] Convention on the Continental Shelf, 15 U.S.T. 471 (1958), Article 5 provides in
part:
    2. Subject to the provisions of paragraphs 1 and 6 of this article, the coastal
    State is entitled to construct and maintain or operate on the continental shelf
    installations and other devices necessary for its exploration and the
    exploitation of its natural resources, and to establish safety zones around
    such installations and devices and to take in those zones measures necessary
    for their protection. 3. The safety zones referred to in paragraph 2 of this
    article may extend to a distance of 500 meters around the installations and
    other devices which have been erected, measured from each point of their outer
    edge. Ships of all nationalities must respect these safety zones. 4. Such
    installations and devices, though under the jurisdiction of the coastal State,
    do not possess the status of islands. They have no territorial sea of their
    own, and their presence does not affect the delimitation of the territorial sea
    of the coastal State.

[69] With the length of each FLNGV and the TYMS mooring structure added to the proposed
500-meter Safety Zone area, each of the four Safety Zone zones would have a radius of
approximately 916 meters (3,005 feet)

with Delfin LNG and appropriate stakeholders to determine if the proposed routing measures properly address matters including, but not limited to: Port and vessel operational hazards and risks; vessel traffic characteristics, volumes and trends; and other maritime operations and facilities in the vicinity of the Port.

In accordance with 33 C.F.R. § 150.915(c), NAAs and ATBAs are established via the International Maritime Organization (IMO). In accordance with past practice, the USCG, in coordination with the Department of State, will prepare and submit to the IMO Marine Safety Committee for approval a proposal to establish the NAAs/ATBAs. If approved, the NAAs/ATBAs will be implemented by the IMO and published in the appropriate IMO Circular. The USCG will undertake preparation and publication of a Federal Register notice that sets forth the geographic boundaries of all of the regulated navigational areas. In accordance with 33 C.F.R. § 150.905(c), compliance with the requirements of a Safety Zone and an NAA is mandatory, whereas an ATBA is a recommendatory routing measure. This comports with advice given by the Department of State.[70]

In addition to these safety measures, the Coast Guard Captain of the Port has authority to introduce additional vessel movement controls within the safety zone to enhance the safety of ship movements to and from the deepwater port.

Moreover, the Operations Manual, which Delfin LNG is required by law and regulation to develop for USCG approval, will specify vessel operating procedures for LNG carriers calling at the deepwater port.[71]

Finally, the Port will be adjacent to the Sabine Pass Shipping Fairway (the Fairway), an unobstructed shipping lane that extends southward into the Gulf of Mexico from Sabine Pass, Louisiana. The nearest permanent Port component to the Fairway is the FLNGV#2 TYMS, which is located 3.13 nautical miles to the northeast of the

---

[70] January 12, 2005, letter from Margaret F. Hayes, op. cit.

[71] The USCG has the statutory responsibility to approve an operations manual for a deepwater port. 33 U.S.C. § 1503(e)(1).

Fairway. The stern of FLNGV#2, when weathervaning nearest the Fairway, will be 2.91 nautical miles distant from the Fairway and create no obstruction or other hazard to offshore navigation.

Based on the above, I determine that the Port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention or customary international law.

## 5. Protecting and Enhancing the Environment

Section 4(c)(5) of the Act [33 U.S.C. § 1503(c)(5)] requires the Secretary to determine, in accordance with environmental review criteria established pursuant to 33 U.S.C. § 1505, "…that the applicant has demonstrated that the deepwater port will be constructed and operated using the best available technology, so as to prevent or minimize adverse impact on the marine environment."

To support the best available technology criteria, Delfin LNG proposes to use four FLNGVs that will use an air cooled, single mixed refrigerant gas liquefaction process. The air cooled liquefaction process will use approximately 3.2 million gallons per day (mgd) of seawater per FLNGV. By comparison, cooling technologies that use seawater rather than air require approximately 72 to 290 mgd. Thus, use of an air cooled liquefaction technology will limit seawater thermal and ichthyoplankton impacts typically associated with use of seawater cooling systems. Air-cooled heat exchangers will result in slightly increased air emissions due to the higher power requirement as compared to water cooling. However, the difference in emissions would be negligible compared to the overall potential emissions from the proposed Port.

The Port's use of FLNGVs creates a small footprint that will result in fewer impacts to the seafloor as compared to other types of deepwater ports, such as platforms or gravity-based port structures. Each FLNGV will be semi-permanently moored to a TYMS structure and permanently attached to the seafloor. The TYMS structures will provide a permanent, secure and environmentally benign mooring system for the FLNGVs by eliminating the need for vessel anchors and the resulting scouring of the seabed by anchor chains. Additionally, Delfin LNG proposes to minimize environmental impacts resulting from installation of new

pipeline by reusing approximately 43.3 nautical miles of existing pipeline infrastructure.  New pipeline installation will be limited to approximately 4.85 miles of 30-inch diameter laterals and a 42-inch diameter 700-foot bypass (see Section 1 of this Record of Decision).

In analyzing Delfin LNG's proposal to construct and operate the Port for the export of LNG, USEPA, NOAA, NMFS, U.S. Fish and Wildlife Service (USFWS), DOE, FERC, USCG and other Federal, State, local and tribal entities served as cooperating agencies and/or provided information and recommendations which were adopted.  MARAD also received and reviewed comments and suggestions in response to the Delfin LNG EIS from interested persons and groups, such as CBD and others, some in favor of the Port and others opposed.  A brief summary of the substantive comments received from various agencies and other interested parties regarding Delfin's proposal is provided below.[72]

1. USEPA commented that MARAD, in general, responded satisfactorily to its requests for additional information regarding the Delfin LNG proposal. However, USEPA indicated that the Final EIS did not provide adequate information regarding the potential impacts of indirect GHG emissions that could be associated with the production, transport and combustion of the natural gas to be exported.[73] MARAD's response to USEPA's concern regarding the analysis and inclusion of potential impacts of indirect GHG emissions is addressed in Section 4.9.5 of the Delfin LNG Final EIS and herein, under Section 6, Advice of the Administrator of USEPA.

