No. 25-60282

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; HABITAT
RECOVERY PROJECT

*Petitioners*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, IN
HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF
TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION, AN
AGENCY OF THE U.S. DEPARTMENT OF TRANSPORTATION; SANG H. YI,
IN HIS OFFICIAL CAPACITY AS ACTING MARITIME ADMINISTRATOR

*Respondents*

On Petition for Review from Maritime Administration,

USCG-2015-0472

## INITIAL BRIEF OF PETITIONERS

SUBMITTED BY:

Lauren Parker (DC1670885)  
Jason Rylander (DC474995)  
Center for Biological Diversity  
1411 K Street NW, Suite 1300  
Washington, DC 20005  
*Counsel for Petitioner*  
*Center for Biological Diversity*

Devorah Ancel (TX24111073)  
Rebecca McCreary (CO54097)  
Sierra Club  
1650 38th St., Suite 103 W  
Boulder, CO 80301  
*Counsel for Petitioners Sierra*  
*Club and Habitat Recovery*  
*Project*

Submitted on: September 22, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Respondents: | Counsel for Respondents: |
| --- | --- |
| Sean Duffy, Secretary, U.S. Department of Transportation | Ezekial A. Peterson of U.S. Department of Justice Washington, DC |
| Sean Duffy, Secretary, U.S. Department of Transportation | Rebecca Jaffe of U.S. Department of Justice Washington, DC |
| Sang H. Yi, Acting Administrator, U.S. Maritime Administration | Ezekial A. Peterson of U.S. Department of Justice Washington, DC |
| Sang H. Yi, Acting Administrator, U.S. Maritime Administration | Rebecca Jaffe of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Ezekial A. Peterson of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Rebecca Jaffe of U.S. Department of Justice Washington, DC |
| United States Maritime Administration | Ezekial A. Peterson of U.S. Department of Justice Washington, DC |
| United States Maritime Administration | Rebecca Jaffe of U.S. Department of Justice Washington, DC |

| Petitioners: | Counsel for Petitioners: |
| --- | --- |
| Center for Biological Diversity | Lauren Parker of Center for Biological Diversity Washington, DC |
| Center for Biological Diversity | Jason Rylander of Center for Biological Diversity Washington, DC |
| Habitat Recovery Project | Devorah Ancel of Sierra Club Austin, TX |

| Habitat Recovery Project | Rebecca McCreary of Sierra Club Boulder, CO |
|---|---|
| Sierra Club | Devorah Ancel of Sierra Club Austin, TX |
| Sierra Club | Rebecca McCreary of Sierra Club Boulder, CO |

| Intervenors: | Counsel for Intervenors: |
|---|---|
| Delfin LNG, LLC | Sean Marotta of Hogan Lovells US L.L.P., Washington, DC |
| Delfin LNG, LLC | Natalie Salamanowitz of Hogan Lovells US L.L.P., Washington, DC |
| Delfin LNG, LLC | James T. Banks of Hogan Lovells US L.L.P., Washington, DC |
| Delfin LNG, LLC | Joanne Rotondi of Hogan Lovells US L.L.P., Washington, DC |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| Delfin Midstream Inc. | |

*/s/ Lauren A. Parker*
Lauren A. Parker
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: 202-868-1008
lparker@biologicaldiversity.org
*Counsel for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Petitioners Center for Biological Diversity; Habitat Recovery Project; and Sierra Club (hereafter "Petitioners") respectfully request that the Court hold oral argument in this case. At issue is whether the U.S. Department of Transportation violated the Deepwater Port Act and National Environmental Policy Act when it issued the license for the construction and operation of the Delfin LNG, LLC deepwater port. Delfin is a proposed floating liquefied natural gas ("LNG") deepwater export terminal approximately 40 nautical miles off the coast of Cameron Parish, Louisiana, that would export up to 657.5 billion cubic feet of natural gas per year and operate for approximately 30 years. The deepwater platform would encompass three semi-permanently moored Floating LNG vessels and four ~30-inch diameter pipeline laterals of about 6,400 feet each deepwater infrastructure and connect to 40.8 nautical miles of subsea pipeline running from shore. Petitioners respectfully submit that oral argument would assist the Court with the complex legal issues and the voluminous administrative record in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.........................................................2

STATEMENT REGARDING ORAL ARGUMENT................................................4

TABLE OF CONTENTS ........................................................................................5

TABLE OF AUTHORITIES...................................................................................7

JURISDICTIONAL STATEMENT .......................................................................12

STATEMENT OF THE ISSUES ...........................................................................13

STATEMENT OF THE CASE................................................................................14

   I.    Statement of Facts.....................................................................................14

   II.   Legal Background .....................................................................................18

      A.  Deepwater Port Act............................................................................18

      B.  National Environmental Policy Act...................................................21

SUMMARY OF THE ARGUMENT ......................................................................24

STANDARD OF REVIEW ....................................................................................25

ARGUMENT ..........................................................................................................26

   I.    Petitioners Have Standing.........................................................................26

   II.   MARAD's Approval of the Delfin License Violated the Deepwater Port Act and Administrative Procedure Act .......................................................31

      A.  MARAD's Failure to Require an Amended Application Violated Procedural Requirements Under the DWPA and Was Arbitrary and Capricious Under the APA ....................................................................32

      B.  MARAD's Procedural Errors Deprived the Petitioners of their Right to Participate in the Licensing Process..........................................36

   III.  NEPA Requires MARAD to Prepare a Supplemental EIS Before Issuing a Final License .............................................................................................37

      A.  Delfin LNG's Significant Changes Proposed Since Completion of the 2016 FEIS Require Supplemental NEPA Review.....................................39

B. New Significant Information and Circumstances Require MARAD to Prepare an SEIS ..........................................................................................43

IV. MARAD's Unexplained Reversal of Position Is Arbitrary and Capricious ...................................................................................................46

V. MARAD's Failure to Prepare a Supplemental EIS Does Not Result in Harmless Error ....................................................................................48

VI. Remedy .................................................................................................50

CONCLUSION ..................................................................................................51

CERTIFICATE OF SERVICE ..........................................................................53

CERTIFICATE OF COMPLIANCE .................................................................54

CERTIFICATE OF ELECTRONIC COMPLIANCE ..........................................55

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal v. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)............................................................50

*Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*,
  894 F.3d 692 (5th Cir. 2018)............................................................26

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................22

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ......................................................................23

*Caring Hearts Pers. Home Servs., Inc. v. Burwell*,
  824 F.3d 968 (10th Cir. 2016)............................................................32

*Citizens for Clean Air v. United States DOT*,
  98 F.4th 178 (5th Cir. 2024) ............................................................27

*City of Port Isabel v. FERC*,
  111 F.4th 1198 (D.C. Cir. 2024) ................................................. 23, 41

*Dubois v. United States Dep't of Agric.*,
  102 F.3d 1273 (1st Cir. 1996)............................................................41

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................ 26, 46, 48

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
  877 F.3d 1051 (D.C. Cir. 2017)................................................ 41, 42, 45

*Friends of Richards-Gebaur Airport v. FAA*,
  251 F.3d 1178 (8th Cir. 2001)............................................................32

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................... 27, 28

*Harrison Cnty. v. United States Army Corps of Eng'rs*,
  63 F.4th 458 (5th Cir. 2023) ...................................................... 22, 23

*Hunt v. Wash. Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ......................................................................27

*Jupiter Energy Corp. v. FERC*,
    407 F.3d 346 (5th Cir. 2005) ................................................................46

*La. Wildlife Fed'n, Inc. v. York*,
    761 F.2d 1044 (5th Cir. 1985) ........................................................ 43, 45

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ....................................................................... 22, 41

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
    60 F.4th 956 (5th Cir. 2023) .................................................................48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................ 26, 47

