**No. 25-60282**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; HABITAT
RECOVERY PROJECT,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED
STATES MARITIME ADMINISTRATION; CHARLES MAKINGS, Acting
Administrator U.S. Maritime Administration; SEAN DUFFY, Secretary, U.S.
Department of Transportation,
*Respondents*.

On Petition for Review of a License Issued by the Maritime Administration

**BRIEF FOR FEDERAL RESPONDENTS**

Of Counsel:
GREGORY ZERZAN
*General Counsel*
CHARLES E. ENLOE
*Assistant General Counsel*
PAULA LEE
*Senior Trial Attorney*
U.S. Dept. of Transportation

ELIZABETH O'CONNOR
*Chief Counsel*
AINSLEY Q. PARRISH
JOSEPH CLICK
*Trial Attorneys*
Maritime Administration

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
EZEKIEL PETERSON
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
rebecca.jaffe@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS

No. 25-60282

CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; HABITAT
RECOVERY PROJECT,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED
STATES MARITIME ADMINISTRATION; CHARLES MAKINGS, Acting
Administrator U.S. Maritime Administration; SEAN DUFFY, Secretary, U.S.
Department of Transportation,
*Respondents*.

Under Circuit Rule 28.2.1, Federal Respondents are governmental parties

that need not furnish a certificate of interested persons.

s/ *Rebecca Jaffe*
REBECCA JAFFE

Attorney of Record for Federal
Respondents

ii

## STATEMENT REGARDING ORAL ARGUMENT

Federal Respondents submit that oral argument would assist the Court in assessing the issues in the parties' briefs and the administrative record.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ................................................ iii

TABLE OF CONTENTS ...................................................................................... iv

TABLE OF AUTHORITIES ............................................................................... vii

PRIOR OR RELATED APPEALS ........................................................................ xi

GLOSSARY ........................................................................................................ xii

INTRODUCTION .................................................................................................. 1

STATEMENT OF JURISDICTION ....................................................................... 2

STATEMENT OF THE ISSUES ............................................................................ 3

STATEMENT OF THE CASE ............................................................................... 4

        A.     Statutory background ......................................................................... 4

               1.     Deepwater Port Act ............................................................... 4

               2.     National Environmental Policy Act ...................................... 5

        B.     Factual background ........................................................................... 7

               1.     Application and 2017 record of decision .............................. 7

               2.     Project changes after the record of decision ....................... 10

               3.     Subsequent analysis and 2025 issuance of the
                     license ................................................................................. 13

SUMMARY OF ARGUMENT ............................................................................. 15

STANDARD OF REVIEW .................................................................................. 18

ARGUMENT ...................................................................................................19

I.      Petitioners lack standing. ..................................................................19

        A.      Petitioners fail to show concrete, particularized injury........................20

                1.      Declarant Eddie LeJuine failed to show injury in
                        fact.................................................................................21

                2.      Declarants Roddy Hughes and Kristen Monsell
                        failed to show injury in fact. ......................................22

                3.      Declarant Aaron N. Rice failed to show injury in
                        fact.................................................................................23

                4.      Declarant John Allaire failed to show injury in
                        fact.................................................................................24

        B.      Petitioners' climate change allegations fail to establish
                causation or redressability. ...............................................................27

II.     MARAD complied with the Deepwater Port Act. ...........................28

        A.      MARAD completed the required Deepwater Port Act
                process before issuing the 2017 record of decision. ...........................28

                1.      The agencies provided ample public notice and
                        opportunities for public participation. ......................29

                2.      MARAD evaluated and satisfied the criteria under
                        the Deepwater Port Act in 2017................................32

        B.      MARAD evaluated the project changes before issuing the
                2025 license. ....................................................................................36

        C.      A second amended application was not required under
                the Deepwater Port Act. ...................................................................38

III.    MARAD reasonably concluded that supplemental NEPA
        analysis was not required.................................................................43

A.   The project changes reduced environmental impacts and did not require supplemental NEPA analysis........................................45

B.   MARAD considered updated information about listed species and consulted with the Fish and Wildlife Service and the National Marine Fisheries Service. ........................................49

C.   Other potential projects did not warrant supplemental NEPA analysis for this project. ...........................................54

IV.   MARAD did not change position and, even if it did, any change was reasonable. ...................................................................57

V.   The Court should deny the petition and, if not, should remand without vacatur. ..................................................................60

CONCLUSION.....................................................................................62

CERTIFICATE OF SERVICE .............................................................63

CERTIFICATE OF COMPLIANCE......................................................64

ADDENDUM ........................................................................................65

# TABLE OF AUTHORITIES

## Cases

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025) ........................................................ 6, 54

*Brennan v. Dickson*,
45 F.4th 48 (D.C. Cir. 2022) ................................................................. 42

*CBD v. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ............................................................... 27

*CBD v. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) ................................................ 24, 26, 27

*CBD v. EPA*,
937 F.3d 533 (5th Cir. 2019) ......................................... 21, 22, 23, 26

*Citizens for Clean Air v. USDOT*,
98 F.4th 178 (5th Cir. 2024) ........................................... 7, 19, 46

*El Puente v. USACE*,
100 F.4th 236 (D.C. Cir. 2024) ....................................... 57, 58

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................. 27

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) ........................................................ 58, 59, 60

*Gas Transmission Nw. v. FERC*,
157 F.4th 674 (5th Cir. 2025) ............................................ 54

*Gulf Restoration Network v. USDOT*,
452 F.3d 362 (5th Cir. 2006) .......................................... 18, 19

*Harrison Cnty. v. USACE*,
63 F.4th 458 (5th Cir. 2023) .......................................... 44

*Healthy Gulf v. Department of Interior,*
152 F.4th 180 (D.C. Cir. 2025)....................................................................21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020)....................................................................40

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)....................................................................41

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)............................................................... 21, 23

*Marsh v. Oregon Nat. Res. Council,*
490 U.S. 360 (1989)................................................................ 6, 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
463 U.S. 29 (1983)....................................................................19

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ....................................................54

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
605 U.S. 168 (2025)................ 6, 7, 19, 43, 44, 45, 46, 47, 48, 49, 54, 55, 56, 61

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality,*
968 F.3d 419 (5th Cir. 2020) ............................................. 19, 20, 25

*Sierra Club v. FERC,*
153 F.4th 1295 (D.C. Cir. 2025)............................................. 43, 55

*Spokeo v. Robins,*
578 U.S. 330 (2016)....................................................................20

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)....................................................................22

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
989 F.3d 368 (5th Cir. 2021) ....................................................61

*Texas Off. of Pub. Util. Couns. v. F.C.C.*,
  265 F.3d 313 (5th Cir. 2001) ..................................................................42

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ..................................................................61

*Washington Env't Council v. Bellon*,
  732 F.3d 1131 (9th Cir. 2013) ................................................................28

**Statutes**

5 U.S.C. § 706(2)(A)................................................................................18

16 U.S.C. § 1536(a)(2)............................................................................50

16 U.S.C. § 1536(d) ................................................................................50

33 U.S.C. § 1501......................................................................................4

33 U.S.C. § 1502(9)(A)............................................................................4

33 U.S.C. § 1503(b)(1).............................................................................4

33 U.S.C. § 1503(c) ...............................................................................38

33 U.S.C. § 1503(c)(1)-(9)................................................................ 5, 33

33 U.S.C. § 1503(c)(3)..............................................................................5

33 U.S.C. § 1503(c)(4)..............................................................................5

33 U.S.C. § 1504(c)(2)............................................................................41

33 U.S.C. § 1504(e)(2)..............................................................................5

33 U.S.C. § 1504(g) ........................................................................... 5, 29

33 U.S.C. § 1504(i)(1) ............................................................................31

33 U.S.C. § 1504(i)(4)(A)..........................................................................5

ix

33 U.S.C. § 1504(i)(5) ................................................................................ 39, 40

33 U.S.C. § 1504(i)(5)(B) ...................................................................................39

33 U.S.C. § 1504(i)(5)(C) ...................................................................................39

33 U.S.C. § 1504(i)(5)(D) ...................................................................................39

33 U.S.C. § 1508(b) .............................................................................................5

33 U.S.C. § 1508(b)(1)(C) ..................................................................................35

33 U.S.C. § 1513(b) ............................................................................................42

33 U.S.C. § 1516................................................................................ 2, 15, 32, 36, 60

42 U.S.C. § 4332(2)(C)........................................................................................6

## Regulations

33 C.F.R. § 148.276(c)..........................................................................................5

40 C.F.R. § 1502.23 ...........................................................................................59

40 C.F.R. § 1508.7 (1978) ..................................................................................55

49 C.F.R. § 1.93(h)(2)...........................................................................................5

50 C.F.R. § 402.13(c)..........................................................................................50

50 C.F.R. § 402.16(a)..................................................................................... 50, 52

*Removal of NEPA Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025) ........................................................................................ 56, 59

## PRIOR OR RELATED APPEALS

There are no prior or related appeals or petitions.

# GLOSSARY

| | |
|---|---|
| EIS | Environmental Impact Statement |
| LNG | Liquefied Natural Gas |
| MARAD | Maritime Administration |
| NEPA | National Environmental Policy Act |

**INTRODUCTION**

In 2017, the Maritime Administration (MARAD) issued a record of decision approving Intervenor Delfin's application for a deepwater port license. Delfin planned to build a deepwater port over 37 miles off the coast of Cameron Parish, Louisiana. The port would consist of floating vessels that would receive natural gas via pipeline, cool it to form liquefied natural gas (LNG), and then transfer it to LNG carriers for export. Before issuing the record of decision, MARAD published five Federal Register notices about Delfin's project, solicited public comments four times, and held six public hearings. It also analyzed the project's impacts under the National Environmental Policy Act (NEPA) by preparing an environmental impact statement (EIS) that was over 1,800 pages long, including attachments.

MARAD did not actually issue the license in 2017 because Delfin had to satisfy various conditions in the record of decision first. While Delfin was working to satisfy the conditions, it refined the project. It reduced the number of floating vessels, selected a better deepwater mooring system, and improved the vessels' design. In 2025, Delfin submitted—and MARAD considered—extensive information about the project modifications and the impacts of the refinements. MARAD reasonably concluded that Delfin's refinements largely reduced environmental impacts and further NEPA analysis was unnecessary. So MARAD issued Delfin's license.

Petitioners challenge MARAD's issuance of the license, raising claims under the Deepwater Port Act, NEPA, and the Administrative Procedure Act. The Court should dismiss the petition because Petitioners lack standing. They failed to show concrete injuries from Delfin's project or any geographic nexus to the project's locations. On the merits, Petitioners' claims fail. MARAD complied with the Deepwater Port Act. No provision of the Deepwater Port Act required MARAD to redo the extensive process that culminated in the 2017 record of decision. MARAD also was not required to supplement its EIS under NEPA because the project changes largely reduced impacts and because impacts from the changes fell within the EIS's analysis. Finally, MARAD's issuance of the license was consistent with its 2017 record of decision and did not represent an arbitrary change in position.

## STATEMENT OF JURISDICTION

Under the Deepwater Port Act, petitions challenging MARAD's decision to issue a license shall be brought within 60 days in the appeals court for the circuit within which the nearest adjacent coastal state is located. 33 U.S.C. § 1516. The adjacent coastal states are Texas and Louisiana, both within this Circuit. AR_5303. MARAD issued the license on March 21, 2025, and Petitioners filed suit on May 19, 2025.

2

The Court lacks jurisdiction because Petitioners have not established standing. *Infra* pp. 19-28.

## STATEMENT OF THE ISSUES

1.  Whether Petitioners lack standing because they fail to satisfy the geographic-nexus requirement, they fail to allege concrete injuries from Delfin's project, and their climate change allegations do not establish causation or redressability.

2.  Whether MARAD complied with the Deepwater Port Act when

(A) MARAD issued five Federal Register notices, solicited public comment four times, held six public hearings, and issued a detailed record of decision;

(B) MARAD evaluated the project changes before issuing the 2025 license; and

(C) no provision of the Deepwater Port Act required an amended application from Delfin.

3.  Whether MARAD reasonably concluded that supplemental NEPA analysis was not required when

(A) the project changes largely reduced environmental impacts from those analyzed in the EIS;

3

(B) MARAD analyzed impacts to threatened and endangered species under the Endangered Species Act; and

(C) no provision of NEPA requires MARAD to analyze cumulative impacts of other projects separate from "the proposed action."

4.      Whether MARAD's issuance of the license was consistent with the 2017 record of decision and did not represent a change in the agency's position, and whether, even if MARAD did change position, any change was reasonable.

## STATEMENT OF THE CASE

### A.      Statutory background[1]

### 1.      Deepwater Port Act

To "promote" oil and gas production, the Deepwater Port Act establishes procedures to authorize construction and operation of deepwater ports.  33 U.S.C. § 1501.  A deepwater port is "any fixed or floating manmade structure ... located beyond State seaward boundaries and ... used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas." *Id.* § 1502(9)(A).  "[O]n application," MARAD has authority to "issue a license for the ownership, construction, and operation of a deepwater port." *Id.* § 1503(b)(1). When Delfin applied for a deepwater port license, MARAD and the Coast Guard shared authority to process deepwater port applications.  49 C.F.R. § 1.93(h)(2).

---

[1] Pertinent statutes are in the Addendum.

MARAD "may issue a license" if nine conditions have been satisfied. 33 U.S.C. § 1503(c)(1)-(9). For example, MARAD must determine that the port "will be in the national interest" and "will not unreasonably interfere with international navigation." *Id.* § 1503(c)(3)-(4).

MARAD must provide public notice and hold public hearings. *Id.* § 1504(g). It must also solicit input on the application from adjacent coastal States, which can approve, disapprove, or approve with conditions. *Id.* § 1508(b). Other federal agencies with jurisdiction "over any aspect" of a deepwater port "shall review the application and, based upon legal considerations within [their] area[s] of responsibility, recommend ... approval or disapproval of the application." *Id.* § 1504(e)(2).

MARAD "shall approve or deny" any deepwater port application "not later than 90 days after the last public hearing." *Id.* § 1504(i)(4)(A). That approval or disapproval comes in the form of a record of decision. 33 C.F.R. § 148.276(c). "Actual issuance of a license may not take place until" the applicant has satisfied conditions in the record of decision. *Id.*

### 2. National Environmental Policy Act

NEPA directs federal government agencies to prepare an environmental report, called an EIS, for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA is a "purely

procedural statute" that "imposes no substantive environmental obligations or restrictions" and "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). "Under NEPA, an agency's only obligation is to prepare an adequate report." *Id.* at 180.

Just as importantly, "the central principle of judicial review in NEPA cases is deference." *Id.* at 179. As *Seven County* explains at length, "judicial deference in NEPA cases can take several forms," always keeping in mind that "Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects." *Id.* at 180, 184; *see also Appalachian Voices v. FERC*, 139 F.4th 903, 916 (D.C. Cir. 2025) (Henderson, J., concurring) (discussing the "national sclerosis" caused by misuse of NEPA).

In certain circumstances, an agency may "supplement" its EIS "[i]f there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (cleaned up). "But not all new information is significant*." Citizens for Clean Air v. USDOT,* 98 F.4th 178, 192 (5th Cir. 2024) (cleaned up). And "agencies"—not courts—"determine whether *and to what extent* to prepare an EIS based on the usefulness of any new

6

potential information to the decisionmaking process." *Seven Cnty.*, 605 U.S. at 181. "[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.*; *see also Citizens for Clean Air*, 98 F.4th at 192 ("[W]hen determining what information warrants EIS supplementation, courts generally defer to the agency's well-informed judgment.").

## B.    Factual background

### 1.    Application and 2017 record of decision

In May 2015, Delfin applied for a license for a deepwater port located on the outer continental shelf approximately 37.4 to 40.8 miles off the coast of Cameron Parish, Louisiana, in waters ranging from 64 to 72 feet deep. AR_5299; *see also* AR_131 (map). The port would consist of four floating vessels, an onshore metering facility, and pipelines. AR_5299-300.

The vessels, called floating LNG vessels, would be semi-permanently moored to four mooring systems that allow the vessels to turn based on weather conditions. These are called weathervaning tower-yoke mooring systems (it's a mouthful, we know). AR_5300, AR_8255. The image below shows a tower-yoke mooring system.



AR_2609.  The floating LNG vessels would be self-propelled and able to disconnect from the mooring systems and set sail to avoid hurricanes or facilitate inspections and maintenance.  AR_5301.  Each floating LNG vessel would be able to moor LNG carriers side-by-side and then transfer LNG to carriers through loading arms or cryogenic hoses.  AR_5301.

Delfin would build four lateral pipelines connecting each floating vessel to existing offshore pipelines to supply the port with gas.  AR_5301.  The lateral pipelines would connect to the existing pipelines 37.4 miles offshore and then would extend 6,400 feet to the floating vessels.  AR_5301, AR_8049.  After receiving gas from the lateral pipelines, the floating vessels would cool it to produce LNG.  AR_5301.

Delfin would also have an onshore facility in Cameron Parish, Louisiana, with natural gas compressor and metering stations. AR_5300. It would take approximately five years to build the port, lateral pipelines, and onshore facility. AR_5302.

The agencies identified Texas and Louisiana as the adjacent coastal states and advised those states' governors of their right to approve, disapprove, or approve with conditions Delfin's application. AR_5303. Neither governor responded so MARAD presumed they approved. AR_5303, 5317.

While evaluating Delfin's application, MARAD and the Coast Guard published five Federal Register notices about the project, held six public hearings in Texas and Louisiana, and solicited public comment four times. AR_5302-06; *Deepwater Port License Application: Delfin LNG,* 80 Fed. Reg. 42,162 (July 16, 2015); *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 45,270-02 (July 29, 2015); *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 80,455 (Dec. 24, 2015); *Deepwater Port License Application: Delfin LNG*, 81 Fed. Reg. 46,157-01 (July 15, 2016); *Delfin LNG Deepwater Port; Final Application Public Hearing and Final EIS*, 81 Fed. Reg. 85,678-01 (Nov. 28, 2016).

In 2016, the agencies prepared, under NEPA, an EIS that was over 1,800 pages long, including attachments. AR_3364-5257. The EIS examined potential impacts, including impacts to biological resources (such as marine mammals,

migratory birds, and fisheries), socioeconomics, transportation (such as vessel traffic and recreational boating), and air quality.  AR_3366-83.  And MARAD consulted under the Endangered Species Act with the Fish and Wildlife Service and the National Marine Fisheries Service, both of whom concluded that Delfin's project was unlikely to harm critical habitat or threatened or endangered species.  AR_4217-19, AR_5258-89, AR_5337-38.

In March 2017, MARAD issued a record of decision approving Delfin's application and authorizing issuance of a license to Delfin.  AR_5306-07.  Before MARAD could actually issue the license, Delfin had to satisfy various requirements, such as obtaining financing agreements and providing information about the nationalities of the officers and crew that would service the port.  AR_5324, AR_5357-58.

No one—including Petitioners—sued to challenge the 2017 record of decision.

### 2.    Project changes after the record of decision

After MARAD issued its record of decision, Delfin refined the project's design.  AR_5389.

Instead of the tower-yoke mooring systems that it originally planned to use, Delfin decided to use submerged swivel-yoke mooring systems.  AR_5391.  The image below shows a submerged swivel-yoke mooring system.



AR_7428.  With the tower-yoke mooring system that Delfin originally planned to use, key components are above the water; whereas with the submerged swivel-yoke system that Delfin later chose instead, key components are below the water. *Compare* AR_2609 (tower-yoke mooring system picture, also at p. 8 above) *with* AR_7428 (submerged swivel-yoke mooring system picture, also directly above).

The submerged swivel-yoke mooring system has advantages over the tower-yoke mooring system.  AR_5394.  Delfin could reconnect the vessels to the submerged system more quickly after leaving the area if hurricanes approached, and the submerged design would provide more protection for the mooring systems during hurricanes.  AR_5394.  The tower-yoke mooring system rests on four 78-inch thick pillars (called "piles") driven into the seabed; the submerged swivel-

yoke mooring system rests on three 96-inch thick piles.  AR_5394, AR_7312.  So there would be less seabed disturbance, shorter construction times, and reduced construction noise from driving three piles instead of four.  AR_5394, AR_7423.

In addition, after optimizing its design, Delfin needed to build only three (instead of four) floating LNG vessels to process the same amount of gas. AR_7399, AR_8210, AR_8263.  With one fewer vessel, Delfin would build one fewer mooring system and one fewer lateral pipeline to bring gas to the vessels. AR_8210, AR_8263.

Delfin also improved the floating LNG vessel design.  AR_5391-92.  For example, Delfin redesigned the cooling systems so that the vessels would no longer use seawater for cooling and would instead use air for cooling.  AR_7425.  Using air instead of seawater meant that Delfin would be able to avoid impacts from intaking seawater and discharging hot water.  AR_7430.

In addition, Delfin's financing changed.  The original proposal involved financing and guarantees from Enbridge Holdings LNG and Korea Development Bank.  AR_5322-25.  Delfin submitted a new financial plan that involved different entities, including Mitsui O.S.K. Lines, Ltd.  *E.g.,* AR_5686, AR_8219.

Notably, while the port design and financing evolved, the location and fundamental nature of the project—a deepwater port over 37 miles off the coast of

12

Cameron Parish, Louisiana that would receive gas by pipeline and cool it to LNG for export—did not change.

### 3.    Subsequent analysis and 2025 issuance of the license

Delfin, MARAD, and the Coast Guard had many exchanges regarding the analysis necessary to evaluate the project changes. *E.g.*, AR_5401-02; AR_5404-09. Delfin repeatedly provided more information. *E.g.*, AR_7312-33; AR_7395-96 (listing Delfin submissions).

In April 2024, MARAD sent Delfin a letter saying that it "will not issue a license at this time as the [record of decision] no longer supports the issuance of a license" and that Delfin should submit an amended application. AR_7344-45.

In January 2025, President Trump issued Executive Order 14154, *Unleashing American Energy,* encouraging energy production and referencing Delfin's project. AR_7376; *see also* AR_7380 (referencing deepwater port that had been approved in a record of decision but MARAD had not yet issued the license); AR_7388 (noting that Delfin's project is the only deepwater port project to which the Executive Order directly applied). The President directed MARAD to determine within 30 days whether Delfin's project changes after the 2017 record of decision "are likely to result in adverse environmental consequences that substantially differ from those associated with the originally-evaluated project so as to present a seriously different picture of the foreseeable adverse environmental

13

consequences." AR_7380. If MARAD determined that the project changes did not cause "seriously different consequences," the Executive Order directed MARAD to issue the license within 30 days. AR_7380.

In January 2025, after the Executive Order, Delfin submitted updated financial information and a detailed, updated assessment of potential environmental impacts. AR_7385-87; AR_7401-8120.

MARAD analyzed the updated information and, in February 2025, concluded that the project changes largely reduced environmental impacts. AR_8209-14; AR_8253-58. For example, reducing the number of floating LNG vessels from four to three would reduce impacts from construction and operations. AR_8211, AR_8255. Switching from tower-yoke mooring systems with four 78-inch piles each to submerged swivel-yoke mooring systems with three 96-inch piles each would increase the intensity needed to drive each pile into the seabed (given the thicker piles) but decrease the duration of pile driving (given the smaller number of piles). AR_8211, AR_8255. Since Delfin eliminated one floating LNG vessel and changed the mooring system, the total number of piles to be driven into the seabed decreased from sixteen to nine, which would reduce environmental impacts such as noise and sedimentation. AR_8255-56. MARAD concluded that the modified project did not involve seriously different environmental impacts from those considered in the EIS. AR_8258, AR_8268.

The Coast Guard also reviewed the project changes, focusing on safety, navigation, design, construction, and operations.  AR_5684.  It said the changes "generally appear[ed] to have reduced scope and size, as well as reduc[ing] [] construction and decommissioning activities."  AR_5684; *see also* AR_7250-51.  Since the EIS "evaluated larger, more robust systems," the Coast Guard "expect[ed] lesser impact based on these proposed changes."  AR_5684; *see also* AR_8248-51.

In March 2025, MARAD issued Delfin's deepwater port license.  AR_9347-400.  In May 2025, Petitioners brought suit under the Deepwater Port Act's judicial review provision, 33 U.S.C. § 1516, to challenge the license.  Dkt. No. 1-1.  In essence, Petitioners contend that MARAD violated the Deepwater Port Act, NEPA, and the Administrative Procedure Act because they claim that, before issuing the license in 2025, MARAD had to redo the extensive public participation, decision-making, consultation, and NEPA processes that supported its 2017 record of decision.

## SUMMARY OF ARGUMENT

1.      Petitioners have failed to establish standing and, thus, the Court should dismiss their petition.  None of the declarants showed any concrete, particularized injury from or geographic nexus to Delfin's project.  Declarant Eddie LeJuine—the only declarant who alleged any offshore activities—fishes

twenty to thirty miles offshore, which is at least 7.4 miles away from Delfin's offshore location.  He failed to allege any geographic connection to Delfin's facilities.  Declarants Roddy Hughes and Kristen Monsell did not allege any personal impacts from the project, instead describing only how their organizations' members have interests in the Gulf region that Delfin's project would allegedly disrupt.  Declarant Aaron N. Rice described his personal and professional interests in the Rice's whale, but failed to allege that he has been in the past or intends in the future to visit the project locations.  And declarant John Allaire complains about other LNG projects in the region, but fails to allege any specific harms from Delfin's facilities.  Petitioners also allege that Delfin's project may increase greenhouse gas emissions.  But generalized allegations about climate change are too attenuated to establish causation and redressability.