2. NMFS commented that the Delfin LNG Draft EIS adequately evaluated the potential project impacts to marine fishery resources and essential fish habitat (EFH) under the provisions of the Magnuson-Stevens Fishery Conservation and Management Act.[74]  NMFS also concurred on the EFH conclusion in Section 4.4 of the

[72] See Appendix C of the Final EIS for a more detailed discussion of the evaluation and resolution of public comments received during the environmental review process.

[73] Federal Docket Management System, USCG 2015-0472-0116.

[74] Federal Docket Management System, USCG 2015-0472-0090.

Final EIS, which states that the implementation of the Port will not result in a substantial adverse effect to EFH or Federally managed fishery species. NMFS made no conservation recommendations and recommended no revisions to the Final EIS with respect to EFH.

NMFS also provided comment on the impacts of the Port on threatened and endangered species and designated critical habitat under the ESA Section 7 consultation process. In a letter dated March 8, 2017, NMFS concurred with MARAD's determination of effects on listed species and designated critical habitat, and indicated that all potential project effects were found to be discountable or insignificant. Therefore, NMFS concluded that "the proposed action is not likely to adversely affect listed species under NMFS' purview and that consultation responsibilities under ESA for species under NMFS' purview is concluded."[75]

NMFS also indicated that consultation must be reinitiated if a take occurs, new information reveals effects of the action not previously considered or if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat designated that may be affected by the identified action. NMFS' findings on the project's potential effects are based on the project description in their response letter. Any changes to the proposed action may require reinitiation of consultation with NMFS.

As identified in the NMFS letter, consultation does not address potential project effects to marine mammals protected under the Marine Mammal Protection Act (MMPA) and taking of marine mammals is not authorized. Incidental taking of marine mammals must be authorized under Section 101(a)(5)(E) of the MMPA.

3. USFWS provided comment on the Port under the ESA Section 7 consultation process. In a letter dated August 10, 2016, USFWS concurred with the USCG and MARAD's determination that the proposed Port is not likely to adversely affect Federally-listed threatened

---

[75] Federal Docket Management System, USCG 2015-0472-0119.

or endangered species or designated critical habitat under USFWS jurisdiction.[76]

The U.S. Department of Interior (DOI) provided comments pertaining to the Migratory Bird Treaty Act. DOI indicated that the Draft EIS adequately addressed concerns regarding migratory birds and lighting, but recommended that appropriate conservation measures be imposed upon the applicant should a favorable Record of Decision be granted. Requiring implementation of specific conservation measures to address potentially detrimental effects to bird populations will ensure that adverse effects of the Port's proposed flare system will be minimized or avoided. These recommended conservation measures have been incorporated into Delfin's proposed project and are listed in Appendix G of the Final EIS.[77] These conservation measures shall be carried forward into the Prevention, Monitoring, and Mitigation Plan (PMMP) (see below sub-Section 16, PMMP), compliance with which will be made a condition of the License.

4. The CBD expressed concerns regarding the Port's consistency with national policy goals and the national interest, as well as additional concerns regarding compliance with NEPA and other environmental laws and obligations.[78]

As articulated in this Record of Decision, I have determined that the construction and operation of the Port supports the national interest and the other criteria set forth in the Act. Moreover, the environmental impact analysis requirements of NEPA have been satisfied. The Final EIS was prepared in conjunction with a transparent, publicly inclusive administrative process that included development and public comment on the Draft and Final EIS, extensive Federal, State, local and tribal consultations, public scoping and Draft EIS meetings and final licensing hearings in each ACS.

---

[76] Federal Docket Management System, USCG 2015-0472-0098.

[77] Federal Docket Management System, USCG 2015-0472-0105.

[78] Federal Docket Management System, USCG 2015-0472-0114.

As the License to construct and operate the Port is
prepared, conditions will be included that incorporate
the results, assessments, Best Management Practices
(BMPs) and operating conditions listed in the Final
EIS.  Compliance with the requirements imposed by
other Federal and State agency permits (e.g., USEPA
permits issued under the authority of the CWA and CAA)
will be a condition of the License.  Further, I note
the NEPA process undertaken by MARAD, USCG and other
cooperating agencies included the required ESA
consultation process conducted with the USFWS and
NMFS.  The results of those consultations have been
factored into my decision and are addressed in this
Record of Decision. Any related conditions specified
by the cognizant agencies will be incorporated into
the License upon its issuance.

Based upon the above factors, the Final EIS and the
comprehensive review performed by MARAD and the USCG
support my determination under Section 4(c)(5), [33 U.S.C.
§ 1503(c)(5)] that the proposed technology to be used by
Delfin LNG for constructing and operating the proposed Port
is the best available technology to minimize or prevent
adverse impact on the environment for this project.

The Act requires compliance with NEPA.  In order to
identify the environmentally preferred alternative, a
reasonable range of alternatives to the proposed action
were examined.  The action alternatives are described in
Section 2.3 of the Final EIS.  The considered alternatives
include port design, liquefaction technology, cooling
media, pipeline route, location, alternative uses of the
offshore pipeline manifold structure (WC 167), mooring
system, anchoring method, DOF location, no action and
energy alternatives.  The potential environmental
consequences for the proposed action and alternatives are
evaluated under each resource area in Section 4 of the
Final EIS.[79]

In consideration of the information and analysis included
in the Final EIS, I have determined that the construction
and operation of the Port as currently proposed, the

---

[79] Federal Docket Management System, USCG 2015-0472-0105.

repurpose and reuse of existing onshore and offshore infrastructure and incorporation of the conditions described generally in this Record of Decision, to be more specifically detailed in the License, is the environmentally preferred alternative for this project.