*Rest. L. Ctr. v. United States DOL*,
    120 F.4th 163 (2024) .............................................................................32

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .................................................................. 21, 43, 50

*Save Our Cmty. v. EPA*,
    971 F.2d 1155 (5th Cir. 1992) ..............................................................31

*Sierra Club v. FERC*,
    2023 WL 5537562 (D.C. Cir.) ..............................................................42

*Sierra Club v. FERC*,
    68 F.4th 630 (D.C. Cir. 2023) ..............................................................42

*Sierra Club v. Glickman*,
    67 F.3d 90 (5th Cir. 1995) ...................................................................25

*Sierra Club v. United States EPA*,
    939 F.3d 649 (5th Cir. 2019) ...............................................................48

*Stand Up for Cal.! v. DOI*,
    994 F.3d 616 (D.C. Cir. 2021) .............................................................45

*Sw. Elect. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ...............................................................50

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
    207 F.3d 789 (5th Cir. 2000) ...............................................................27

*Texas Office of Pub. Util. Couns. v. FCC,*
  183 F.3d 393 (5th Cir. 1999)..................................................................26

*Texas v. United States,*
  126 F.4th 392 (5th Cir. 2025) ...............................................................23

*UAW v. Brock,*
  477 U.S. 274 (1986) ...............................................................................27

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. United States HHS,*
  985 F.3d 472 (5th Cir. 2021)..................................................................47

*Wisconsin v. Weinberger,*
  745 F.2d 412 (7th Cir. 1984)..................................................................43

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ...............................................................................39

## Statutes

33 U.S.C. § 1501 ......................................................................................18

33 U.S.C. § 1503 ......................................................................................21

33 U.S.C. § 1503(c)(5)..............................................................................51

33 U.S.C. § 1504 .............................................................. 19, 21, 35, 38

33 U.S.C. § 1504(c) ..................................................................................36

33 U.S.C. § 1504(c)(1)(B) .........................................................................34

33 U.S.C. § 1504(c)(1)(B)(ii)(I)..................................................................20

33 U.S.C. § 1504(c)(1)(B)(ii)(II) ................................................................20

33 U.S.C. § 1504(c)(1)(B)(ii)(II)(bb) .........................................................33

33 U.S.C. § 1504(c)(2)......................................................................... 20, 34

33 U.S.C. § 1504(f).....................................................................................21

33 U.S.C. § 1504(g) ...................................................................................37

33 U.S.C. § 1504(i)(4) ...............................................................................36

33 U.S.C. § 1504(i)(4)(A)...........................................................................32

33 U.S.C. § 1504(i)(5) ...................................................................19

33 U.S.C. § 1504(i)(5)(C)(iii) .......................................................35

33 U.S.C. § 1505 ................................................. 19, 20, 21, 34, 35, 38

33 U.S.C. § 1516 ...........................................................................12

33 U.S.C. §§ 1501-1524 ...............................................................12

42 U.S.C. § 4332(C) ......................................................................21

5 U.S.C. § 500 et seq ......................................................................25

5 U.S.C. § 706(2) ...........................................................................47

5 U.S.C. § 706(2)(A) ............................................................... 25, 26

5 U.S.C. § 706(2)(D) .....................................................................37

## Regulations

33 C.F.R. § 148.105(z) ..................................................................21

33 C.F.R. § 148.200 ......................................................................37

33 C.F.R. § 148.207 ................................................................ 34, 37

33 C.F.R. § 148.222 ................................................................ 32, 37

33 C.F.R. § 148.277(b) ..................................................................21

33 C.F.R. § 148.705 ......................................................................38

33 C.F.R. § 148.707 ......................................................................38

33 C.F.R. § 148.710 ......................................................................38

33 C.F.R. § 148.710(c) ..................................................................38

33 C.F.R. § 148.715 ................................................................ 34, 38

40 C.F.R. §§ 1500-1508 ...............................................................23

40 C.F.R. § 1502.23 (2022) ..................................................... 46, 47

40 C.F.R. § 1502.9(d) (2022) ............................................. 23, 38, 40

40 C.F.R. § 1502.9(d) (2024) .......................................................23

40 C.F.R. § 1502.9(d)(1) (2022) ................................................................ 22, 23, 41

40 C.F.R. § 1502.9(d)(1)(ii) (2022) ........................................................................23

40 C.F.R. § 1502.9(d)(3) (2022) ................................................................... 22, 38

**Other Authorities**

Deepwater Port License Application: Delfin LNG. LLC. Deepwater Port License
   Application: Delfin LNG, LLC, Delfin LNG Deepwater Port,
   80 Fed. Reg. 42162 (July 16, 2015) ....................................................................14

Delfin LNG LLC; Request for Amendment of Long-Term Authorizations To
   Export Liquefied Natural Gas and for Additional Extension of Time To
   Commence Exports,
   90 Fed. Reg. 24,111 (June 6, 2025) ....................................................................51

Organization and Delegation of Powers and Duties; Update of Secretarial
   Delegations,
   68 Fed. Reg. 36,496 (June 18, 2003)............................................................ 12, 18

Review of the Primary National Ambient Air Quality Standards for Oxides of
   Nitrogen,
   83 Fed. Reg. 17,226 (Apr. 18, 2018) ..................................................................42

## JURISDICTIONAL STATEMENT

Petitioners seek review of the Department of Transportation ("Department") Maritime Administration's ("MARAD") decision to license the Delfin LNG, LLC ("Delfin") deepwater port, issued under the Deepwater Port Act of 1974, 33 U.S.C. Sections 1501-1524 ("DWPA").[1] This Court has original jurisdiction over this case pursuant to Section 1516 of the DWPA. The case seeks review of a decision to issue a deepwater port license within the Gulf of Mexico, and the nearest adjacent coastal states to the project are Louisiana and Texas, which are within the jurisdiction of this Court. 33 U.S.C. § 1516.

Petitioners are "aggrieved by the Secretary [of Transportation]'s decision" because it adversely affects them, and Petitioners participated in the administrative proceedings before the Secretary. *Id.*

---

[1] The Secretary of Transportation delegated to the Maritime Administration authority to issue licenses for construction and operation of deepwater ports as provided for in the DWPA of 1974. Organization and Delegation of Powers and Duties; Update of Secretarial Delegations, 68 Fed. Reg. 36,496 (June 18, 2003)

# STATEMENT OF THE ISSUES

1) Whether MARAD's decision to issue a final license for the construction and operation of Delfin LNG's deepwater export facility violates the DWPA because:

   a. MARAD failed to require a complete amended application incorporating significant project modifications, and publish such application in the Federal Register for public review and comment, 33 U.S.C. 1504(c);

   b. MARAD failed to review the statutorily required environmental criteria of the Delfin LNG deepwater port project as licensed. *Id*. § 1505.

2) Whether MARAD violated NEPA when it failed to complete supplemental environmental review of the project's significant design and operational changes, and in light of new information and changed environmental circumstances occurring since publication of the project's 2016 Final Environmental Impact Statement ("FEIS").

3) Whether MARAD's failure to provide reasoning for reversing its April 2024 decision denying Delfin LNG a final license deprived Petitioners and the public of their right to participate in the review and approval process for this

project, violating National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").