2.     MARAD complied with the Deepwater Port Act.  The Act requires MARAD to provide public notice and public hearings.  MARAD satisfied that requirement by publishing five Federal Register notices about Delfin's project, soliciting public comments four times, holding six public hearings, and maintaining a public docket with information about Delfin's project.  The Act also requires MARAD to determine that nine criteria have been satisfied.  MARAD addressed the required criteria in a detailed record of decision in 2017.  In 2025, it evaluated the changes in the project and determined that Delfin had largely

reduced impacts. Petitioners assert that MARAD erred by not requiring Delfin to submit an amended application, but no provision of the Deepwater Port Act requires amended applications. And, here, the modified project is fundamentally the same project that MARAD approved in 2017.

      3.     MARAD reasonably concluded that it did not need to prepare supplemental NEPA analysis. Supplemental NEPA analysis is required only when new information shows that the remaining action will have significant effects that the agency has not already considered to a significant extent. MARAD is entitled to deference in making those determinations. MARAD reasonably determined that it had sufficient information to analyze the project changes, the changes largely reduced environmental impacts, and impacts from the changes fell within the impacts analyzed in the EIS. As to its NEPA analysis of the potential impacts on listed species, MARAD reasonably relied on its consultations with the Fish and Wildlife Service and the National Marine Fisheries Service under the Endangered Species Act.

      Finally, MARAD did not need to prepare supplemental NEPA analysis based on other projects in the region. The textually mandated focus of NEPA is the proposed action, not other projects. MARAD analyzed the cumulative impacts of other projects in the EIS. Under NEPA's text and the Supreme Court's recent

17

decision in *Seven County*, MARAD had no obligation to analyze cumulative impacts again in 2025.

4.      MARAD issued a record of decision in 2017 approving Delfin's application and its issuance of Delfin's license in 2025 was consistent with that 2017 decision.  MARAD made no change in position to which the change-in-position doctrine applies.  Petitioners emphasize a letter that MARAD sent Delfin in 2024 saying that it would not issue a license "at this time" and that Delfin should submit an amended application.  That letter was correspondence—not a formal, final position to which the change-in-position doctrine applies.  Even if MARAD did change position from its 2024 letter, it satisfied the change-in-position requirements by displaying awareness that it was changing course from the 2024 letter and explaining its decision in memoranda describing and analyzing the impacts of the project changes.

**STANDARD OF REVIEW**

The Court reviews agency action under the Deepwater Port Act under the "highly deferential" standard of the Administrative Procedure Act.  *Gulf Restoration Network v. USDOT*, 452 F.3d 362, 368 (5th Cir. 2006).  Under that standard, courts overturn agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* (quoting 5 U.S.C. § 706(2)(A)); *see also Citizens for Clean Air*, 98 F.4th at 185.  "An arbitrary or

18

capricious action is one that relies on improper factors, fails to consider key information, offers a decision that the record does not support, or lacks plausibility." *Id.* at 190. This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Court reviews the agency's decision "not as a chemist, biologist, or statistician ... but as a reviewing court exercising [a] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Gulf Restoration Network,* 452 F.3d at 368 (cleaned up); *see also Seven County*, 605 U.S. at 182 ("Black-letter administrative law instructs that when an agency makes ... speculative assessments or predictive or scientific judgments, ... a reviewing court must be at its most deferential." (cleaned up)).

**ARGUMENT**

## I.    Petitioners lack standing.

The Court should dismiss the petition because Petitioners failed to establish standing. A petitioner who seeks judicial review of agency action "bears the burden of establishing" Article III standing. *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020) (cleaned up). The elements of standing are "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the respondent, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 424.

To establish an injury in fact, Petitioners must show an "invasion of a legally protected interest" that is both "concrete and particularized" and also "actual or imminent, not conjectural or hypothetical." *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). The Court "do[es] not recognize the concept of probabilistic standing based on a non-particularized increased risk—that is, an increased risk that equally affects the general public." *Shrimpers & Fishermen of RGV*, 968 F.3d at 424 (cleaned up).

Because Petitioners Center for Biological Diversity, Sierra Club, and Habitat Recovery Project are membership organizations, they must establish associational standing by showing, inter alia, that their members would independently have Article III standing to sue. *Id.* They have not met this burden.

Petitioners' members failed to show injury in fact, and they failed to establish causation or redressability for their climate change allegations.

**A.     Petitioners fail to show concrete, particularized injury.**

Petitioners submitted five declarations—none of which shows the concrete, particularized injury required to establish standing. The declarants have extensive complaints about fossil fuel development in the region, but they do not tie Delfin's project to any specific harm. "In environmental cases, courts must carefully distinguish between injury to the petitioner and injury to the environment. Article

20

III standing requires injury to the petitioner.  Injury to the environment is insufficient."  *CBD v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019).

### 1.    Declarant Eddie LeJuine failed to show injury in fact.

Declarant Eddie LeJuine, a member of the Habitat Recovery Project, shows no geographic connection to Delfin's facilities.  He says that he occasionally fishes "upwards of 20-30 miles offshore."  Dkt. No. 39 at 18-19.  LeJuine does not allege that he fishes anywhere near Delfin's offshore location, which is 37.4 to 40.8 miles off the coast of Cameron Parish, Louisiana, AR_5299—at least 7.4 miles farther offshore than he alleges that he fishes, Dkt. No. 39 at 18.  He complains that underwater pipelines scare fish and may leak, but he does not allege that he fishes where Delfin's pipelines will be.  *Id.* at 20.  "[A] plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly in the vicinity of it."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565-66 (1992) (cleaned up).

In *Healthy Gulf v. Department of Interior*, the D.C. Circuit held that petitioners had standing because the declarant "identifie[d] specific" locations in the Gulf covered by the agency action and, if the action proceeded, it would harm "his favored fishing and recreating spots."  152 F.4th 180, 190 (D.C. Cir. 2025).  LeJuine made no such showing here.  He failed to show that he "plan[s] to make use of the specific site[] upon which [the] project[] may take place."  *Summers v.*

*Earth Island Inst.*, 555 U.S. 488, 499 (2009).  He "ha[s] not pointed to the specific locations of the relevant facilities."  *CBD v. EPA*, 937 F.3d at 539.

LeJuine also complains about LNG export projects generally and having to avoid LNG vessels, Dkt. No. 39 at 18-20, but Delfin's port will receive gas by pipeline and LNG carriers will load and depart from the port, AR_5300-01—again, at least 7.4 miles farther offshore than he fishes.  LeJuine "plainly fail[s] to satisfy the geographic-nexus requirement."  *CBD v. EPA*, 937 F.3d at 538.

### 2.      Declarants Roddy Hughes and Kristen Monsell failed to show injury in fact.

Declarants Roddy Hughes, a Sierra Club field organizer, and Kristen Monsell, the Center for Biological Diversity's litigation director, do not allege that they will be personally impacted—in any way—by Delfin's project.  They say only that their organizations' memberships include people who are "subject to the adverse impacts" from the project and that the project would interfere with members' "use and enjoyment" of the area's natural resources.  Dkt. No. 39 at 13-14; *see also id.* at 28 (Members recreate "in and near the Gulf" and "have interests in the water quality, air quality, and health of the Gulf ecosystem.").  Even if Hughes and Monsell were describing their own alleged harms (they are not), these generalized complaints about impacts to the Gulf region would be insufficient to establish standing.  "[P]etitioners cannot simply assert some interest somewhere within a large geographic area."  *CBD v. EPA*, 937 F.3d at 538.

### 3. Declarant Aaron N. Rice failed to show injury in fact.

Declarant Aaron N. Rice, a Sierra Club member, describes his scientific research about marine mammals, including Rice's whales, Dkt. No. 39 at 31-56, but he fails to allege any specific, concrete impacts to him from Delfin's project. The "injury in fact test ... requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (cleaned up). Rice has not satisfied this burden. Rice says that Delfin's project could harm the Rice's whale and such impacts "will directly threaten [his] professional and career interests, as well as [his] personal enjoyment of the species." Dkt. No. 39 at 52. But he does not allege that he has been to the area where Delfin's project will be located or that he intends to visit that area.

Even if Rice's declaration showed that the project would threaten the Rice's whale, "though that is questionable," his declaration "plainly contain[s] no facts, however, showing how damage to the species will produce imminent injury" to him specifically. *Lujan*, 504 U.S. at 564. "It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.* at 567.

23

### 4.    Declarant John Allaire failed to show injury in fact.

Finally, Declarant John Allaire, a Sierra Club member, says that "[t]he LNG terminal and extensive infrastructure buildout in the region has already had detrimental impacts on my life." Dkt. No. 39 at 3. Allaire lives "roughly 17 miles" from the proposed Delfin onshore facility. *Id.* at 5. He is concerned that the "cumulative impacts" of Delfin and the other LNG projects in the region "will have adverse impacts to [his] health, property, and the many species onshore and offshore that [he] enjoy[s] observing." *Id.* at 6. But Allaire does not allege any particularized, concrete harm from Delfin's project.

Allaire says that Delfin's onshore facility will affect his commute, but he fails to describe how, saying only that he "drive[s] by the location of the proposed onshore facility" every two weeks. *Id.* at 7-8. The D.C. Circuit noted in a case challenging drilling permits that plaintiffs could have established standing if they "trace[d] new wells to visible blight by alleging that the size of the typical drilling apparatus and the sightlines around identified groups of permitted drill sites ma[d]e them visible to at least one of the Plaintiffs from the roads or other locations where they travel, live, or visit." *CBD v. Dep't of Interior*, 144 F.4th 296, 309 (D.C. Cir. 2025). The plaintiffs in that case failed to present sufficient allegations to establish standing, *id.*, and Allaire similarly failed to establish standing by failing to allege any specific harm from Delfin's onshore facility, Dkt. No. 39 at 7-8. In any event,

24

Delfin's onshore facility will have only compressor and metering stations, with no drilling or liquefaction apparatus, AR_5300.

Allaire expresses concern about adverse health impacts "from air pollution from Delfin LNG," referencing both facility emissions and vessels. Dkt. No. 39 at 8. But he does not specify how far emissions might travel, *id.* at 8, a notable omission given that the port will be at least 37.4 miles offshore, AR_5299. And this Court has rejected standing based on "elevated risks of harm" from an LNG facility's air emissions, saying that "[e]ven if we charitably construe this argument as claiming that individuals living, working, and driving within a roughly fourteen-mile radius of the proposed facility (i.e., Petitioners' members) will suffer an increased risk of harm ..., these claims are too generalized and Petitioners have not produced enough evidence to show an actual or imminent harm." *Shrimpers & Fishermen of RGV*, 968 F.3d at 425. "Even if Petitioners' members did identify specific risks, there is no evidence of the extent to which those risks would be increased for those members by the expected emissions." *Id.* This reasoning controls here.

Allaire expresses concerns about noise and light pollution, saying that a different, onshore LNG facility has lit up the sky near his property, and that Delfin's facility will exacerbate noise, smoke, and light pollution, thus impacting birds and animals that inhabit the area and visit his property. Dkt. No. 39 at 9. But

25

Allaire lives "roughly 17 miles" from the onshore facility, *id.* at 5, and the port will be 37.4 to 40.8 miles off the coast, AR_5299. He does not explain how Delfin's facilities will specifically affect him—particularly given the distances between the facilities and his home. Allaire fails to "describe the geographic reach" of Delfin's project's alleged "contribution to the various types of harmful effects" that Allaire ascribes to LNG facilities. *CBD v. Dep't of Interior*, 144 F.4th at 308-09. "Without such information as to the ambit of any of the asserted effects," Petitioners lack standing. *Id.*

Allaire says that Delfin's onshore facility will "be located near" the Sabine National Wildlife Refuge, which he visits several times a year. Dkt. No. 39 at 7. In fact, the Sabine National Wildlife Refuge is 4.9 miles from Delfin's onshore facility. AR_3603. Allaire speculates—without any specifics—that lighting and noise from Delfin's project "may" impact the eastern black rail's migration and use of the region, which would harm him. Dkt. No. 39 at 7. "Article III demands more than such conclusory assertions." *CBD v. EPA*, 937 F.3d at 545. And Louisiana is not known to support a breeding eastern black rail population; the birds are rare in Louisiana and unlikely to be near Delfin's onshore facilities. AR_7017. Allaire's allegations are too vague; he has not shown that Delfin's facilities will cause him concrete harm.

26

**B.    Petitioners' climate change allegations fail to establish causation or redressability.**

Petitioners complain generally that the project "will contribute to climate change" by increasing greenhouse gas emissions, and, thus, worsening hurricanes and increasing sea level rise.  Dkt. No. 39 at 8, 15, 29.  These allegations are "too generalized to establish standing" because "climate change is a harm that is shared by humanity at large, and the redress that Petitioners seek—to prevent an increase in global temperature—is not focused any more on these petitioners than it is on the remainder of the world's population."  *CBD v. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009).

Even if Petitioners' generalized, vague allegations were sufficient to establish injury in fact (they are not), they are too attenuated to establish causation.  "Given that climate change results from the combined effects of greenhouse gas emissions around the globe, plaintiffs resting on injury from climate change must also allege that their personal injury is traceable to the challenged action."  *CBD v. Dep't of Interior*, 144 F.4th at 314.  The causation requirement "rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).  "[S]imply saying that" greenhouse gas emissions from one project contribute "in some undefined way and to some undefined degree" to hurricanes and sea level

27

rise "relies on an attenuated chain of conjecture insufficient to support standing." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1143 (9th Cir. 2013) (cleaned up).

For the same reasons, Petitioners' climate change allegations also do not meet the redressability requirement. Climate change "is not a localized problem endemic" only to the Gulf, but rather it is "a global occurrence." *Id.* at 1147. Petitioners have not shown that their requested relief (vacatur of Delfin's license and record of decision) will redress their alleged climate change injuries. *See* Br. 51.

## II.    MARAD complied with the Deepwater Port Act.

MARAD complied with the Deepwater Port Act before issuing its record of decision in 2017. Petitioners claim that MARAD failed to satisfy the Deepwater Port Act and that MARAD should have required Delfin to submit an amended application. Br. 32-37. But their argument ignores the record—both before and after the 2017 record of decision—and the statutory text, which does not require amended applications.

### A.    MARAD completed the required Deepwater Port Act process before issuing the 2017 record of decision.

The Deepwater Port Act prescribes a series of steps that MARAD must take before issuing a license, and MARAD took all required steps before issuing the 2017 record of decision. MARAD and the Coast Guard provided ample public

28

notice and opportunities for public participation through five Federal Register notices, four solicitations for public comment, and six public hearings. Then, MARAD issued a 68-page record of decision where it evaluated the required criteria under the Deepwater Port Act and explained its decision to approve Delfin's application.

### 1. The agencies provided ample public notice and opportunities for public participation.

Petitioners complain that MARAD "deprived the public of its procedural right to participate in the licensing process," but they ignore the myriad public participation opportunities that MARAD provided. Br. 36. Before issuing a license, MARAD must provide "public notice and public hearings." 33 U.S.C. § 1504(g). It satisfied this requirement by publishing five Federal Register notices, soliciting public comments four times, holding six public hearings, and maintaining a public docket with information about the project.

After Delfin submitted its application in June 2015, MARAD and the Coast Guard established a public docket (available at https://www.regulations.gov/docket/USCG-2015-0472) and posted Delfin's application on the docket. AR_5297. Then, in July 2015, the agencies published notice in the Federal Register that they had received Delfin's application, and that the application was available for review on the public docket. *Deepwater Port License Application: Delfin LNG,* 80 Fed. Reg. 42,162 (July 16, 2015).

29

Two weeks later, the agencies published a notice of intent to prepare an EIS under NEPA, announced upcoming public hearings, and solicited public comments. *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 45,270-02 (July 29, 2015). The agencies then held public hearings in Lake Charles, Louisiana, and Beaumont, Texas in August 2015. AR_5304. They published transcripts of those hearings on the public docket. AR_5304.

In 2015, Delfin amended its application (to modify some characteristics of the floating LNG vessels), and MARAD and the Coast Guard published another Federal Register notice in December 2015 to notify the public about the amended application. *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 80,455 (Dec. 24, 2015). The agencies again solicited public comment. *Id.*

In July 2016, the agencies published notice in the Federal Register that the draft EIS was available and solicited public comments, either in writing or at upcoming public hearings. *Deepwater Port License Application: Delfin LNG*, 81 Fed. Reg. 46,157-01 (July 15, 2016). The agencies held public hearings in Cameron, Louisiana, and Beaumont, Texas, in August 2016. AR_5305. The agencies placed the draft EIS and the transcripts of the August 2016 public hearings on the public docket. AR_5305. The public, including Petitioner Center for Biological Diversity, submitted five written comments during the comment

period. MARAD responded to the comments in an appendix to the EIS and also in the record of decision. AR_4054-87, AR_5305, AR_5308.

In November 2016, the agencies issued a fifth Federal Register notice about Delfin's project. *Delfin LNG Deepwater Port; Final Application Public Hearing and Final EIS*, 81 Fed. Reg. 85,678-01 (Nov. 28, 2016). They announced final public hearings, provided notice that the final EIS was available, and again solicited public comments. *Id.* They held two public hearings in Cameron, Louisiana, and Beaumont, Texas, in December 2016. AR_5305. The agencies published the transcripts of those hearings on the public docket. AR_5306. Aside from the public hearings, the agencies also received and reviewed one comment. AR_5306.

MARAD must approve or deny an application for a deepwater port license no later than 90 days after the last public hearing. 33 U.S.C. § 1504(i)(1). The last hearing was in December 2016, and, in March 2017, MARAD issued its record of decision approving Delfin's application. AR_5292, AR_5306.

These facts—five Federal Register notices, four public comment solicitations, and six public hearings—contradict Petitioners' argument that MARAD deprived them of their public participation rights. Br. 36.

31

**2.    MARAD evaluated and satisfied the criteria under the Deepwater Port Act in 2017.**

Petitioners allege that MARAD failed to review the statutorily required criteria, *e.g.*, Br. 31, but, in the 2017 record of decision, MARAD explained how the project satisfied those criteria. Petitioners never challenged the 2017 record of decision, and they cannot do so now because any challenge now would be untimely. *See* 33 U.S.C. § 1516 (60-day statute of limitations).

Before issuing a license, MARAD must determine that nine criteria have been satisfied:

(1) the applicant is "financially responsible";

(2) the applicant will comply with applicable laws and license conditions;

(3) the port "will be in the national interest";

(4) the port "will not unreasonably interfere with international navigation";

(5) the port "will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment";

(6) the Environmental Protection Agency has not informed MARAD that the port will violate the Clean Air Act, the Clean Water Act, or the Marine Protection, Research and Sanctuaries Act;

(7) MARAD has consulted with the Secretaries of the Army, State, and Defense about the project;

(8) the governors of adjacent coastal states approve issuance of the license; and

> (9) adjacent coastal States to which the deepwater port will be connected by pipeline have developed approved coastal zone management programs under the Coastal Zone Management Act.

33 U.S.C. § 1503(c)(1)-(9).  MARAD evaluated these criteria in the 68-page record of decision and concluded that the project would satisfy them.  AR_5318-55.

First, to assess financial responsibility, MARAD evaluated whether Delfin was financially able to own, construct, and operate the port and whether Delfin provided assurances that the port and its components would be removed when the license ends.  AR_5319.  MARAD examined Delfin's financial plans and determined they were suitable, AR_5318-25, although, as noted above and below (pp. 12, 37), Delfin's financial plans changed after MARAD issued the record of decision.  MARAD analyzed the changed plans in 2025.  AR_8218; *see also infra* p. 37.

Second, MARAD determined that Delfin "*can and will comply* with applicable laws, regulations, and License conditions."  AR_5325.  MARAD noted the experience and expertise of Delfin's personnel and affiliates.  AR_5326.  In addition, Delfin would agree in writing to comply with all license conditions.  AR_5326.

Third, MARAD determined that the port was in the national interest.  AR_5329.  For example, the project received near unanimous local support (voiced

33

in comments and public hearings) because it would provide jobs and economic opportunities.  AR_5329, 5358.  The project would also expand and diversify the country's energy infrastructure and provide a reliable energy source for the country's allies.  AR_5356, 5358.  Exporting LNG would expand global trade without infringing upon the nation's energy sufficiency and independence. AR_5327.

Fourth, the port would not unreasonably interfere with international navigation or other uses of the high seas because Delfin would work with the Coast Guard to establish safety zones, no-anchoring areas, and areas-to-be-avoided around each mooring system.  AR_5332-33.  The port would not obstruct offshore navigation because the floating LNG vessels would be at least 2.91 miles from the nearest shipping lane.  AR_5334-35.

Fifth, MARAD concluded that the technology that Delfin planned to use was "the best available technology to minimize or prevent adverse impact on the environment."  AR_5339, 5356-57.  The floating LNG vessels would have a small footprint and fewer impacts to the seafloor than other types of structures. AR_5335.  Delfin minimized environmental impacts by reusing 43.3 miles of existing pipelines.  AR_5335-36.  MARAD coordinated with the National Marine Fisheries Service and the Fish and Wildlife Service and imposed various protective conditions to ensure that the project would not adversely affect threatened and

endangered species. AR_5336-38; *see also* below pp. 50-51. And MARAD prepared an EIS where it considered potential environmental consequences for myriad alternatives, including alternative designs, liquefaction technologies, and offshore and onshore locations. AR_5339. Based on this extensive analysis, MARAD determined that Delfin was using the best available technology to minimize environmental impacts. AR_5356-57.

Sixth, the Environmental Protection Agency did not comment that the project would violate the Clean Air Act, the Clean Water Act or the Marine Protection, Research and Sanctuaries Act. AR_5357. Seventh, the Departments of Defense and State both said that the port would not adversely impact their programs. AR_5353.

Eighth, MARAD identified Texas and Louisiana as the adjacent coastal states and sent the governors letters about the project. AR_5303. Neither governor responded. AR_5303. Under the Deepwater Port Act, "[i]f the Governor of an adjacent coastal State fails to transmit a required approval or disapproval to [MARAD] not later than 45 days after the last public hearing ..., such approval shall be conclusively presumed." 33 U.S.C. § 1508(b)(1)(C). So MARAD presumed that the governors approved. AR_5317.

Ninth, Delfin received certifications from the relevant state agencies that the project was consistent with the Texas and Louisiana Coastal Zone Management

35

Act programs.  AR_5355, AR_5357.  MARAD's 2017 record of decision thus

evaluated all required criteria.  AR_5359.

Petitioners never challenged the 2017 record of decision, and any challenge

now would be untimely.  The Deepwater Port Act requires challenges to be

brought "not later than 60 days after any such decision is made."  33 U.S.C.

§ 1516.  MARAD issued the record of decision in 2017, AR_5292, and Petitioners

did not file this suit until 2025, Dkt. No. 1-1.

### B.   MARAD evaluated the project changes before issuing the 2025 license.

Petitioners claim that MARAD lacked the "statutorily required information

to ensure sufficient project review" and failed to reevaluate the Deepwater Port Act

criteria "in light of the substantial technological modifications."  Br. 34-35.  But

they ignore Delfin's repeated, voluminous submissions describing the project

changes, and they also ignore MARAD's memoranda evaluating the project

changes.

First, MARAD repeatedly obtained more information from Delfin about the

project changes.  *E.g.*, AR_7401-534 (2025 updated environmental documentation

from Delfin); AR_8121-44 (2025 updated financial documentation from Delfin);

AR_7312-33 (2024 letter from Delfin addressing National Marine Fisheries

Service questions).  MARAD reasonably concluded that these submissions—

particularly the "thorough and comprehensive" materials in Delfin's January 2025 submission—provided the information MARAD needed.  AR_9403.

Second, MARAD prepared memoranda analyzing the additional information from Delfin and concluded that the project changes largely reduced environmental impacts.  AR_8209-14, AR_8253-58, AR_8262-68.  MARAD examined the project changes, including the reduction in mooring locations (because Delfin reduced the number of floating LNG vessels from four to three), the changed mooring system, and the switch to an air-cooling system (instead of using seawater for cooling).  AR_8209-14, AR_8255-58, AR_8263-68.  MARAD further concluded that the impacts from Delfin's updated project fell "within the range and scope of impacts analyzed in" the EIS.  AR_8214; *see also* AR_8258, AR_8268.

In February 2025, MARAD also analyzed Delfin's updated financial plan.  AR_8215.  Delfin intended to use Mitsui O.S.K. Lines as the financial guarantor for construction, operations, and decommissioning.  AR_8217-18.  MARAD concluded that Delfin had "demonstrated compliance with the requirements laid out in the [record of decision]."  AR_8218.  When MARAD issued the license, it directed Delfin to provide executed decommissioning, construction, and operation guarantees within 90 days.  AR_9351.[2]

---

[2] After MARAD issued the license, Delfin chose to use bonding instead of Mitsui to guarantee decommissioning costs.

Petitioners emphasize that MARAD did not reevaluate the Deepwater Port Act criteria again before issuing the license, but they cite no statutory provision requiring MARAD to do so.  Br. 35.  And the record shows that MARAD evaluated the project changes.  Petitioners assert that MARAD failed to show that Delfin's port would use the "best available technology so as to prevent or minimize adverse impact on the marine environment."  Br. 34-35 (quoting 33 U.S.C. § 1503(c)).  But MARAD made the best-available-technology determination in the 2017 record of decision, AR_5339, 5356-57, and then it determined that the project changes "utilize updated technology to further reduce the environmental footprint of the project," AR_8254, AR_8263.  For example, the floating LNG vessels would no longer use seawater for cooling, thus avoiding water quality impacts from intaking seawater and discharging hot water.  AR_9314-15.  And, since Delfin eliminated one floating LNG vessel and changed the mooring system, the total number of piles to be driven into the seabed decreased from sixteen to nine, which reduced environmental impacts.  AR_8255-56, AR_8264-65.