In order to assure that all possible care is taken to protect the environment, the License will contain a continuing obligation to employ best available technology and use BMPs and conservation measures that Delfin LNG has committed to incorporating into their proposed action. These include measures that control changes in the project, construction of the four offshore pipeline laterals and WC167 bypass, operation of the Port, air emissions, industrial and wastewater discharges, potential for impacts on marine protected species and habitats, avoidance of adverse effects on historical and archaeological sites, and potential for adverse impacts from project decommissioning. The License will be subject to the conditions listed below as well as additional conditions, consistent with Appendix G of the Final EIS and this Record of Decision, all of which will be set forth in precise detail in the License.[80]

All applicable Federal, State and local authorizations and permits must be obtained for the construction, operation and decommissioning of the Port. Delfin LNG will comply with all applicable authorizations, permits and License requirements, including monitoring and compliance requirements. Any additional requirements and conditions will be explained in detail in the deepwater port License or under the relevant permit authorizations upon issuance. The Applicant shall provide copies of all final permits and authorizations to MARAD and the USCG. These include, but are not limited to, the following.

1. Natural Gas Act of 1938 (NGA) – Delfin LNG shall comply, at a minimum, with the following conditions relating to the NGA:

   i.  Delfin LNG shall obtain DOE authorization for export of LNG to Free Trade Agreement and Non-Free Trade Agreement nations pursuant to Section 3 of the NGA and 10 C.F.R. Part 590.

---

[80] Id.

      ii.   Delfin LNG shall obtain the necessary authorizations from FERC to construct and operate the DOF and any abandonment of natural gas pipelines, pursuant to NGA Sections 7(b) and 7(c), as amended, and other applicable FERC regulations.

2.  Federal Water Pollution Control Act, as amended (Clean Water Act (CWA)) – Delfin LNG shall comply, at a minimum, with the following conditions relating to the CWA:

      i.   Delfin LNG shall obtain a Louisiana Department of Environmental Quality Section 401 Water Quality Certification and provide the Certification to USEPA.

      ii.   Delfin LNG shall obtain a USEPA National Pollutant Discharge Elimination System permit(s) for regulated discharges of pollutants.  FLNGVs and other vessels operating at the Port may be required to comply with the requirements of the USEPA Vessel General Permit.

      iii. Delfin LNG shall, to the extent required, obtain permits under Section 10 of the Rivers and Harbors Act and a Section 404 Permit administered by the U.S. Army Corps of Engineers (USACE).

3.  Clean Air Act, as amended (CAA) – Delfin LNG shall comply, at a minimum, with the following conditions relating to the CAA:

      i.   Delfin LNG shall obtain a Title V Operating Permit from the USEPA and comply with the terms and conditions of such permit.

4.  Endangered Species Act of 1973 (ESA) – Consultation with the USFWS required under Section 7 of the ESA was completed and a concurrence letter dated August 10, 2016, was received.  Consultation with NMFS was completed and a concurrence letter was received on March 8, 2017.  No further consultation is required at this time; however, consultation must be reinitiated

if Delfin LNG wishes to make changes to the proposed
construction, operation or decommissioning of the Port
after issuance of the License.  If changes are
proposed post-License, Delfin LNG must first notify
MARAD and the USCG of any proposed Port changes and
their potential effects.  MARAD and the USCG will
evaluate the proposed changes to see if they warrant
reinitation of ESA Section 7 consultation with the
NMFS and/or USFWS.  Delfin LNG shall comply with the
following conditions relating to the ESA as identified
in the Final EIS and during the ESA Section 7
consultation process:

i.   Delfin LNG shall consult with NMFS to determine
     if Port construction, operation, and/or
     decommissioning activities require Incidental
     Take or Harassment Authorizations under the
     MMPA.  If required, Delfin LNG shall obtain
     such authorization and submit the authorization
     to MARAD and the USCG prior to commencement of
     construction or decommissioning activities.

ii.  Delfin LNG will implement NMFS' *Sea Turtle and
     Smalltooth Sawfish Construction Conditions*[81]
     during all construction activities.

iii. Delfin LNG will implement the procedures
     described in *NOAA Fisheries Guidelines for
     Vessel Strike Avoidance Measures and Reporting
     for Mariners*[82] on all vessels operated by Delfin
     LNG.  These guidelines will also be provided to
     the operators of LNGCs that are not owned or
     operated by Delfin LNG.

iv.  Delfin LNG will implement mitigations related
     to pile driving noise generation that include,
     but are not limited to: use of the lowest
     noise-producing impact hammer available; use of
     temporary noise attenuation piles (TNAP),
     including the introduction of bubbles within

---

[81] NMFS, Sea Turtle and Smalltooth Sawfish Construction Conditions, revised March 23, 2006.

[82] NOAA, Vessel Strike Avoidance Measures and Reporting for Mariners, revised February, 2008.

the annulus between the inner and outer piles to reduce the transmission of marine noise; use of pile driving soft start ramp-up procedures preceded by clearing the surrounding waters by a Protected Species Observer; and the suspension of pile driving should a protected species be observed in proximity to the active pile driving operation.

v. All anchor lines securing construction and service vessels will be large in diameter, knotless, non-floating and taut to avoid posing entanglement risks to marine species. Anchor lines will be steel cable, 2-4 inches in diameter, and will be kept taut by use of hydraulic winches.

vi. Minimal safe operating power will be maintained for FLNGVs at all times and dynamic positioning thrusters will not be engaged unless required. Thruster power will also be reduced to the absolute lowest safe operating levels if sea turtles are detected within 500 meters of an FLNGV and all other vessels in the immediate vicinity will be instructed to reduce to slow speed and minimum safe operating power consistent with the operations being performed.

vii. All lighting at the proposed Port will be downshielded to the greatest extent possible to reduce light dispersion to a minimum.