## STATEMENT OF THE CASE

### I.    Statement of Facts

On May 8, 2015, Delfin LNG, LLC submitted an application to own, construct, and operate a liquefied natural gas ("LNG") deepwater export facility to MARAD. Deepwater Port License Application: Delfin LNG. LLC. Deepwater Port License Application: Delfin LNG, LLC, Delfin LNG Deepwater Port, 80 Fed. Reg. 42162 (July 16, 2015). In June 2015, the Department deemed the application for Delfin LNG, as proposed, complete and published it in the Federal Register for comment on July 2015. *Id*. Pursuant to NEPA and the DWPA, the FEIS was published by the U.S. Coast Guard ("USCG") and MARAD in November 2016. MARAD_AR_003364-003963. Subsequently, MARAD published a Record of Decision ("ROD") approving Delfin's application to own, construct, and operate a deepwater port off the coast of Louisiana on March 13, 2017. MARAD_AR_005292-005359. The final license was to be issued when Delfin met the conditions of the ROD. *Id*. To date, Delfin has not met those conditions. MARAD_AR_007370.

Throughout the years 2017 to 2024, Delfin LNG made substantial changes to the proposed project including widespread changes to financing, ownership, and

design that were not previously evaluated and approved under the initial ROD. *See* MARAD_AR_007344-46; MARAD_AR_007518-007522. For that reason, MARAD concluded in a letter dated April 17, 2024, "[T]he [2017] ROD no longer supports the issuance of a license" because "design changes to the mooring system, power generation systems, and cooling systems . . . . were not included in the Final Environmental Impact Statement and therefore require an updated environmental review, public engagement, and evaluation." MARAD_AR_007344-007345. The letter explicitly directs Delfin to submit an amended application reflecting project changes upon which supplemental NEPA review would be conducted, and a new ROD would be issued. *Id*. Notably, the record provides that the letter "served as a *decision* from [MARAD] not to issue Delfin a deepwater port license due to Delfin's failure to meet the conditions set in the Record of Decision (ROD)… and served as an invitation for Delfin to submit an amended application." MARAD_AR_007370 (emphasis added). Despite clear directive, no such application, supplemental review or ROD is on record in the project docket.

In January 2025, President Trump issued Executive Order 14154 (the "E.O.") titled "Unleashing American Energy." MARAD_AR_007376-007382. The E.O. instructed MARAD to determine whether any refinements to a proposed deepwater port after a "favorable ROD" are likely to result in any adverse environmental consequences that substantially differ from those associated with

the originally evaluated project. MARAD_AR_007380. This specific language is only applicable to the Delfin project. MARAD_AR_008254. To that end, MARAD was instructed to qualitatively assess any difference between the project with and without the proposed refinements, including any potential consequences not addressed in the FEIS. *Id*. This assessment was to be submitted within 30 days to the Secretary of Transportation and the President. *Id*. The E.O. further provides, if MARAD determined that such refinements were not likely to result in "seriously different consequences," it must update the ROD with a description of the refinements and, no later than 30 days thereafter, issue the DWPA license. *Id*. But, if MARAD determined the refinements were likely to result in "seriously different consequences," it must within 60 days issue an Environmental Assessment examining those consequences, and within 30 days thereafter, issue an addendum to the ROD and a DWPA license. *Id*. In either scenario, MARAD was directed to reach a predetermined conclusion without any independent assessment or public comment, in violation of the DWPA, and, in no uncertain terms, contradicting MARAD's previous determinations.

The Center for Biological Diversity ("Center") and Sierra Club submitted multiple comments and letters to the responsible agencies regarding their statutory duties under NEPA and the DWPA. First, in August 2015, the Center submitted scoping comments for the project's review. Monsell Decl. ⁋ 11. Next, the Center

submitted comments on the draft environmental impact statement ("EIS") in August 2016, and the FEIS in January 2017. *Id*; MARAD_AR_004054-004087.

After the ROD was issued, in October 2021, the Center and Sierra Club sent a letter to MARAD, USCG, and the National Marine Fisheries Service regarding the agencies' duties to prepare a supplemental EIS and reinitiate Endangered Species Act ("ESA") Section 7 consultation. MARAD_AR_003562-003585. Again, on February 19, 2025, the Center submitted a letter to the Department and MARAD in response to the E.O. reminding the agency of its previous denial of the project license, the statutory requirements under the DWPA and NEPA, and the need for supplemental review. MARAD_AR_008260-008261. Lastly, on March 18, 2025, the Center and Sierra Club sent a similar letter to the Department, MARAD and the USCG in response to E.O. 14154, detailing how the E.O. conflicted with MARAD's prior determinations and final license denial, and reminding the agencies of their statutory duties under the DWPA and NEPA. MARAD_AR_008965-009304. These letters detailed the changes in project design, climate science, and newly federally-listed species of concern that trigger the agency requirements to conduct additional review. *See* MARAD_AR_008260-008261; MARAD_AR_008965-008979. These letters also underscore MARAD's obligation to maintain its April 2024 license denial, at the very least, until

supplemental review and a new ROD is completed, consistent with the applicable laws and regulations at issue in this case. *Id.*

Contradicting its previous determinations, MARAD nonetheless approved the Delfin LNG deepwater port license via press release on March 21, 2025. Pet'rs' Pet. for Review, ECF No. 1, Exhibit B. To date, no other documentation has been added to the official docket or published in the Federal Register regarding the modified project and MARAD's final license approval; nor has the public been afforded the opportunity to review or participate in the agency's project review and licensing decision.

## II.    Legal Background

### A. Deepwater Port Act

The DWPA of 1974, as amended, establishes a licensing process for the ownership, construction, operation, and decommissioning of manmade structures beyond U.S. territorial seas[2] for the import and export of oil and natural gas. Section 1503(c) confers authority on the Secretary of Transportation through MARAD, 68 Fed. Reg. 36,496 (June 18, 2003), to issue deepwater port licenses in a manner that protects "the marine and coastal environment to prevent or minimize any adverse impact which might occur." 33 U.S.C. § 1501.

---

[2] Waters beyond U.S. territorial waters are those seaward of twelve nautical miles from a coastal state's mean low water mark.

The DWPA establishes a six step 360-day process that begins when the applicant submits a completed application and ends when MARAD issues a ROD. 33 U.S.C. §§ 1504, 1505. The six-step process includes: (1) notice of application; (2) notice of intent to prepare an EIS; (3) NEPA review; (4) comment periods for the public, Governor(s) of adjacent coastal state(s), and federal agencies; (5) final public hearing(s) in the adjacent coastal state; and (6) issuance of a ROD. 33 U.S.C. § 1504.

In December 2024, the DWPA was amended to include a slightly expedited review process for amended deepwater port applications. The amended application process allows for expedited review and approval or denial of an application if it meets the following criteria:

> "(i) [t]he amended license application is for a natural gas deepwater port facility.
> (ii) The Secretary had determined that the project as specified in the initial license application was not likely to have any significant adverse environmental impact on species and habitat, consistent with law including National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).
> (iii) The Secretary has determined that the results of the environmental review conducted for the initial license application is still applicable to the amended license application and an additional environmental review is not required.
> (iv) The Secretary had published an affirmative Record of Decision for the initial license application." *Id*. § 1504(i)(5).

The amended application must be approved or denied no later than 270 consecutive days after the date the application is determined to be complete. *Id*.

A complete application includes but is not limited to information regarding: the location of the facility; financial and technical capabilities of the applicant; the type and design of all components of the deepwater port and any storage facilities associated with the deepwater port; identifying information of the ownership interest in the applicant; and other information required by the Secretary of Transportation to determine environmental impact. 33 U.S.C. § 1504(c)(2). If an application is determined to be incomplete, the Secretary must notify the applicant of any deficiencies and take no further action on the application until those deficiencies are remedied. *Id*. § 1504(c)(1)(B)(ii)(II). Once an application is determined to be complete, a notice of application and summary of the plans must be published in the Federal Register. *Id*. § 1504(c)(1)(B)(ii)(I).