### C.    A second amended application was not required under the Deepwater Port Act.

The Deepwater Port Act allows applicants to submit amended applications, but it does not require them to do so.  If an applicant submits an amended application after receiving an affirmative record of decision on its initial application and other criteria are satisfied, then MARAD must "expedite the

38

review" and approve or deny the amended application within 270 days. 33 U.S.C. § 1504(i)(5)(B), (D).[3] The statute gives applicants a right to expedited review (if certain criteria are satisfied), but the statute contains no text requiring them to submit amended applications. *See* 33 U.S.C. § 1504(i)(5). Petitioners rely on MARAD's April 2024 letter directing Delfin to submit an amended application, Br. 33-36, but that letter does not cite any statutory requirement to submit an amended application, *see* AR_7344-46.

Delfin submitted an amended application in November 2015, five months after it submitted its original application. AR_1498. Delfin had changed some aspects of the floating LNG vessels, specifically increasing their liquefaction capacity and changing the design to use newly built hulls versus hulls converted from other ships. AR_1498. This amended application is the one that MARAD analyzed and ultimately approved in the record of decision. AR_5313.

Delfin did not submit another amended application and was not required to do so. If Delfin had submitted an amended application and if the criteria for expedited review had been satisfied, then MARAD would have been required to approve or deny the amended application within 270 days. 33 U.S.C.

---

[3] The other criteria to qualify for expedited review are: the amended application is for a natural gas deepwater port, the initial project was unlikely to have significant adverse impacts on species and habitat, the environmental review for the initial application applies to the amended application, and additional environmental review is unnecessary. 33 U.S.C. § 1504(i)(5)(C).

39

§ 1504(i)(5)(D). Petitioners assert that "Delfin's modified project underwent substantial changes that triggered the obligation to submit an amended application." Br. 33. But the Deepwater Port Act contains no such requirement. "It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up). Because the statute does not require applicants to submit amended applications, Petitioners' claim that MARAD should have required Delfin to submit an amended application fails.

Petitioners mistakenly complain that an amended application was required because eight years passed between MARAD's 2017 record of decision and 2025 issuance of the license. Br. 35. The statute does not require amended applications and certainly does not require them based on any passage of time. *See* 33 U.S.C. § 1504(i)(5). The project changed in certain ways after MARAD issued the record of decision, but the fundamental features of the project did not change. MARAD's 2017 record of decision approved a deepwater port located 37.4 to 40.8 miles off the coast of Cameron Parish, Louisiana, and consisting of floating LNG vessels that would receive gas via pipeline and cool it to produce LNG for export. AR_5299. MARAD issued a license for the same project—albeit with one fewer floating LNG vessel and a different mooring system. AR_9348, AR_9399.

Petitioners cite the Deepwater Port Act's application requirements and claim that the project changes rendered Delfin's application incomplete. Br. 33-34. This argument fails. First, the Deepwater Port Act gives MARAD discretion to determine whether an application is complete. The Act provides that "[e]ach application shall include such financial, technical, and other information as [MARAD] determines to be necessary or appropriate." 33 U.S.C. § 1504(c)(2). The language as MARAD "determines to be necessary or appropriate," *id.*, gives MARAD "flexibility" and "discretion[]," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). The Deepwater Port Act does not provide a basis for holding Delfin's application incomplete based on subsequent project changes, particularly when MARAD did not make any such determination.

Second, the statute does not specify that projects cannot change after applications are submitted. Requiring licensed ports to be identical to the applications would be inconsistent with the purpose of the Deepwater Port Act's requirements that MARAD provide public notice, hold public hearings, coordinate with other federal and state agencies, and solicit input from adjacent states. Projects evolve during that process by design, especially when MARAD considers input from other federal and state agencies and the public. The law regarding notice-and-comment rulemaking is instructive here: "[T]he very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that

41

rules evolve from conception to completion." *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022). In addition, "while interested parties should be able to participate meaningfully in the rulemaking process, the public need not have an opportunity to comment on every bit of information influencing an agency's decision." *Texas Off. of Pub. Util. Couns. v. F.C.C.*, 265 F.3d 313, 326 (5th Cir. 2001) (cleaned up). It makes no sense to require an applicant to effectively start over with an amended application every time a project is adjusted during the required review and public-participation process.

Petitioners claim that they were prejudiced by MARAD's failure to give them an opportunity to comment on the project modifications and changed circumstances. Br. 36-37. But as explained above and below (pp. 14, 45-49), MARAD reasonably determined that the modified project's impacts fell within those considered in the EIS—on which the public had ample opportunity to comment. *Supra* pp. 30-31. And the public typically does not have an opportunity to comment on applicants' financial arrangements because the Deepwater Port Act prohibits MARAD from disclosing information "that concerns or relates to a trade secret ... or to a contract." 33 U.S.C. § 1513(b).

At bottom, Petitioners (and the public) had ample opportunity to comment (and Petitioner Center for Biological Diversity did comment, AR_5308) on Delfin's proposal to construct a deepwater port off the coast of Cameron Parish,

Louisiana, consisting of floating LNG vessels that would receive gas via pipeline, cool it, and then export LNG.  Petitioners' insistence that MARAD should have solicited public comment again—after five Federal Register notices, four solicitations for public comment, and six public hearings—amounts to a demand for "[d]elay upon delay, so much so that the process" would "borde[r] on the Kafkaesque."  *Seven Cnty.*, 605 U.S. at 184 (cleaned up).

In sum, MARAD complied with Deepwater Port Act.

### III. MARAD reasonably concluded that supplemental NEPA analysis was not required.

MARAD's EIS satisfied NEPA's requirements, and MARAD was not required to supplement its NEPA analysis.  Petitioners contend that MARAD had to prepare a supplemental EIS, but they ignore the appropriate standard and the facts here.  Br. 37.

In evaluating an agency's NEPA compliance, "a court should afford substantial deference to the agency."  *Seven Cnty.*, 605 U.S. at 180.  Incredibly, Petitioners fail to cite *Seven County*, the governing precedent from last year in which the Supreme Court held that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense."  *Id.* at 184.  "After *Seven County*, the era of searching NEPA review is over—or at least it should be."  *Sierra Club v. FERC*, 153 F.4th 1295, 1311 (D.C. Cir. 2025).

Aside from minimizing the deference that should apply to MARAD's analysis, Petitioners also distort the supplemental NEPA standard. Petitioners contend that "projects with design changes not previously considered by prior NEPA review and that may have unevaluated environmental effects, require new and/or supplemental NEPA review." Br. 41. That is not the standard. Supplemental NEPA analysis is required only "if the new information is sufficient to show that the remaining action will affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (cleaned up); *see also Harrison Cnty. v. USACE,* 63 F.4th 458, 464 (5th Cir. 2023) (same). Supplementation is not required merely because there is a piece of information that the agency did not consider in its NEPA review. And MARAD is entitled to deference in determining whether the project changes will cause significant impacts that it has not already considered to a significant extent. *Seven Cnty.*, 605 U.S. at 180.

Supplemental NEPA analysis was not required here because the project changes largely reduced environmental impacts, MARAD considered impacts to listed species under the Endangered Species Act, and other potential projects in the Gulf region did not warrant more review of this project.

### A.     The project changes reduced environmental impacts and did not require supplemental NEPA analysis.

MARAD reasonably concluded supplemental NEPA analysis was unnecessary because "the proposed changes to the Delfin project are not likely to result in adverse environmental consequences nor a seriously different picture of the foreseeable adverse environmental consequences." AR_8263. The Court should defer to MARAD's determination. "A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions." *Seven Cnty.*, 605 U.S. at 183 (cleaned up). MARAD reasonably determined that it had sufficient information to analyze the impacts of project changes, the project changes largely reduced environmental impacts, and MARAD had already analyzed the relevant impacts in the EIS.

After reviewing extensive data and reports, MARAD reasonably determined that it did not need any further information to evaluate environmental impacts from the project changes. AR_8264 (The information before MARAD in February 2025 was "sufficient for its review and analysis."); *see also* AR_9403 (March 2025 letter from MARAD to Delfin saying "we have all the information we need at this time"). MARAD reviewed the EIS and 2017 record of decision, additional environmental analyses that Delfin submitted in 2023 and 2025, materials from consultations with the Fish and Wildlife Service and the Marine Fisheries Service, and a February 2025 report about threatened and endangered species in the project

45

area.  AR_8263-64.  "[A]gencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."  *Seven Cnty.*, 605 U.S. at 183.  MARAD reasonably determined that it had sufficient information and that further analysis would not be "useful[]."  *Id.*

MARAD also reasonably concluded that Delfin's project updates after the 2017 record of decision would "further reduce the environmental footprint of the project."  AR_8254, AR_8263.  MARAD's determination that the modified project would reduce impacts was "based on consultations with the agency's experts and a detailed review of the record," warrants deference, and should be upheld.  *Citizens for Clean Air*, 98 F.4th at 197-98. !

Because the project updates removed one of the floating LNG vessels and, thus one of the mooring locations and one of the lateral pipelines, there would be a "corresponding decrease in adverse construction and environmental impacts from those evaluated" in EIS.  AR_8255, AR_8263.  Delfin changed the mooring systems from four tower-yoke mooring systems each with four 78-inch thick piles to three submerged swivel-yoke mooring systems each with three 96-inch thick piles.  AR_8255, AR_8265.  MARAD acknowledged that the thicker piles increased the intensity of pile driving, but the number of piles that needed to be driven into the seabed reduced from sixteen to nine.  AR_8255, AR_8265.  By

eliminating seven piles, Delfin reduced the duration of pile driving, which reduced turbidity, habitat disruption, and certain air pollutants.  AR_8255-56, AR_8265.

Delfin refined the power generation systems and the process for liquefying natural gas, and those refinements both decreased air emissions.  AR_8256, AR_8266.  Delfin eliminated its plans to use seawater for cooling and for cleaning cargo tanks, which reduced environmental impacts from withdrawing and discharging seawater.  AR_8256-57, AR_8266-67.  Delfin reduced from 36 hours to 31 hours the amount of time required to offload LNG from the floating LNG vessels to the LNG carriers.  AR_8257, AR_8267.  This reduction in offloading time reduced underwater noise and air emissions.  AR_8257, AR_8267.

MARAD's determinations regarding the impacts of Delfin's project refinements are "scientific judgments [] assessing the relevant impacts" and "[b]lack-letter administrative law instructs that when an agency makes those kinds of ... scientific judgments, ... a reviewing court must be at its most deferential." *Seven Cnty.*, 605 U.S. at 181-82 (cleaned up).  The Court should defer to MARAD's expert conclusion that supplemental NEPA analysis was unnecessary because the project changes largely reduced environmental impacts.

MARAD also concluded that the impacts from Delfin's design modifications "fall within the scope and range of impacts and alternatives analyzed" in the EIS and "do[] not require the preparation of a supplemental EIS".  AR_8263,

47

AR_8268.  That determination was reasonable.  For example, in the EIS, MARAD analyzed disconnectable mooring systems that would allow the floating LNG vessels to leave the port during severe storms.  AR_3483.  Both the tower-yoke mooring system that Delfin originally planned to use and the submerged swivel-yoke mooring system that Delfin later decided to use are disconnectable systems that fall within the EIS's analysis.  *See* AR_3483.  MARAD explained in the EIS that disconnectable mooring systems would impact seafloor habitat.  AR_3927.  In 2025, MARAD said that the change from the tower-yoke mooring system to the submerged swivel-yoke mooring system would not affect its prior analysis regarding marine impacts.  AR_8265.  MARAD was "exercis[ing] substantial discretion" in making a "scientific judgment in assessing the relevant impacts," and the Court should defer to its determination.  *Seven Cnty.*, 605 U.S. at 181.

MARAD also reasonably determined that the project changes that reduced air emissions fell within the impacts analyzed in the EIS.  *E.g.*, AR_8266 (describing updates to power generation systems that would reduce nitrogen oxide and carbon monoxide emissions by 70 percent).  It is "common sense" that if the EIS analyzed greater impacts, then reduced impacts fall within that analysis.  *Seven Cnty.*, 605 U.S. at 184.

Petitioners emphasize that some air emissions may increase, *e.g.*, Br. 42, but any increases are modest and do not warrant further review.  For example, during

construction, sulfur dioxide emissions will decrease by 48 percent, but certain pollutants, such as carbon monoxide, will increase by eleven percent or less. AR_8205.  And those modest increases are from construction only; there are other emissions decreases from, for example, updates to the floating LNG vessels' power generation systems.  AR_8205, 8266.

MARAD reasonably concluded that the updated project largely reduced impacts and more analysis was unnecessary.  It made "a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry," and courts "should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183.

**B.    MARAD considered updated information about listed species and consulted with the Fish and Wildlife Service and the National Marine Fisheries Service.**

Petitioners also contend that MARAD needed to supplement its NEPA analysis because of "new studies and significant information regarding listed species and habitat," Br. 38, including "significant new information" regarding the Rice's whale, Br. 45.  But they fail to acknowledge that MARAD analyzed impacts to listed species and critical habitat under the Endangered Species Act—both before and after the 2017 record of decision—and reasonably determined that the project was unlikely to harm listed species or critical habitat.

When MARAD originally evaluated Delfin's application, it consulted with the National Marine Fisheries Service and the Fish and Wildlife Service about potential impacts under the Endangered Species Act. The Endangered Species Act provides that federal agencies must ensure that their actions are "not likely to jeopardize the continued existence of any" species listed as endangered or threatened under the Act. 16 U.S.C. § 1536(a)(2). Federal agencies comply with the Endangered Species Act by consulting with Fish and Wildlife Service and National Marine Fisheries Service (collectively, the Services). If the agency and the Services agree that "the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(c). Agencies must "reinitiat[e]" consultation if, inter alia, "a new species is listed or critical habitat designated that may be affected by" the action. *Id.* § 402.16(a). After initiating (or reinitiating) consultation, a federal agency "shall not make any irreversible or irretrievable commitment of resources" that forecloses the agency from implementing measures to avoid jeopardizing threatened or endangered species. 16 U.S.C. § 1536(d).

The National Marine Fisheries Service reviewed the EIS (which contained 96 pages analyzing impacts to offshore biological resources and essential fish habitat, AR_3657-753), surveys about underwater sound, and many studies about the effects of construction noise on whales and sea turtles. *E.g.*, AR_5258-59,

50

5270, 5272, 5274. It also considered other potential impacts like vessels striking marine mammals, mammals becoming entangled in anchor lines, potential LNG spills, light pollution, and increased turbidity. AR_5277-80. The National Marine Fisheries Service recommended various conservation measures that Delfin agreed to implement and that MARAD agreed to require in the license. AR_5267-68, AR_5314. These measures included minimizing construction noise, managing anchor lines to avoid entangling animals, and implementing the National Oceanic Atmospheric Administration's guidelines to avoid vessels striking marine species. AR_5267-68; AR_5342-44. In March 2017, the National Marine Fisheries Service concluded that potential effects to species listed under the Endangered Species Act were "discountable, insignificant, or beneficial" and so the project would not adversely affect listed species. AR_5258, 5282.

The Fish and Wildlife Service also evaluated Delfin's application and concluded that the project was unlikely to adversely affect species within its jurisdiction. AR_5337-38. The Fish and Wildlife Service recommended various conservation measures to protect migratory birds, and MARAD said that compliance with those measures would be a condition of the license. AR_5338; *see also* AR_9386 (license condition requiring Delfin to implement Fish and Wildlife Service recommended measures to protect migratory birds).

51

In both 2023 and 2025, MARAD reinitiated consultation with the National Marine Fisheries Service.  AR_7266, AR_9306; *see also* 50 C.F.R. § 402.16(a).  In reinitiating consultation, MARAD noted the project changes and that new species had been listed under the Endangered Species Act since the National Marine Fisheries Service determined in 2017 that the project would not adversely affect listed species.  AR_7267.  For example, the oceanic whitetip shark and giant manta ray were listed as threatened in 2018, the Rice's whale was listed as endangered in 2019, and the queen conch was listed as threatened in 2024.  AR_7277-78, AR_9318.  Critical habitats for the Rice's whale and the green sea turtle had been proposed in 2023 (although no final designation had occurred for either species).  AR_7278, AR_9319.

As with the original project proposal, MARAD again analyzed potential effects of the project's construction and operations on threatened and endangered species.  AR_9319-25.  MARAD considered many types of potential impacts, such as impacts from the noise of driving piles into the seabed or from vessel strikes.  AR_9319-21.  MARAD concluded that Delfin's project was unlikely to adversely affect endangered or threatened species or critical habitat.  AR_9325.

MARAD was unable to obtain a response from the National Marine Fisheries Service before issuing the license.  *See* AR_9338.  But MARAD determined that issuing the license before completing consultation would not

52

constitute an irreversible or irretrievable commitment of resources because MARAD could rescind the license if necessary or amend the license if the National Marine Fisheries Service prescribed conditions necessary to protect threatened or endangered species. AR_9340, 9342-43. MARAD also planned to mandate in the license that Delfin must implement any required mitigation resulting from the consultation. AR_9343. And the license would include other requirements (relating to, for example, mitigating construction noise and avoiding vessel strikes) that MARAD and the National Marine Fisheries Service had identified in the original consultation to minimize potential impacts to listed species. AR_9343.[4]

MARAD also reinitiated consultation with the Fish and Wildlife Service in 2023. AR_7011. The project changes did not affect the onshore facility, but certain species (such as the eastern black rail) under the Fish and Wildlife Service's purview were newly listed under the Endangered Species Act after the initial consultation. AR_7012. The Fish and Wildlife Service concurred with MARAD that the project was unlikely to adversely affect listed species and their critical habitats. AR_7020.

MARAD did not need to do supplemental NEPA analysis to analyze species impacts when it already analyzed them under the Endangered Species Act. *See*

---

[4] The National Marine Fisheries Service concurred with MARAD in April 2025 (after MARAD issued the license) that Delfin's project was unlikely to adversely affect listed species and critical habitat.

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) ("Congress specifically contemplated that an agency could comply with NEPA while discharging its duties under Section 7 of the [Endangered Species Act]."). MARAD's analysis of species impacts "fall[s] within the broad zone of reasonableness that courts must afford agencies implementing NEPA." *Gas Transmission Nw. v. FERC*, 157 F.4th 674, 709 (5th Cir. 2025) (cleaned up).

### C. Other potential projects did not warrant supplemental NEPA analysis for this project.

Petitioners argue that MARAD failed to consider the cumulative impacts of "numerous LNG and crude oil export projects" in addition to Delfin's project and that MARAD had to prepare a supplemental EIS to consider cumulative impacts. Br. 38, 44. But Supreme Court precedent forecloses this argument because, under *Seven County*, MARAD was required to consider only this project's impacts. "[T]he textually mandated focus of NEPA is the proposed action—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded)." *Seven Cnty.*, 605 U.S. at 186-87. "An agency need not assess the environmental effects of other separate projects simply because those projects (and effects) ... are in some sense foreseeable." *Id.* at 190. "[N]othing in NEPA" requires an agency to study impacts from "projects separate in time or place." *Id.* at 189; *see also Appalachian Voices,* 139 F.4th at 924 (Henderson, J.,

54

concurring) (noting that the "cumulative impact[s]" requirement "appears nowhere in NEPA itself").

In addition, most of the projects that Petitioners cite (such as onshore LNG facilities), Br. 44, are outside of MARAD's regulatory authority. "[A]fter *Seven County*, agencies are no longer required to analyze the effects of projects over which they do not exercise regulatory authority." *Sierra Club v. FERC*, 153 F.4th at 1308 (cleaned up).

Even if an agency does analyze separate projects, courts must defer to the agency regarding the extent of its analysis. *Seven County,* 605 U.S. at 181. "So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line— including ... whether to analyze environmental effects from other projects separate in time or place from the project at hand." *Id.* at 182. In answering those questions, "agencies possess discretion and must have broad latitude to draw a manageable line." *Id.* (cleaned up).

The NEPA regulations in place at the time the EIS was prepared required agencies to consider "cumulative impacts," defined as "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," whether federal or not. 40 C.F.R. § 1508.7 (1978). Those regulations have since been rescinded.

55

*Removal of NEPA Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025).

Even if MARAD was required to analyze cumulative impacts (it was not), it analyzed them in the EIS. AR_3902-25. In 2016, MARAD considered cumulative impacts from other projects, such as onshore LNG terminals, pipeline projects, and other industrial facilities, and it also considered cumulative impacts by resource, such as water, essential fish habitat, and air quality. AR_3902-25. For example, MARAD said that there could be cumulative impacts on biological resources from construction, marine traffic, or pipeline installation, which can degrade water quality, increase noise, or alter habitat. AR_3919-25. Even if there are new projects since the EIS, MARAD's analysis of impacts to different resources is still apt. MARAD "should definitely not receive a failing grade just because its [1,800]-page EIS was less thorough in analyzing the effects from other projects than the Court of Appeals might have preferred," particularly when MARAD was "not mandated by NEPA" to analyze these other projects at all. *Seven Cnty.*, 605 U.S. at 186 n.5.

"The goal of [NEPA] is to inform agency decisionmaking, not to paralyze it." *Id.* at 173. MARAD reasonably chose not to prepare supplemental NEPA analysis.

56

## IV.   MARAD did not change position and, even if it did, any change was reasonable.

Petitioners contend that MARAD's 2025 issuance of the license was an "unexplained reversal of position" that violated the Administrative Procedure Act, Br. 46, but, in fact, MARAD's issuance of the license was consistent with its 2017 record of decision.  And, even if MARAD did change position, any change was reasonable.

In 2017, MARAD issued a record of decision approving Delfin's deepwater port license application.  AR_5359.  MARAD's issuance of the license in 2025 was consistent with that decision.  There was no change in position to which the change-in-position doctrine applies.

Petitioners emphasize, Br. 46-47, MARAD's April 2024 letter to Delfin saying that it "will not issue a license at this time," and directing Delfin to submit an amended application, AR_7344-45.  Petitioners insist that MARAD's 2025 issuance of the license was "a complete about-face" from the April 2024 letter "absent any explanation or reasoning."  Br. 47.  But there was no "policy change" for MARAD "to acknowledge or explain."  *El Puente v. USACE*, 100 F.4th 236, 256 (D.C. Cir. 2024).

MARAD's April 2024 letter was "correspondence" that "did not embody the sort of authoritative agency policy or position that triggers the rule prohibiting agencies from ignor[ing] or countermand[ing] [their] earlier factual findings

57

without reasoned explanation for doing so." *Id.* (cleaned up); *see also FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 570 n.5 (2025) ("We have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting."). For example, agencies have changed position when they "rescinded a prior regulation" or "abandon[ed a] decades-old practice" applied in enforcement actions. *Id.* at 570. MARAD's April 2024 letter was correspondence, not a formal, final position subject to the change-in-position doctrine.[5]

Even if MARAD did change position, it satisfied the change-in-position doctrine. "[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *Wages & White Lion*, *Id.* at 568 (cleaned up).

First, MARAD displayed awareness that it was changing course from the April 2024 letter. It said that it planned to issue Delfin's license "without further amendment to the [record of decision]." AR_8254. In 2025, MARAD expressly considered whether it needed to prepare a supplemental EIS and determined that supplemental NEPA analysis was unnecessary. AR_8268. After MARAD

---

[5] In a November 2024 letter, MARAD referred to the April 2024 letter as a "decision," AR_7370, but that reference does not mean the April 2024 letter was a formal, final position subject to the change-in-position doctrine.

received Delfin's January 2025 submissions providing more information about the project changes' impacts, MARAD said that it did not need any further information.  AR_8264; *see also* AR_9403.

Second, MARAD provided a "reasoned explanation" for its decision to issue the license without requiring further process, *Wages & White Lion*, 604 U.S. at 568, contrary to Petitioners' assertion that "[n]o documentation exists on record of the Project's proposed changes since completion of the 2016 [final EIS]," Br. 49. MARAD prepared multiple memoranda describing and analyzing the impacts of the project changes.  *E.g.*, AR_8253-58, 8262-68.  In addition, the license itself summarizes the project refinements.  AR_9399-400.  As explained above (pp. 14, 45-49), MARAD reasonably determined that the project refinements largely reduced environmental impacts and fell within the impacts considered in the EIS.

As part of their change-in-position argument, Petitioners claim that MARAD violated the requirement in NEPA's regulations to "identify any methodologies used and [] make explicit reference to the scientific and other sources relied upon." Br. 46 (quoting 40 C.F.R. § 1502.23).  But MARAD's memoranda evaluating the project changes discuss the information it relied upon.  *E.g.*, AR_8264 (listing information sources on which MARAD relied).  In any event, this regulation has been rescinded.  90 Fed. Reg. 10610-01.  And Petitioners cite no cases relying on

this regulation as a basis for holding that an agency violated the change-in-position doctrine.  *See* Br. 46-48.

Third, the relevant reliance interests from MARAD's decision to issue the license are Delfin's.  Insofar as Petitioners claim they were "depriv[ed] public participation as promised in the" April 2024 letter, Br. 48, this argument fails.  The decision on record was the 2017 record of decision, which MARAD never revoked.  "At most," the April 2024 letter "may have led [Petitioners] to *believe* that" MARAD was unlikely to issue the license, but "such a belief about how an agency is likely" to act is "not a serious reliance interes[t]."  *Wages & White Lion*, 604 U.S. at 585 (cleaned up).  The Supreme Court's "change-in-position cases have set a much higher bar, requiring, for example, decades of industry reliance on [an agency's] prior policy."  *Id.* (cleaned up).

MARAD did not change position.  And, even if it did, it satisfied the change-in-position doctrine's requirements.

## V.     The Court should deny the petition and, if not, should remand without vacatur.

The Court should deny the petition.  But, if not, any remedy must be limited to the March 2025 license only.  Petitioners ask the Court to vacate the 2017 record of decision, Br. 51, but they are not entitled to that remedy.  Any challenge to the record of decision is eight years too late given the Deepwater Port Act's 60-day statute of limitations.  33 U.S.C. § 1516.