viii. All facility operations will remain in compliance with the International Convention for the Prevention of Pollution from Ships (MARPOL, 1973) and other applicable regulations set forth to minimize the risk of inadvertent release of materials. In addition, solid waste management training that emphasizes the importance of minimizing impacts on marine species will be provided to vessel crews.

ix. Seawater intakes will be screened and the maximum intake velocity across the screens will be less than 0.5 feet per second.

x.  Liquids from hazardous area drains will be pumped from the drain tanks to the hull settling tanks for final treatment before intermittently being transported to shore for disposal.

xi.  Water, oil and solids collected in the slop tanks will be separated and water will be treated to 15 parts per million oil before being discharged overboard (per MEPC 107(49)).

xii.  Ballast water discharges will be required to meet C.F.R. Title 46, Chapter I, Subchapter Q, Part 162 that addresses requirements for ballast water management systems to be installed onboard vessels for the purpose of complying with the ballast water discharge standard of 33 C.F.R. Part 151, Subparts C and D.  Additional treatment via a copper aluminum anode system will also occur.

xiii.  Decommissioning will require a demonstration of site clearance under BOEM regulations (30 C.F.R. Part 250, Subpart Q; Sections 1740—1743 for platforms and other facilities and sections 1750—1754 for pipelines).  BOEM regulations provide for the following methods to verify adequate site clearance: trawling with a shrimp style net; using high frequency sonar (at least 500 kHz); using divers; and using Remotely Operated Vehicles.  NMFS noted that the use of trawling gear can injur or kill sea turtles.  If Delfin LNG determines that it needs to use trawling gear, it must reinitiate consultation with NMFS to consider potential adverse effects on sea turtles.

5.  <u>Outer Continental Shelf (OCS) Activities</u> - Delfin LNG must comply, at a minimum, with the following conditions relating to activities on the OCS:

i.  Delfin LNG will secure the necessary rights to utilize the OCS, including pipeline rights-of-way through the Bureau of Safety and Environmental Enforcement (BSEE).  Additionally, Delfin LNG will work with the Bureau of Ocean Energy Management (BOEM) to

obtain a Fair Market Rental Value assessment
for the submerged lands required for the
construction, operation and decommissioning of
the Port, including pipelines.  After the
initial assessment is made by BOEM, Delfin LNG
will pay to MARAD the annual lease payments for
the Fair Market Rental Value and pipeline right
of way assessments, which will be calculated
and collected by MARAD on an annual basis until
the Port is decommissioned.

    ii.  Delfin LNG will also follow all applicable BOEM
and BSEE Notices to Lessees and Operators
concerning impacts to OCS areas.

6.  <u>Deepwater Port Operations Manual.</u>  Prior to
commencement of construction activities, Delfin LNG
will prepare, submit to the USCG for review and
approval, and maintain throughout the operational life
of the Port, a Deepwater Port Operations Manual that
conforms to the requirements set forth at 33 C.F.R.
Part 150.

7.  <u>Additional Coast Guard Requirements.</u>  Delfin LNG must
meet the requirements of 33 C.F.R. Part 149 governing
design, plan review, fabrication, installation,
inspection, maintenance and oversight of the Port.
Coast Guard Navigation and Vessel Inspection Circular
No. 03-2005 provides useful reference information.

8.  <u>Inspections and Monitoring.</u>  Delfin LNG shall allow
authorized representatives from MARAD and the USCG
access to inspect the Port at any time to ensure that
the Port is being operated in conformity with the
License and other applicable regulatory requirements.
To the extent required, Delfin LNG shall allow
authorized representatives of USEPA and other
authorized Federal and State agencies to verify and
enforce requirements of licenses issued by them.

9.  <u>Safety, Security and Risk Mitigation.</u>  Delfin LNG has
committed to, and will work with, local and
headquarters USCG units and applicable local
stakeholders to ensure the development and
implementation of safety and security risk mitigation
measures to reduce the risk of, and consequences
associated with, an LNG release caused by either

accidental or intentional events that could
potentially impact other maritime activities in the
area and vessel traffic in the Sabine Pass Safety
Fairway. These measures will meet the requirements of
the USCG Maritime Security and Response Operations
Manual and also address ships' routing measures,
including Safety Zones, NAAs and an ATBA.  Delfin LNG
will address simultaneous operations protocols
(communications, identification, safety, security,
etc.) to ensure coordination between Port operations
and other vessels to manage risks through controlled
access and operational restrictions.  This effort may
include, but is not limited to, providing additional
or updated vessel traffic and spill consequence
analysis if deemed necessary.

10. Avoidance of Geologic Hazards and Hazardous Materials.
Before the commencement of any marine construction
authorized under the License, Delfin LNG shall update
the geophysical and geotechnical survey originally
conducted as part of the Application for both the
onshore and offshore Port facilities.  The purpose of
the surveys is to: avoid any significant debris which
may adversely affect construction activities and to
identify cultural areas of significance and/or
significant geologic hazards including hazardous waste
containers during construction and installation of
Port components.  Geologic hazards may include, but
are not limited to, seismicity, liquefaction, slope
stability, competency of bedrock and subsidence or
settlement.  The Licensee shall make the results of
such surveys known to appropriate personnel in BOEM,
USACE, USEPA, and USCG.

11. Protection of Cultural/Archeological Resources.  The
Licensee shall develop and implement an Unanticipated
Discoveries Plan (UDP).  The UDP will address
procedures if previously unidentified cultural or
underwater archaeological resources are discovered
during construction of the offshore components of the
deepwater port and onshore areas related to the DOF.
The offshore portion of the UDP shall be reviewed by
the Louisiana State Historic Preservation Officer
(SHPO), Texas SHPO, BOEM, MARAD and USCG.  The onshore
UDP shall be reviewed by the Louisiana SHPO, and FERC.
In the event of a cultural resource or archaeological
discovery in Federal waters, the Licensee shall

follow the UDP and comply with applicable BOEM
regulations.