For all applications deemed complete, MARAD must review specific criteria within the ROD and make this review available for public comment. 33 U.S.C. § 1505. These criteria include:

> "(1) the effect on the marine environment;
> (2) the effect on oceanographic currents and wave patterns;
> (3) the effect on alternate uses of the oceans and navigable waters, such as scientific study, fishing, and exploitation of other living and nonliving resources;
> (4) the potential dangers to a deepwater port from waves, winds, weather, and geological conditions, and the steps which can be taken to protect against or minimize such dangers;
> (5) effects of land-based developments related to deepwater port development;

20

(6) the effect on human health and welfare; and

(7) such other considerations as the Secretary deems necessary or appropriate." *Id*.

To issue a ROD approving the licensing of a deepwater port, MARAD must receive a completed application, publish that application in the Federal Register, review specific environmental criteria, comply with NEPA and other environmental laws, and hold at least one public hearing in each adjacent coastal state, among other things. 33 U.S.C. § 1504. A licensing determination must ensure that the proposed project would advance energy sufficiency, environmental quality, and that the Project applicant can meet financial responsibility, and regulatory requirements. *Id*. § 1503. Any ROD issued by MARAD is a conditional approval. The applicant is thus required to satisfy prerequisites set out in the ROD before a final license is issued.

### B. National Environmental Policy Act

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). To serve that goal, NEPA mandates that federal agencies prepare an EIS before taking any major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C). The Department's regulations require compliance with NEPA. 33 U.S.C. § 1504(f); 33 C.F.R. §§ 148.105(z), 148.277(b).

NEPA obligations do not end with publication of the EIS. NEPA demands agencies supplement an EIS in situations where supplementation serves NEPA's requirement "that agencies take a 'hard look' at the environmental effects of their planned action." *Harrison Cnty. v. United States Army Corps of Eng'rs*, 63 F.4th 458, 463-64 (5th Cir. 2023) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-374 (1989)). Such supplementation must follow the same procedures as preparation of the EIS itself. 40 C.F.R. § 1502.9(d)(3) (2022).[3]

Agencies shall prepare a supplemental EIS when "a major Federal action remains to occur, and: (i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1) (2022). *Harrison Cnty.,* 63 F.4th at 463.

The 2022 Phase 1 NEPA regulations, applicable at the time MARAD denied Delfin LNG a final license and determined the project required an amended application and supplemental environmental review,[4] provide that a supplemental

---

[3] Citations to Council on Environmental Quality ("CEQ") regulations in this brief refer to the regulations in effect on April 17, 2024, the date of the Department's letter denying final licensing due to project changes.

[4] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (letter was the consummation of the agency's original decisionmaking process, and one by "which rights or

EIS is required when "*significant* new circumstances or information [exist that are] relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2022); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (agency decisions judged on their compliance with regulations the agency applied at the time of its decisionmaking); *and see City of Port Isabel v. FERC*, 111 F.4th 1198, 1205 n.2 (D.C. Cir. 2024). Although NEPA regulations governing supplemental environmental review have been amended in recent years, this court has recognized, the "pertinent language remains unchanged as a substantive matter." *Harrison Cnty.,* 63 F.4th at 463, n. 7. Specifically, the factors triggering a supplemental EIS in the 2024 Phase 2 NEPA regulations applicable in March 2025, at the time of the project's final licensing, remain relatively unchanged in its core wording. *Compare* 40 C.F.R. § 1502.9(d) (2022) and *id.* § 1502.9(d) (2024)[5, 6]

---

obligations have been determined, or from which legal consequences will flow"); *see also Texas v. United States*, 126 F.4th 392, 417 (5th Cir. 2025).

[5] The 2022 Phase 1 NEPA regulation (40 C.F.R. § 1502.9(d)(1)(ii)) required an SEIS for "*significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Similarly, the 2024 Phase 2 revision of 40 C.F.R. § 1502.9(d)(1)(ii) triggers the SEIS requirement when there are "*substantial* new circumstances or information about the significance of adverse effects that bear on the analysis."

[6] CEQ's interim final rule to remove the CEQ regulations implementing NEPA from the Code of Federal Regulations (40 C.F.R §§ 1500-1508) did not go into effect until April 11, 2025, after final licensing of this project.

# SUMMARY OF THE ARGUMENT

MARAD violated multiple statutory obligations when issuing the license to Delfin LNG without requiring an amended application or preparing a supplemental EIS. These failures contravened both the DWPA and NEPA, and rendered MARAD's actions arbitrary and capricious under the APA.

First, MARAD's failure to require an amended application and provide public notice and opportunities for engagement following Delfin's substantial project changes violated the DWPA's procedural requirements. By issuing a license based on outdated and materially incomplete information, and without holding the required public hearing, MARAD deprived Petitioners and other stakeholders of their statutory right to meaningfully participate in the licensing process.

Second, NEPA requires MARAD to prepare a supplemental EIS before issuing the final license. Delfin's significant project modifications as well as new circumstances and conditions surrounding the project that would likely result in increased impacts triggered NEPA's mandate for supplemental analysis.

Third, MARAD's unexplained reversal of its prior decision, denying the license and requiring Delfin LNG submit an amended application for review and public engagement, amounts to arbitrary and capricious decision-making. This

reversal violates both NEPA and the APA, and underscores the agency's departure from its statutory duties.

Finally, MARAD's violations were not harmless. By failing to require an amended application and complete a supplemental EIS, the agency excluded Petitioners and the public from the DWPA and NEPA processes, denying them a fair opportunity to evaluate and comment on Delfin's significantly modified project. Had the agency complied with the required statutory processes, different outcomes may have transpired. Thus, MARAD's errors fundamentally compromised the integrity of the licensing decision and warrant vacatur under the APA.

## STANDARD OF REVIEW

The APA, 5 U.S.C. § 500 et seq., governs the Court's review of MARAD's DWPA licensing decision, as well as the agency's deficient NEPA review, including failure to conduct a statutorily required supplemental analysis. A reviewing court "shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id*. § 706(2)(A); *see Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir. 1995). A decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action may also be held arbitrary and capricious when there is an unexplained inconsistency between agency actions. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009). Deference is due only when the agency can "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018).

A Court is authorized "to reverse an agency's action" if it "fail[s] to give a reasonable explanation for how it reached its decision." *Texas Office of Pub. Util. Couns. v. FCC,* 183 F.3d 393, 410 (5th Cir. 1999); *see* 5 U.S.C. § 706(2)(A) (1994).

## ARGUMENT

### I.    Petitioners Have Standing

Petitioners are membership organizations with standing to bring this case. An organization has standing to bring an action on behalf of its members when: (1) its members have standing in their own right; (2) the interests which the organization seeks to protect in the lawsuit are germane to the organization's purpose; and (3)

neither the claim asserted, nor the relief requested requires members' individual participation in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000); *see also Citizens for Clean Air v. United States DOT*, 98 F.4th 178, 187 (5th Cir. 2024) (finding standing on the basis of a procedural deprivation in approval of fossil fuel export project that could cause harm to concrete interests).

Petitioners satisfy all three requirements. Regarding the second criteria, Petitioner groups are all nonprofit organizations with environmental missions and conservation missions. Allaire Decl. ¶ 7; Hughes Decl. ¶¶ 2, 3, 5; LeJuine Decl. ¶ 3; Monsell Decl. ¶¶ 3-4; Rice Decl. ¶ 2. Petitioners seek to safeguard their members' interests in protecting the environment, including wildlife, air and water quality. Petitioners also satisfy the third criteria because the Court's determination whether MARAD's decision to license Delfin LNG violates applicable law does not require individual participation of Petitioners' members. *See also Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *UAW v. Brock*, 477 U.S. 274, 287-88 (1986) (associational standing satisfied where statutory requirements do not require evaluation of "unique facts" personal to union members).