If the Court finds any error, it should remand without vacatur. As to Petitioners' NEPA arguments, courts may not vacate an "agency's ultimate approval of a project" "absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185. Petitioners make no effort to meet that burden, nor could they. There is no indication here that MARAD might disapprove the project if it added more NEPA analysis.

As to Petitioners' Deepwater Port Act and change-in-position arguments, "[t]wo factors determine whether vacatur is warranted: (1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (cleaned up). "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). As with Petitioners' NEPA arguments, the Deepwater Port Act arguments, if credited, would result in only more process or more analysis. There is at least a serious possibility that MARAD could substantiate its decision on remand.

61

**CONCLUSION**

The Court should dismiss the petition for lack of standing or deny it on the

merits.

Of Counsel:
GREGORY ZERZAN
*General Counsel*
CHARLES E. ENLOE
*Assistant General Counsel*
PAULA LEE
*Senior Trial Attorney*
U.S. Dept. of Transportation

ELIZABETH O'CONNOR
*Chief Counsel*
AINSLEY Q. PARRISH
JOSEPH CLICK
*Trial Attorneys*
Maritime Administration

/s/ *Rebecca Jaffe*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant*
*Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
EZEKIEL PETERSON
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice

*Counsel for Federal Respondents*

January 15, 2026
90-13-1-17931

62

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all registered CM/ECF users.

s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Federal Respondents

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,972 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Federal Respondents

## ADDENDUM

Deepwater Port Act

33 U.S.C. § 1501................................................................................1a

33 U.S.C. § 1502................................................................................2a

33 U.S.C. § 1503................................................................................6a

33 U.S.C. § 1504..............................................................................10a

33 U.S.C. § 1505..............................................................................20a

33 U.S.C. § 1508..............................................................................22a

33 U.S.C. § 1513..............................................................................24a

33 U.S.C. § 1516..............................................................................25a

National Environmental Policy Act

42 U.S.C. § 4332..............................................................................26a

Federal Register Notices

*Deepwater Port License Application: Delfin LNG,* 80 Fed. Reg. 42,162 (July 16, 2015)................................................................29a

*Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 45,270-02 (July 29, 2015)..........................................................35a

*Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 80,455 (Dec. 24, 2015) ...........................................................42a

*Deepwater Port License Application: Delfin LNG*, 81 Fed. Reg. 46,157-01 (July 15, 2016)..........................................................46a

*Delfin LNG Deepwater Port; Final Application Public Hearing and Final EIS*, 81 Fed. Reg. 85,678-01 (Nov. 28, 2016) ...........................52a

United States Code Annotated
 Title 33. Navigation and Navigable Waters (Refs & Annos)
  Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1501

§ 1501. Congressional declaration of policy

Effective: December 22, 2023
Currentness

**(a) Purposes**

The purposes of this chapter are--

**(1)** to authorize and regulate the location, ownership, construction, and operation of deepwater ports in waters beyond the territorial limits of the United States;

**(2)** to provide for the protection of the marine and coastal environment to prevent or minimize any adverse impact which might occur as a consequence of the development of deepwater ports;

**(3)** to protect the interests of the United States and those of adjacent coastal States in the location, construction, and operation of deepwater ports;

**(4)** to protect the rights and responsibilities of States and communities to regulate growth, determine land use, and otherwise protect the environment in accordance with law;

**(5)** to promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States and transporting oil or natural gas from the outer Continental Shelf while minimizing tanker traffic and the risks associated with that traffic; and

**(6)** to promote oil or natural gas production on the outer Continental Shelf by affording an economic and safe means of transportation of outer Continental Shelf oil or natural gas to the United States mainland.

**(b) Effect of chapter**

Nothing in this chapter affects the legal status of the high seas, the superjacent airspace, or the seabed and subsoil, including the Continental Shelf.

**CREDIT(S)**

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1502

§ 1502. Definitions

Effective: December 22, 2023
Currentness

In this chapter:

**(1) Adjacent coastal State**

The term "adjacent coastal State" means any coastal State which (A) would be directly connected by pipeline to a deepwater port, as proposed in an application; (B) would be located within 15 miles of any such proposed deepwater port; or (C) is designated by the Secretary in accordance with section 1508(a)(2) of this title.

**(2) Affiliate**

The term "affiliate" means any entity owned or controlled by, any person who owns or controls, or any entity which is under common ownership or control with an applicant, licensee, or any person required to be disclosed pursuant to subparagraph (A) or (B) of section 1504(c)(2) of this title.

**(3) Application**

The term "application" means an application submitted under this chapter for a license for the ownership, construction, and operation of a deepwater port.

**(4) Citizen of the United States**

The term "citizen of the United States" means any person who is a United States citizen by law, birth, or naturalization, any State, any agency of a State or a group of States, or any corporation, partnership, or association organized under the laws of any State which has as its president or other executive officer and as its chairman of the board of directors, or holder of a similar office, a person who is a United States citizen by law, birth or naturalization and which has no more of its directors who are not United States citizens by law, birth or naturalization than constitute a minority of the number required for a quorum necessary to conduct the business of the board.

**(5) Coastal environment**

The term "coastal environment" means the navigable waters (including the lands therein and thereunder) and the adjacent shorelines including [1] waters therein and thereunder). The term includes transitional and intertidal areas, bays, lagoons, salt

Add-2a

marshes, estuaries, and beaches; the fish, wildlife and other living resources thereof; and the recreational and scenic values of such lands, waters and resources.

### (6) Coastal State

The term "coastal State" means any State of the United States in or bordering on the Atlantic, Pacific, or Arctic Oceans, or the Gulf of Mexico.

### (7) Construction

The term "construction" means the supervising, inspection, actual building, and all other activities incidental to the building, repairing, or expanding of a deepwater port or any of its components, including, but not limited to, pile driving and bulkheading, and alterations, modifications, or additions to the deepwater port.

### (8) Control

The term "control" means the power, directly or indirectly, to determine the policy, business practices, or decisionmaking process of another person, whether by stock or other ownership interest, by representation on a board of directors or similar body, by contract or other agreement with stockholders or others, or otherwise.

### (9) Deepwater port

The term "deepwater port"--

**(A)** means any fixed or floating manmade structure other than a vessel, or any group of such structures, that are located beyond State seaward boundaries and that are used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for transportation to or from any State, except as otherwise provided in section 1522 of this title, and for other uses not inconsistent with the purposes of this chapter, including transportation of oil or natural gas from the United States outer continental shelf;

**(B)** includes all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark;

**(C)** in the case of a structure used or intended for such use with respect to natural gas, includes all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys, mooring lines, and similar facilities that are proposed or approved for construction and operation as part of a deepwater port, to the extent that they are located seaward of the high water mark and do not include interconnecting facilities; and

**(D)** shall be considered a "new source" for purposes of the Clean Air Act (42 U.S.C. 7401 et seq.), and the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

### (10) Governor

Add-3a

The term "Governor" means the Governor of a State or the person designated by State law to exercise the powers granted to the Governor pursuant to this chapter.

**(11) Licensee**

The term "licensee" means a citizen of the United States holding a valid license for the ownership, construction, and operation of a deepwater port that was issued, transferred, or renewed pursuant to this chapter.

**(12) Marine environment**

The term "marine environment" includes the coastal environment, waters of the contiguous zone, and waters of the high seas; the fish, wildlife, and other living resources of such waters; and the recreational and scenic values of such waters and resources.

**(13) Natural gas**

The term "natural gas" means either natural gas unmixed, or any mixture of natural or artificial gas, including compressed or liquefied natural gas, natural gas liquids, liquefied petroleum gas, and condensate recovered from natural gas.

**(14) Oil**

The term "oil" means petroleum, crude oil, and any substance refined from petroleum or crude oil.

**(15) Person**

The term "person" includes an individual, a public or private corporation, a partnership or other association, or a government entity.

**(16) Safety zone**

The term "safety zone" means the safety zone established around a deepwater port as determined by the Secretary in accordance with section 1509(d) of this title.

**(17) Secretary**

The term "Secretary" means the Secretary of Transportation.

**(18) State**

The term "State" includes each of the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possessions of the United States.

**(19) Vessel**

Add-4a

The term "vessel" means every description of watercraft or other artificial contrivance used as a means of transportation on or through the water.

## CREDIT(S)

(Pub.L. 93-627, § 3, Jan. 3, 1975, 88 Stat. 2127; Pub.L. 98-419, § 2(a), Sept. 25, 1984, 98 Stat. 1607; Pub.L. 104-324, Title V, § 503, Oct. 19, 1996, 110 Stat. 3926; Pub.L. 107-295, Title I, § 106(b), Nov. 25, 2002, 116 Stat. 2086; Pub.L. 109-58, Title III, § 321(b), Aug. 8, 2005, 119 Stat. 694; Pub.L. 112-213, Title III, § 312, Dec. 20, 2012, 126 Stat. 1569; Pub.L. 118-31, Div. C, Title XXXV, § 3514(k)(2), Dec. 22, 2023, 137 Stat. 813.)

## Footnotes

1    So in original. Probably should be preceded by an opening parenthesis.

33 U.S.C.A. § 1502, 33 USCA § 1502
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**                                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1503

§ 1503. License for ownership, construction, and operation of deepwater port

Effective: December 22, 2023
Currentness

**(a) Requirement**

No person may engage in the ownership, construction, or operation of a deepwater port except in accordance with a license issued pursuant to this chapter. No person may transport or otherwise transfer any oil or natural gas between a deepwater port and the United States unless such port has been so licensed and the license is in force.

**(b) Issuance, transfer, amendment, or reinstatement**

The Secretary may--

**(1)** on application, issue a license for the ownership, construction, and operation of a deepwater port; and

**(2)** on petition of the licensee, amend, transfer, or reinstate a license issued under this chapter.

**(c) Conditions for issuance**

The Secretary may issue a license in accordance with the provisions of this chapter if--

**(1)** the Secretary determines that the applicant is financially responsible and will meet the requirements of section 2716 of this title;

**(2)** the Secretary determines that the applicant can and will comply with applicable laws, regulations, and license conditions;

**(3)** the Secretary determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;

**(4)** the Secretary determines that the deepwater port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention, or customary international law;

**(5)** the Secretary determines, in accordance with the environmental review criteria established pursuant to section 1505 of this title, that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment;

**(6)** the Secretary has not been informed, within 45 days of the last public hearing on a proposed license for a designated application area, by the Administrator of the Environmental Protection Agency that the deepwater port will not conform with all applicable provisions of the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, or the Marine Protection, Research and Sanctuaries Act, as amended;

**(7)** the Secretary has consulted with the Secretary of the Army, the Secretary of State, and the Secretary of Defense, to determine their views on the adequacy of the application, and its effect on programs within their respective jurisdictions;

**(8)** the Governor of each adjacent coastal State approves, or is presumed to approve, the issuance of the license pursuant to section 1508(b)(1) of this title, if applicable; and

**(9)** the adjacent coastal State to which the deepwater port is to be directly connected by pipeline has developed, or is making, at the time the application is submitted, reasonable progress, as determined in accordance with section 1508(c) of this title, toward developing, an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972.

**(d) Application for license subject to examination and comparison of economic, social, and environmental effects of deepwater port facility and deep draft channel and harbor; finality of determination**

If an application is made under this chapter for a license to construct a deepwater port facility off the coast of a State, and a port of the State which will be directly connected by pipeline with such deepwater port, on the date of such application--

**(1)** has existing plans for construction of a deep draft channel and harbor; and

**(2)** has either (A) an active study by the Secretary of the Army relating to the construction of a deep draft channel and harbor, or (B) a pending application for a permit under section 403 of this title for such construction; and

**(3)** applies to the Secretary for a determination under this section within 30 days of the date of the license application;

the Secretary shall not issue a license under this chapter until he has examined and compared the economic, social, and environmental effects of the construction and operation of the deepwater port with the economic, social and environmental effects of the construction, expansion, deepening, and operation of such State port, and has determined which project best serves the national interest or that both developments are warranted. The Secretary's determination shall be discretionary and nonreviewable.

**(e) Additional conditions; removal requirements, waiver; Outer Continental Shelf Lands Act applicable to utilization of components upon waiver of removal requirements**

Add-7a

**(1)** In issuing a license for the ownership, construction, and operation of a deepwater port, the Secretary shall prescribe those conditions which the Secretary deems necessary to carry out the provisions and requirements of this chapter or which are otherwise required by any Federal department or agency pursuant to the terms of this chapter. To the extent practicable, conditions required to carry out the provisions and requirements of this chapter shall be addressed in license conditions rather than by regulation and, to the extent practicable, the license shall allow a deepwater port's operating procedures to be stated in an operations manual, approved by the Coast Guard, in accordance with section 1509(a) of this title, rather than in detailed and specific license conditions or regulations, except that basic standards and conditions shall be addressed in regulations. On petition of a licensee, the Secretary shall review any condition of a license issued under this chapter to determine if that condition is uniform, insofar as practicable, with the conditions of other licenses issued under this chapter, reasonable, and necessary to meet the objectives of this chapter. The Secretary shall amend or rescind any condition that is no longer necessary or otherwise required by any Federal department or agency under this chapter.

**(2)** No license shall be issued, transferred, or renewed under this chapter unless the licensee or transferee first agrees in writing that (A) there will be no substantial change from the plans, operational systems, and methods, procedures, and safeguards set forth in his license, as approved, without prior approval in writing from the Secretary; and (B) the licensee or transferee will comply with any condition the Secretary may prescribe in accordance with the provisions of this chapter.

**(3)** The Secretary shall establish such bonding requirements or other assurances as the Secretary determines to be necessary to ensure that, upon the revocation or termination of a license, the licensee will remove all components of the deepwater port. In the case of components lying in the subsoil below the seabed, the Secretary is authorized to waive the removal requirements if the Secretary finds that such removal is not otherwise necessary and that the remaining components do not constitute any threat to navigation or to the environment. At the request of the licensee, the Secretary, after consultation with the Secretary of the Interior, is authorized to waive the removal requirement as to any components which the Secretary determines may be utilized in connection with the transportation of oil, natural gas, or other minerals, pursuant to a lease granted under the provisions of the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.), after which waiver the utilization of such components shall be governed by the terms of that Act.

**(f) Amendments, transfers, and reinstatements**

The Secretary may amend, transfer, or reinstate a license issued under this chapter if the Secretary finds that the amendment, transfer, or reinstatement is consistent with the requirements of this chapter.

**(g) Eligible citizens**

Any citizen of the United States who otherwise qualifies under the terms of this chapter shall be eligible to be issued a license for the ownership, construction, and operation of a deepwater port.

**(h) Term of license**

A license issued under this chapter remains in effect unless suspended or revoked by the Secretary or until surrendered by the licensee.

**(i) Liquefied natural gas facilities**

Add-8a

To promote the security of the United States, the Secretary shall give top priority to the processing of a license under this chapter for liquefied natural gas facilities that will be supplied with or that will supply liquefied natural gas by United States flag vessels.

### CREDIT(S)

(Pub.L. 93-627, § 4, Jan. 3, 1975, 88 Stat. 2128; Pub.L. 98-419, § 2(b) to (e), Sept. 25, 1984, 98 Stat. 1607; Pub.L. 101-380, Title II, § 2003(a)(1), Aug. 18, 1990, 104 Stat. 507; Pub.L. 104-324, Title V, § 504, Oct. 19, 1996, 110 Stat. 3926; Pub.L. 107-295, Title I, § 106(a)(2), Nov. 25, 2002, 116 Stat. 2086; Pub.L. 109-241, Title III, § 304(b), July 11, 2006, 120 Stat. 527; Pub.L. 113-281, Title III, § 307(c), Dec. 18, 2014, 128 Stat. 3045; Pub.L. 118-31, Div. C, Title XXXV, § 3514(k)(3), Dec. 22, 2023, 137 Stat. 813.)

33 U.S.C.A. § 1503, 33 USCA § 1503

Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. **Add-9a**

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1504

§ 1504. Procedure

Effective: December 23, 2024
Currentness

**(a) Regulations; issuance, amendment, or rescission; scope**

The Secretary shall, as soon as practicable after January 3, 1975, and after consultation with other Federal agencies, issue regulations to carry out the purposes and provisions of this chapter in accordance with the provisions of section 553 of Title 5, without regard to subsection (a) thereof. Such regulations shall pertain to, but need not be limited to, application, issuance, transfer, renewal, suspension, and termination of licenses. Such regulations shall provide for full consultation and cooperation with all other interested Federal agencies and departments and with any potentially affected coastal State, and for consideration of the views of any interested members of the general public. The Secretary is further authorized, consistent with the purposes and provisions of this chapter, to amend or rescind any such regulation.

**(b) Additional regulations; criteria for site evaluation and preconstruction testing**

The Secretary, in consultation with the Secretary of the Interior and the Administrator of the National Oceanic and Atmospheric Administration, shall, as soon as practicable after January 3, 1975, prescribe regulations relating to those activities involved in site evaluation and preconstruction testing at potential deepwater port locations that may (1) adversely affect the environment; (2) interfere with authorized uses of the Outer Continental Shelf; or (3) pose a threat to human health and welfare. Such activity may thenceforth not be undertaken except in accordance with regulations prescribed pursuant to this subsection. Such regulations shall be consistent with the purposes of this chapter.

**(c) Applications**

  **(1) Requirements**

    **(A) In general**

    Each person that submits to the Secretary an application shall include in the application a detailed plan that contains all information required under paragraph (2).

    **(B) Action by Secretary**

    Not later than 21 days after the date of receipt of an application, the Secretary shall--

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. **Add-10a**

**(i)** determine whether the application contains all information required under paragraph (2); and

**(ii)(I)** if the Secretary determines that such information is contained in the application, not later than 5 days after making the determination, publish in the Federal Register--

    **(aa)** a notice of the application; and

    **(bb)** a summary of the plans; or

**(II)** if the Secretary determines that all required information is not contained in the application--

    **(aa)** notify the applicant of the applicable deficiencies; and

    **(bb)** take no further action with respect to the application until those deficiencies have been remedied.

**(C) Applicability**

On publication of a notice relating to an application under subparagraph (B)(ii)(I), the Secretary shall be subject to subsection (f).

**(2) Inclusions**

Each application shall include such financial, technical, and other information as the Secretary determines to be necessary or appropriate, including--

**(A)** the name, address, citizenship, telephone number, and the ownership interest in the applicant, of each person having any ownership interest in the applicant of greater than 3 per centum;

**(B)** to the extent feasible, the name, address, citizenship, and telephone number of any person with whom the applicant has made, or proposes to make, a significant contract for the construction or operation of the deepwater port and a copy of any such contract;

**(C)** the name, address, citizenship, and telephone number of each affiliate of the applicant and of any person required to be disclosed pursuant to subparagraphs (A) or (B), together with a description of the manner in which such affiliate is associated with the applicant or any person required to be disclosed under subparagraph (A) or (B);

**(D)** the proposed location and capacity of the deepwater port, including all components thereof;

Add-11a

**(E)** the type and design of all components of the deepwater port and any storage facilities associated with the deepwater port;

**(F)** with respect to construction in phases, a detailed description of each phase, including anticipated dates of completion for each of the specific components thereof;

**(G)** the location and capacity of existing and proposed storage facilities and pipelines which will store or transport oil transported through the deepwater port, to the extent known by the applicant or any person required to be disclosed pursuant to subparagraphs (A), (B), or (C);

**(H)** with respect to any existing and proposed refineries which will receive oil transported through the deepwater port, the location and capacity of each such refinery and the anticipated volume of such oil to be refined by each such refinery, to the extent known by the applicant or any person required to be disclosed pursuant to subparagraphs (A), (B), or (C);

**(I)** the financial and technical capabilities of the applicant to construct or operate the deepwater port;

**(J)** other qualifications of the applicant to hold a license under this chapter;

**(K)** the nation of registry for, and the nationality or citizenship of officers and crew serving on board, vessels transporting natural gas that are reasonably anticipated to be servicing the deepwater port;

**(L)** a description of procedures to be used in constructing, operating, and maintaining the deepwater port, including systems of oil spill prevention, containment, and cleanup; and

**(M)** such other information as may be required by the Secretary to determine the environmental impact of the proposed deepwater port.

**(3)** Upon written request of any person subject to this subsection, the Secretary may make a determination in writing to exempt such person from any of the informational filing provisions enumerated in this subsection or the regulations implementing this section if the Secretary determines that such information is not necessary to facilitate the Secretary's determinations under section 1503 of this title and that such exemption will not limit public review and evaluation of the deepwater port project.

**(d) Application area; publication in Federal Register; "application area" defined; submission of other applications; notice of intent and submission of completed applications; denial of pending application prior to consideration of other untimely applications**

**(1)** At the time notice of an application is published pursuant to subsection (c) of this section, the Secretary shall publish a description in the Federal Register of an application area encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within that application area.

Add-12a

**(2)** As used in this section, "application area" means any reasonable geographical area within which a deepwater port may be constructed and operated. Such application area shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State.

**(3)** The Secretary shall accompany such publication with a call for submission of any other applications for licenses for the ownership, construction, and operation of a deepwater port within the designated application area. Persons intending to file applications for such license shall submit a notice of intent to file an application with the Secretary not later than 60 days after the publication of notice pursuant to subsection (c) of this section and shall submit the completed application no later than 90 days after publication of such notice. The Secretary shall publish notice of any such application received in accordance with subsection (c) of this section. No application for a license for the ownership, construction, and operation of a deepwater port within the designated application area for which a notice of intent to file was received after such 60-day period, or which is received after such 90-day period has elapsed, shall be considered until the application pending with respect to such application area have been denied pursuant to this chapter.

**(4)** This subsection shall not apply to deepwater ports for natural gas.

**(e) Recommendations to Secretary of Transportation; application for all Federal authorizations; copies of application to Federal agencies and departments with jurisdiction; recommendation of approval or disapproval and of manner of amendment to comply with laws or regulations**

**(1)** Not later than 30 days after January 3, 1975, the Secretary of the Interior, the Administrator of the Environmental Protection Agency, the Chief of Engineers of the United States Army Corps of Engineers, the Administrator of the National Oceanic and Atmospheric Administration, and the heads of any other Federal departments or agencies having expertise concerning, or jurisdiction over, any aspect of the construction or operation of deepwater ports shall transmit to the Secretary written comments as to their expertise or statutory responsibilities pursuant to this chapter or any other Federal law.

**(2)** An application filed with the Secretary shall constitute an application for all Federal authorizations required for ownership, construction, and operation of a deepwater port. At the time notice of any application is published pursuant to subsection (c) of this section, the Secretary shall forward a copy of such application to those Federal agencies and departments with jurisdiction over any aspect of such ownership, construction, or operation for comment, review, or recommendation as to conditions and for such other action as may be required by law. Each agency or department involved shall review the application and, based upon legal considerations within its area of responsibility, recommend to the Secretary, the approval or disapproval of the application not later than 45 days after the last public hearing on a proposed license for a designated application area. In any case in which the agency or department recommends disapproval, it shall set forth in detail the manner in which the application does not comply with any law or regulation within its area of responsibility and shall notify the Secretary how the application may be amended so as to bring it into compliance with the law or regulation involved.

**(f) NEPA compliance**

For all applications, the Secretary, in cooperation with other involved Federal agencies and departments, shall comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4332). Such compliance shall fulfill the requirement of all Federal agencies in carrying out their responsibilities under the National Environmental Policy Act of 1969 pursuant to this chapter.

Add-13a

**(g) Public notice and hearings; evidentiary hearing in District of Columbia; decision of Secretary based on evidentiary record; consolidation of hearings**

A license may be issued only after public notice and public hearings in accordance with this subsection. At least one such public hearing shall be held in each adjacent coastal State. Any interested person may present relevant material at any hearing. After hearings in each adjacent coastal State are concluded if the Secretary determines that there exists one or more specific and material factual issues which may be resolved by a formal evidentiary hearing, at least one adjudicatory hearing shall be held in accordance with the provisions of section 554 of Title 5 in the District of Columbia. The record developed in any such adjudicatory hearing shall be basis for the Secretary's decision to approve or deny a license. Hearings held pursuant to this subsection shall be consolidated insofar as practicable with hearings held by other agencies. All public hearings on all applications for any designated application area shall be consolidated and shall be concluded not later than 240 days after notice of the initial application has been published pursuant to subsection (c).

**(h) Fees**

**(1) Requirement**

**(A) In general**

Each person applying for a license pursuant to this chapter shall remit to the Secretary at the time the application is filed a nonrefundable application fee established by regulation by the Secretary.

**(B) Reimbursement**

In addition to a fee under subparagraph (A), an applicant shall also reimburse the United States and the appropriate adjacent coastal State for any additional costs incurred in processing an application.

**(2) Usage fees**

**(A) Definition of directly related land-based facility**

In this paragraph, the term "directly related land-based facility", with respect to a deepwater port facility, means an onshore tank farm and any pipelines connecting the tank farm to the deepwater port facility.

**(B) Authorization**

Notwithstanding any other provision of this chapter, and unless prohibited by law, an adjacent coastal State may fix reasonable fees for the use of a deepwater port facility, and such State and any other State in which land-based facilities directly related to a deepwater port facility are located may set reasonable fees for the use of such land-based facilities.

**(C) Treatment**

Add-14a

A fee may be established pursuant to this paragraph as compensation for any economic cost attributable to the construction and operation of the applicable deepwater port and the applicable land-based facilities, which cannot be recovered under other authority of the applicable State or political subdivision thereof, including, but not limited to, ad valorem taxes, and for environmental and administrative costs attributable to the construction and operation of the applicable deepwater port and the applicable land-based facilities.

**(D) Amount**

The amount of a fee established under this paragraph shall not exceed the applicable economic, environmental, and administrative costs of the applicable State.