12. Port and Pipeline Construction. Delfin LNG will
minimize underwater noise production by the use of the
lowest noise-producing impact hammer available, use of
a cofferdam system (including the introduction of
bubbles within the annulus between the pile and the
cofferdam) to reduce the transmission of marine noise,
and use of the pile-driving soft start ramp-up
procedures. Prior to initiation of construction
activities, including piledriving operations, the
surrounding waters will be cleared by a certified
Protected Species Observer. Best available offshore
construction practices using the most efficient and
effective construction equipment and methods available
must be used to minimize the duration of construction
activities. Delfin LNG will notify MARAD and the USCG
in writing at least thirty (30) days prior to
commencement of any marine construction authorized by
the License.

13. Pipeline and Hazardous Materials Safety Administration
(PHMSA) Office of Pipeline Safety (OPS) Requirements.
Delfin LNG will ensure the pipeline(s) are designed,
constructed, installed, tested, inspected, operated
and maintained according to applicable Federal
Pipeline Safety Regulations as defined in 49 U.S.C. §§
601 and 603 and 49 C.F.R. §§ 190-199 in coordination
with the PHMSA OPS.

14. Decommissioning. Delfin LNG will conduct all
decommissioning activities in accordance with approved
plans required by the Maritime Administrator.
Decommissioning plans shall be in compliance with all
applicable and appropriate regulations and guidelines
in place at the time of decommissioning. As discussed
under the Financial Responsibility Section of this
Record of Decision, a financial guarantee must be
provided to ensure that, at the time of
decommissioning, the applicant has sufficient
financial resources to decommission all components of
the Port in a manner acceptable to me. The
guarantor(s) shall provide annual financial statements
to MARAD to demonstrate its or their continued
financial capability to fund the full costs of
decommissioning the Port, which may include removal

and/or abandonment of Port structures and associated facilities. Approval of the decommissioning plan may require preparation of a supplemental NEPA document if it contains elements that are not covered in the Final EIS and/or ESA consultation. As noted above, NMFS has indicated that the use of trawling gear for site clearance activities will require reinitiation of ESA consultation with NMFS to consider potential adverse effects on sea turtles.[83] All required Federal, State and local permits, approvals and authorizations must be applied for and received prior to commencement of any decommissioning activity. Other conditions related to decommissioning requirements will be set forth in the License.

15. <u>Changes to the Deepwater Port.</u> In the event that Delfin LNG proposes to make any substantive change to the construction and/or operation of the Port from what is specifically authorized in the License, Delfin LNG shall submit to USCG, with a copy to MARAD, an Environmental Impact Assessment (Assessment) that details the proposed change and evaluates its probable environmental consequences, adverse or beneficial. The Assessment shall be appropriate to the nature of the proposed changes and of a level of detail and depth of analysis to enable USCG and MARAD to prepare the appropriate NEPA document, if necessary. USCG and MARAD, in consultation with FERC and other agencies as appropriate, will decide what level of further environmental review, if any, will be necessary. To the extent the substantive changes require preparation of a supplemental environmental impact statement, Delfin LNG shall reimburse the Government for all costs associated with the preparation thereof.

In addition, any proposed major substantive change to the construction and/or operation of the Port not provided for in the License shall require the prior review and approval of MARAD, USCG and other Federal and State agencies as applicable. Major substantive changes include but are not limited to:

---

[83] Federal Docket Management System, USCG 2015-0472-0119.

i. Changes in technology, mechanical systems or
     infrastructure, and operations that will have
     any significant effect on the environment
     and/or are not consistent with the project, as
     described in the Port's original application,
     as amended, or as analyzed in the Final EIS;

  ii. Any change that would require significant
      modifications to the Deepwater Port Operations
      Manual that are inconsistent with the
      requirements of the License; and

  iii. Any change in water intake volume or pipeline
       routing for which the environmental impacts
       were not analyzed in the Final EIS, or that are
       not consistent with the analysis in the Final
       EIS, including but not limited to:
       a) Increases in water usage during operation of
          the Port; or
       b) Routing the pipeline through areas that were
          not included in the biological and
          geotechnical surveys on which the Final EIS
          analyses were based.

In the event substantive changes are proposed, Delfin
LNG must do the following: provide a list of all
Federal, State or local permits which may be affected
by the proposed change; apply for new or amended
permits as required; and provide MARAD and the USCG
with information sufficient for the re-initiation of
consultation under the Endangered Species Act,
Magnuson-Stevens Fishery Conservation and Management
Act, the National Marine Sanctuaries Act or other
applicable laws.  All required new/amended permits,
approvals and authorizations must be received prior to
commencement of construction or operation activities
related to the substantive change.

16. Prevention, Monitoring and Mitigation Plan (PMMP).
    The PMMP, with concurrence from appropriate resource
    agencies, shall be approved by the USCG and MARAD and
    be incorporated as an Annex to the Deepwater Port
    Operations Manual.  The PMMP will:

    i. Establish a single consolidated PMMP that will
       satisfy the needs of Federal, State and local
       agencies to ensure the prevention, monitoring

and mitigation of the environmental impacts which may result from the construction and operation of the Port.

ii. Address regulatory requirements and requirements of permits, approvals and authorizations; project specific requirements; best management practices; and any other commitments made by Delfin LNG included in the application and Final EIS, including Appendix G – Best Management Practices and Recommendations.

iii. Provide Port personnel the necessary information, training, procedures and equipment to implement the PMMP's requirements and integrate them into all Port operations.

Delfin LNG will collectively work with MARAD, USCG, NOAA, USEPA, the ACSs and other Federal, State and local agencies, as appropriate, to develop the PMMP. The PMMP will be regulatory and performance-based, and include periodic evaluation of effectiveness to identify environmental protection improvements in the Port's operating area.