On the first requirement, members have standing to sue in their own right if they have suffered "an 'injury in fact' that is (a) concrete and particularized and (b)

actual or imminent, not conjectural or hypothetical…." *See Laidlaw Envt'l Servs.*, 528 U.S. at 180-81. These injuries must be "fairly traceable to the challenged action of the defendant; and … it is likely, as opposed to merely speculative, that the [injuries] will be redressed by a favorable decision." *Id*.

Petitioners' members have suffered injury-in-fact. MARAD's decision to license Delfin's construction and operation, in violation of DWPA procedure and by failing to satisfy the NEPA requirement to conduct supplemental environmental review and provide opportunities for public comment, directly harms Petitioners' members' concrete interests. Petitioners' members live, work, and recreate in and near areas that will be impacted by the Project, including near the onshore compressor station and within Gulf waters. Allaire Decl. ¶¶ 3, 11, 16, 17, 20; LeJuine Decl. ¶¶ 2, 5, 10. Petitioners' members regularly use the area for fishing, hunting, birdwatching, and other outdoor recreational activities. Allaire Decl. ¶¶ 4, 5, 16, 20-21; LeJuine Decl. ¶ 5.

Delfin's air pollution emissions will reduce members' use and enjoyment of their property and the surrounding areas, further diminishing Petitioners' members' quality of life and enjoyment of the area for decades. Allaire Decl. ¶¶ 6, 14, 18, 19. Members are concerned about Delfin's air pollution emissions that will further compromise the area's existing impaired air quality and cause adverse health impacts. *Id*. Delfin LNG's onshore infrastructure will contribute to the region's

existing air pollution problems by contributing to exceedances of the 1-hour

Nitrogen Oxide ("NO2") National Ambient Air Quality Standards ("NAAQS").

MARAD_AR_003832-003838.

Petitioners' members also have concrete interests in numerous species that

Delfin will impact, including the critically endangered Rice's whale, the threatened

Eastern Black Rail, threatened and endangered sea turtles, and shrimp and

commercial fish in the region. Allaire Decl. ¶¶ 11, 16, 21; LeJuine Decl. ¶¶ 5, 8,

11, 12; Rice Decl. ¶¶ 24, 30. Construction and operation of the offshore Delfin

LNG facilities will have impacts to commercial fishing. MARAD_AR_003382.

Impacts from increased vessel traffic, will directly harm marine species, and could

cause extinction level harm to the Rice's whale, a critically endangered species with

a population of less than 50 individuals exclusively inhabiting Gulf waters. Rice

Decl. ¶¶ 24-25, 32. Newly published studies documenting Rice's whale

occurrences near Delfin's offshore platform demonstrate that Project impacts will

further aggravate members' scientific and career interests. Rice Decl.¶¶ 26, 30, 32.

The scientific and professional interests of Petitioners' members will suffer

significant, direct harm as a result of species' injury. Rice Decl. ¶¶ 30, 33.

Petitioners' members also will suffer due to potential impacts on the commercial

fishing industry. LeJuine Decl. ¶¶ 5, 8, 9, 11.

MARAD's failure to notify the public about project changes that required an amended application for Delfin, and afford opportunities for public participation, including public comment and hearings, deprived members' the ability to review and weigh in on the substantially modified project with concerns and expertise that could have led to additional mitigation and/or different outcomes and decision-making. Allaire Decl. ¶¶ 14, 15; LeJuine Decl. ¶¶ 4, 6, 7, Rice Decl. ¶¶ 32-35. In addition to substantial project changes, during the ten years that have passed since Delfin LNG submitted its initial application, circumstances surrounding the Project changed, including new proposals and permitting of several additional projects in the Gulf region, further burdening members' quality of life and interests. Allaire Decl. ¶¶ 12, 19. Recently published climate change research demonstrates the increasing harms on members' communities and livelihoods from continued fossil fuel dependence that Delfin would directly induce. Allaire Decl. ¶ 18. Additionally, new information and research on the Rice's whale has been published that reveals that the species' range extends far beyond the zone in which it was originally thought to inhabit. And, species' habits and behaviors will be directly and indirectly impacted by underwater noise from fossil fuel development activities like pile driving and vessel transit which would be generated by Delfin LNG. Rice Decl. ¶¶ 26, 28, 29. Members have been unable to ascertain Delfin's true impacts

as a result of these unaccounted for project modifications and changed circumstances. LeJuine Decl. ¶ 11; Rice Decl. ¶¶ 32-35.

Petitioners' members' injuries would be redressed by vacating MARAD's decision to license Delfin, compelling the company to file an amended application and the agency to complete a supplemental environmental impact analyses and provide opportunities for public review and input pursuant to the DWPA and NEPA. A revised analysis could lead to improved mitigation and/or a different outcome for Delfin LNG's license that would reduce or prevent the above injuries from occurring. *Save Our Cmty. v. EPA*, 971 F.2d 1155, 1161 (5th Cir. 1992).

## II.  MARAD's Approval of the Delfin License Violated the Deepwater Port Act and Administrative Procedure Act

MARAD's approval of the Delfin LNG deepwater port license violated the explicit procedural requirements of the DWPA in several ways. First, MARAD failed to require a complete amended application and publish such application in the Federal Register for review and public comment. Second, MARAD failed to conduct review of the statutorily required environmental criteria of the Delfin project as licensed. These failures not only constitute arbitrary and capricious decision-making, but also deprived Petitioners and the public of their right to participate in the review and approval process for this project, which harms Petitioners and their members.

## A. MARAD's Failure to Require an Amended Application Violated Procedural Requirements Under the DWPA and Was Arbitrary and Capricious Under the APA

MARAD violated the DWPA by failing to require Delfin to submit an amended application following significant changes to the proposed project. The DWPA establishes a mandatory, multi-step process for the review of deepwater port license applications. That process begins only when the Secretary deems the application complete and publishes it in the Federal Register, and it concludes with the issuance of a ROD within 90 days after the final public hearing. *See* 33 U.S.C. § 1504(i)(4)(A). These procedural requirements are not optional and serve to promote public participation in the agency decision-making process. 33 U.S.C § 1504(g), 33 C.F.R. § 148.222.

In reviewing agency action, courts are tasked with determining whether the agency conformed with controlling statutes. *Rest. L. Ctr. v. United States DOL*, 120 F.4th 163, 166 (2024) (Department's final rule was arbitrary and capricious because it did not conform with the clear statutory text of the Fair Labor Standards Act.). Agency action that fails to follow statutory requirements is arbitrary and capricious and must be set aside. *See*, e.g., *id*.; *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970–71 (10th Cir. 2016); *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1195 (8th Cir. 2001).

Here, both the statutory text and MARAD's own April 2024 decision denying a final license confirm that Delfin's modified project underwent substantial changes that triggered the obligation to submit an amended application. *See* 33 U.S.C. § 1504(c)(1)(B)(ii)(II)(bb); *see also* MARAD_AR_ 007344-007346, 007370. MARAD outlined in its April 2024 decision letter that the project had undergone significant changes in financing and ownership, including that Delfin's amended proposal would have "floating liquefied natural gas vessels (FLNGVs)…, which are critical to port operations, potentially owned, financed, and operated by third parties other than Delfin." The agency stated that this change was "a significant departure from what was contemplated in, and approved under, the ROD, and will require additional evaluation and consideration." MARAD_AR_007344. In fact, the project's initial "[d]ebt financing was from established sources including the Korea Development Bank, which had made a commitment of $1.5 billion. Enbridge, Inc. was also to serve as guarantor of Delfin's decommissioning obligations and was committed to guarantee the project's full decommissioning costs." MARAD_AR_007345. However, Enbridge and other affiliates identified in the application approved under the ROD "no longer appear[ed] to be actively involved in the equity financing". *Id*. The agency also stated that "[i]n addition to financing and ownership changes to the project, Delfin's project update proposed design changes to the mooring system, power

33

generation systems, and cooling systems" and "therefore require an updated environmental review, public engagement, and evaluation." *Id*.