**(E) Approval**

A fee established under this paragraph shall be subject to the approval of the Secretary.

**(3) Rental payment**

A licensee shall pay annually in advance the fair market rental value (as determined by the Secretary of the Interior) of the subsoil and seabed of the outer Continental Shelf of the United States to be utilized by the deepwater port, including the fair market rental value of the right-of-way necessary for the pipeline segment of the port located on such subsoil and seabed.

**(i) Application approval; period for determination; priorities; criteria for determination of application best serving national interest**

**(1)** The Secretary shall approve or deny any application for a designated application area submitted pursuant to this chapter not later than 90 days after the last public hearing on a proposed license for that area.

**(2)** In the event more than one application is submitted for an application area, the Secretary, unless one of the proposed deepwater ports clearly best serves the national interest, shall issue a license according to the following order of priorities:

**(A)** First, to an adjacent coastal State (or combination of States), any political subdivision thereof, or agency or instrumentality, including a wholly owned corporation of any such government.

**(B)** Second, to a person who is neither (i) engaged in producing, refining, or marketing oil, nor (ii) an affiliate of any person who is engaged in producing, refining, or marketing oil or an affiliate of any such affiliate.

**(C)** Third, to any other person.

**(3)** In determining whether any one proposed deepwater port clearly best serves the national interest, the Secretary shall consider the following factors:

Add-15a

**(A)** The degree to which the proposed deepwater ports affect the environment, as determined under criteria established pursuant to section 1505 of this title.

**(B)** National security, including an assessment of the implications for the national security of the United States or an allied country (as that term is defined in section 2350f(d)(1) of Title 10) of the United States.

**(C)** Any significant differences between anticipated completion dates for the proposed deepwater ports.

**(D)** Any differences in costs of construction and operation of the proposed deepwater ports, to the extent that such differential may significantly affect the ultimate cost of oil to the consumer.

**(4) Applications for deepwater ports for natural gas**

**(A) Deadline for determination**

The Secretary shall approve or deny any application for a deepwater port for natural gas submitted pursuant to this chapter not later than 90 days after the last public hearing on a proposed license.

**(B) Effect of failure to determine**

If the Secretary fails to approve or deny an application for a deepwater port for natural gas by the applicable deadline under subparagraph (A), the reporting requirements under paragraphs (1), (2), and (3) shall not apply to the application.

**(5) Decision on amended license applications**

**(A) Definition of amended license application**

In this paragraph, the term "amended license application" means a license application for a deepwater port for natural gas--

**(i)** that was originally submitted to the Secretary prior to the issuance of the proclamation issued by the President on March 13, 2020, with respect to the Coronavirus Disease 2019 (COVID-19) pandemic; and

**(ii)** with respect to which the applicant, based on guidance offered by the Secretary, has made subsequent revisions since the submission of the initial license application and submitted such revised application.

**(B) Expedited review and approval**

The Secretary shall expedite the review and subsequent approval or denial of amended license applications submitted pursuant to this section that meet the eligibility criteria described in subparagraph (C).

**Add-16a**

**(C) Eligibility criteria**

To be eligible for review under this paragraph, an amended license application shall meet the following criteria:

**(i)** The amended license application is for a natural gas deepwater port facility.

**(ii)** The Secretary had determined that the project as specified in the initial license application was not likely to have any significant adverse environmental impact on species and habitat, consistent with law including National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

**(iii)** The Secretary has determined that the results of the environmental review conducted for the initial license application is still applicable to the amended license application and an additional environmental review is not required.

**(iv)** The Secretary had published an affirmative Record of Decision for the initial license application.

**(D) Deadline for decision**

The Secretary shall approve or deny an amended license application submitted pursuant to this paragraph by no later than 270 consecutive days after the date on which the Secretary determines that the amended license application is complete and meets the requirements under this section.

**(j) LNG tankers**

**(1) Program**

The Secretary shall develop and implement a program to promote the transportation of liquefied natural gas to and from the United States on United States flag vessels.

**(2) Information to be provided**

When the Coast Guard is operating as a contributing agency in the Federal Energy Regulatory Commission's shoreside licensing process for a liquefied natural gas or liquefied petroleum gas terminal located on shore or within State seaward boundaries, the Coast Guard shall provide to the Commission the information described in subsection (c)(2)(K) with respect to vessels reasonably anticipated to be servicing that port.

**(k) Transparency in issuance of licenses and permits**

**(1) Definition of applicable deadline**

In this subsection, the term "applicable deadline", with respect to an applicant, means the deadline or date applicable to the applicant under any of the following:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. **Add-17a**

**(A)** Section 1503(c)(6) of this title.

**(B)** Section 1503(d)(3) of this title.

**(C)** Subsection (c)(1)(B) (including clause (ii)(I) of that subsection).

**(D)** Subsection (d)(3).

**(E)** Paragraph (1) or (2) of subsection (e).

**(F)** Subsection (g).

**(G)** Paragraph (1) or (4)(A) of subsection (i).

**(2) Suspensions and delays**

If the Secretary suspends or delays an applicable deadline, the Secretary shall submit to the applicant, and publish in the Federal Register, a written statement--

**(A)** describing the reasons for the suspension or delay;

**(B)** describing and requesting any information necessary to issue the applicable license or permit and the status of applicable license or permit application at the lead agency and any cooperating agencies; and

**(C)** identifying the applicable deadline with respect to the statement.

**(3) Applicant rights to technical assistance**

**(A) In general**

An applicant that receives a statement under paragraph (2) may submit to the Secretary a request for a meeting with appropriate personnel of the Department of Transportation and representatives of each cooperating Federal agency, as appropriate, determined by the Secretary to be relevant with respect to the application, including such officials as are appropriate, who shall provide technical assistance, status, process, and timeline updates and additional information as necessary.

**(B) Timing**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. **Add-18a**

A meeting requested under clause (i) shall be held not later than 30 days after the date on which the Secretary receives the request under that clause.

**(4) Requirements**

On receipt of a request under paragraph (3)(A), and not less frequently than once every 30 days thereafter until the date on which the application process is no longer suspended or delayed, the Secretary shall submit a notice of the delay, including a description of the time elapsed since the applicable deadline and the nature and circumstances of the applicable suspension or delay, to--

**(A)** the Committee on Commerce, Science, and Transportation of the Senate; and

**(B)** the Committee on Transportation and Infrastructure of the House of Representatives.

**(5) Briefing**

If the Secretary suspends or delays an applicable deadline, not later than 120 days after that applicable deadline, and not less frequently than once every 120 days thereafter until the date on which the application process is no longer suspended or delayed, the Secretary (or a designee of the Secretary) shall provide a briefing regarding the time elapsed since the applicable deadline and the nature and circumstances of the applicable suspension or delay to--

**(A)** the Committee on Commerce, Science, and Transportation of the Senate; and

**(B)** the Committee on Transportation and Infrastructure of the House of Representatives.

## CREDIT(S)

(Pub.L. 93-627, § 5, Jan. 3, 1975, 88 Stat. 2131; Pub.L. 98-419, § 2(f), Sept. 25, 1984, 98 Stat. 1607; Pub.L. 104-324, Title V, § 505, Oct. 19, 1996, 110 Stat. 3927; Pub.L. 107-295, Title I, § 106(c), (f), (g), Nov. 25, 2002, 116 Stat. 2086 to 2088; Pub.L. 109-241, Title III, § 304(c)(1), July 11, 2006, 120 Stat. 527; Pub.L. 111-281, Title IX, § 903(d), Oct. 15, 2010, 124 Stat. 3011; Pub.L. 116-283, Div. G, Title LVXXXV [LXXXV], § 8502(b)(2), Jan. 1, 2021, 134 Stat. 4747; Pub.L. 118-31, Div. C, Title XXXV, § 3514(k)(4), Dec. 22, 2023, 137 Stat. 814; Pub.L. 118-159, Div. C, Title XXXV, § 3538, Dec. 23, 2024, 138 Stat. 2316.)

33 U.S.C.A. § 1504, 33 USCA § 1504
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. **Add-19a**

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1505

§ 1505. Environmental review criteria

Effective: December 22, 2023
Currentness

**(a) Establishment**

The Secretary, in accordance with the recommendations of the Administrator of the Environmental Protection Agency and the Administrator of the National Oceanic and Atmospheric Administration and after consultation with any other Federal departments and agencies having jurisdiction over any aspect of the construction or operation of a deepwater port, shall establish, as soon as practicable after January 3, 1975, environmental review criteria consistent with the National Environmental Policy Act. Such criteria shall be used to evaluate a deepwater port as proposed in an application, including--

**(1)** the effect on the marine environment;

**(2)** the effect on oceanographic currents and wave patterns;

**(3)** the effect on alternate uses of the oceans and navigable waters, such as scientific study, fishing, and exploitation of other living and nonliving resources;

**(4)** the potential dangers to a deepwater port from waves, winds, weather, and geological conditions, and the steps which can be taken to protect against or minimize such dangers;

**(5)** effects of land-based developments related to deepwater port development;

**(6)** the effect on human health and welfare; and

**(7)** such other considerations as the Secretary deems necessary or appropriate.

**(b) Review and revision**

The Secretary shall periodically review and, whenever necessary, revise in the same manner as originally developed, criteria established pursuant to subsection (a).

**(c) Requirement**

Add-20a

The criteria established pursuant to this section shall be developed concurrently with the regulations promulgated pursuant to section 1504(a) of this title and in accordance with that section.

## CREDIT(S)

(Pub.L. 93-627, § 6, Jan. 3, 1975, 88 Stat. 2135; Pub.L. 118-31, Div. C, Title XXXV, § 3514(k)(5), Dec. 22, 2023, 137 Stat. 818.)

33 U.S.C.A. § 1505, 33 USCA § 1505
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-21a

United States Code Annotated
   Title 33. Navigation and Navigable Waters (Refs & Annos)
      Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1508

§ 1508. Adjacent coastal States

Effective: December 22, 2023
Currentness

**(a) Designation**

In issuing a notice relating to an application for a deepwater port under section 1504(c)(1)(B)(ii)(I) of this title, the Secretary shall designate as an adjacent coastal State, with respect to the deepwater port, any coastal State that would be--

**(1)** directly connected by pipeline to that deepwater port; or

**(2)** located within 15 miles of that deepwater port.

**(b) Input from adjacent coastal States and other interested States**

**(1) Submission of applications to governors for approval**

**(A) In general**

Not later than 10 days after the date on which the Secretary designates adjacent coastal States under subsection (a) with respect to a deepwater port proposed in an application, the Secretary shall transmit a complete copy of the application to the Governor of each adjacent coastal State.

**(B) Prohibition**

The Secretary shall not issue a license without the approval of the Governor of each adjacent coastal State.

**(C) Presumed approval**

If the Governor of an adjacent coastal State fails to transmit a required approval or disapproval to the Secretary not later than 45 days after the last public hearing on applications for a particular application area, such approval shall be conclusively presumed.

**(D) Inconsistency with certain State programs**

**Add-22a**

If the Governor of an adjacent coastal State notifies the Secretary that an application, which would otherwise be approved pursuant to this paragraph, is inconsistent with State programs relating to environmental protection, land and water use, and coastal zone management, the Secretary shall condition the license granted so as to make it consistent with such State programs.

**(2) Other interested States**

Any other State with an interest relating to a deepwater port proposed in an application shall have the opportunity to make its views known to, and shall be given full consideration by, the Secretary regarding the location, construction, and operation of the deepwater port.

**(c) Reasonable progress toward development of coastal zone management program; planning grants**

The Secretary shall not issue a license unless the adjacent coastal State to which the deepwater port is to be directly connected by pipeline has developed, or is making, at the time the application is submitted, reasonable progress toward developing an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972 in the area to be directly and primarily impacted by land and water development in the coastal zone resulting from such deepwater port. For the purposes of this chapter, a State shall be considered to be making reasonable progress if it is receiving a planning grant pursuant to section 305 of the Coastal Zone Management Act.

**(d) State agreements or compacts**

The consent of Congress is given to two or more coastal States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, (1) to apply for a license for the ownership, construction, and operation of a deepwater port or for the transfer of such license, and (2) to establish such agencies, joint or otherwise, as are deemed necessary or appropriate for implementing and carrying out the provisions of any such agreement or compact. Such agreement or compact shall be binding and obligatory upon any State or party thereto without further approval by Congress.

## CREDIT(S)

(Pub.L. 93-627, § 9, Jan. 3, 1975, 88 Stat. 2136; Pub.L. 118-31, Div. C, Title XXXV, § 3514(k)(6), Dec. 22, 2023, 137 Stat. 818.)

33 U.S.C.A. § 1508, 33 USCA § 1508
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-23a

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1513

§ 1513. Public access to information

Currentness

**(a) Inspection of copies; reproduction costs; protected information**

Copies of any communication, document, report, or information transmitted between any official of the Federal Government and any person concerning a deepwater port (other than contracts referred to in section 1504(c)(2)(B) of this title) shall be made available to the public for inspection, and shall be available for the purpose of reproduction at a reasonable cost, to the public upon identifiable request, unless such information may not be publicly released under the terms of subsection (b) of this section. Except as provided in subsection (b) of this section, nothing contained in this section shall be construed to require the release of any information of the kind described in subsection (b) of section 552 of Title 5 or which is otherwise protected by law from disclosure to the public.

**(b) Information disclosure prohibition; confidentiality of certain disclosures**

The Secretary shall not disclose information obtained by him under this chapter that concerns or relates to a trade secret, referred to in section 1905 of Title 18, or to a contract referred to in section 1504(c)(2)(B) of this title, except that such information may be disclosed, in a manner which is designed to maintain confidentiality--

**(1)** to other Federal and adjacent coastal State government departments and agencies for official use, upon request;

**(2)** to any committee of Congress having jurisdiction over the subject matter to which the information relates, upon request;

**(3)** to any person in any judicial proceeding, under a court order formulated to preserve such confidentiality without impairing the proceedings; and

**(4)** to the public in order to protect health and safety, after notice and opportunity for comment in writing or for discussion in closed session within fifteen days by the party to which the information pertains (if the delay resulting from such notice and opportunity for comment would not be detrimental to the public health and safety).

**CREDIT(S)**

(Pub.L. 93-627, § 14, Jan. 3, 1975, 88 Stat. 2139.)

33 U.S.C.A. § 1513, 33 USCA § 1513

Add-24a

United States Code Annotated
    Title 33. Navigation and Navigable Waters (Refs & Annos)
        Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1516

§ 1516. Judicial review; persons aggrieved; jurisdiction of courts of appeal

Currentness

Any person suffering legal wrong, or who is adversely affected or aggrieved by the Secretary's decision to issue, transfer, modify, renew, suspend, or revoke a license may, not later than 60 days after any such decision is made, seek judicial review of such decision in the United States Court of Appeals for the circuit within which the nearest adjacent coastal State is located. A person shall be deemed to be aggrieved by the Secretary's decision within the meaning of this chapter if he--

**(A)** has participated in the administrative proceedings before the Secretary (or if he did not so participate, he can show that his failure to do so was caused by the Secretary's failure to provide the required notice); and

**(B)** is adversely affected by the Secretary's action.

**CREDIT(S)**

(Pub.L. 93-627, § 17, Jan. 3, 1975, 88 Stat. 2141.)

33 U.S.C.A. § 1516, 33 USCA § 1516
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-25a

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 55. National Environmental Policy (Refs & Annos)
            Subchapter I. Policies and Goals (Refs & Annos)

42 U.S.C.A. § 4332

§ 4332. Cooperation of agencies; reports; availability of information;
recommendations; international and national coordination of efforts

Effective: June 3, 2023
Currentness

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** reasonably foreseeable environmental effects of the proposed agency action;

**(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

**(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

Add-26a

**(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;

**(E)** make use of reliable data and resources in carrying out this chapter;

**(F)** consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

**(G)** any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [1]

**(H)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

Add-27a

**(I)** consistent with the provisions of this chapter, recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(J)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(K)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(L)** assist the Council on Environmental Quality established by subchapter II of this chapter.

## CREDIT(S)

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424; Pub.L. 118-5, Div. C, Title III, § 321(a), June 3, 2023, 137 Stat. 38.)

## Footnotes

1        So in original. The period probably should be a semicolon.

42 U.S.C.A. § 4332, 42 USCA § 4332
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-28a

80 FR 42162-01, 2015 WL 4270127(F.R.)

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[Docket No. USCG-2015-0472]

Deepwater Port License Application: Delfin LNG, LLC, Delfin LNG Deepwater Port

Thursday, July 16, 2015

AGENCY: Maritime Administration, Department of Transportation.

**\*42162** ACTION: Notice of application.

SUMMARY: The Maritime Administration (MARAD) and the U.S. Coast Guard (USCG) announce they have received an application for the licensing of a liquefied natural gas (LNG) export deepwater port and that the application contains all required information. This notice summarizes the applicant's plans and the procedures that will be followed in considering the application. DATES: The Deepwater Port Act of 1974, as amended, requires any public hearing(s) on this application to be held not later than 240 days after publication of this notice, and a decision on the application not later than 90 days after the final public hearing.

ADDRESSES: The public docket for USCG-2015-0472 is maintained by the U.S. Department of Transportation, Docket Management Facility, West Building, Ground Floor, Room W12-140, 1200 New Jersey Avenue SE., Washington, DC 20590. The Federal Docket Management Facility accepts hand-delivered submissions, and makes docket contents available for public inspection and copying at this address between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Federal Docket Management Facility's telephone number is 202-366-9329, the fax number is 202-493-2251 and the Web site for electronic submissions or for electronic access to docket contents is http://www.regulations.gov. keyword search "USCG-2015-0472".

FOR FURTHER INFORMATION CONTACT: Mr. Roddy Bachman, U.S. Coast Guard, telephone: 202-372-1451, email: Roddy.C.Bachman@uscg.mil or

Ms. Yvette M. Fields, Maritime Administration, telephone: 202-366-0926, email: Yvette.Fields@dot.gov. For questions regarding viewing the Docket, call Docket Operations, telephone: 202-366-9826.

SUPPLEMENTARY INFORMATION:

**Receipt of Application**

On May 8, 2015, MARAD and USCG received an application from Delfin LNG, LLC (Delfin LNG) for all Federal authorizations required for a license to own, construct, and operate a deepwater port (DWP) for the export of natural gas authorized under the Deepwater Port Act of 1974, as amended, 33 U.S.C. 1501 et seq. (the Act), and implemented under 33 CFR parts 148, 149, and 150. After a coordinated completeness review by MARAD and other cooperating Federal agencies, it was determined that the application required supplemental information, and, by letter of May 29, 2015 to Delfin LNG, the USCG deemed the application incomplete. On June 22, 2015, in response to the USCG letter, Delfin LNG submitted the requested supplemental information entitled "Deepwater Port License Application Delfin LNG Project May 8, 2015—Supplemented June 19, 2015." It has now been determined that the application contains all information necessary to initiate processing of the application. The USCG deemed the application complete on June 29, 2015.

Also on May 8, 2015, Delfin LNG filed an application with the Federal Energy Regulatory Commission (FERC) requesting authorizations pursuant to the Natural Gas Act and 18 CFR part 157. This application was noticed on FERC's Docket No. CP15-490-000 on May 20, 2015 and in the Federal Register (80 FR 30266-01). The following is an excerpt from that Federal Register Notice:

Take notice that on May 8, 2015 Delfin LNG LLC (Delfin LNG), 1100 Louisiana Street, Houston, Texas 77002, filed in Docket No. CP15-490-000, an Application pursuant to section 7(c) of the Commission's Regulations under the Natural Gas Act and Parts 157 of the Federal Energy Regulatory Commission's (Commission) regulations requesting authorization to (1) reactivate approximately 1.1 miles of existing 42-inch pipeline formerly owned by U-T Offshore System (UTOS), which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean highwater mark along the Cameron Parish Coast; (2) install 74,000 horsepower of new compression; (3) construct 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construct 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station in Cameron Parrish, Louisiana that comprise the onshore portion of Delfin LNG's proposed deepwater port (DWP), an offshore liquefied natural gas facility located off the coast of Louisiana in the Gulf of Mexico, all as more fully set forth in the application, which is on file with the Commission and open to public inspection. Additionally, Delfin LNG requests a blanket construction certificate under Part 17, Subpart F of the Commission's regulations. This filing may be viewed on the web at http://www.ferc.gov using the"eLibrary" link. Enter the docket number excluding the last three digits in the docket number field to access the document. For assistance, please contact FERC at FERCOnlineSupport@ferc.gov or call toll-free, (886) 208-3676 or TYY, (202) 502-8659.

. . . .

Delfin LNG's onshore facilities will connect with the DWP facilities that are subject to jurisdiction of the Maritime Authority [sic] (MARAD) and the United States Coast Guard (USCG). Additionally, as part of Delfin LNG's DWP, Delfin LNG proposes to lease a segment of pipeline from High Island Offshore System, LLC (HIOS) that extends from the terminus of the UTOS pipeline offshore. Delfin LNG states in its application that HIOS will submit a separate application with the Commission seeking authorization to abandon by lease its facilities to Delfin LNG.

Because the review of the DWP proposal is the jurisdiction of MARAD and USCG, the Commission acknowledges Delfin LNG's application in Docket No. CP15-490-000 on May 8, 2015. However, the Commission will **\*42163** not begin processing Delfin LNG's application until such time that MARAD and USCG accept Delfin LNG's DWP application, and HIOS submits an abandonment application with the Commission.

**Background**

According to the Act, a deepwater port is a fixed or floating manmade structure other than a vessel, or a group of structures, including all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys, mooring lines, and similar facilities that are proposed as part of a deepwater port, located beyond State seaward boundaries and used or intended for use as a port or terminal for the transportation, storage, and further handling of oil or natural gas for transportation to, or from, any State.[FN1]

[1] On December 20, 2012, the Coast Guard and Maritime Transportation Act of 2012 (Title III, Sec. 312) amended Section 3(9)(A) of the Deepwater Port Act of 1974 (33 U.S.C. 1502(9)(A)) to insert the words "or from" before the words "any State" in the definition of Deepwater Port. This amendment grants MARAD the authority to license the construction of Deepwater Ports for the export of oil and natural gas from domestic sources within the United States to foreign markets abroad.

The Secretary of Transportation delegated to the Maritime Administrator authorities related to licensing deepwater ports (49 CFR 1.93(h)). Statutory and regulatory requirements for licensing appear in 33 U.S.C. 1501 et seq. and 33 CFR part 148.

Under delegations from, and agreements between, the Secretary of Transportation and the Secretary of Homeland Security, applications are jointly processed by MARAD and USCG. Each application is considered on its merits.

In accordance with 33 U.S.C. 1504(f) for all applications, MARAD and the USCG, working in cooperation with other Federal agencies and departments considering a DWP application shall comply with the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 et seq.). The U.S. Environmental Protection Agency (EPA), the U.S. Army Corps of Engineers (USACE), the National Oceanic and Atmospheric Administration (NOAA), the Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the Pipeline and Hazardous Materials Safety Administration (PHMSA), among others, are cooperating agencies and will assist in the NEPA process as described in 40 CFR 1501.6.; may participate in scoping meeting(s); and will incorporate the Environmental Impact Statement (EIS) into their permitting processes. Comments addressed to the EPA, USACE, or other federal cooperating agencies will be incorporated into the Department of Transportation (DOT) docket and considered as the EIS is developed to ensure consistency with the NEPA process.

All connected actions, permits, approvals and authorizations will be considered in the deepwater port license application review. FERC has jurisdiction over the onshore components of the proposed deepwater port as well as the change in service of the offshore HIOS pipeline. As noted above, these matters will be addressed by FERC through a separate application process. FERC has also noted they cannot participate until such time as HIOS submits a pipeline abandonment application with the Commission. For purposes of the Delfin LNG DWP license application, MARAD and the USCG consider both the DWP application and the FERC application to be included in this review. For your convenience, we have included the Delfin LNG application to FERC under Docket Number USCG-2015-0472.

MARAD, in issuing this Notice of Application pursuant to section 1504(c) of the Act, must designate as an "Adjacent Coastal State" any coastal state which (A) would be directly connected by pipeline to a deepwater port as proposed in an application, or (B) would be located within 15 miles of any such proposed deepwater port (see 33 U.S.C. 1508(a)(1)). On April 30, 2013, MARAD issued a Notice of Policy Clarification advising the public that nautical miles shall be used when determining Adjacent Coastal State status (78 FR 25349). Pursuant to the criteria provided in the Act, Louisiana and Texas are the Adjacent Coastal States for this application. Other states may apply for Adjacent Coastal State status in accordance with 33 U.S.C. 1508(a)(2).

The Act directs that at least one public hearing take place in each Adjacent Coastal State, in this case, Louisiana and Texas. Additional public meetings may be conducted to solicit comments for the environmental analysis to include public scoping meetings, or meetings to discuss the Draft EIS and the Final EIS.

MARAD and USCG will publish additional Federal Register notices with information regarding these public meeting(s) and hearing(s) and other procedural milestones, including the NEPA environmental review. The Maritime Administrator's decision, and other key documents, will be filed in the public docket.

The Deepwater Port Act imposes a strict timeline for processing an application. When MARAD and USCG determine that an application contains the required information, the Act directs that all public hearings on the application be concluded within 240 days after publication of this Notice of Application.

Within 45 days after the final hearing, the Governor(s) of the Adjacent Coastal State(s), in this case the Governors of Louisiana and Texas, may notify MARAD of their approval, approval with conditions, or disapproval of the application. MARAD may not issue a license without the explicit or presumptive approval of the Governor(s) of the Adjacent Coastal State(s). During this 45 day time period, the Governor(s) may also notify MARAD of inconsistencies between the application and State programs relating to environmental protection, land and water use, and coastal zone management. In this case, MARAD may condition the license to make it consistent with such state programs (33 U.S.C. 1508(b)(1)). MARAD will not consider written approvals or disapprovals of the application from Governors of Adjacent Coastal States until the 45-day period after the final public hearing.