## 6. Advice of the Administrator of EPA

Section 4(c)(6) of the Act [33 U.S.C. § 1503(c)(6)] provides that the License may be issued if the Secretary

has not been informed, within 45 days following the last public hearing on a proposed License for a designated application area, by the Administrator of the Environmental Protection Agency that the deepwater port will not conform with all applicable provisions of the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, or the Marine Protection, Research and Sanctuaries Act, as amended.

I was informed by USEPA that, in general, MARAD and USCG responded satisfactorily to USEPA's comments on the Draft EIS.[84] USEPA's initial comments, dated August 29, 2016,

---

[84] Federal Docket Management System, USCG 2015-0472-0116.

requested that additional information be added to include the analysis of alternatives, consultation and coordination with State agencies, cumulative impacts, GHG emissions and environmental justice.[85]

In its final letter to MARAD dated January 12, 2017, USEPA Region 6 expressed continued concern that the Delfin LNG Final EIS did not provide adequate analysis and information regarding GHG emissions associated with the production, transport and combustion of the natural gas proposed to be exported.[86] Specifically, USEPA stated that "[s]ince EPA rated the draft EIS as 'insufficient information' and this recommendation was not incorporated, we remain concerned that the Final EIS does not provide adequate information required to render an informed decision."

In response to USEPA's final comment regarding GHG emissions, I find that the scope of the EIS for the Delfin LNG project meets the statutory requirement of NEPA and the Act. The Final EIS evaluates the direct and indirect impacts of the proposed Port that are subject to MARAD's Federal action, which is the licensing of the construction, operation and decommissioning of the Port. In addition, reasonably foreseeable connected actions were analyzed in the Final EIS as required under NEPA, such as the Federal actions of cooperating agencies, including but not limited to, FERC (for certification of the components of the DOF) and USEPA (for permit authorization under the CWA and CAA).

Delfin LNG proposes to receive natural gas through its interconnection with other existing U.S. natural gas pipelines that service markets throughout the Nation. While the Final EIS includes an estimate of GHG emissions related to the proposed construction, operation and decommissioning of the proposed Port, it does not analyze the upstream effects from potential induced production or downstream effects from the export of natural gas.

The factors described under the CEQ regulations for a meaningful analysis—including when, where and how natural gas development would occur as related to the proposed

---

[85] Federal Docket Management System, USCG 2015-0472-0100.

[86] Federal Docket Management System, USCG 2015-0472-0116.

project—are unknown.[87]  CEQ's final guidance on evaluating GHG impacts does not require NEPA analyses to include such unforeseeable effects.[88]

Regarding downstream GHG emissions from overseas transport, regasification, and combustion of exported LNG, Delfin LNG has been approved by DOE to export natural gas to Free-Trade Agreement countries, and has an application pending before DOE to export LNG to Non-Free Trade Agreement countries.  The necessary factors for a meaningful analysis, including the demand for LNG exported from the Port, the destination(s) of the exports, the transport routes and the ultimate end uses of the LNG are unknown and, as such, the GHG emissions from same are not reasonably foreseeable.[89]

## 7.    Consultations with the Secretaries of State, Defense, and Army

[87] USEPA suggested that the Final EIS consider DOE's Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States, wherein the agency provides additional information to the public regarding the potential environmental impacts of unconventional natural gas production activities. The Addendum provides GHG emissions information from the upstream natural gas industry as a whole, but DOE recognized that lacking an understanding of where and when additional gas production will arise, the environmental impacts resulting from production activity induced by LNG exports to non-Free Trade Agreement countries are not "reasonably foreseeable" within the meaning of the CEQ NEPA regulations (40 C.F.R. § 1508.7). See DOE Addendum at p. 2 (2014).

[88] Vol. 81, Federal Register, No. 151, Friday, August 5, 2015, pp. 51866-51867 (81 FR 51866).

[89] The USEPA suggested that the Final EIS consider the analysis prepared by the DOE's National Energy Technology Laboratory (NETL) in 2014 into the estimated "life cycle" of GHG emissions for exporting LNG from the U.S. In the life-cycle analysis, NETL identified two representative markets for U.S. exported LNG—Rotterdam, Netherlands, and Osaka, Japan—then compared the total GHGs that would be emitted to generate one megawatt hour (MWh) of electricity in each market, using: (1) LNG imported from the United States; (2) LNG imported from closer regional sources; (3) natural gas exported via pipeline from Russia; and (4) regional coal. In each scenario, NETL considered carbon dioxide and methane emissions from all stages of fuel production, from extraction to final combustion. NETL concluded that exporting U.S. LNG to produce power in Europe and Asia will not increase GHG emissions compared to regional coal power, and that potential differences in GHG emissions relating to the use of U.S. LNG, regional LNG, or Russian gas are largely limited to "transport distance" and are otherwise "indeterminate" due to uncertainty in the modeling data. Additionally, NETL concluded that no significant increase or decrease in net climate impact is anticipated from any of these scenarios (see NETL 2014, § 7 Summary and Study Limitations, p. 18). Because NETL analyzed representative approaches for U.S. LNG exports, the general conclusions regarding GHG emissions from such exports are expected to apply to this project.

Pursuant to the requirement of Section 4(c)(7) of the Act [33 U.S.C. § 1503(c)(7)], the Departments of State, Defense and Army have been consulted to determine their views on the adequacy of the application, and the effect of the deepwater port on programs within their respective jurisdictions.

By letter dated January 10, 2017, the Department of State advised its review of the Port's License application was complete and found "that the issuance of a License will have no adverse effect on programs within the Department's jurisdiction."[90]

By email dated January 11, 2017, the Department of Defense (DOD) had no comment on the Delfin LNG application. Therefore, I conclude the Port will have no adverse impacts on DOD programs.[91]

USACE provided comment on the application and indicated the New Orleans District will remain as a representative for the Secretary of the Army in the review of all Department of the Army permit applications and final permit decisions.[92] USACE also indicated a wetlands Jurisdictional Determination (JD) is pending and cannot proceed with permitting activities until the JD is finalized. Any USACE conditions incorporated within the JD or USACE permit will be included as conditions in the Delfin LNG License.