The DWPA is explicit that a complete application includes proposed location, design components, and the financial and technical capabilities of the applicant among other things, 33 U.S.C. § 1504(c)(2),—factors that have changed since Delfin received its ROD in 2017. Thus, no further action should have been taken until a complete, amended application was submitted and published in the Federal Register for comment. *Id*. § 1504(c)(1)(B). Yet, despite the agency's own acknowledgment of this clear requirement, MARAD proceeded with licensing based on outdated application materials from nearly a decade ago, without requiring Delfin to submit a new or complete amended application that included statutorily required information to ensure sufficient project review.

This foundational procedural error led to a cascade of subsequent violations. The DWPA mandates that MARAD evaluate project-specific criteria in the ROD, including environmental impacts specific to the technological specifications, which must be made available for public review and comment. *See* 33 U.S.C. § 1505; 33 C.F.R. § 148.715, 148.207. Notably, MARAD's project review must, among other things, ensure that the project "applicant is financially responsible" to satisfy maximum liability requirements, and "has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent

or minimize adverse impact on the marine environment." 33 U.S.C. § 1503(c).While some of these criteria were assessed in the 2017 ROD addressing specifications reflected in the 2015 application, MARAD failed to reevaluate those criteria in light of the substantial technological modifications reflected in the agency's own 2024 correspondence with Delfin.

The DWPA requires MARAD to assess the environmental and operational impacts of the proposed project—not a project as it existed nearly ten years earlier. *See* 33 U.S.C. §§ 1504, 1505. As stated above, MARAD itself acknowledged in 2024 that the Delfin project recently licensed is materially different from the one originally proposed and evaluated in the 2017 ROD. MARAD_AR_007344-46. These changes may have direct implications for the project's impacts on marine life, air and water quality, navigational safety, and public health, among other factors considered in the FEIS and  that the agency must demonstrate are met in the ROD.

Congress's 2024 amendment to the DWPA for expedited review confirms the significance of these procedural safeguards. The amendment created a slightly expedited process for amended applications *only* when the Secretary of Transportation determines that the prior environmental review remains applicable and no new review is needed. 33 U.S.C. § 1504(i)(5)(C)(iii). But Delfin never submitted an amended application, and no such determination was made. On the

contrary, MARAD stated in its April 2024 letter that the changes to Delfin's project were substantial and would require not only an amended application but also additional environmental review and a new ROD. *See* MARAD_AR_007344-46. MARAD's decision to issue the license without that review violates the DWPA, both pre- and post-amendment for expedited consideration.

### B. MARAD's Procedural Errors Deprived the Petitioners of their Right to Participate in the Licensing Process

Moreover, by failing to conduct any supplemental review, MARAD deprived the public of its procedural right to participate in the licensing process. The DWPA mandates publication of new and amended applications in the Federal Register, solicitation of public comments, and holding public hearings. 33 U.S.C. §§ 1504(c), 1504(g), 1504(i)(4). None of these steps occurred. As outlined in MARAD's own April 2024 decision letter, the required amended application would have triggered a new public notice and comment period, culminating in a revised ROD based on updated public and agency input. MARAD_AR_007344-45. Petitioners had previously submitted detailed comments on the original 2015 Delfin application and the FEIS issued in 2016. Monsell Decl. ⁋ 11; MARAD_AR_004054-004087. Petitioners also informed MARAD of subsequent changed environmental and technical circumstances after the 2017 ROD issued. MARAD_AR_003582-003585; MARAD_AR_008964-009305; MARAD_AR_008259-008261. Likewise, Petitioners would have participated fully

in the review of an amended application disclosing and evaluating project modifications and other changed circumstances had they been afforded the opportunity. By failing to initiate that process, MARAD not only violated the DWPA but also prejudiced Petitioners' rights. 33 U.S.C. § 1504(g); 33 C.F.R. §§ 148.200, 148.207, 148.222.

In sum, MARAD's failure to require an amended application, publish it in the Federal Register, and conduct a full, updated review of the new proposal with opportunities for public participation violates the procedural mandates of the DWPA. Under the APA, agency action taken "without observance of procedure required by law," or that is "arbitrary [or] capricious," must be set aside. *See* 5 U.S.C. § 706(2)(A), (D). Because MARAD's licensing decision departed from binding statutory requirements and deprived the public of procedural protections, it is unlawful and must be vacated.

## III. NEPA Requires MARAD to Prepare a Supplemental EIS Before Issuing a Final License

MARAD violated NEPA and the DWPA by authorizing the deepwater port without preparing a supplemental EIS or other NEPA analysis in light of significant project changes and new circumstances that have occurred since the agency's initial review nearly a decade ago. DWPA project review procedures mandate compliance with NEPA to evaluate the effects of the deepwater port on the marine and land environments, human health, welfare, alternative uses of the oceans and

navigable waters, and other impacts deemed necessary or appropriate for consideration. 33 U.S.C. §§ 1504, 1505; 33 C.F.R. §§ 148.705, 148.707, 148.710, 147.715. Moreover, the DWPA and NEPA require supplemental review "if there is significant new information or circumstances relevant to environmental concerns and bearing on the deepwater port and related activities affecting its location site, construction, operation or decommissioning" 33 C.F.R. § 148.710(c); *and see* 40 C.F.R. § 1502.9(d) (2022). NEPA affords the public an opportunity for review and comment when any such project evaluation is completed, including supplemental review. 40 C.F.R. § 1502.9(d)(3) (2022).

Since its 2015 application submission, Delfin LNG has undergone significant structural and design modifications that could result in changed impacts on the marine and human environments. Additionally, numerous LNG and crude oil export projects have been approved, constructed and commenced operation since MARAD's 2016 project review and ROD. MARAD_AR_008969. Construction and operation of Delfin LNG, as a result of licensing, contribute to cumulative environmental effects resulting from new circumstances surrounding the project, all of which remain unevaluated. Moreover, since 2016, new studies and significant information regarding listed species and habitat that would be affected by Delfin LNG have been published, amplifying the need for further environmental review.

With no supplemental NEPA review and opportunity for public engagement since MARAD's 2016 project evaluation, MARAD's March 21, 2025 final licensing of Delfin LNG remains legally deficient, in violation of NEPA, and must be vacated.

### A. Delfin LNG's Significant Changes Proposed Since Completion of the 2016 FEIS Require Supplemental NEPA Review

MARAD failed to complete supplemental environmental review despite significant project changes triggering the agency's NEPA obligations. This was memorialized in MARAD's April 2024 letter denying Delfin LNG's request for a final license, and concluding "widespread changes were made to the project," including "design changes to the mooring system, power generation systems, and cooling systems" that "were not included in the Final Environmental Impact Statement." MARAD_AR_007344-45. MARAD determined that the changes required "[a] supplemental Environmental Assessment or Supplemental Environmental Impact Statement … made available to the public" for review, comment and a public hearing. *Id*. However, no amended application was formally submitted, and the supplemental review was never completed for MARAD's final licensing of Delfin LNG on March 21, 2025, pursuant to Executive Order 14,154. MARAD_AR_007376-007382. Notably, MARAD's NEPA duties pursuant to the DWPA and NEPA did not change or disappear as a result of Executive Order 14,154. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (an

executive order is valid only to the extent that it is consistent with a constitutional power or a congressional statute).