The Maritime Administrator must render a decision on the application within 90 days after the final hearing.

**Add-31a**

Should a favorable record of decision be rendered and license be issued, MARAD may include specific conditions related to design, construction, operations, environmental permitting, monitoring and mitigations, and financial responsibilities. If a license is issued, USCG would oversee the review and approval of the deepwater port's Floating Liquefied Natural Gas Vessels (FLNGVs) and in coordination with other agencies as appropriate review of engineering design and construction; operations/ security procedures; waterways management and regulated navigation areas; maritime safety and security requirements; risk assessment; and compliance with domestic and international laws and regulations for vessels that may call on the port. The deepwater port would be designed, constructed and operated in accordance with applicable codes and standards.

In addition, installation of pipelines and other structures, such as the Tower Yoke Mooring Systems (TYMSs), may require permits under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, which are administered by USACE.

Permits from the EPA may also be required pursuant to the provisions of the Clean Air Act, as amended, and the Clean Water Act, as amended.

**\*42164**   As mentioned above, Delfin LNG has filed an application with FERC for a Certificate of Public Convenience and Necessity for the Delfin LNG Project Onshore Facilities as described in the FERC Federal Register notice (80 FR 30266-01). In order to achieve the goals of NEPA, this application to operate onshore facilities is included as a connected action for the proposed deepwater port and the environmental impact of its construction and operation will be included in the MARAD/USCG NEPA review. However, to reiterate, FERC has stated it will not be able to commence processing Delfin LNG's application for the proposed onshore facility until such time as the HIOS abandonment application is filed.

The Department of Energy (DOE) is also a cooperating agency. On February 20, 2014, DOE approved Delfin LNG's application to export LNG by vessel from its proposed deepwater port to Free Trade Agreement (FTA) nations. On November 12, 2013, Delfin LNG applied to the DOE for a long-term multi-contract authorization to export domestically produced LNG to non-FTA nations. Pursuant to DOE's revised procedures for LNG export decisions (79 FR 48132), the DOE will act on applications to export LNG to non-FTA nations only after the NEPA review is completed by the lead Federal agency, in this case the USCG and MARAD.

**Summary of the Application**

Delfin LNG is proposing to construct, own, and operate a DWP terminal (referred to herein as the Delfin Terminal) in the Gulf of Mexico to liquefy natural gas for export to FTA and non-FTA nations.

The proposed Project has both onshore and offshore components. The proposed DWP would be located in Federal waters within the Outer Continental Shelf (OCS) West Cameron Area, West Addition Protraction Area (Gulf of Mexico), approximately 37.4 to 40.8 nautical miles (or 43 to 47 statute miles) off the coast of Cameron Parish, Louisiana, in water depths ranging from approximately 64 to 72 feet (19.5 to 21.9 meters). The DWP would consist of four semi-permanently moored FLNGVs located as follows: 1B1 (29°8'13.1" N./93°32'2.2" W.), 1B2 (29°6'13.6" N./93°32'42.4" W.), 1B3 (29°6'40.7" N./93°30'10.1" W.), and 1B4 (29°4'40.9" N./93°30'51.8" W.), located in WC 319, 327, 328, and 334 blocks, respectively. It would reuse and repurpose two existing offshore natural gas pipelines: The former U-T Operating System (UTOS) pipeline, and the High Island Operating System (HIOS) pipeline. Four new pipeline laterals connecting the HIOS pipeline to each of the FLNGVs would be constructed. The feed gas would be supplied through these new pipeline laterals to each of the FLNGVs where it would be super cooled to produce LNG. The LNG would be stored onboard the FLNGV and transferred via ship-to-shop transfer to properly certified LNG trading carriers. Each of the FLNGVs would be semi-permanently moored to four new weather-vaning TYMSs.

The onshore components in Cameron Parish, Louisiana consist of engineering, constructing, and operating a new natural gas compressor station, gas supply header and metering station at an existing gas facility. The proposal would require: (1) Reactivation of approximately 1.1 miles of existing 42-inch pipeline, formerly owned by UTOS, which runs from

Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean high water mark along the Cameron Parish Coast; (2) installation of 74,000 horsepower of new compression; (3) construction of 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construction of 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station.

Onshore pipeline quality natural gas from the interstate grid would be compressed and sent to the existing, but currently idled, 42-inch UTOS pipeline. The gas would be transported through the UTOS pipeline and would bypass the existing manifold platform located at West Cameron (WC) 167 approximately 24.7 nautical miles (28.4 statute miles) offshore in the Gulf of Mexico. The bypass of WC 167 would be a newly installed pipeline segment, 700 feet in length, connecting to the existing 42-inch HIOS pipeline.

The bypass of the WC 167 platform would be trenched so that the top of the pipe is a minimum of 3 feet below the seafloor. From the bypass, the feed gas would then be transported further offshore using the HIOS pipeline portion leased by the Applicant between WC 167 and High Island A264. The existing UTOS and HIOS pipelines transect OCS Lease Blocks WC 314, 318, 319, 327, and 335, and would transport feed gas from onshore to offshore (one-directional flow). Delfin LNG proposes to install four new lateral pipelines along the HIOS pipeline, starting approximately 16.0 nautical miles (18.4 statute miles) south of the WC 167 platform. Each subsea lateral pipeline would be 30 inches in diameter and approximately 6,400 feet in length, extending from the HIOS pipeline to the Delfin Terminal.

The FLNGVs would receive pipeline quality natural gas via the laterals and TYMS where it would be cooled sufficiently to totally condense the gas to produce LNG. The produced LNG would be stored in International Maritime Organization (IMO) type B, prismatic, independent LNG storage tanks aboard each of the FLNGVs. Each vessel would have a total LNG storage capacity of 165,000 cubic meters ($m^3$).

An offloading mooring system would be provided on each FLNGV to moor an LNG trading carrier side-by-side for cargo transfer of LNG through loading arms or cryogenic hoses using ship-to-ship transfer procedures. LNG carriers would be moored with pilot and tug assist. The FLNGV would be equipped with fenders and quick-release hooks to facilitate mooring operations. The offloading system would be capable of accommodating standard LNG trading carriers with nominal cargo capacities up to 170,000 $m^3$. It is expected that the typical LNG cargo transfer operation would be carried out within 24 hours, including LNG trading carrier berthing, cargo transfer and sail-away.

The FLNGVs would be self-propelled vessels and have the ability to disconnect from the TYMS and set sail to avoid hurricanes or to facilitate required inspections, maintenance, and repairs.

In the nominal design case, each of the four FLNGVs would process approximately 330 million standard cubic feet per day (MMscfd), which would total 1.32 billion standard cubic feet per day (Bscf/d) of input feed gas for all four of the FLNGVs. Based on an estimated availability of 92 percent and allowance for consumption of feed gas during the liquefaction process, each FLNGV would produce approximately 97.5 billion standard cubic feet per year (Bscf/y) of gas (or approximately 2.0 million metric tonnes per annum (MMtpa)) for export in the form of LNG. Together, the four FLNGVs are designed to have the capability to export 390.1 Bscf/y of gas (or approximately 8.0 MMtpa) in the form of LNG.

As detailed engineering and equipment specification advances during the design process, and operating efficiencies are gained post-commissioning, the liquefaction process could perform better than this nominal design case. It is therefore anticipated that LNG output, based on the high-side design case of 375 MMscfd of input feed gas, would be as much as approximately 110.8 Bscf/y of gas (or approximately 2.3 MMtpa) for each FLNGV. Taken together, the four FLNGVs would be capable of exporting the equivalent of 443.3 Bscf/y of natural gas in the form  **\*42165**  of LNG. Therefore, Delfin LNG is requesting authorization to construct and operate facilities capable of exporting up to 443.3 Bscf/y of natural gas in the form of LNG (which equates to approximately 9.2 MMtpa).

Add-33a

The proposed Project would take a modular implementation approach to allow for early market entry and accommodate market shifts. Offshore construction activities are proposed to begin first quarter (Q1) of 2018 and would be completed in four stages. Each stage corresponds to the commissioning and operation of an FLNGV. The anticipated commissioning of FLNGV 1 is Q3 of 2019 with start-up of commercial operation of FLNGV 1 by the end of 2019. It is anticipated that FLNGVs 2 through 4 would be commissioned 12 months apart. The Delfin Terminal would be completed and all four FLNGVs would be fully operational by the summer of 2022.

**Privacy Act**

The electronic form of all comments received into the Federal Docket Management System can be searched by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). The DOT Privacy Act Statement can be viewed in the Federal Register published on April 11, 2000 (Volume 65, Number 70, pages 19477-78) or by visiting http://www.regulations.gov.

Authority: 33 U.S.C. 1501, et seq.; 49 CFR 1.93(h).

Dated: July 13, 2015.

By order of the Maritime Administrator.

T. Mitchell Hudson, Jr.,

Secretary, Maritime Administration.

[FR Doc. 2015-17465 Filed 7-15-15; 8:45 am]

BILLING CODE 4910-81-P

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-34a

80 FR 45270-02, 2015 WL 4538900(F.R.)

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[Docket No. USCG-2015-0472]

Deepwater Port License Application: Delfin LNG LLC, Delfin LNG Deepwater Port

Wednesday, July 29, 2015

AGENCY: Maritime Administration, Department of Transportation.

**\*45270** ACTION: Notice of intent; notice of public meeting; request for comments.

SUMMARY: The Maritime Administration (MARAD), in coordination with the U.S. Coast Guard (USCG), will prepare an environmental impact statement (EIS) as part of the environmental review of the Delfin LNG LLC (Delfin LNG) deepwater port license application. The application proposes the ownership, construction, operation and eventual decommissioning of an offshore liquefied natural gas (LNG) deepwater port export facility that would be located in Federal waters within the Outer Continental Shelf (OCS) West Cameron Area, West Addition Protraction Area (Gulf of Mexico), approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana, in water depths ranging from approximately 64 to 72 feet (19.5 to 21.9 meters). The deepwater port would consist of four semi-permanently moored floating liquefaction natural gas vessels (FLNGVs), and would reuse and repurpose two existing offshore natural gas pipelines: The former U-T Operating System (UTOS) pipeline and the High Island Operating System (HIOS) pipeline (see Summary of the Application for additional project specifics).

The onshore components of the proposed deepwater port would be located in Cameron Parish, Louisiana and would be reviewed by the Federal Energy Regulatory Commission (FERC) under a separate authorization process (see FERC Docket No. CP15-490-000; 80 FR 30226 (May 27, 2015)). The onshore facility would consist of reactivating approximately 1.1 miles of the existing UTOS pipeline; the addition of 74,000 horsepower of new compression and associated metering and regulation facilities; the installation of new supply header pipelines (which would consist of 0.25 miles of new 42-inch pipeline to connect the former UTOS line to the new meter station); and 0.6 miles of new twin 30-inch pipelines between Transco Station 44 and the new compressor station site. Publication of this Notice of Intent (NOI) begins a 30 day scoping process that will help identify and determine **\*45271** the scope of environmental issues to be addressed in the EIS. MARAD and the USCG will consider both the Delfin LNG deepwater port license application and the FERC application to be included in this review. For your convenience, we have included the Delfin LNG application to FERC under docket number USCG-2015-0472. This NOI requests public participation in the scoping process, provides information on how to participate and announces informational open houses and public meetings in Louisiana and Texas. Pursuant to the criteria provided in the Deepwater Port Act of 1974, as amended, 33 U.S.C. 1501 et seq. (the Act), both Louisiana and Texas are the Adjacent Coastal States for this application.

DATES: There will be two public scoping meetings held in connection with the application. The first public meeting will be held in Lake Charles, Louisiana on August 18, 2015, from 6 p.m. to 8 p.m. The second public meeting will be held in Beaumont, Texas on August 19, 2015, from 6 p.m. to 8 p.m. Both public meetings will be preceded by an informational open house from 4 p.m. to 5:30 p.m.

Each of the public meetings may end later than the stated time, depending on the number of persons wishing to speak. Additionally, materials submitted in response to this request for comments on the Delfin LNG deepwater port license application must reach the Federal Docket Management Facility as detailed below by August 28, 2015.

Add-35a

ADDRESSES: The open house and public meeting in Lake Charles, Louisiana will be held at the Lake Charles Civic Center, 900 Lakeshore Drive, Lake Charles, Louisiana 70601, telephone: 337-491-1256. The open house and public meeting in Beaumont, Texas will be held at the Holiday Inn Beaumont Plaza, 3950 Walden Road, Beaumont, Texas 77705, telephone: 409-842-5995. Free parking is available at both the Lake Charles Civic Center and the Holiday Inn Beaumont Plaza locations.
The public docket for USCG-2015-0472 is maintained by the U.S. Department of Transportation, Docket Management Facility, West Building, Ground Floor, Room W12-140, 1200 New Jersey Avenue SE., Washington, DC 20590.

The Federal Docket Management Facility accepts hand-delivered submissions, and makes docket contents available for public inspection and copying at this address between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Federal Docket Management Facility's telephone number is 202-366-9329, the fax number is 202-493-2251 and the Web site for electronic submissions or for electronic access to docket contents is http://www.regulations.gov. keyword search "USCG-2015-0472".

FOR FURTHER INFORMATION CONTACT: Mr. Roddy Bachman, USCG, telephone: 202-372-1451, email: Roddy.C.Bachman@uscg.mil, or Ms. Yvette M. Fields, MARAD, telephone: 202-366-0926, email: Yvette.Fields@dot.gov. For questions regarding viewing the Docket, call Docket Operations, telephone 202-366-9826.

SUPPLEMENTARY INFORMATION:

**Public Meeting and Open House**
We invite you to learn about the proposed deepwater port at any of the above informational open houses and to comment at any of the above public meetings on environmental issues related to the proposed deepwater port. Your comments will help us identify and refine the scope of the environmental issues to be addressed in the EIS.

Speaker registrations will be available at the door. Speakers at the public scoping meetings will be recognized in the following order: Elected officials, public agencies, individuals or groups in the sign-up order and then anyone else who wishes to speak.

In order to allow everyone a chance to speak at a public meeting, we may limit speaker time, extend the meeting hours or both. You must identify yourself, and any organization you represent, by name. Your remarks will be recorded or transcribed for inclusion in the public docket.

You may submit written material at a public meeting, either in place of or in addition to speaking. Written material must include your name and address and will be included in the public docket.

Public docket materials will be made available to the public on the Federal Docket Management Facility Web site (see Request for Comments).

Our public meeting locations are wheelchair-accessible. If you plan to attend an open house or public meeting and need special assistance such as sign language interpretation, non-English language translator services or other reasonable accommodation, please notify the USCG (see FOR FURTHER INFORMATION CONTACT) at least 5 business days in advance. Include your contact information as well as information about your specific needs.

**Request for Comments**
We request public comments or other relevant information on environmental issues related to the proposed deepwater port. The public meeting is not the only opportunity you have to comment on the Delfin LNG deepwater port license application. In addition to or in place of attending a meeting, you can submit comments directly to the Federal Docket Management Facility during the public comment period (see DATES). We will consider all comments and material received during the 30-day scoping period. The license application, comments and associated documentation as well as the draft and final EISs (when published) are

**Add-36a**

available for viewing at the Federal Docket Management System (FDMS) Web site: http://www.regulations.gov under docket number USCG-2015-0472.

Public comment submissions should include:

• Docket number USCG-2015-0472.

• Your name and address.

Submit comments or material using only one of the following methods:

• Electronically (preferred for processing) to the Federal Docket Management System (FDMS) Web site: http://www.regulations.gov under docket number USCG-2015-0472.

• By mail to the Federal Docket Management Facility (USCG-2015-0472), U.S. Department of Transportation, West Building, Ground Floor, Room W12-140, 1200 New Jersey Avenue SE., Washington, DC 20590-0001

• By personal delivery to the room and address listed above between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

• By fax to the Federal Docket Management Facility at 202-493-2251.

Faxed, mailed or hand delivered submissions must be unbound, no larger than 8½ by 11 inches and suitable for copying and electronic scanning. The format of electronic submissions should also be no larger than 8½ by 11 inches. If you mail your submission and want to know when it reaches the Federal Docket Management Facility, please include a stamped, self-addressed postcard or envelope.

Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the FDMS Web site (http://www.regulations.gov) and will include any personal information you provide. Therefore, submitting this information to the docket makes it public. You may wish to read the Privacy and Use Notice that is available on the FDMS Web site and the Department of Transportation Privacy Act Notice that appeared in the Federal Register on April 11, 2000 (65 FR 19477), see Privacy Act. You may **\*45272** view docket submissions at the Federal Docket Management Facility or electronically on the FDMS Web site.

**Background**

Information about deepwater ports, the statutes, and regulations governing their licensing, including the application review process, and the receipt of the current application for the proposed Delfin LNG deepwater port appears in the July 16, 2015 edition of the Federal Register. The "Summary of the Application" from that publication is reprinted below for your convenience.

Consideration of a deepwater port license application includes review of the proposed deepwater port's impact on the natural and human environment. For the proposed deepwater port, USCG and MARAD are the co-lead Federal agencies for determining the scope of this review, and in this case, it has been determined that review must include preparation of an EIS. This NOI is required by 40 CFR 1501.7. It briefly describes the proposed action, possible alternatives and our proposed scoping process. You can address any questions about the proposed action, the scoping process or the EIS to the USCG project manager identified in this notice (see For Further Information Contact).

**Proposed Action and Alternatives**

**Add-37a**

The proposed action requiring environmental review is the Federal licensing of the proposed deepwater port described in "Summary of the Application" below. The alternatives to licensing the proposed port are: (1) Licensing with conditions (including conditions designed to mitigate environmental impact), (2) proposed deepwater port site alternatives or (3) denying the application, which for purposes of environmental review is the "no-action" alternative.

**Scoping Process**

Public scoping is an early and open process for identifying and determining the scope of issues to be addressed in the EIS. Scoping begins with this notice, continues through the public comment period (see DATES), and ends when USCG and MARAD have completed the following actions:

• Invites the participation of Federal, state, and local agencies, any affected Indian tribe, the applicant, in this case Delfin LNG, and other interested persons;

• Determines the actions, alternatives and impacts described in 40 CFR 1508.25;

• Identifies and eliminates from detailed study, those issues that are not significant or that have been covered elsewhere;

• Identifies other relevant permitting, environmental review and consultation requirements;

• Indicates the relationship between timing of the environmental review and other aspects of the application process; and

• At its discretion, exercises the options provided in 40 CFR 1501.7(b).

Once the scoping process is complete, USCG will prepare a draft EIS in conjunction with MARAD. Also, MARAD will publish a Federal Register notice announcing public availability of the draft EIS. (If you want that notice to be sent to you, please contact the USCG project manager identified in For Further Information Contact). You will have an opportunity to review and comment on the draft EIS. USCG will consider those comments and then prepare the final EIS. As with the draft EIS, we will announce the availability of the final EIS and once again, give you an opportunity for review and comment and include final public hearings as required by the Act.

**Summary of the Application**

Delfin LNG is proposing to construct, own, operate, and eventually decommission a deepwater port (referred to hereafter as the Delfin deepwater port) in the Gulf of Mexico to liquefy domestically-sourced natural gas for export to nations with which the United States has a Free Trade Agreement (FTA) and with non-FTA nations.

The proposed Delfin deepwater port has both onshore and offshore components. As previously described, the proposed Delfin deepwater port would be located in Federal waters within the OCS West Cameron Area, West Addition Protraction Area (Gulf of Mexico) approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana, in water depths ranging from approximately 64 to 72 feet (19.5 to 21.9 meters). The Delfin deepwater port would consist of four semi-permanently moored FLNGVs located as follows: 1B1 (29°8'13.1" N./93°32'2.2" W.), 1B2 (29°6'13.6"N./93°32'42.4" W.), 1B3 (29°6'40.7" N./93°30'10.1" W.), and 1B4 (29°4'40.9" N./93°30'51.8" W.) located in West Cameron (WC) lease blocks 319, 327, 328, and 334, respectively. Delfin LNG would reuse and repurpose two existing offshore natural gas pipelines, the former UTOS pipeline and the HIOS pipeline. Four new 30-inch diameter pipeline laterals, each approximately 6,400 feet in length, connecting the HIOS pipeline to each of the FLNGVs, would be constructed. In addition, a 700-foot 42-inch diameter new pipeline would be constructed to bypass a platform at WC lease block 167 (WC 167) and connect the UTOS and HIOS pipelines. Feed gas would be supplied through the new pipeline laterals to each of the FLNGVs where it would be super cooled to produce LNG. The LNG would be stored onboard the FLNGVs and transferred via ship-to-ship transfer to properly certified LNG trading carriers. Each of the FLNGVs would be semi-permanently moored to four new weathervaning tower yoke mooring systems (TYMS).

**Add-38a**

The onshore components in Cameron Parish, Louisiana are described specifically in an application submitted to FERC. The onshore components of the Delfin deepwater port will consist of constructing and operating a new natural gas compressor station, gas supply header and a metering station at an existing gas facility (see the FERC Application referenced below). The proposal would require: (1) Reactivation of approximately 1.1 miles of existing 42-inch pipeline, formerly owned by UTOS, which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean highwater mark along the Cameron Parish Coast; (2) installation of 74,000 horsepower of new compression; (3) construction of 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construction of 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station.

Onshore pipeline quality natural gas from the interstate grid would be sent to the existing, but currently idle, 42-inch UTOS pipeline. The gas transported through the UTOS pipeline would then bypass the existing manifold platform located at WC 167 via a newly installed pipeline segment, 700 feet in length, connecting to the existing 42-inch HIOS pipeline.

The bypass of the WC 167 platform would be trenched so that the top of the pipe is a minimum of 3 feet below the seafloor. From the bypass, the feed gas would then be transported further offshore using the HIOS pipeline portion leased by Delfin LNG between WC 167 and High Island A264. The existing UTOS and HIOS pipelines transect OCS Lease Blocks WC 314, 318, 319, 327, and 335, and would transport feed gas from onshore to offshore (one-directional flow). Delfin LNG proposes to install four new lateral pipelines along the HIOS pipeline, starting approximately 16.0 nautical miles south of the WC 167 platform. Each subsea lateral pipeline would be 30 inches in **\*45273** diameter and approximately 6,400 feet in length, extending from the HIOS pipeline to the Delfin deepwater port. The maximum allowable operating pressure of the pipeline system (UTOS, bypass, HIOS and laterals) would be 1,250 pounds per square inch gauge (psig).

The FLNGVs would receive pipeline quality natural gas via the laterals and TYMS where it would be cooled sufficiently to completely condense the gas and produce LNG. The produced LNG would be stored in International Maritime Organization (IMO) type B, prismatic, independent LNG storage tanks aboard each of the FLNGVs. Each vessel would have a total LNG storage capacity of 165,000 cubic meters (m[FN3]).

An offloading mooring system would be provided on each FLNGV to moor an LNG trading carrier side-by-side for cargo transfer of LNG through loading arms or cryogenic hoses using ship-to-ship transfer procedures. LNG carriers would be moored with pilot and tug assist. The FLNGVs would be equipped with fenders and quick-release hooks to facilitate mooring operations. The offloading system would be capable of accommodating standard LNG trading carriers with nominal cargo capacities up to 170,000 m[FN3]. Delfin LNG estimates that the typical LNG cargo transfer operation would be carried out within 24 hours, including LNG trading carrier berthing, cargo transfer and sail-away. Approximately 31 LNG trading carriers are expected to visit each of the four FLNGVs per year for a total of up to 124 cargo transfer operations per year. Each LNG trading carrier would be assisted by up to three tugs during approach and mooring and up to two tugs while departing the Delfin deepwater port.

The FLNGVs would be self-propelled vessels and have the ability to disconnect from the TYMS and set sail to avoid hurricanes or to facilitate required inspections, maintenance and repairs.

In the nominal design case, each of the four FLNGVs would process approximately 330 million standard cubic feet per day (MMscfd), which would total 1.32 billion standard cubic feet per day (Bscf/d) of input feed gas for all four of the FLNGVs. Based on an estimated availability of 92 percent and allowance for consumption of feed gas during the liquefaction process, each FLNGV would produce approximately 97.5 billion standard cubic feet per year (Bscf/y) of gas (or approximately 2.0 million metric tonnes per annum [MMtpa]) for export in the form of LNG. Together, the four FLNGVs are designed to have the capability to export 390.1 Bscf/y of gas (or approximately 8.0 MMtpa) in the form of LNG.

As detailed engineering and equipment specification advances during the design process and operating efficiencies are gained post-commissioning, the liquefaction process could perform better than this nominal design case. It is therefore anticipated

Add-39a

that LNG output, based on the high-side design case of 375 MMscfd of input feed gas, would be as much as approximately 110.8 Bscf/y of gas (or approximately 2.3 MMtpa) for each FLNGV. Taken together, the four FLNGVs would be capable of exporting the equivalent of 443.3 Bscf/y of natural gas in the form of LNG. Therefore, Delfin LNG is requesting authorization to construct and operate facilities capable of exporting up to 443.3 Bscf/y of natural gas in the form of LNG (which equates to approximately 9.2 MMtpa).

The proposed Delfin deepwater port would take a modular implementation approach to allow for early market entry and accommodate market shifts. Offshore construction activities are proposed to begin at the end of first quarter of 2018 and would be completed in four stages, with each stage corresponding to the commissioning and operation of an FLNGV. The anticipated commissioning of FLNGV 1 is the third quarter of 2019 with start-up of commercial operation of FLNGV 1 by the end of 2019. It is anticipated that FLNGVs 2 through 4 would be commissioned 12 months apart. Following this schedule and barring unforeseen events, the Delfin deepwater port would be completed and all four FLNGVs would be fully operational by the summer of 2022.