## 8. Approval of Adjacent Coastal State Governors

Section 4(c)(8) of the Act [33 U.S.C. § 1503(c)(8)] conditions issuance of a License on the approval(s) of the Governor(s) of the "Adjacent Coastal State or States" (ACS). ACS status confers project approval, disapproval, and approval with conditions authority to States if they meet certain criteria. 33 U.S.C. § 1508(a)(1) of the Act provides that the Secretary must:

> [D]esignate as an 'Adjacent Coastal State' any coastal State which (A) would be directly connected by

---

[90] Federal Docket Management System, USCG 2015-0472-0115.

[91] Federal Docket Management System, USCG 2015-0472-0117.

[92] Federal Docket Management System, USCG 2015-0472-0117.

pipeline to a deepwater port as proposed in an
application, or (B) would be located within 15 miles
of any such proposed deepwater port.

In addition, 33 U.S.C. § 1508(a)(2) provides:

> The Secretary shall, upon request of a State, and
> after having received the recommendations of the
> Administrator of the National Oceanic and Atmospheric
> Administration, designate such State as an "Adjacent
> Coastal State" if he determines that there is a risk
> of damage to the coastal environment of such State
> equal to or greater than the risk posed to a State
> directly connected by pipeline to the proposed
> deepwater port.

The Governor of any State designated by the Secretary as an
ACS can, by timely notification to the Secretary of his/her
disapproval, prevent the issuance of a deepwater port
License.

The States of Louisiana and Texas were designated as the
ACSs for the Delfin LNG project. Section 9(b)(1) of the
Act [33 U.S.C. § 1508(b)(1)] states: "[i]f the Governor
fails to transmit his approval or disapproval to the
Secretary not later than 45 days after the last public
hearing on applications for a particular application area,
such approval shall be conclusively presumed."[93]  As such,
for the subject Delfin LNG deepwater port License
application review process, the 45-day time limit ended on
January 30, 2017, without receipt of expressed written
comment from either the Governor of Louisiana or the
Governor of Texas.  Therefore, in accordance with the Act,
the ACS Governor of Louisiana and the ACS Governor of Texas
are conclusively presumed to have granted approval of the
construction and operation of the Port.

## 9.    Coastal Zone Management Act (CZMA)

Section 4(c)(9) of the Act [33 U.S.C. § 1503(c)(9)]
authorizes issuance of a License if the State or States
adjacent to the proposed deepwater port are making

---

[93] The final public hearing for the Delfin LNG deepwater port License application was
held on December 14, 2016.

reasonable progress toward developing an approved coastal zone management program. Section 9(c) of the Act [33 U.S.C. § 1508(c)] provides that a State is considered to be making such progress if it is receiving a planning grant pursuant to Section 305 of the CZMA.[94] Delfin LNG has obtained the necessary CZMA consistency certifications from the States of Louisiana and Texas.

The Office of Coastal Management within the State of Louisiana Department of Natural Resources provided a CZMA consistency determination by letter dated August 3, 2016.[95] The letter stated that "the project, as proposed in the application, is consistent with the Louisiana Coastal Resources Program (LCRP) as required by Section 307 of the Coastal Zone Management Act of 1972, as amended." The letter also indicated that "if any changes are made to the plans before or during construction and operation of the facility, a modification request must be submitted for consistency review."

By letter dated August 7, 2015, the Texas General Land Office indicated that "it has been determined that it (Delfin LNG deepwater port) will likely not have adverse impacts on coastal natural resource areas (CNRA's) in the Texas coastal zone."[96] The letter also stated that "it has been determined that there are no significant unresolved consistency issues with respect to the project. Therefore, this project is consistent with the Texas Coastal Management Program goals and policies." Finally, the Texas General Land Office noted that "siting and construction should avoid and minimize impacts to CNRAs."

Delfin LNG shall comply with all conditions set forth in the CZMA consistency certifications.

## VI. CONCLUSION

For the reasons set forth above, I have reached the following conclusions:

---

[94] 16 U.S.C. § 1451 et seq.

[95] Federal Docket Management System, USCG 2015-0472-0092.

[96] Federal Docket Management System, USCG 2015-0472-0106.

1) Delfin LNG has provided the necessary documentation, guarantees and surety to confirm it has, or has access to, the required financial capital to construct, operate and decommission the Port.  Delfin LNG has the financial resources to acquire and maintain marine insurance coverage in an amount equal to the limit of liability for deepwater ports as established by the Oil Pollution Act of 1990, and as amended by regulation at 33 C.F.R. § 138.230(c).

2) Delfin LNG brings together an experienced team of offshore energy (facility and pipeline) development engineers, managers and financial backers.  It is clear from the responsiveness to MARAD, USCG and cooperating agency requests for information that Delfin LNG's team understands the statutory and regulatory framework under which construction and operation of the Port is governed. I conclude that the Delfin LNG owner/operator consortium will comply with all applicable laws, regulations and License conditions, and those responsible parties understand the adverse ramifications that may result for noncompliance.

3) I find construction and operation of the Port to be in the national interest because Delfin LNG will have a beneficial effect on economic growth, both on the local level and the national level, it will expand and diversify U.S. energy infrastructure, it will provide a reliable source of clean energy to U.S. allies in the event of market disruption, and it will have a low impact on the availability and cost of natural gas in the U.S. domestic market.  To the extent of my authority, I will also encourage Delfin LNG to use U.S.-flagged vessels crewed with U.S. mariners to support Port operations.

4) I find the Port will not unreasonably interfere with international navigation or other reasonable uses of the high seas.  The requirement to establish safety zones and other regulated navigational areas, the Port's location 40 nautical miles offshore and outside of the Sabine Pass Safety Fairway, and its low proximity to other OCS activities lead me to conclude the Port will not affect vessel traffic operating in the Gulf of Mexico.