MARAD's final licensing failed to conduct any supplemental NEPA review, SEIS or otherwise. No such review was published in the project docket. Nor was the public notified of an amended application or afforded opportunities to review or comment on the project's design changes or MARAD's assessment of impacts and analytical methodologies used to evaluate the effects those changes would have on the marine environment, public health and welfare. No public hearing was held prior to licensing as promised. In fact, between MARAD's April 17, 2024 determination denying Delfin LNG a final license and requiring an amended application and supplemental NEPA review, and the project's March 21, 2025 final licensing date, the project docket remained devoid of any agency review or other assessment of changed impacts.[7]

Indeed, the design and system changes Delfin has proposed, and that MARAD had concluded warrant additional review, are precisely the type of project modifications and new information necessitating supplemental review under NEPA. 40 C.F.R. § 1502.9(d) (2022). Courts have long reinforced the need for supplemental NEPA review when significant changes occur in a project after initial

---

[7] Docket Documents, Deepwater Port License Application: Delfin LNG, LLC, Delfin LNG Deepwater Port, Docket ID USCG-2015-0472, Regulations.gov, https://www.regulations.gov/docket/USCG-2015-0472/document (last accessed Sept. 17, 2025).

review. Specifically, when changes to a project's scope or design are deemed substantial and environmentally significant, as is the case here.

MARAD_AR_007344-45 (mandating supplemental environmental review). *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989); *City of Port Isabel v. FERC*, 111 F.4th at 1207 (proposal to add carbon capture to project after initial EIS was significant new information requiring SEIS); *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996) (different configuration of project activities and locations not previously considered as a project alternative considered a substantial change that required an SEIS). In short, while "substantial change" is not explicitly defined by NEPA, projects with design changes not previously considered by prior NEPA review and that may have unevaluated environmental effects, require new and/or supplemental NEPA review.

Likewise, courts have affirmed that increased effects resulting from project modifications not previously considered within the project's initial NEPA review must be evaluated in supplemental analyses. Supplementation is required where new information demonstrates that a project "will affect the quality of the human environment … to a significant extent not already considered." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (cleaned up). New "circumstances or information" can be "significant" for purposes of 40 C.F.R. § 1502.9(d)(1)(ii) even if they do not demonstrate a new

significant "impact." *Id*. at 1058. *See also Sierra Club v. FERC*, 68 F.4th 630, 651 (D.C. Cir. 2023), *vacated as moot by* 2023 WL 5537562 (D.C. Cir.) (new information about the "nature" or the "extent" of impacts can trigger supplemental NEPA review obligations).

Here, the record shows Delfin's documents, filed after MARAD's 2024 denial, provide evidence that the project's design changes would have increased environmental harms. Specifically, project changes would increase $PM_{10}/PM_{2.5}$, $NO_X$, CO, and $CO_2$ emissions during construction of each mooring system. MARAD_AR_008205; MARAD_AR_008387. These pollutants compromise air quality and harm public health, causing asthma and other respiratory illnesses, decreased lung function, and cancers, among other health conditions.[8] Furthermore, design changes will result in increased pile driving intensity than originally proposed, which will result in noise propagation that will expand the project's zone of impact. MARAD_AR_008255. Increased noise can increase turbidity causing habitat avoidance, MARAD_AR_007803, as well as physical injury to fish and elasmobranchs, such as the giant manta ray. These effects alter species' behavior, impacting migration patterns, feeding, resting, and reproduction.

---

[8] *See, e.g.*, Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17,226, 17,240-244 (Apr. 18, 2018)

MARAD_AR_007738. At bottom, the Department's 2016 FEIS did not evaluate the increased environmental effects that the modified project will now generate.

NEPA mandates disclosure and evaluation of the Project's modifications and changed impacts prior to a final licensing decision, otherwise decision makers cannot possibly make an informed decision. *Methow Valley Citizens Council*, 490 U.S. at 349. In sum, MARAD's failure to comply with its NEPA obligations to complete supplemental review due to the project's significant modifications, renders the Project's final licensing legally deficient.

## B. New Significant Information and Circumstances Require MARAD to Prepare an SEIS

Significant new information and changed circumstances surrounding the project trigger supplemental NEPA review. New information is significant and requires a supplemental EIS if it "presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1051 (5th Cir. 1985) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 421 (7th Cir. 1984)).

Since the project's FEIS and ROD were issued in 2016 and 2017, the affected environment and circumstances surrounding the proposed project have changed. MARAD explicitly acknowledged the changed context in 2023 when it requested updated analyses from Delfin due to "potential changes to some resource areas and/or Federal agencies' methodologies for analyzing impacts."

43

MARAD_AR_005402. Since this project's FEIS and ROD were issued, upwards of four very large crude carriers (VLCCs) and seven LNG export terminals have been proposed, with several final permit applications imminently pending and multiple projects now under construction.[9] Each of these new facilities will increase the risk of environmental damages and harm to species due to air, noise, water pollution, and increased ship traffic that must be evaluated in conjunction with this project. The 2016 FEIS and 2017 ROD do not consider the cumulative impacts and aggregated effects of the *additional* large fossil fuel infrastructure projects within the Gulf of Mexico and along the Texas and Louisiana coasts adjacent to or overlapping with Delfin's operations and zone of impact. Nor does any subsequent analysis of these changed circumstances exist in the project's public docket.

---

[9] Additional LNG projects have been proposed and are in various stages of permitting and construction since the 2017 Delfin Record of Decision, including Commonwealth LNG (CP19-502), Port Fourchon LNG (PF17-9), Pointe LNG (PF18-8), Delta LNG (PF19-4), Port Arthur LNG Trains 3 & 4 (CP20-55), CP2 LNG (PF21-1), and West Delta LNG. Proposed deepwater VLCC oil export facilities along the Gulf Coast with pending applications include: Bluewater (1.92 million barrels per day (MMbbl/d) crude oil export capacity, sited approximately 15 miles off San Patricio County, Texas coast with Texas onshore components); GulfLink (1 MMbbl/d crude oil export capacity, sited approximately 30 miles off the Brazoria County, Texas coast with Texas onshore components); Sea Port Oil Terminal (SPOT) (2 MMbbl/d crude export capacity, sited approximately 30 miles off Freeport, Texas coast with Texas onshore components); and Blue Marlin (1.92 MMbbl/d crude oil export capacity, sited 99 miles off Cameron Parish, Louisiana coast with onshore components in Texas). MARAD_AR_008969.

Additionally, significant new information regarding the critically endangered Rice's whale (formerly identified as the Gulf of Mexico Bryde's whale) has come to light, including identification as a genetically distinct whale species with population numbers estimated below 50, that exclusively inhabit Gulf of Mexico waters. In 2019, the species received a federally endangered designation. Recent scientific studies also conclude that increased fossil fuel infrastructure represents the most significant threat to the species long-term existence, with the possibility of species' extinction resulting from even the loss of one whale. MARAD_AR_008968-69; MARAD_AR_008975-79; MARAD_AR_009168-009185

Indeed, these changed circumstances and new information present "a seriously different picture of the environmental landscape," thereby triggering supplemental NEPA review. *La. Wildlife Fed'n, Inc.*, 761 F.2d at 1051; *Friends of Cap. Crescent Trail,* 877 F.3d at 1060 (D.C. Cir. 2017) (cleaned up); *Stand Up for Cal.! v. DOI*, 994 F.3d 616, 629 (D.C. Cir. 2021). Importantly, Petitioners "need not show that the proposed project *will* have significant adverse impacts that the [the agency] has not considered. They must show only that the project *may* have such impacts" to warrant supplemental analysis. *La. Wildlife Fed'n, Inc.*, 761 F.2d at 1052. Here, Petitioners have identified numerous changes to the project's surrounding landscape and environmental circumstances since the project's initial

NEPA review and ROD. As such, these changes, taken individually or combined, warrant supplemental NEPA review.