**FERC Application**

The onshore component and nearshore pipeline component of the proposed Delfin deepwater port falls under the jurisdiction of and is processed under a separate authorization by FERC. On May 8, 2015, Delfin LNG filed an application with FERC to construct and operate the onshore/nearshore components of the proposed deepwater port. This application was noticed on FERC's Docket: No. CP15-490-000 on May 20, 2015, and in the Federal Register Vol. 80, No. 101/Wednesday, May 27, 2015/ Notices. The following is an excerpt from FERC's Federal Register Notice:

Take notice that on May 8, 2015 Delfin LNG LLC (Delfin LNG), 1100 Louisiana Street, Houston, Texas 77002, filed in Docket No. CP15-490-000, an Application pursuant to section 7(c) of the Commission's Regulations under the Natural Gas Act and Parts 157 of the Federal Energy Regulatory Commission's (Commission) regulations requesting authorization to (1) reactivate approximately 1.1 miles of existing 42-inch pipeline formerly owned by U-T Offshore System (UTOS), which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean highwater mark along the Cameron Parish Coast; (2) install 74,000 horsepower of new compression; (3) construct 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construct 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station in Cameron Parrish, Louisiana that comprise the onshore portion of Delfin LNG's proposed deepwater port (DWP), an offshore liquefied natural gas facility located off the coast of Louisiana in the Gulf of Mexico, all as more fully set forth in the application, which is on file with the Commission and open to public inspection. Additionally, Delfin LNG requests a blanket construction certificate under Part 17, Subpart F of the Commission's regulations. This filing may be viewed on the Web at http://www.ferc.gov using the "eLibrary" link. Enter the docket number (excluding the last three digits) in the docket number field to access the document. For assistance, please contact FERC at FERCOnlineSupport@ferc.gov or call toll-free (866) 208-3676 or TYY, (202) 502-8659.

It is important to note that the onshore facilities will connect with the offshore deepwater port facilities which are subject to the jurisdiction of MARAD and USCG. As previously discussed, Delfin LNG proposes to lease a segment of pipeline from HIOS that extends from the terminus of the UTOS pipeline offshore. Delfin LNG states in its application that HIOS will submit a separate application with FERC seeking authorization to abandon by lease its facilities to Delfin LNG. Because the review of the deepwater port proposal is the jurisdiction of MARAD and USCG, FERC has acknowledged receipt of the Delfin LNG application, provided under Docket No. CP15-490-000 on May 8, 2015; however, FERC will not begin processing the Delfin LNG application until such time that HIOS submits an abandonment application to FERC for review and processing. Accordingly, although the USCG and MARAD will commence review and processing of the Delfin deepwater port license application, upon the publication of this Notice of Intent, MARAD and USCG will not publish the draft EIS until FERC has received an application for abandonment of the HIOS pipeline and has begun to process Delfin's application for the construction and operation of the onshore components of the proposed deepwater port.

**Privacy Act**

The electronic form of all comments received into the FDMS can be searched **\*45274** by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). The Department of Transportation Privacy Act Statement can be viewed in the Federal Register published on April 11, 2000 (Volume 65, Number 70, pages 19477-78) or by visiting http://www.regulations.gov.

(Authority: 33 U.S.C. 1501, et seq., 49 CFR 1.93(h)).

Dated: July 24, 2015.

By Order of the Maritime Administrator.

T. Mitchell Hudson, Jr.,

Secretary, Maritime Administration.

[FR Doc. 2015-18594 Filed 7-28-15; 8:45 am]

BILLING CODE 4910-81-P

---

**End of Document**                                         © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-41a

80 FR 80455-01, 2015 WL 9316176(F.R.)

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[Docket No. USCG-2015-0472]

Deepwater Port License Application: Delfin LNG LLC, Delfin LNG Deepwater Port

Thursday, December 24, 2015

AGENCY: Maritime Administration, U.S. Department of Transportation.

**\*80455**  ACTION: Notice of Receipt of Amended Application; Request for Comments.

SUMMARY: The Maritime Administration (MARAD), in cooperation with the U.S. Coast Guard (USCG), announces the receipt and availability of the amended deepwater port license application submitted by Delfin LNG LLC (Delfin LNG) on November 19, 2015 (amended application). The purpose of this Federal Register Notice is to explain the changes between the original application and the amended application and seek public comments regarding the amended application. Please note, MARAD and USCG have determined that this Federal Register Notice is sufficient for satisfying National Environmental Policy Act (NEPA) requirements for public scoping and seeking public comment on an agency action. As such, no public scoping meetings are planned to be held for the Delfin LNG amended application.

A Notice of Application that summarized the original Delfin LNG license application was published in the Federal Register on July 16, 2015 (80 FR 42162). A Notice of Intent to Prepare an Environmental Impact Statement and Notice of Public Meetings was published in the Federal Register on Wednesday, July 29, 2015 (80 FR 45270). This Notice incorporates the aforementioned Notices by reference and highlights changes to the proposed Delfin LNG project made since the original application was deemed complete.

The proposed Delfin LNG deepwater port incorporates onshore components, which are subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC). These facilities are described in the section of this notice titled "FERC Application."

FOR FURTHER INFORMATION CONTACT: Mr. Roddy Bachman, USCG, telephone: 202-372-1451, email: Roddy.C.Bachman@uscg.mil, or Ms. Yvette M. Fields, Director, Office of Deepwater Ports and Offshore Activities, MARAD, telephone: 202-366-0926, email: Yvette.Fields@dot.gov. For questions regarding viewing the Federal docket, call Docket Operations, telephone 202-366-9826.

SUPPLEMENTARY INFORMATION:

**Request for Comments**

We request public comments on the amended application for the proposed deepwater port. You can submit comments directly to the Docket Operations Facility during the public comment period from publication date of this Notice until Tuesday, January 19, 2016. We will consider all comments and materials received during the public comment period. Public comment submissions must be unbound, no larger than 8½ by 11 inches and suitable for copying and electronic scanning. Please include the docket number (USCG-2015-0472) and your name and address on any correspondence.

Submit comments or material using only one of the following methods:

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.  Add-42a  1

• Online: Go to www.regulations.gov and search docket number "USCG-2015-0472." Follow the online instructions for sending your comments electronically.

• Mail: Send comments to Docket Operations, M-30; U.S. Department of Transportation, 1200 New Jersey Avenue SE, Room W12-140, West Building Ground Floor, Washington, DC 20590-0001.

• Hand Delivery or Courier: Bring comments to Docket Operations in Room W12-140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9:00 a.m. and 5:00 p.m., Monday through Friday, except Federal holidays.

• Fax: Fax comments to Docket Operations at 202-493-2251.

While not required, it is preferred that comments be submitted electronically, which facilitates use of computer software to sort, organize and search the comments. If you submit your comments electronically, it is not necessary to also submit a hard copy.

**Background**

On May 8, 2015, as supplemented on June 19, 2015, MARAD and USCG received an application from Delfin LNG for all Federal authorizations required for a license to own, construct, and operate a deepwater port for the export of natural gas. On Thursday, July 16, 2015, a Notice of Application was published in the Federal Register (80 FR 42162) advising the public of the completed original application. Louisiana and Texas were designated as adjacent coastal States (ACS) for the original application.

Two public scoping meetings were held in connection with the original Delfin LNG application. The first public scoping meeting was held in Lake Charles, Louisiana on August 18, 2015, and the second public scoping meeting was held in Beaumont, Texas on August 19, 2015. After the public scoping meetings concluded, Delfin LNG advised MARAD and USCG of its intent to amend the original application.

In anticipation of the amended application, MARAD and USCG issued a regulatory "stop-clock" letter to Delfin LNG on September 18, 2015. That letter commenced a regulatory "stop-clock," effective September 18, 2015, which would remain in effect until MARAD and USCG received the amended application and determined it contained sufficient information to continue the Federal review process. On November 19, 2015, Delfin LNG submitted its amended application to MARAD and USCG.

Working in coordination with participating Federal and State agencies, we will commence processing the amended application and complete a Draft EIS which analyzes reasonable alternatives to, and the direct, indirect and cumulative environmental impacts of, the proposed action. When the Draft EIS is complete and ready for public review, a Notice of Availability will be published in the Federal Register. The Notice of Availability will provide for a public comment period that includes public meetings in Louisiana and Texas. The amended application is currently available for public review at the Federal docket Web site: www.regulations.gov under docket number USCG-2015-0472.

**Summary of the Amended Application**

The specific project changes from the original Delfin LNG application are: 1) the liquefaction capacity of the four proposed FLNGVs that would service the proposed Delfin deepwater port is increased from a base design capacity of two million metric tons per annum **\*80456** (MMtpa) each (approximately 97 billion standard cubic feet per year [Bscf/y]) to three MMtpa each (approximately 146 Bscf/y), and 2) construction of new-build FLNGV hulls instead of converting existing tank vessels. In sum, the four FLNGVs will be designed to have the capability to produce approximately 12.0 MMtpa of LNG for export (approximately 585 Bscf/y), and as much as 13.2 MMtpa in the optimized design case, (approximately 657.5 Bscf/y). Each FLNGV would have a total LNG storage capacity of 210,000 cubic meters (m[FN3]), an increase from the original application's 165,000 m[FN3].

Add-43a

The amended application also provides for increased natural gas compression horsepower requirements at the onshore facility. These are described in the section of this Federal Register Notice entitled "FERC Application."

Other fundamental aspects of the proposed Delfin LNG project remain unchanged, including Port Delfin's location nearly 40 nautical miles offshore of Louisiana, the reuse and repurpose of two existing offshore pipelines, installation of new pipeline laterals leading to each tower yoke mooring system (TYMS), construction of a pipeline bypass around an existing platform at WC 167, and use of air cooling technology for the natural gas liquefaction process.

**FERC Application**

On May 8, 2015, Delfin LNG filed its original application with FERC requesting authorizations pursuant to the Natural Gas Act and 18 CFR part 157 for the onshore components of the proposed deepwater port terminal including authorization to use the existing pipeline infrastructure, which includes leasing a segment of pipeline from HIOS extending from the terminus of the UTOS pipeline offshore. On May 20, 2015, FERC issued its Notice of Application for the onshore components of Delfin LNG's deepwater port project in Docket No. CP15-490-000. This Notice was published in the Federal Register on May 27, 2015 (80 FR 30226). Delfin LNG stated in its application that High Island Offshore System, LLC (HIOS) would submit a separate application with FERC seeking authorization to abandon by lease its facilities to Delfin LNG. FERC, however, advised Delfin LNG that it would not begin processing Delfin LNG's application until such time that MARAD and USCG deemed Delfin LNG's deepwater port license application complete and HIOS submitted an abandonment application with FERC. On June 29, 2015, MARAD and USCG accepted the documentation and deemed the original Delfin application complete.

On November 19, 2015, HIOS filed an application (FERC Docket No. CP16-20-000) to abandon certain offshore facilities in the Gulf of Mexico, including its 66-mile-long mainline, an offshore platform, and related facilities ("HIOS Repurposed Facilities"). Also, on November 19, 2015, Delfin LNG filed an amended application in FERC Docket No. CP15-490-001 to use the HIOS Repurposed Facilities and to revise the onshore component of its deepwater port project. On December 1, 2015, FERC issued a Notice of Application for Delfin LNG's amendment, which was published in the Federal Register on December 7, 2015 (80 FR 76003).

The amended FERC application specifically discusses the onshore facility and adjustments to the onshore operations that would involve reactivating approximately 1.1 miles of the existing UTOS pipeline; the addition of four new onshore compressors totaling 120,000 horsepower of new compression; activation of associated metering and regulation facilities; the installation of new supply header pipelines (which would consist of 0.25 miles of new 42-inch-diameter pipeline to connect the former UTOS line to the new meter station) and 0.6 miles of new twin 30-inch-diameter pipelines between Transco Station 44 and the new compressor station site. The original FERC application consisted of three new onshore compressors totaling 74,000 horsepower.

Additional information regarding the details of Delfin LNG's original and amended application to the FERC is on file and open to public inspection. Project filings may be viewed on the web at www.ferc.gov using the "eLibrary" link. Enter the docket number excluding the last three digits (i.e., CP15-490) in the docket number field to access project information. For assistance, please contact FERC at FERCOnlineSupport@ferc.gov or call toll-free, (886) 208-3676 or TYY, (202) 502-8659.

**Privacy Act**

Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to www.regulations.gov and will include any personal information you provide. Therefore, submitting this information to the docket makes it public. You may wish to read the Privacy and Security Notice, as well as the User Notice, that is available on the www.regulations.gov Web site and the Department of Transportation Privacy Act Notice that appeared in the Federal Register on April 11, 2000 (65 FR 19477), see Privacy Act. You may view docket submissions in person at the Docket Operations Facility or electronically on the www.regulations.gov Web site.

Add-44a

(Authority: 33 U.S.C. 1501, et seq., 49 CFR 1.93(h)).

Dated: December 18, 2015.

By Order of the Maritime Administrator.

T. Mitchell Hudson, Jr.,

Secretary, Maritime Administration.

[FR Doc. 2015-32349 Filed 12-23-15; 8:45 am]

BILLING CODE 4910-81-P

---

**End of Document**                                       © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-45a

81 FR 46157-01, 2016 WL 3753672(F.R.)

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[Docket No. USCG-2015-0472]

Deepwater Port License Application: Delfin LNG LLC, Delfin LNG Deepwater Port

Friday, July 15, 2016

AGENCY: Maritime Administration, Department of Transportation

**\*46157**  ACTION: Notice of availability; notice of public meeting; request for comments.

SUMMARY: The Maritime Administration (MARAD), in cooperation with the U.S. Coast Guard (USCG) and the Federal Energy Regulatory Commission (FERC), announces the availability of the Draft Environmental Impact Statement (DEIS) for the Delfin LNG deepwater port license application for the exportation of natural gas. Delfin LNG, LLC (Delfin LNG), is the applicant.

A Notice of Application that summarized the original Delfin LNG license application was published in the Federal Register on July 16, 2015 (80 FR 42162). A Notice of Intent to Prepare an Environmental Impact Statement (EIS) and Notice of Public Meetings was published in the Federal Register on July 29, 2015 (80 FR 45270). A Notice of Receipt of Amended Application was published in the Federal Register on December 24, 2015 (80 FR 80455). This Notice of Availability (NOA) incorporates the aforementioned Notices by reference.

The proposed Delfin LNG deepwater port would be located in Federal waters within the Outer Continental Shelf (OCS) approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana.

The proposed Delfin LNG deepwater port incorporates onshore components, which are subject to FERC jurisdiction. These facilities are described in the section of this Notice titled "FERC Application."

Publication of this notice begins a 45-day comment period, requests public participation in the environmental impact review process, provides information on how to participate in the process and announces informational open houses and public meetings in Cameron, Louisiana and Beaumont, Texas.

DATES: The Maritime Administration will hold two public meetings in connection with the license application DEIS. The first public meeting will be held in Cameron, Louisiana, on August 9, 2016, from 6 p.m. to 8 p.m. The second public meeting will be held in Beaumont, Texas, on August 10, 2016, from 6 p.m. to 8 p.m. Each public meeting will be preceded by an open house from 4:30 p.m. to 5:30 p.m. The public meeting may end later than the stated time, depending on the number of persons who wish to make a comment on the record. Additionally, material you submit in response to the request for comments must reach www.regulations.gov by close of business August 29, 2016, or 45 days after the date of publication of this NOA in the Federal Register, whichever is later.

ADDRESSES: The open house and public meeting in Cameron, Louisiana will be held at the Johnson Bayou Community Center, 5556 Gulf Beach Highway, Cameron, LA, 70631; telephone: 337-569-2454. Free parking is available at the Community

Add-46a

Center. The open house and public meeting in Beaumont, Texas will be held at the Holiday Inn Beaumont Plaza, 3950 Walden Road, Beaumont, Texas 77705; telephone: 409-842-5995. Free parking is available at the Holiday Inn Beaumont Plaza. The license application, comments, supporting information and the DEIS are available for viewing at the Regulations.gov Web site: http://www.regulations.gov under docket number USCG-2015-0472. The Final EIS (FEIS), when published, will be announced and available at this site as well.

We encourage you to submit comments electronically through the Federal eRulemaking Portal at http://www.regulations.gov. If you submit your comments electronically, it is not necessary to also submit a hard copy. If you cannot submit material using http://www.regulations.gov, please contact either Mr. Roddy Bachman, USCG or Ms. Yvette M. Fields, MARAD, as listed in the following FOR FURTHER INFORMATION CONTACT section of this document. This section provides alternate instructions for submitting written comments. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted. Anonymous comments will be accepted. All comments received will be posted without change to http://www.regulations.gov and will include any personal information you have provided.

FOR FURTHER INFORMATION CONTACT: Mr. Roddy Bachman, USCG, telephone: 202-372-1451, email: Roddy.C.Bachman@uscg.mil; or Ms. Yvette M. Fields, Director, Office of Deepwater Ports and Offshore Activities, MARAD, telephone: 202-366-0926, email: Yvette.Fields@dot.gov.

SUPPLEMENTARY INFORMATION:

**Request for Comments**

We request public comments or other relevant information related to the DEIS for the proposed Delfin LNG deepwater port. These comments will inform our preparation of the FEIS. We encourage attendance at the open houses and public meetings; however, you may submit comments electronically. It is preferred that comments be submitted electronically. Regardless of the method you use to submitting comments or material, all submissions will be posted, without change, to the Federal Docket Operations Facility Web site (http://www.regulations.gov), and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to read the Privacy and Use Notice that is available on the www.regulations.gov Web site, and the Department of Transportation (DOT) Privacy Act Notice that appeared in the Federal Register on April 11, 2000 (65 FR 19477), see PRIVACY ACT. You may view docket submissions at the DOT Docket Operations Facility or electronically at the www.reguations.gov Web site.

**Public Meeting and Open House**

You are invited to learn about the proposed Delfin LNG deepwater port at either of the informational open houses and to comment on the proposed action and the environmental impact analysis contained in the DEIS. Speakers may register upon arrival and will be recognized in the following order: Elected officials, public agency representatives, then individuals or groups in the order in which they registered. In order to accommodate all speakers, speaker time may be limited, meeting hours may be extended, or both. Speakers' transcribed remarks will be included in the public docket. You may also submit written material for inclusion in the public docket. Written material must include the author's name. We ask attendees to respect the meeting procedures in order to ensure a constructive information-gathering session. Please do not bring signs or banners inside the meeting venue. The presiding officer will use his/her discretion to conduct the meeting in an orderly manner.

Public meeting locations are wheelchair accessible; however, attendees who require special assistance such as sign language interpretation or other reasonable accommodation, please notify the USCG (see FOR FURTHER INFORMATION CONTACT) at least five (5) business days in advance. Please **\*46158** include contact information as well as information about specific needs.

**Background**

Add-47a

On May 8, 2015, as supplemented on June 19, 2015, MARAD and USCG received a license application from Delfin LNG for all Federal authorizations required for a license to own, construct and operate a deepwater port for the export of natural gas. The proposed deepwater port would be located in Federal waters approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana. Louisiana and Texas were designated as Adjacent Coastal States (ACS) for the Delfin LNG license application.

The Federal agencies involved held two public scoping meetings in connection with the original Delfin LNG license application. The first public scoping meeting was held in Lake Charles, Louisiana on August 18, 2015; the second public scoping meeting was held in Beaumont, Texas on August 19, 2015. Transcripts of the scoping meetings are included in the public docket. After the public scoping meetings concluded, Delfin LNG advised MARAD, the USCG and FERC of its intent to amend the original license application.

In anticipation of the amended license application, MARAD and USCG issued a regulatory "stop-clock" letter to Delfin LNG on September 18, 2015. That letter commenced a regulatory "stop-clock," effective September 18, 2015, which remained in effect until MARAD and USCG received the amended license application and determined it contained sufficient information to continue the Federal review process. On November 19, 2015, Delfin LNG submitted its amended license application to MARAD and USCG.

Working in coordination with participating Federal and State agencies, MARAD commenced processing the amended license application and completed the DEIS. The purpose of the DEIS is to analyze reasonable alternatives to, and the direct, indirect and cumulative environmental impacts of, the proposed action. The DEIS is currently available for public review at the Federal docket Web site: www.regulations.gov under docket number USCG-2015-0472.

**Summary of the License Application**

Delfin LNG is proposing to construct, own, operate and eventually decommission a deepwater port in the Gulf of Mexico to liquefy domestically-sourced natural gas for export. Exports are proposed to both Free Trade Agreement nations and non-Free Trade Agreement nations, in accordance with Department of Energy export license approvals.

The proposed Delfin LNG deepwater port has both onshore and offshore components. As previously described, the proposed Delfin LNG deepwater port would be located in Federal waters within the OCS West Cameron Area, West Addition Protraction Area (Gulf of Mexico) approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana, in water depths ranging from approximately 64 to 72 feet (19.5 to 21.9 meters). The Delfin LNG deepwater port would consist of four semi-permanently moored Floating Liquefied Natural Gas Vessels (FLNGVs) located as follows: 1B1 (29°8'13.1" N./93°2'2.2" W.), 1B2 (29°6'13.6" N./ 93° 32'42.4" W.), 1B3 (29°6'40.7" N./93°30'10.1" W.) and 1B4 (29°4'40.9" N./93°30'51.8" W.) located in West Cameron (WC) lease blocks 319, 327, 328 and 334, respectively. The Delfin LNG deepwater port would reuse and repurpose two existing offshore natural gas pipelines; the former U-T Operating System (UTOS) pipeline and the High Island Operating System (HIOS) pipeline. Four new 30-inch diameter pipeline laterals, each approximately 6,400 feet in length, connecting the HIOS pipeline to each of the FLNGVs, would be constructed. In addition, a 700-foot 42-inch diameter new pipeline would be constructed to bypass a platform at WC lease block 167 (WC 167) and connect the UTOS and HIOS pipelines. Feed gas would be supplied through the new pipeline laterals to each of the FLNGVs where it would be super-cooled to produce LNG. The LNG would be stored onboard the FLNGVs and transferred via ship-to-ship transfer to properly certified LNG tankers. Each of the FLNGVs would be semi-permanently moored to four new weathervaning tower yoke mooring systems (TYMS).

The onshore components in Cameron Parish, Louisiana are described specifically in an application submitted to FERC. The onshore components of the Delfin LNG deepwater port will consist of constructing and operating a new natural gas compressor station, gas supply header and a metering station at an existing gas facility. The proposal would require: (1) Reactivation of approximately 1.1 miles of existing 42-inch pipeline, formerly owned by UTOS, which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean highwater mark along the Cameron Parish Coast; (2) installation

**Add-48a**

of 120,000 horsepower of new compression; (3) construction of 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construction of 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station.

Onshore pipeline quality natural gas from the interstate grid would be sent to the existing, but currently idle, 42-inch UTOS pipeline. The gas transported through the UTOS pipeline would then bypass the existing manifold platform located at WC 167 via a newly installed pipeline segment, 700 feet in length, connecting to the existing 42-inch HIOS pipeline.

The bypass of the WC 167 platform would be trenched so that the top of the pipe is a minimum of 3 feet below the seafloor. From the bypass, the feed gas would then be transported further offshore using the HIOS pipeline portion leased by Delfin LNG between WC 167 and High Island A264. The existing UTOS and HIOS pipelines transect OCS Lease Blocks WC 314, 318, 319, 327, and 335, and would transport feed gas from onshore to offshore (one-directional flow). Delfin LNG proposes to install four new lateral pipelines along the HIOS pipeline, starting approximately 16.0 nautical miles south of the WC 167 platform. Each subsea lateral pipeline would be 30 inches in diameter and approximately 6,400 feet in length, extending from the HIOS pipeline to the Delfin LNG deepwater port. The maximum allowable operating pressure of the pipeline system (UTOS, bypass, HIOS and laterals) would be 1,250 pounds per square inch gauge (psig).

The FLNGVs would receive pipeline quality natural gas via the laterals and TYMS where it would be cooled sufficiently to completely condense the gas and produce LNG. The produced LNG would be stored in International Maritime Organization (IMO) type B, prismatic, independent LNG storage tanks aboard each of the FLNGVs. Each vessel would have a total LNG storage capacity of 210,000 cubic meters (m[FN3]).

An offloading mooring system would be provided on each FLNGV to moor an LNG tanker side-by-side for cargo transfer of LNG through loading arms or cryogenic hoses using ship-to-ship transfer procedures. LNG tankers would be moored with pilot and tug assist. The FLNGVs would be equipped with fenders and quick-release hooks to facilitate mooring and unmooring operations. The offloading system would be capable of accommodating standard LNG tankers with nominal cargo capacities up to 170,000 m[FN3]. Delfin LNG estimates that the typical LNG cargo transfer operation would be  **\*46159**  carried out within 24 hours, including LNG tanker berthing, cargo transfer and sail-away. Approximately 31 LNG tankers are expected to visit each of the four FLNGVs per year for a total of up to 124 cargo transfer operations per year. Each LNG tanker would be assisted by up to three tugs during approach and mooring and up to two tugs while departing the Delfin LNG deepwater port.

The FLNGVs would be self-propelled vessels and have the ability to disconnect from the TYMS and set sail to avoid hurricanes or to facilitate required inspections, maintenance and repairs.

In the nominal design case, based on an estimated availability of 92 percent and allowance for consumption of feed gas during the liquefaction process, each of the four FLNGVs would produce approximately 146 billion standard cubic feet per year (Bscf/y) of gas (approximately 3.0 million metric tonnes per annum [MMtpa]) for export in the form of LNG. Together, the four FLNGVs are designed to have the capability to export 585 Bscf/y of gas (approximately 12.0 MMtpa).