5) I find the Port will be constructed and operated using the best available technology.  By using new build vessels, rather than retrofitting existing vessels,

Delfin LNG will be able to design, engineer and construct the first-of-its-kind FLNGV to be operated on the U.S. OCS. Using air-cooled, rather than water-cooled, liquefaction trains, Delfin LNG will reduce the amount of water each FLNGV requires for its industrial processes and minimize the impact on the marine environment.

6) The Administrator of the U.S. Environmental Protection Agency has not informed me that the Port will not conform to all applicable provisions of the Clean Air Act, the Clean Water Act or the Marine Protection, Research and Sanctuaries Act. I therefore conclude the Port will be able to comply with the requirements of those Acts.

7) I have consulted with the Secretaries of State, Defense and the Army. No objections to the Port have been received.

8) The Adjacent Coastal State Governors of Louisiana and Texas registered no objection to the Port's construction and operation. I presume each Governor approves of the Port as applied for.

9) The State of Louisiana has an approved coastal zone management program. The Louisiana Department of Natural Resources concluded that "the project, as proposed in the application, is consistent with the Louisiana Coastal Resources Program." Similarly, the State of Texas also has an approved coastal zone management program. The Texas General Land Office indicated that "it has been determined that there are no significant unresolved consistency issues with respect to the project. Therefore, this project is consistent with the Texas Coastal Management Program goals and policies."

Delfin LNG will reduce the risks of environmental harm from liquefaction and export of natural gas. Any possible environmental damage caused by the accidental release of natural gas or LNG resulting from offshore or onshore operations, transshipment or harbor collision will be reduced substantially because of the efforts undertaken to make certain the Port is located, constructed and operated in an environmentally sound manner.

Under recent amendments to the Act, Delfin LNG must provide information to the Secretary regarding the nationality of the flag state of vessels and the nationality of officers

and crew that will service the Port prior to issuance of the License.  MARAD is also working closely with Delfin LNG to explore opportunities for U.S.-flag vessels and develop programs for the training and use of U.S. officers and mariners on LNG carrier vessels that will service the Port.

I recognize that the export of natural gas from the Port will not jeopardize the Nation's environmental security or the commodity's availability to domestic markets, as the Energy Information Administration notes that the Nation's reliance on natural gas imports has declined beginning in 2007 and continues to decline as the result of increases in domestic natural gas production.[97]  Further, EIA notes that the Nation has approximately 93 years of proved reserves and is well-positioned to contribute to meeting this growing international demand.  The export of natural gas will serve U.S. national security interests through the diversification of global natural gas supply, benefitting U.S. allies that are subject to unreliable natural gas supplies.

The construction of the Delfin LNG deepwater port will have a positive impact on the employment levels in Louisiana. The Port will also create numerous permanent jobs for the region primarily in the operations of the Port and on support vessels that will service the Port.

I have generally accepted the advice and recommendations of other Federal and State agencies.  Where I have not adopted specific recommendations, I have selected an alternative course that, in my judgment, will work to achieve the objective more effectively.

I recognize that the conditions that have been designed to ensure that the Port is constructed and operated in accordance with the statutory and regulatory requirements of the Act may not be acceptable to the applicant.  If so, the License will not be issued, and other potential applicants will have an opportunity to consider submitting a proposal.  If the conditions are accepted and the License is issued, by the authority delegated to me by the Secretary of the U.S. Department of Transportation, I am directing all Departmental modes to exercise their

---

[97] EIA, U.S. Natural Gas Imports & Exports 2015, dated May 31, 2016.

responsibilities with due diligence, in cooperation with
other Federal and State agencies, to ensure that the letter
and spirit of the License requirements are followed.

Consequently, I conclude that construction and operation of
the Delfin LNG deepwater port will be in the national
interest and consistent with national security and other
national policy goals and objectives, including energy
sufficiency and environmental quality. Pursuant to issuance
of an Operating License, and compliance with all conditions
set forth therein, I hereby approve Delfin LNG LLC's
application to construct and operate the Delfin LNG
deepwater port.


Dated:

_____

Joel Szabat
Executive Director
Maritime Administration
Washington, D.C.

# EXHIBIT D

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that a true and correct copy of this Petition for Review was served via U.S. Mail on each of the parties that may have participated in the underlying procedure:

Delfin LNG, LLC
1100 Louisiana Street, Suite 3100
Houston, TX 77002

Delfin Midstream
25 West Cedar Street
Pensacola, FL 32502

Daniel P. Werner
Delfin LNG, LLC
1100 Louisiana Street, Suite 3100
Houston, TX 77002

J. Patrick Nevins
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004

This 19th day of May 2025

*/s/ Lauren A. Parker*
Lauren A. Parker (DC1670885)
Jason R. Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldivsreity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

*/s/ Devorah Ancel*
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 103 W
Boulder, CO 80301
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mcreary@sierraclub.org
*Counsel for Petitioners*
*Sierra Club and Habitat Recovery Project*

# EXHIBIT E

## LIST OF RESPONDENTS

Pursuant to Federal Rule of Appellate Procedure 15(c), Petitioners hereby provide a list

of Respondents, specifically identifying the Respondents' names and the addresses where

Respondents may be served with copies of the Petition for Review.

United States Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

United States Maritime Administration
1200 New Jersey Ave., SE
Washington, DC 20590

Hon. Sean Duffy
Secretary
U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

Charles Makings
Acting Administrator
U.S. Maritime Administration
1200 New Jersey Ave., SE
Washington, DC 20590

Respectfully submitted,

*/s/ Lauren A. Parker*
Lauren A. Parker (DC1670885)
Jason R. Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

*/s/ Devorah Ancel*
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 103 W
Boulder, CO 80301
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org
*Counsel for Petitioners*
*Sierra Club and Habitat Recovery Project*