### IV. MARAD's Unexplained Reversal of Position Is Arbitrary and Capricious

MARAD's reversal of its prior determination to deny Delfin LNG a final license based upon project changes, including design changes that would have environmental impacts, violates the APA and NEPA. Several Circuits, including this one, have established that unexplained inconsistencies between agency actions are reason for holding that a decision is arbitrary and capricious. *Fox Television Stations,* 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it is changing position. . . . [T]he agency must show that there are good reasons for the new [position]." (emphasis omitted) (citation omitted)); *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (agency action is arbitrary and capricious when it fails to "supply a reasoned analysis for any departure from other agency decision"). Likewise, NEPA mandates that an agency "identify any methodologies used and [ ] make explicit reference to the scientific and other sources relied upon for conclusions." 40 C.F.R. § 1502.23 (2022).

MARAD's April 2024 letter denying the Delfin LNG license plainly states that Delfin's modified project involved significant changes that require further agency and public consideration. Specifically, the letter stated "Delfin must update

the application to reflect the changes and submit an amended application for interagency review," and guaranteed that in accordance with the DWPA "[t]he public will be afforded an opportunity to comment on the supplemental EA or SEIS and the amended application." MARAD_AR_007345. Yet, in a complete about-face, MARAD issued Delfin LNG a final license in March 2025 absent any explanation or reasoning, ignoring its previous conclusion and unambiguous instruction to submit an amended application, complete environmental analysis of project changes and issue a new ROD.

An agency's reversal in position must be justified by the record. 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (cleaned up); *Univ. of Tex. M.D. Anderson Cancer Ctr. v. United States HHS*, 985 F.3d 472, 479 (5th Cir. 2021). Here, the changes to the project design and environmental impacts were never contemplated by the existing EIS or elsewhere in the public docket. MARAD's hollow licensing approval failed to disclose or explain any new analysis, data and methodology used to assess the updated project and upend its 2024 decision denying the license, in violation of NEPA. This omission deprived the public of the opportunity to comment on the agency's analytic process, not merely the result thereof. *See* 40 C.F.R. § 1502.23 (2022) (agencies "shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions" in an EIS). Indeed, the absence of an

explanation or record justification that project changes no longer warrant further review, and depriving public participation as promised in the most recent public docket entry, underscore the absence of transparency and procedural integrity by MARAD.

While agencies are permitted to change course, they are not permitted to do so arbitrarily. Any shift in position must be adequately supported by the record and must reflect a reasoned explanation that accounts for prior findings. *See* e.g. *Fox Television Stations, Inc.*, 556 U.S. at 515. MARAD's failure to acknowledge or explain its reversal is precisely the kind of unexplained inconsistency that courts have repeatedly found to be arbitrary and capricious under the APA. *Sierra Club v. United States EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (agency must engage in "reasoned decisionmaking," by "articulat[ing] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'"); *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023) (same). MARAD's failure to provide any reasoning to support its reversal thus renders the licensing decision unlawful.

## V.     MARAD's Failure to Prepare a Supplemental EIS Does Not Result in Harmless Error

MARAD's failure to follow DWPA and NEPA procedures cannot be dismissed as harmless error. Project changes and other circumstances surrounding the project, deemed significant or not, could have far reaching impacts that could

influence agency decisionmaking, ultimately leading to a different licensing determination and/or modified outcomes regarding mitigation and harm reduction. Public and cooperating agency comments can also influence agency decisionmaking and lead to different results.

Here, affording the public an opportunity to review and weigh-in on project modifications and associated impacts, as well as new and changed circumstances, could lead to additional harm mitigation, such as requirements for more stringent pollution reduction technology, implementation of air monitors for impacted onshore communities, and/or vessel traffic restrictions like speed limits that will lessen risk to federally protected species. No documentation exists on record of the Project's proposed changes since completion of the 2016 FEIS. Thus, MARAD deprived the public of the opportunity to review the changed impacts resulting from project modifications and other changed circumstances. MARAD also failed to provide the public with an explanation of its position reversal and the methodology it relied on to issue the license, *see supra* IV, after it had determined less than a year prior that the project changes warranted submission of an amended application, supplemental NEPA review and a new ROD. This information failure could have consequential effects on local communities and the decisions of affected residents directly impacting their health, welfare, and livelihoods. Indeed, these failures undermine NEPA's significant purpose of providing a springboard for

public comment, so that the public may "play a role in …. the decisionmaking process." *Methow Valley Citizens Council,* 490 U.S. at 349.

In sum, the absence of supplemental review does not amount to harmless error. MARAD's failure to complete a supplemental EIS for Delfin LNG violates NEPA's key purpose of informing the public and ensuring the agency executes informed decisionmaking that may ultimately lead to different outcomes, especially when, as here, significant project and contextual changes occur.

## VI. Remedy

Vacatur is the APA's presumptive remedy. 5 U.S.C. § 706(2)(A) (directing courts to "set aside agency action … found to be … not in accordance with law"); *See, e.g., Sw. Elect. Power Co. v. EPA,* 920 F.3d 999, 1022 (5th Cir. 2019); *See also Allied-Signal v. Nuclear Regulatory Comm'n,* 988 F.2d 146 (D.C. Cir. 1993) (setting out factors to determine appropriateness of vacatur). Vacatur also is appropriate applying the *Allied-Signal* factors.

First, MARAD's errors in issuing Delfin LNG's final license are "serious" because they stem from a lack of requisite analysis. *Id.* at 150. MARAD failed entirely to execute its DWPA and NEPA duties to review and analyze the effects of a significantly changed project, and failed to notify the public and afford participation opportunities including written comments and hearings. Indeed, these errors and omissions could have led to different outcomes. MARAD could

determine that the modified project lacks best available technology, 33 U.S.C. § 1503(c)(5), must include additional mitigation to protect species and prevent air quality degradation, and/or require implementation of other licensing conditions. By issuing a final license to Delfin LNG, MARAD contradicted its previous determination denying the project absent any explanation or justification. MARAD cannot simply fix these violations on remand with superficial explanation, and without substantive analyses requiring cooperative agency and public input.

Second, Delfin LNG has not raised any "disruptive consequences" of vacating the license, and requiring analysis of the changed project with public participation opportunities. Nor would vacatur cause harmful delay. In fact, as recently as June 2025, Delfin LNG requested an extension of two years to commence operations in 2031.[10] And the company has provided no evidence it intends to begin construction in the foreseeable future. Accordingly, presumptive vacatur applies.

## CONCLUSION

For the foregoing reasons, Petitioners request this Court vacate the Maritime Administration's licensing decision and Record of Decision for the construction and operation of the Delfin LNG export facility.

_____

[10] Delfin LNG LLC; Request for Amendment of Long-Term Authorizations To Export Liquefied Natural Gas and for Additional Extension of Time To Commence Exports, 90 Fed. Reg. 24,111 (June 6, 2025).

Respectfully submitted,

Lauren A. Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
*Counsel for Petitioner*
*Center for Biological Diversity*

Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
Sierra Club
650 38th St., Suite 103 W
Boulder, CO 80301
*Counsel for Petitioners Sierra*
*Club and Habitat Recovery Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2025, I electronically filed the

foregoing Initial Brief of Petitioners with the Clerk of the Court using the CM/ECF

system, which will send notice of such filing to all registered CM/ECF users.

/s/ *Lauren A. Parker*
Lauren A. Parker
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: 202-868-1008
lparker@biologicaldiversity.org

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains 9240 words excluding the parts of the brief exempted by Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

/s/ *Lauren A. Parker*
Lauren A. Parker
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: 202-868-1008
lparker@biologicaldiversity.org

*Counsel for Petitioners*

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I further hereby certify that in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.2.13 have been made, and (2) the electronic submission is an exact copy of the paper document.

/s/ *Lauren A. Parker*
Lauren A. Parker
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: 202-868-1008
lparker@biologicaldiversity.org

*Counsel for Petitioners*