As detailed engineering and equipment specification advances during the design process and operating efficiencies are gained post-commissioning, the liquefaction process could perform better than this nominal design case. It is anticipated that LNG output could improve to as much as 657.5 Bscf/y in the optimized design case (approximately 13.2 MMtpa) which is the amount Delfin LNG is requesting authorization to export.

The proposed Delfin LNG deepwater port would take a modular implementation approach to allow for early market entry and accommodate market shifts. Offshore construction activities are proposed to begin at the end of first quarter of 2018 and would be completed in four stages, with each stage corresponding to the commissioning and operation of an FLNGV. The anticipated commissioning of FLNGV 1 is the third quarter of 2019 with start-up of commercial operation of FLNGV 1 by the end of 2019. It is anticipated that FLNGVs 2 through 4 would be commissioned 12 months apart. Following this schedule and barring

**Add-49a**

unforeseen events, the Delfin deepwater port would be completed and all four FLNGVs would be fully operational by the summer of 2022.

Should a license be issued, the Delfin LNG deepwater port would be designed, fabricated, constructed, commissioned, maintained, inspected and operated in accordance with applicable codes and standards and with USCG oversight as regulated under Title 33, Code of Federal Regulations (CFR), subchapter NN-Deepwater Ports (33 CFR 148, 149 and 150). This includes applicable waterways management and regulated navigations areas, maritime safety and security requirements, risk assessment and compliance with domestic and international laws and regulations for vessels that may call at the port.

**FERC Application**

On May 8, 2015, Delfin LNG filed its original application with FERC requesting authorizations pursuant to the Natural Gas Act and 18 CFR part 157 for the onshore components of the proposed deepwater port terminal including authorization to use the existing pipeline infrastructure, which includes leasing a segment of pipeline from HIOS extending from the terminus of the UTOS pipeline offshore. On May 20, 2015, FERC issued its Notice of Application for the onshore components of Delfin LNG's deepwater port project in Docket No. CP15-490-000. This Notice was published in the Federal Register on May 27, 2015 (80 FR 30226). Delfin LNG stated in its application that High Island Offshore System, LLC would submit a separate application with FERC seeking authorization to abandon by lease its facilities to Delfin LNG. FERC, however, advised Delfin LNG that it would not begin processing Delfin LNG's application until such time that MARAD and USCG deemed Delfin LNG's deepwater port license application complete and High Island Offshore System, LLC submitted an abandonment application with FERC. On June 29, 2015, MARAD and USCG accepted the documentation and deemed the original Delfin license application complete.

On November 19, 2015, High Island Offshore System, LLC filed an application (FERC Docket No. CP16-20-000) to abandon certain offshore facilities in the Gulf of Mexico, including its 66-mile-long mainline, an offshore platform and related facilities ("HIOS Repurposed Facilities"). Accordingly, on November 19, 2015, Delfin LNG filed an amended application in FERC Docket No. CP15-490-001 to use the HIOS Repurposed Facilities and to revise the onshore component of its deepwater port project. On December 1, 2015, FERC issued a Notice of Application for Delfin LNG's amendment, which was published in the Federal Register on December 7, 2015 (80 FR 76003).

The amended FERC application specifically discusses the onshore facility and adjustments to the onshore operations that would involve reactivating approximately 1.1 miles of the existing UTOS pipeline; the addition of four new onshore compressors totaling 120,000 horsepower of new compression; activation of associated metering and regulation facilities; the installation of new supply header pipelines (which would consist of 0.25 miles of new 42-inch-diameter pipeline to connect the former UTOS line to the new meter station); and 0.6 miles of new twin 30-inch-diameter pipelines between Transco Station 44 and the new compressor station site.

Additional information regarding the details of Delfin LNG's original and amended application to FERC is on file and open to public inspection. Project filings may be viewed on the web at www.ferc.gov using the "eLibrary" link. Enter the docket number excluding the last three digits (i.e., CP15-490) in the docket number field to access project information. For assistance, please contact FERC at FERCOnlineSupport@ferc.gov or call toll-free, (886) 208-3676 or TYY, (202) 502-8659.

**Privacy Act**

Regardless of the method used for submitting comments or materials, all submissions will be posted, without change, to www.regulations.gov and will include any personal information you provide. Therefore, submitting this information to the docket makes it public. You may wish to read the Privacy and Security Notice, as well as the User Notice, that is available on the www.regulations.gov Web site. The Privacy Act notice regarding the Federal Docket Management System is available in the March 24, 2005, issue of the Federal Register (70 FR 15086).

Authority: 33 U.S.C. 1501 et seq., 49 CFR 1.93(h).

**Add-50a**

Dated: July 7, 2016.

By Order of the Maritime Administrator.

T. Mitchell Hudson, Jr.,

Secretary, Maritime Administration.

[FR Doc. 2016-16540 Filed 7-14-16; 8:45 am]

BILLING CODE 4910-81-P

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Add-51a**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

81 FR 85678-01, 2016 WL 6920817(F.R.)

NOTICES

DEPARTMENT OF TRANSPORTATION

Maritime Administration

[Docket No. USCG-2015-0472]

Deepwater Port License Application: Delfin LNG LLC; Delfin LNG Deepwater

Port; Final Application Public Hearing and Final Environmental Impact Statement

Monday, November 28, 2016

AGENCY: Maritime Administration, U.S. Department of Transportation.

 **\*85678**  ACTION: Notice of availability; notice of public hearing; request for comments.

SUMMARY: The Maritime Administration (MARAD), in cooperation with the U.S. Coast Guard (USCG) and the Federal Energy Regulatory Commission (FERC), announces: (1) The schedule and locations of public hearings; and (2) the availability of the Final Environmental Impact Statement (EIS) for the Delfin LNG, LLC (Delfin LNG) deepwater port license application for the exportation of natural gas.

A Notice of Application that summarized the original Delfin LNG deepwater port license application was published in the Federal Register on July 16, 2015 (80 FR 42162). A Notice of Intent (NOI) to Prepare an Environmental Impact Statement (EIS) and Notice of Public Meetings was published in the Federal Register on July 29, 2015 (80 FR 45270). A Notice of Receipt of Amended Application was published in the Federal Register on December 24, 2015 (80 FR 80455). A Notice of Availability (NOA) and Notice of Public Meetings for the Draft EIS was published in the Federal Register July 15, 2016 (81 FR 46157). This NOA incorporates the aforementioned Notices by reference.

The proposed Delfin LNG deepwater port would be located in Federal waters within the Outer Continental Shelf (OCS) approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana.

The proposed Delfin LNG deepwater port incorporates onshore components, which are subject to FERC jurisdiction. These facilities are described in the section of this Notice titled "FERC Application."

Publication of this notice begins a 45-day comment period, requests public participation in the environmental impact review process, provides information on how to participate in the process and announces final public hearings in Cameron, Louisiana and Beaumont, Texas. The Final EIS complies with the Deepwater Port Act of 1974, as amended (33 United States Code (U.S.C.) 1501 et seq.) (DWPA) and the National Environmental Policy Act (42 U.S.C. 4332(2)(C)) (NEPA), as implemented by the Council on Environmental Quality regulations (40 CFR 1500 to 1508). MARAD and the USCG request public comments on the Final EIS and the application.

Pursuant to the criteria provided in the DWPA, both Louisiana and Texas have been designated as Adjacent Coastal States (ACS) for this application.

DATES: MARAD and USCG will hold two public hearings in connection with the license application's Final EIS. The first public hearing will be held in Cameron, Louisiana, on December 13, 2016, from 6 p.m. to 8 p.m. The second public hearing

Add-52a

will be held in Beaumont, Texas, on December 14, 2016, from 6 p.m. to 8 p.m. Each public hearing will be preceded by an open house from 4:30 p.m. to 5:30 p.m. The public hearing may end later than the stated time, depending on the number of persons who wish to make a comment on the record. Additionally, material you submit in response to the request for comments must reach www.regulations.gov by close of business January 12, 2017, or 45 days after the date of publication of this NOA in the Federal Register, whichever is later.

Federal and State agencies must also submit comments, recommended conditions for licensing, or letters of no objection by Friday, January 12, 2017, or 45 days after publication of this notice in the Federal Register, whichever is later. Also, within 45 days following the final hearing, on or prior to January 30, 2017, the Governor of Louisiana and the Governor of Texas (ACS Governors) may approve, disapprove, or notify MARAD of inconsistencies with State programs relating to environmental protection, land and water use, and coastal zone management for which MARAD may ensure consistency by placing conditions on the license.

MARAD must issue a Record of Decision (ROD) to approve, approve with conditions, or deny the deepwater port license application, within 90 days following the final license hearing, on or prior to March 14, 2017.

ADDRESSES: The open house and public hearing in Cameron, Louisiana will be held at the Johnson Bayou Community Center, 5556 Gulf Beach Highway, Cameron, LA, 70631; telephone: 337-569-2454. Free parking is available at the Community Center. The open house and public hearing in Beaumont, Texas will be held at the Holiday Inn Beaumont Plaza, 3950 Walden Road, Beaumont, Texas 77705; telephone: 409-842-5995. Free parking is available at the Holiday Inn Beaumont Plaza.

The license application, comments, supporting information and the Final EIS are available for viewing at the Regulations.gov Web site: http://www.regulations.gov under docket number USCG-2015-0472.

We encourage you to submit comments electronically through the Federal eRulemaking Portal at http://www.regulations.gov. If you submit your comments electronically, it is not necessary to also submit a hard copy. If you cannot submit material using http://www.regulations.gov, please contact either Mr. Roddy Bachman, USCG or Ms. Yvette M. Fields, MARAD, as listed in the following FOR FURTHER INFORMATION CONTACT section of this document. This section provides alternate instructions for submitting written comments. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted. Anonymous comments will be accepted. All comments received will be posted without change to http://www.regulations.gov and will include any personal information you have provided.

FOR FURTHER INFORMATION CONTACT: Mr. Roddy Bachman, USCG, telephone: 202-372-1451, email: Roddy.C.Bachman@uscg.mil; or Ms. Yvette M. Fields, Director, Office of Deepwater Ports and Offshore Activities, MARAD, telephone: 202-366-0926, email: Yvette.Fields@dot.gov.

SUPPLEMENTARY INFORMATION:

**Request for Comments**

We request public comments on the Final EIS and the application. We also encourage attendance at the open houses and public hearings; however, the public hearing is not the only opportunity you have to comment. You may submit comments electronically at any time, as described in above in ADDRESSES, to http://www.regulations.gov under docket number USCG-2015-0472.

**\*85679**  Regardless of the method you use to submit comments or material, all submissions will be posted, without change, to the Federal Docket Operations Facility Web site (http://www.regulations.gov), and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to read the Privacy and Use Notice that is available on the http://www.regulations.gov Web site, and the Department of Transportation (DOT) Privacy Act Notice that appeared in the Federal Register on April 11, 2000 (65 FR 19477), see PRIVACY ACT. You may view docket submissions at the DOT Docket Operations Facility or electronically at the http://www.regulations.gov Web site.

**Public Hearing and Open House**

The open houses, public hearings and docket comments will be used by MARAD to inform the Maritime Administrator's decision making process, including the ROD and any conditions that may be placed on a subsequent license to own, construct and operate a deepwater port.

You are invited to learn about the proposed Delfin LNG deepwater port at either of the informational open houses and to comment at the public hearings on the proposed action and the environmental impact analysis contained in the Final EIS. Speakers may register upon arrival and will be recognized in the following order: (1) Elected officials; (2) public agency representatives; then (3) individuals or groups in the order in which they registered. In order to accommodate all speakers, speaker time may be limited, hearing hours may be extended, or both. Speakers' transcribed remarks will be included in the public docket. You may also submit written material for inclusion in the public docket. Written material must include the author's name. We ask attendees to respect the hearing process in order to ensure a constructive information-gathering session. Please do not bring signs or banners inside the hearing venue. The presiding officer will use his/her discretion to conduct the hearing in an orderly manner.

Public hearing locations are wheelchair accessible; however, attendees who require special assistance such as sign language interpretation or other reasonable accommodation, should notify the USCG (see FOR FURTHER INFORMATION CONTACT) at least five (5) business days in advance. Please include contact information as well as information about specific needs.

**Background**

On May 8, 2015, as supplemented on June 19, 2015, MARAD and USCG received an application from Delfin LNG for all Federal authorizations required for a license to own, construct and operate a deepwater port for the export of natural gas. The proposed deepwater port would be located in Federal waters approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana. Louisiana and Texas were designated as ACSs for the Delfin LNG license application. A Notice of Application was published in the Federal Register on July 16, 2015 (80 FR 42162).

On July 29, 2015, a NOI to Prepare an EIS and Notice of Public Meetings was published in the Federal Register (80 FR 45270). MARAD and USCG hosted two public scoping meetings in connection with the original Delfin LNG deepwater port license application.[FN1] The first public scoping meeting was held in Lake Charles, Louisiana on August 18, 2015; the second public scoping meeting was held in Beaumont, Texas on August 19, 2015. Transcripts of the scoping meetings are included in the public docket. After the public scoping meetings concluded, Delfin LNG advised MARAD, the USCG and FERC of its intent to amend the original license application.

1    The Federal Energy Regulatory Commission did not have a representative in attendance; however, to the extent any were made, comments related to the construction and operation of the FERC jurisdictional Delfin Onshore Facility were received into the administrative record.

In anticipation of the amended license application, MARAD and USCG issued a regulatory "stop-clock" letter to Delfin LNG on September 18, 2015. That letter commenced a regulatory "stop-clock," effective September 18, 2015, which remained in effect until MARAD and USCG received the amended license application and determined it contained sufficient information to continue the Federal review process. On November 19, 2015, Delfin LNG submitted its amended license application to MARAD and USCG and a Notice of Receipt of Amended Application was published in the Federal Register on December 24, 2015 (80 FR 80455).

Working in coordination with participating Federal and State agencies, MARAD and USCG commenced processing the amended license application and completed the Draft EIS. A NOA and Notice of Public Meetings for the Draft EIS was published in the Federal Register July 15, 2016 (81 FR 46157). MARAD and the USCG hosted two Draft EIS public meetings in connection with the Delfin LNG deepwater port license application. The first public meeting was held in Cameron, Louisiana

Add-54a

on August 9, 2016; the second public scoping meeting was held in Beaumont, Texas on August 10, 2016. Transcripts of the scoping meetings are included in the public docket under docket number USCG-2015-0472.

The Final EIS, application materials and associated comments are currently available for public review at the Federal docket Web site: www.regulations.gov under docket number USCG-2015-0472.

**Proposed Action and Alternatives**

USCG and MARAD are co-lead Federal agencies for the preparation of the Final EIS; MARAD is the Federal licensing agency (action agency). The proposed action requiring environmental review is the Federal licensing of the proposed deepwater port described in the "Summary of the License Application" below. The alternatives to licensing the proposed port are: (1) Licensing with conditions (including conditions designed to mitigate environmental impact) and (2) denying the application, which, for purposes of environmental review, is the "no-action" alternative. These alternatives are more fully discussed in the Final EIS. You can address any questions about the proposed action or the Final EIS to USCG or MARAD project managers identified in FOR FURTHER INFORMATION CONTACT.

**Summary of the License Application**

Delfin LNG has applied for a MARAD-issued license to construct, own, operate and eventually decommission a deepwater port in the Gulf of Mexico to liquefy domestically-sourced natural gas for export. Exports are proposed to both Free Trade Agreement nations and non-Free Trade Agreement nations, in accordance with the Department of Energy export license approvals.

The proposed Delfin LNG deepwater port has both onshore and offshore components. The proposed Delfin LNG deepwater port would be located in Federal waters within the OCS West Cameron (WC) Area, West Addition Protraction Area (Gulf of Mexico) approximately 37.4 to 40.8 nautical miles off the coast of Cameron Parish, Louisiana, in water depths ranging from approximately 64 to 72 feet (19.5 to 21.9 meters). The Delfin LNG deepwater port would consist of four semi-permanently moored Floating Liquefied Natural Gas Vessels (FLNGVs) located as follows: No. 1 (29°8'13.1" N/93°32'2.2" W), No. 2 (29°6'13.6" N/93°32'42.4" W), **\*85680** No. 3 (29°6'40.7" N/93°30'10.1" W) and No. 4 (29°4'40.9" N/93°30'51.8" W) located in WC lease blocks 319, 327, 328 and 334, respectively. The Delfin LNG deepwater port would reuse and repurpose two existing offshore natural gas pipelines; the former U-T Operating System (UTOS) pipeline and the High Island Offshore System (HIOS) pipeline. Four new 30-inch diameter pipeline laterals, each approximately 6,400 feet in length, connecting the HIOS pipeline to each of the FLNGVs, would be constructed. In addition, a 700-foot 42-inch diameter new pipeline would be constructed to bypass a platform at WC lease block 167 (WC 167) and connect the UTOS and HIOS pipelines. Feed gas would be supplied through the new pipeline laterals to each of the FLNGVs where it would be super-cooled to produce LNG. The LNG would be stored onboard the FLNGVs and transferred via ship-to-ship transfer to properly certified LNG tankers. Each of the FLNGVs would be semi-permanently moored to four new weathervaning tower yoke mooring systems (TYMS).

The onshore components in Cameron Parish, Louisiana are described specifically in an application originally submitted to FERC (see FERC Application). The onshore components of the Delfin LNG deepwater port would consist of constructing and operating a new natural gas compressor station, gas supply header and a metering station at an existing gas facility. The proposal would require: (1) Reactivation of approximately 1.1 miles of existing 42-inch pipeline, formerly owned by UTOS, which runs from Transcontinental Gas Pipeline Company Station No. 44 (Transco Station 44) to the mean highwater mark along the Cameron Parish Coast; (2) installation of 120,000 horsepower of new compression; (3) construction of 0.25 miles of 42-inch pipeline to connect the former UTOS line to the new meter station; and (4) construction of 0.6 miles of twin 30-inch pipelines between Transco Station 44 and the new compressor station.

Onshore pipeline quality natural gas from the interstate grid would be sent to the existing, but currently idle, 42-inch UTOS pipeline. The gas transported through the UTOS pipeline would then bypass the existing manifold platform located at WC 167 via a newly installed pipeline segment, 700 feet in length, connecting to the existing 42-inch HIOS pipeline.

**Add-55a**

The bypass of the WC 167 platform would be trenched so that the top of the pipe is a minimum of 3 feet below the seafloor. From the bypass, the feed gas would then be transported further offshore using the HIOS pipeline portion leased by Delfin LNG between WC 167 and High Island A264 OCS lease block. The existing UTOS and HIOS pipelines transect OCS Lease Blocks WC 314, 318, 319, 327 and 335, and would transport feed gas from onshore to offshore (one-directional flow). Delfin LNG proposes to install four new lateral pipelines along the HIOS pipeline, starting approximately 16.0 nautical miles south of the WC 167 platform. Each subsea lateral pipeline would be 30 inches in diameter and approximately 6,400 feet in length, extending from the HIOS pipeline to the Delfin LNG deepwater port. The maximum allowable operating pressure of the pipeline system (UTOS, bypass, HIOS and laterals) would be 1,250 pounds per square inch gauge (psig).

The FLNGVs would receive pipeline quality natural gas via the laterals and TYMS, and then, using onboard liquefaction equipment, cool it sufficiently to completely condense the gas and produce LNG. The produced LNG would be stored in International Maritime Organization (IMO) type B, prismatic, independent LNG storage tanks aboard each of the FLNGVs. Each vessel would have a total LNG storage capacity of 210,000 cubic meters (m[FN3]).

An offloading mooring system would be provided on each FLNGV to moor an LNG tanker side-by-side for cargo transfer of LNG through loading arms or cryogenic hoses using ship-to-ship transfer procedures. LNG tankers would be moored with pilot and tug assist. The FLNGVs would be equipped with fenders and quick-release hooks to facilitate mooring and unmooring operations. The offloading system would be capable of accommodating standard LNG tankers with nominal cargo capacities up to 170,000 m[FN3]. Delfin LNG estimates that the typical LNG cargo transfer operation would be carried out within 24 hours, including LNG tanker berthing, cargo transfer and sail-away. Approximately 31 LNG tankers are expected to visit each of the four FLNGVs per year for a total of up to 124 cargo transfer operations per year. Each LNG tanker would be assisted by up to three tugs during approach and mooring and up to two tugs while departing the Delfin LNG deepwater port.

The FLNGVs would be self-propelled vessels and have the ability to disconnect from the TYMS and set sail to avoid hurricanes or to facilitate required inspections, maintenance and repairs.

In the nominal design case, based on an estimated availability of 92 percent and allowance for consumption of feed gas during the liquefaction process, each of the four FLNGVs would produce approximately 146 billion standard cubic feet per year (Bscf/y) of gas (approximately 3.0 million metric tonnes per annum [MMtpa]) for export in the form of LNG. Together, the four FLNGVs are designed to have the capability to export 585 Bscf/y of gas (approximately 12.0 MMtpa).

As detailed engineering and equipment specification advances during the design process and operating efficiencies are gained post-commissioning, the liquefaction process could perform better than this nominal design case. It is anticipated that LNG output could improve to as much as 657.5 Bscf/y in the optimized design case (approximately 13.2 MMtpa) which is the amount Delfin LNG is requesting authorization to export.

The proposed Delfin LNG deepwater port would take a modular implementation approach to allow for early market entry and accommodate market shifts. Offshore construction activities are proposed to begin at the end of the first quarter of 2018 and would be completed in four stages, with each stage corresponding to the commissioning and operation of an FLNGV. The anticipated commissioning of FLNGV 1 is the third quarter of 2019 with start-up of commercial operation of FLNGV 1 by the end of 2019. It is anticipated that FLNGVs 2 through 4 would be commissioned 12 months apart. Following this schedule and barring unforeseen events, the Delfin LNG deepwater port would be completed and all four FLNGVs would be fully operational by the summer of 2022.

Should a license be issued, the Delfin LNG deepwater port would be designed, fabricated, constructed, commissioned, maintained, inspected and operated in accordance with applicable codes and standards and with USCG oversight as regulated under Title 33, Code of Federal Regulations (CFR), subchapter NN-Deepwater Ports (33 CFR 148, 149 and 150). This includes applicable waterways management and regulated navigations areas, maritime safety and security requirements, risk assessment and compliance with domestic and international laws and regulations for vessels that may call at the port.

Add-56a

**FERC Application**

On May 8, 2015, Delfin LNG filed its original application with FERC requesting authorizations pursuant to the Natural Gas Act and 18 CFR part 157 for the onshore components of the proposed deepwater port terminal including authorization to use the **\*85681** existing pipeline infrastructure, which includes leasing a segment of pipeline from HIOS extending from the terminus of the UTOS pipeline offshore. On May 20, 2015, FERC issued its Notice of Application for the onshore components of Delfin LNG's deepwater port project in Docket No. CP15-490-000. This Notice was published in the Federal Register on May 27, 2015 (80 FR 30226). Delfin LNG stated in its application that High Island Offshore System, LLC would submit a separate application with FERC seeking authorization to abandon by lease its facilities to Delfin LNG. FERC, however, advised Delfin LNG that it would not begin processing Delfin LNG's application until such time that MARAD and USCG deemed Delfin LNG's deepwater port license application complete and High Island Offshore System, LLC submitted an abandonment application with FERC. On June 29, 2015, MARAD and USCG accepted the documentation and deemed the original Delfin LNG license application complete.

On November 19, 2015, High Island Offshore System, LLC filed an application (FERC Docket No. CP16-20-000) to abandon certain offshore facilities in the Gulf of Mexico, including its 66-mile-long mainline, an offshore platform and related facilities ("HIOS Repurposed Facilities"). Accordingly, on November 19, 2015, Delfin LNG filed an amended application in FERC Docket No. CP15-490-001 to use the HIOS Repurposed Facilities and to revise the onshore component of its deepwater port project. On December 1, 2015, FERC issued a Notice of Application for Delfin LNG's amendment, which was published in the Federal Register on December 7, 2015 (80 FR 76003).

The amended FERC application specifically discusses the onshore facility and adjustments to the onshore operations that would involve reactivating approximately 1.1 miles of the existing UTOS pipeline; the addition of four new onshore compressors totaling 120,000 horsepower of new compression; activation of associated metering and regulation facilities; the installation of new supply header pipelines (which would consist of 0.25 miles of new 42-inch-diameter pipeline to connect the former UTOS line to the new meter station); and 0.6 miles of new twin 30-inch-diameter pipelines between Transco Station 44 and the new compressor station site.

Additional information regarding the details of Delfin LNG's original and amended application to FERC is on file and open to public inspection. Project filings may be viewed at the www.ferc.gov Web site using the "eLibrary" link. Enter the docket number excluding the last three digits (i.e., CP15-490) in the docket number field to access project information. For assistance, please contact FERC at FERCOnlineSupport@ferc.gov or call toll-free, (886) 208-3676 or TYY, (202) 502-8659.

**Privacy Act**

In accordance with 5 U.S.C. 553(c), DOT/MARAD solicits comments from the public to better inform its rulemaking process. DOT/MARAD posts these comments, without edit, to www.regulations.gov, as described in the system of records notice, DOT/ALL-14 FDMS, accessible through www.dot.gov/privacy. In order to facilitate comment tracking and response, we encourage commenters to provide their name, or the name of their organization; however, submission of names is completely optional. Whether or not commenters identify themselves, all timely comments will be fully considered. If you wish to provide comments containing proprietary or confidential information, please contact the agency for alternate submission instructions.

Authority: 33 U.S.C. 1501 et seq., 49 CFR 1.93(h).

Dated: November 8, 2016.

By Order of the Maritime Administrator.

T. Mitchell Hudson, Jr.,

Add-57a

Secretary, Maritime Administration.

[FR Doc. 2016-27297 Filed 11-25-16; 8:45 am]

BILLING CODE 4910-81-P

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Add-58a**