No. 25-60282

IN THE

# United States Court of Appeals for the Fifth Circuit

CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; HABITAT RECOVERY PROJECT,

*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION; CHARLES MAKINGS, ACTING ADMINISTRATOR, U.S. MARITIME ADMINISTRATION; SEAN DUFFY, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION,

*Respondents,*

DELFIN LNG, L.L.C.,

*Intervenor*.

On Petition for Review from the Maritime Administration
USCG-2015-0472

## BRIEF FOR INTERVENOR

CATHERINE E. STETSON
JAMES T. BANKS
JOANNE ROTONDI
SEAN MAROTTA
NATALIE SALMANOWITZ
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Intervenor*

January 22, 2026

## CERTIFICATE OF INTERESTED PARTIES

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| Petitioners | Counsel |
|---|---|
| Center for Biological Diversity | Lauren Parker<br>Jason Rylander<br>CENTER FOR BIOLOGICAL DIVERSITY<br>1411 K Street NW, Suite 1300<br>Washington D.C. 20005<br>(202) 868-1008<br>lparker@biologicaldiversity.org |
| Sierra Club | Devorah Ancel<br>Rebecca McCreary<br>SIERRA CLUB<br>1650 38th St., Suite 103 W<br>Boulder, CO 80301 |
| Habitat Recovery Project | Devorah Ancel<br>Rebecca McCreary<br>SIERRA CLUB<br>1650 38th St., Suite 103 W<br>Boulder, CO 80301 |

| Respondents | Counsel |
|---|---|
| United States Department of Transportation;<br><br>United States Maritime Administration; | Adam R.F. Gustafson<br>Robert N. Stander<br>Robert Lundman<br>Ezekiel Peterson<br>Rebecca Jaffe<br>ENVIRONMENT AND NATURAL RESOURCES DIVISION |

i

Charles Makings, Acting
Administrator, U.S. Maritime
Administration;

Sean Duffy, Secretary, U.S.
Department of Transportation

U.S. DEPARTMENT OF JUSTICE
P.O. Box 7415
Washington, D.C. 20044
(202) 598-0402
rebecca.jaffe@usdoj.gov

Gregory Zerzan
Charles E. Enloe
Paula Lee
U.S. DEPARTMENT OF TRANSPORTATION
1200 New Jersey Ave., S.E.
Washington, D.C. 20590

Elizabeth O'Connor
Ainsley Q. Parrish
Joseph Click
MARITIME ADMINISTRATION
1200 New Jersey Ave., S.E.
Washington, D.C. 20590

**Intervenor**

Delfin LNG, L.L.C.;
Delfin Midstream Inc.

**Counsel**

Catherine E. Stetson
James T. Banks
Joanne Rotondi
Sean Marotta
Natalie Salmanowitz
J. Andrew Mackenzie
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

/s/ Catherine E. Stetson

Catherine E. Stetson
*Counsel for Intervenor*

ii

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor agrees with Petitioners and the United States that oral argument would assist the Court in considering the multiple issues raised in this case.

**TABLE OF CONTENTS**

<u>Page</u>

CERTIFICATE OF INTERESTED PARTIES ...........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF AUTHORITIES ...................................................................................vi

INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES...............................................................................4

STATEMENT OF THE CASE...................................................................................4

    A. The Deepwater Port Act .........................................................................4

    B. Delfin's Deepwater Port Project.............................................................7

    C. Delfin's Subsequent Project Refinements.............................................11

    D. MARAD Issues Delfin's License.........................................................15

SUMMARY OF THE ARGUMENT .......................................................................18

STANDARD OF REVIEW .....................................................................................20

ARGUMENT ..........................................................................................................20

  I.   MARAD'S LICENSING DECISION COMPLIES WITH THE
      DEEPWATER PORT ACT........................................................................21

  II.  MARAD'S LICENSING DECISION COMPLIES WITH THE
      NATIONAL ENVIRONMENTAL POLICY ACT .....................................30

    A. MARAD Acted Within Its Broad Discretion In Declining To
       Prepare A Supplemental EIS ...................................................................30

    B. Any Failure To Prepare A Supplemental EIS Was Harmless..................45

  III. MARAD'S LICENSING DECISION COMPLIES WITH THE
       ADMINISTRATIVE PROCEDURE ACT .................................................47

## TABLE OF CONTENTS—Continued

Page

IV. THE REMEDY FOR ANY FLAW IN MARAD'S ANALYSIS IS REMAND WITHOUT VACATUR ........................................................... 51

CONCLUSION ................................................................................................ 54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

**CASES:**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................ 52

*American Bankers Ass'n v. National Credit Union Admin.,*
  934 F.3d 649 (D.C. Cir. 2019) ................................................................ 52

*American Petroleum Inst. v. EPA,*
  661 F.2d 340 (5th Cir. Unit A 1981) ...................................................... 49

*Cboe Global Markets, Inc. v. SEC,*
  155 F.4th 704 (D.C. Cir. 2025) .............................................................. 50

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. DOT,*
  98 F.4th 178 (5th Cir. 2024) ........................................................ *passim*

*City of Grapevine v. DOT,*
  17 F.3d 1502 (D.C. Cir. 1994) ............................................................... 42

*Department of Homeland Sec. v. Regents of Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................................... 47

*DOT v. Public Citizen,*
  541 U.S. 752 (2004) ................................................................................. 7

*El Puente v. U.S. Army Corps of Eng'rs,*
  100 F.4th 236 (D.C. Cir. 2024) ......................................................... 47, 48

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) .......................................................................... 48, 50

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .......................................................................... 47-49

*FDA v. Wages & White Lion Invs., L.L.C.,*
  604 U.S. 542 (2025) .......................................................................... 47-50

## TABLE OF AUTHORITIES—Continued

Page

*Fox Television Stations, Inc. v. FCC,*
280 F.3d 1027 (D.C. Cir. 2002) ........................................................................ 52

*Friends of Capital Crescent Trail v. Fed. Transit Admin.,*
877 F.3d 1051 (D.C. Cir. 2017) ........................................................................ 43

*Gas Transmission Nw., L.L.C. v. FERC,*
157 F.4th 674 (5th Cir. 2025) ........................................................ 31, 33, 45, 46

*Gonzales-Servin v. Ford Motor Co.,*
662 F.3d 931 (7th Cir. 2011) ............................................................................ 33

*Healthy Gulf v. FERC,*
132 F.4th 544 (D.C. Cir. 2025) ........................................................................ 31

*International Union, UMW v. FMSHA,*
920 F.2d 960 (D.C. Cir. 1990) ......................................................................... 52

*Louisiana Wildlife Federation Inc. v. York,*
761 F.2d 1044 (5th Cir. 1985) .......................................................................... 44

*Marsh v. Oregon Nat. Res. Council,*
490 U.S. 360 (1989) ............................................................................... 31, 42, 43

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
460 U.S. 766 (1983) .......................................................................................... 33

*Midcoast Interstate Transmission, Inc. v. FERC,*
198 F.3d 960 (D.C. Cir. 2000) ......................................................................... 28

*National Ass'n of Private Fund Mgrs. v. SEC,*
151 F.4th 252 (5th Cir. 2025) .......................................................................... 53

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ............................................................................................ 50

*PSWF Corp. v. FCC,*
108 F.3d 354 (D.C. Cir. 1997) ......................................................................... 49

# TABLE OF AUTHORITIES—Continued

Page

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ................................................................. 46

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ........................................................ *passim*

*Sierra Club v. FERC*,
  68 F.4th 630 (D.C. Cir. 2023) ................................................ 43

*Sierra Club v. Froehlke*,
  816 F.2d 205 (5th Cir. 1987) ................................................. 31

*Southwestern Electric Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ................................................ 51

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ................................................. 51

*Texas Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ............................................ 51, 53

*Wisconsin v. Weinberger*,
  745 F.2d 412 (7th Cir. 1984) ................................................ 31

**STATUTES:**

33 U.S.C. §§ 1501-1523 ............................................................. 5

33 U.S.C. § 1503 ............................................................... 21, 23

33 U.S.C. § 1503(a) .................................................................. 7

33 U.S.C. § 1503(c)(1) ............................................................. 5

33 U.S.C. § 1503(c)(3) ............................................................. 5

33 U.S.C. § 1503(c)(5) ...................................................... 5, 9, 24

# TABLE OF AUTHORITIES—Continued

Page

33 U.S.C. § 1503(e)(3) ........................................................................ 5

33 U.S.C. § 1504 ......................................................................... 21, 23

33 U.S.C. § 1504(c) ......................................................................... 28

33 U.S.C. § 1504(c)(1)(A) .................................................................. 5

33 U.S.C. § 1504(c)(1)(B)(ii)(I) ......................................................... 6

33 U.S.C. § 1504(c)(1)(B)(ii)(II) ........................................................ 6

33 U.S.C. § 1504(c)(2) ....................................................................... 5

33 U.S.C. § 1504(e) ......................................................................... 28

33 U.S.C. § 1504(e)(2) ....................................................................... 6

33 U.S.C. § 1504(f) ............................................................................ 7

33 U.S.C. § 1504(g) ........................................................................... 6

33 U.S.C. § 1504(i)(1) ....................................................................... 6

33 U.S.C. § 1504(i)(3) ....................................................................... 6

33 U.S.C. § 1504(i)(5) ..................................................................... 23

33 U.S.C. § 1504(i)(5)(A)(i) ............................................................ 25

33 U.S.C. § 1504(i)(5)(C)(iii) .......................................................... 24

33 U.S.C. § 1504(i)(5)(D) ............................................................... 23

33 U.S.C. § 1505 ..................................................................... 5, 21, 23

33 U.S.C. § 1508(b)(1)(A) ................................................................. 6

33 U.S.C. § 1508(b)(1)(C) ................................................................. 6

ix

# TABLE OF AUTHORITIES—Continued

Page

33 U.S.C. § 1516............................................................................................. 10, 53

33 U.S.C. § 2716(c)(2)............................................................................................. 5

42 U.S.C. § 4332(2)(C)............................................................................................. 7

42 U.S.C. § 4332(2)(C) (2018)............................................................................... 40

5 U.S.C. § 706....................................................................................................... 45

5 U.S.C. § 706(2)(A)............................................................................................. 20

**REGULATIONS:**

33 C.F.R. § 148.200............................................................................................... 23

33 C.F.R. § 148.207............................................................................................... 23

33 C.F.R. § 148.209................................................................................................. 6

33 C.F.R. § 148.222............................................................................................... 23

33 C.F.R. § 148.276(c)............................................................................................. 6

33 C.F.R. § 148.277................................................................................................. 6

33 C.F.R. § 148.715............................................................................................... 23

40 C.F.R. § 1502.9(c)(1)(i) (2020)....................................................................... 30

40 C.F.R. § 1502.9(c)(1)(ii) (2020)...................................................................... 30

40 C.F.R. § 1502.9(d)............................................................................................ 16

40 C.F.R. § 1502.9(d) (2024)................................................................................ 31

40 C.F.R. § 1502.9(d)(1)(i) (2024)....................................................................... 42

40 C.F.R. § 1502.9(d)(1)(ii) (2024)...................................................................... 42

# TABLE OF AUTHORITIES—Continued

Page

40 C.F.R. § 1502.9(e) (2024) ................................................................ 10, 31, 42, 44

49 C.F.R. § 1.93(h) ............................................................................................ 5

80 Fed. Reg. 80,455 (Dec. 24, 2015) ................................................................ 8

81 Fed. Reg. 46,157 (July 15, 2016) ................................................................. 8

81 Fed. Reg. 85,678 (Nov. 28, 2016) ............................................................... 8

90 Fed. Reg. 10610 (Feb. 25, 2025) ............................................................... 30

**OTHER AUTHORITIES:**

Fact Sheet: Biden-Harris Administration Announces Temporary Pause
    on Pending Approvals of Liquefied Natural Gas Exports (Jan. 26,
    2024), https://perma.cc/FK8C-UJWR ................................................. 12

**INTRODUCTION**

Delfin LNG LLC (Delfin) is the developer of a deepwater port approximately 40 nautical miles off the coast of Cameron Parish, Louisiana (Port Delfin). Port Delfin is a "brownfield" deepwater port, meaning that it reuses existing infrastructure. When completed, Port Delfin will allow three floating liquefied natural gas (LNG) vessels to produce around 13.2 million tons of LNG per year, further cementing America's energy security and creating hundreds of new local jobs.

In 2017, the U.S. Department of Transportation's U.S. Maritime Administration, more commonly known as MARAD, issued a final record of decision (ROD) for Port Delfin. After compiling and considering a lengthy and detailed environmental impact statement, MARAD determined that Port Delfin complied with the Deepwater Port Act and was in the Nation's best interests. MARAD concluded that Port Delfin will "have a beneficial effect on economic growth, both on the local level and the national level," "expand and diversify U.S. energy infrastructure," "provide a reliable source of clean energy to U.S. allies in the event of market disruption," and "have a low impact on the availability and cost of natural gas in the U.S. domestic market." AR_005356. MARAD thus authorized issuance of a license subject to a number of standard conditions, including that Delfin provide further evidence of financial assurance, submit "further technical

1

information" concerning the Port's construction, and continue to employ the "best available technology so as to prevent or minimize adverse impact on the marine environment." AR_005307, AR_005323, AR_005325.

No one challenged the ROD within the 60 days allowed by the Deepwater Port Act, and the ROD became no longer subject to judicial review.

As a simple matter of logistics, there is often a time lag between the issuance of a ROD and a license, such that a final project might not be identical to the one MARAD initially reviewed. The Deepwater Port Act does not specify how and to what extent MARAD must assess project changes that occur after a ROD has issued. But Condition 15 of the ROD provides a helpful guide. Consistent with then-applicable National Environmental Policy Act (NEPA) regulations, Condition 15 required Delfin to submit an environmental impact assessment for any substantive changes "to the construction and/or operation of the Port from what is specifically authorized in the License," so that the agency could determine whether it had to supplement its environmental analysis under NEPA. AR_005348.

MARAD instructed Delfin to follow this same process to determine whether a supplemental environmental impact statement or additional interagency consultation was required for any post-ROD project refinements made before the license issued. Delfin did so. When Delfin asked for MARAD to issue the license in 2025 after proposing several project refinements, Delfin furnished an

2

environmental impact assessment explaining that its changes to the port had *reduced* the environmental impacts found acceptable in the ROD. Delfin also explained that certain other concerns MARAD had previously raised were either mistaken or unsupported. MARAD reviewed Delfin's information, agreed with Delfin's analysis, and issued the license as the ROD and the Deepwater Port Act contemplated.

Petitioners nonetheless contend that Delfin's refinements required the company to go back to Square One and submit an amended license application. They are wrong. MARAD acted in accordance with Delfin's unchallenged 2017 ROD and in compliance with both NEPA and the Deepwater Port Act in explaining why Delfin's modest modifications required neither an amended license application nor a supplemental environmental impact statement; and it did so in written, reasoned, and reasonable memoranda that Petitioners ignore entirely. MARAD also adequately explained why Delfin's submissions assuaged the other concerns the agency had raised in prior correspondence. And even if MARAD *had* committed some procedural foot-fault, the appropriate remedy would be remand without vacatur of the license to afford MARAD an opportunity to cure the defect—not vacatur of Delfin's license, and certainly not vacatur of Delfin's unchallenged ROD.

The petition should be denied.

3

## STATEMENT OF THE ISSUES

1.    Whether MARAD's license issuance complied with the Deepwater Port Act, where the Deepwater Port Act does not require any specific steps for evaluating post-ROD project refinements and MARAD reasonably followed the ROD's unchallenged procedures for evaluating project changes.

2.    Whether MARAD reasonably declined to prepare a supplemental environmental impact statement, where the only new circumstances were project refinements, the effects of which MARAD found fell within the existing final environmental impact statement; the designation of a new federally protected whale species that MARAD found was unlikely to be encountered near Delfin's project; and the supposed cumulative impact of other deepwater port projects.

3.    Whether MARAD complied with the Administrative Procedure Act when it issued Delfin's license after explaining that the agency's prior concerns about the nature and scope of Delfin's proposed project refinements were adequately addressed by Delfin's subsequent submissions and that the refinements satisfied the ROD's conditions to issue Delfin's license.

## STATEMENT OF THE CASE

### A.    The Deepwater Port Act

The Deepwater Port Act establishes a licensing system administered by the Secretary of Transportation for ownership, construction, operation, and

4

decommissioning of deepwater port structures located beyond the U.S. territorial sea. 33 U.S.C. §§ 1501-1523. The Secretary has delegated his authority under the Act to MARAD. 49 C.F.R. § 1.93(h).

The Act sets forth detailed procedures MARAD must follow before licensing a deepwater port. MARAD must, among other things, ensure that licensure is in the "national interest" and aligns with the Act's "national policy goals and objectives" of "national security," "energy sufficiency," and "environmental quality." 33 U.S.C. § 1503(c)(3). To that end, MARAD must confirm, "in accordance with the environmental review criteria established" under 33 U.S.C. § 1505, that "the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment." *Id*. § 1503(c)(5). And MARAD must ensure that the applicant is "financially responsible," meaning that the applicant has the resources to construct, operate, and eventually decommission the port. *Id*. § 1503(c)(1); *see also id*. §§ 1503(e)(3); 2716(c)(2).

To facilitate MARAD's consideration of these factors, an applicant must submit a "detailed plan," including various "financial [and] technical" information. *Id*. §§ 1504(c)(1)(A), (c)(2). MARAD then assesses whether the application contains all required information and—if not—notifies the applicant that it will not

act until the application is amended to address the deficiencies. *Id.* § 1504(c)(1)(B)(ii)(II).

Once MARAD deems an application complete, it publishes a notice in the *Federal Register* summarizing the application. *Id.* § 1504(c)(1)(B)(ii)(I); 33 C.F.R. § 148.209. MARAD also sends copies of the application to relevant federal agencies and the governor of each adjacent coastal State. *See* 33 U.S.C. §§ 1508(b)(1)(A), 1504(e)(2); 33 C.F.R. § 148.209. Public hearings are held in each adjacent coastal State, 33 U.S.C. § 1504(g), and those States' governors have 45 days following the last public hearing to approve, approve with conditions, or disapprove the application, *id.* § 1508(b)(1)(C); 33 C.F.R. § 148.277. Consulted federal agencies have the same period to inform MARAD that "the application does not comply with any law or regulation within its area of responsibility" and advise "how the application may be amended so as to bring it into compliance with the law or regulation involved." 33 U.S.C. § 1504(e)(2); 33 C.F.R. § 148.277.

The Deepwater Port Act requires MARAD to issue a ROD approving or denying the application within 90 days of the last public hearing. 33 U.S.C. § 1504(i)(1); 33 C.F.R. § 148.276(c). The ROD details MARAD's analysis of the statutory factors, lays out any conditions for issuance of a license, and specifies the steps that must be taken to secure approval of subsequent project alterations. *See, e.g.*, 33 U.S.C. § 1504(i)(3); 33 C.F.R. § 148.276(c); AR_005292-5359. Once all

pre-licensure conditions are met, a license is issued authorizing construction and operation of the deepwater port.  *See* 33 U.S.C. § 1503(a).

The Deepwater Port Act also requires MARAD to comply with NEPA.  *See* 33 U.S.C. § 1504(f).  NEPA instructs federal agencies to prepare an environmental impact statement (EIS) for all "major Federal Actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 172 (2025).  But "NEPA imposes no substantive environmental obligations or restrictions," *id.* at 173, nor does it "mandate environmentally friendly results," *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. DOT*, 98 F.4th 178, 189 (5th Cir. 2024).  NEPA merely "imposes procedural requirements ensuring that the government considers 'the environmental impact of its proposals and actions.' " *Id.* (brackets omitted) (quoting *DOT v. Public Citizen*, 541 U.S. 752, 757 (2004)).

## B.    Delfin's Deepwater Port Project

In November 2015, Delfin applied to construct and operate a deepwater port to liquefy natural gas and export the resulting LNG.  *See* AR_001498-1507.  The application proposed a first-of-its-kind offshore terminal that will use existing underwater pipelines to deliver natural gas from an onshore facility to four vessels

7

moored off the coast of Cameron Parish, Louisiana. AR_001524. From there, the vessels will super-cool the gas to produce LNG, which will then be transferred to customers via ship-to-ship transfer. *Id.* All told, Port Delfin will be capable of producing approximately 13.2 million metric tons of LNG per year. AR_001524-1525.

MARAD found the application complete, published notice in the *Federal Register*, and requested public comment. 80 Fed. Reg. 80,455 (Dec. 24, 2015). Over the following year, MARAD coordinated with participating federal and state agencies, analyzed the application, issued a draft EIS for public comment, and held two public meetings. *See* AR_005304-5305; 81 Fed. Reg. 46,157 (July 15, 2016). In late November 2016, MARAD published a notice of the final EIS and public hearings and solicited further public comment. 81 Fed. Reg. 85,678 (Nov. 28, 2016). MARAD held the final public hearings the following month. *See* AR_005305-5306.

In March 2017, MARAD issued a ROD concluding that Delfin's proposed deepwater port would be "in the national interest and consistent with national security and other national policy goals and objectives, including energy efficiency and environmental quality." AR_005359. Among other things, MARAD determined "construction and operation of the Port to be in the national interest because Delfin LNG will have a beneficial effect on economic growth, both on the local level and the national level, it will expand and diversify U.S. energy

infrastructure, it will provide a reliable source of clean energy to U.S. allies in the event of market disruption, and it will have a low impact on the availability and cost of natural gas in the U.S. domestic market." AR_005356.

MARAD also concluded that Delfin's project met the Deepwater Port Act's "financial, technical and management capability" requirements; that Delfin could comply with all applicable laws and license conditions; and that Delfin could "fulfill its obligation to construct and operate the Port in a timely and efficient manner." AR_005318. MARAD further found that "the environmental impact analysis requirements of NEPA have been satisfied," AR_005338; that "the proposed technology to be used" by Delfin "is the best available technology to minimize or prevent adverse impact on the environment for this project," AR_005339 (citing 33 U.S.C. § 1503(c)(5)); and that Port Delfin "is the environmentally preferred alternative for this project," AR_005340.

MARAD therefore "authorize[d] the issuance of a License to Delfin" subject to certain conditions, including that Delfin demonstrate its financial ability to construct, operate, decommission and cover liabilities for the port by executing the draft guarantee agreements it had submitted during the application process, or present alternative draft agreements from "other credit-worthy financial entities." AR_005323; *see also* AR_005324.

9

The ROD also observed that Delfin's eventual license would impose "a continuing obligation to employ best available technology." AR_005340. MARAD therefore took into account that the time lag between the ROD's issuance and the Port's construction and operation might mean that Delfin would have to refine its plans for the Port. To streamline MARAD's evaluation of future revisions, the ROD set forth a process for considering subsequent project changes. The necessary steps—which tracked the then-governing NEPA regulations—were prescribed in the ROD's environmental Condition 15, entitled "Changes to the Deepwater Port." AR_005348. For anything MARAD deemed a "substantive change to the construction and/or operation of the Port from what is specifically authorized in the License," Delfin must submit an "Environmental Impact Assessment" detailing the alteration and evaluating "its probable environmental consequences, adverse or beneficial." *Id*. The information required was limited to the "level of detail and depth of analysis to enable" MARAD to "prepare the appropriate NEPA document, if necessary." *Id*.; *cf.* 40 C.F.R. § 1502.9(e) (2024) (NEPA regulation authorizing agencies to reevaluate an EIS to decide what level of further review, if any, will be necessary).

Under the Deepwater Port Act, an aggrieved party had 60 days to petition for review of the ROD in this Court. *See* 33 U.S.C. § 1516. No one did. The ROD became no longer subject to judicial review on May 12, 2017.

10

### C.    Delfin's Subsequent Project Refinements

Delfin submitted numerous letters updating MARAD on its progress.  *See* AR_007395.  Most relevant here, Delfin submitted its first project update on June 14, 2022, describing various technological refinements for "minimizing air emissions, water use and other environmental impacts," which resulted in "an equal or lesser level of environmental impacts as analyzed in the 2016 [final EIS] for the Delfin LNG project."  AR_005390.  Delfin also submitted an updated financial plan, including executed long-term offtake contracts with creditworthy buyers and U.S. allies to purchase Port Delfin's LNG production.  AR_005686-7010.

After reviewing Delfin's submissions, MARAD requested an environmental impact assessment detailing "the proposed changes to the project and evaluat[ing] the probable environmental consequences, adverse or beneficial."  AR_005401. MARAD also required Delfin to analyze the impact of its project on any newly listed species or critical habitats, "[g]iven the time that ha[d] elapsed since the issuance of the 2016" final EIS.  AR_005402.  MARAD explained that this process would allow the agency to determine whether a supplemental environmental impact statement or additional interagency consultation was necessary under the then-governing NEPA regulations and consistent with the ROD's Condition 15.  AR_005401.

In 2023, Delfin submitted a responsive assessment that detailed all post-ROD refinements and evaluated the probable environmental consequences, which were

largely beneficial and fell within the scope of impacts considered in the 2016 final EIS. *See* AR_005412-5499. The assessment explained that the "refined Project design would reduce the impacts on air quality, sediment and geologic resources, water quality resources, [federally listed] species [and] their habitats." AR_005462. Following review of Delfin's environmental impact assessment and additional interagency consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, MARAD and its consulting agencies determined that Delfin's project "may affect, but is not likely to adversely affect Federally-listed threatened and endangered species and designated critical habitat[s]." AR_007019 (U.S. Fish & Wildlife consultation); *accord* AR_007285 (National Marine Fisheries Service consultation).

In the beginning of 2024, the then-governing Administration announced a pause on all pending approvals of LNG exports. *See* Fact Sheet: Biden-Harris Administration Announces Temporary Pause on Pending Approvals of Liquefied Natural Gas Exports (Jan. 26, 2024), https://perma.cc/FK8C-UJWR. On April 17, 2024, Delfin received a letter from MARAD's then-associate administrator stating that "MARAD will not issue a license at this time" due to what the letter characterized as "widespread changes" to the Delfin project's "ownership, design, financing, and operations." AR_007344. According to the letter, these changes amounted to "a revised proposal that is not the same as that approved under the

ROD." *Id.* The letter claimed that Delfin "now propose[d]" to have critical equipment "owned, financed, and operated by third parties other than Delfin." *Id.* The letter also speculated that Delfin's original financing partners "no longer appear[ed] to be involved" and that "Delfin's project update proposed design changes" that required "an updated environmental review." AR_007345. But as Delfin would explain, the April 2024 letter appeared to have misunderstood the scope of Delfin's proposed refinements to the project, as well as the project's ownership, control, and financing. AR_007353-7354.

On January 20, 2025, President Trump signed Executive Order 14145, entitled "Unleashing American Energy." *See* AR_007376-7382. The President directed MARAD within 30 days to determine for proposed deepwater port projects, like Delfin's, for which a favorable ROD has been issued, "whether any refinements to the project proposed subsequent to the ROD are likely to result in adverse environmental consequences that substantially differ from those associated with the originally-evaluated project so as to present a seriously different picture of the foreseeable adverse environmental consequences" and to consider "any potential consequences not addressed in the final [EIS], which shall be considered adequate under NEPA." AR_007380. The President further instructed that if MARAD determined that the proposed refinements would *not* have substantially different

13

adverse environmental consequences, MARAD must issue a license within 30 days of that determination. *Id*.

Delfin provided MARAD an "updated package of information" shortly thereafter to aid MARAD's assessment of project changes under the then-applicable NEPA regulations, MARAD's stated process for assessing post-ROD changes consistent with the ROD's Condition 15, and the President's executive order. AR_007385. The 2025 package included "detailed information regarding Project refinements as well as clarifications to correct any potential misperceptions regarding Delfin LNG's continued ownership and control of the Project." *Id*. The package also included updated corporate and financial information as well as a revised and updated 2025 environmental impact assessment. AR_007385-7400 (cover letter); AR_008121-8144 (financial update); AR_007401-8120 (environmental impact assessment).

The 2025 assessment explained that "all of the project updates are designed to further prevent or minimize effect on the environment and use best available technology, consistent with the [Deepwater Port Act] mandate, the ROD, and environmental review criteria." AR_007391. As part of the refinements, Delfin decided to use three rather than four floating LNG vessels and to use an alternative, newer mooring system to anchor the vessels to the seabed. AR_008291; AR_008194. Overall, Delfin's proposed engineering refinements *reduced* air

14

emissions and "construction impacts and seabed disturbances." AR_007398. The 2025 environmental impact assessment thus demonstrated that "the overall environmental impacts are reduced, mitigated or avoided by Delfin's project improvements." AR_007399.

Delfin further clarified that "[c]ontrary to the misunderstandings contained in the April 17 letter, Delfin remains the controlling owner and operator of all components of the proposed Delfin Deepwater Port Project." AR_007396. The April 2024 letter's different view appeared to rest on Delfin's plan to use "special-purpose entities for financing, construction and operation purposes." *Id*. But those entities would be under *Delfin's*, not third parties', ownership and control. *Id*. As Delfin explained, "[a]lthough much more advanced than when originally submitted, Delfin's ownership and commercial plan remains consistent with the original project." *Id.* Delfin also submitted comprehensive financial materials—including draft guarantee agreements with a new guarantor—demonstrating that Delfin remained "financially responsible and has the financial resources to own, construct, operate, and decommission the deepwater port" and that the "Project remain[ed] financially viable." *Id*.

### D.    MARAD Issues Delfin's License

MARAD reviewed Delfin's 2025 submissions and determined that Delfin had adequately "addresse[d] the concerns raised in the April 17, 2024, letter."

15

AR_009403. MARAD concluded that Delfin's design refinements were "not likely to result in environmental consequences that substantially differ from those associated with the originally evaluated project" and that "Delfin's project as so refined meets the requirements of the Deepwater Port Act and [MARAD's] favorable 2017 ROD for license issuance." AR_008258. MARAD explained that the environmental impact assessments outlined in the ROD's Condition 15 are "used to inform if additional NEPA review is necessary" and that "MARAD found the information and analysis in the 2023 and 2025 [environmental impact assessments] sufficient for its review and analysis." AR_008263-8264 (citing 40 C.F.R. § 1502.9(d)).

MARAD additionally concluded that the project did "not require the preparation of a supplemental EIS" because Delfin's assessments demonstrated that "the potential environmental impacts resulting from the changes made to the Delfin LNG project fall within the range and scope of impacts analyzed in the [final] EIS." AR_008268. And MARAD reinitiated consultation with the National Marine Fisheries Service to confirm that newly listed species and habitats would not be significantly affected by the project refinements. AR_009307.

MARAD similarly reviewed Delfin's updated financial information and found that Delfin's new draft guarantee agreements met the ROD's requirement to secure draft financing agreements from alternative creditworthy financial entities.

16

*See* AR_008215-8219; AR_005323.  MARAD's Office of Financial Approvals and Marine Insurance accordingly recommended "the acceptance of the Delfin request for the License to operate the proposed Delfin [deepwater port] from a financial responsibility perspective due to the financial requirements under the Record of Decision being met," on the condition that Delfin finalize its draft guarantee agreements or secure another agreement with a financially sound party. AR_008219.

MARAD issued Delfin's license on March 21, 2025.  AR_009348-9400.  The license, like the ROD, included various conditions to be met before or during construction or operation, including the Office of Financial Approvals' recommended financing condition.  AR 009351.  Moreover, MARAD forbid Delfin from "making any irreversible or irretrievable commitment of resources" until completion of consultation with the National Marine Fisheries Service regarding the effect, if any, of Port Delfin on newly listed endangered species or habitats. AR_009342-9343; AR_009360.  In April 2025, the National Marine Fisheries Service concurred with MARAD that Port Delfin was unlikely to adversely affect listed species and habitats.  MARAD Br. 53 n.4.

Petitioners' petition for review followed.

17

## SUMMARY OF THE ARGUMENT

**I.** MARAD's licensing decision complied with the Deepwater Port Act. MARAD undisputably complied with the Act's procedural requirements when issuing the ROD conditionally approving Delfin's project—and the ROD is now final and unchallengeable. Petitioners nonetheless insist that MARAD had to begin the whole application process all over again because of Delfin's beneficial project refinements. But nothing in the Deepwater Port Act or its implementing regulations requires that wasteful result. The unchallenged ROD set out its own procedures for evaluating refinements to the project authorized in the license. MARAD reasonably applied those same procedures to Delfin's post-ROD changes before issuing Delfin's license.

**II.** MARAD's licensing decision was also consistent with NEPA. Petitioners insist that Delfin's project refinements, new information concerning the Rice's whale, and other proposed large fossil-fuel projects required MARAD to prepare a supplemental EIS. But agencies have wide latitude in deciding whether new circumstances warrant supplementation, and MARAD reasonably determined that supplementation was unnecessary. Delfin's project refinements left the environment better off; MARAD concluded that the Rice's whale is unlikely to be present anywhere near Port Delfin; and the Supreme Court has held that agencies are under

18

no obligation to evaluate environmental effects of projects separate from the one under review.

Regardless, even if a supplemental EIS had been required, MARAD's failure to prepare one would be harmless error. Petitioners have offered no reason to think MARAD would have withheld licensure had it conducted more analysis. The President's executive order demonstrates that Delfin's project is in line with the administration's priorities, and—as noted—Delfin's project refinements only serve to make the Port *more* environmentally friendly.

**III.** MARAD's licensing decision complies with the Administrative Procedure Act, too. Petitioners contend that MARAD violated the change-in-position doctrine by issuing a license without plodding through the additional procedures contemplated in the April 2024 letter. But the change-in-position doctrine does not apply to informal agency correspondence. Moreover, MARAD deemed the April 2024 letter's invitation for additional process unwarranted only after concluding the project had not undergone the transformation the agency previously thought it had. MARAD adequately explained its change in position in a series of memoranda culminating in the agency's ultimate determination that Delfin had fully "address[ed] the concerns raised in the April 17, 2024, letter." AR_009403.

19

**IV.**    Finally, even if the Court finds some error that is more than harmless, the appropriate remedy is remand without vacatur.  This Court typically opts for remand without vacatur when the only flaw in an agency's analysis is procedural, and Petitioners' challenges fit that bill.  Petitioners assert only procedural errors, and they do not give any reason for the Court to believe that MARAD would reach a different licensure decision on remand.  Vacatur of the license is unwarranted.  And Petitioners' throw-away request to vacate the ROD is well out of time.

## STANDARD OF REVIEW

This Court reviews MARAD's actions under the familiar Administrative Procedure Act standard to ensure they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "[I]n determining what information warrants EIS supplementation, courts generally defer to the agency's well-informed judgment."  *Citizens for Clean Air & Clean Water*, 98 F.4th at 192.

## ARGUMENT

As MARAD explains, Petitioners do not have Article III standing to challenge the agency's decision to issue Delfin's license.  MARAD Br. 19-28.  But if the Court does reach the merits, it should deny the petition for review.

20

## I.    MARAD'S LICENSING DECISION COMPLIES WITH THE DEEPWATER PORT ACT.

The Deepwater Port Act prescribes detailed procedures MARAD must follow to issue a ROD. *See* 33 U.S.C. §§ 1503-1505. As MARAD explains, the agency followed those steps to a tee in issuing Delfin's unchallenged ROD. *See* MARAD Br. 32-36. But the Act does not specify what steps MARAD must follow when a project sponsor proposes a modification *after* issuance of a ROD. *See* 33 U.S.C. §§ 1503-1505. So MARAD filled the gap and prescribed those steps itself. *See* AR_005348-5349; AR_005401-5402.

Condition 15 of the ROD states that in the event of a proposal "to make any substantive change to the construction and/or operation of the Port from what is specifically authorized in the License," Delfin must submit an "Environmental Impact Assessment . . . that details the proposed change and evaluates its probable environmental consequences, adverse or beneficial." AR_005348. The environmental impact assessment's scope is limited to the proposed change and need include only "a level of detail and depth of analysis to enable . . . MARAD to prepare the appropriate NEPA document, if necessary." *Id*.

Although Condition 15 contemplates project refinements after a license has issued, MARAD reasonably concluded that the same procedures should govern changes proposed following a ROD but prior to license issuance. AR_005401-5402. After all, the ROD "authorize[d] the issuance of a License to Delfin" for its proposed

21

project subject to certain conditions, many of which were identical to those contained in the ultimate license.  AR_005306-5307; AR_009348-9366.  And Condition 15's steps for determining whether further NEPA review is warranted based on project changes turn on the nature and impact of the proposed changes as compared to those assessed in MARAD's final ROD rather than whether the project's license has issued.  *See* AR_005348-5349; AR_005401-5402.

MARAD therefore reasonably followed Condition 15's process to assess Delfin's project refinements.  MARAD determined that various project refinements were sufficiently substantive and asked Delfin to submit an environmental impact assessment; Delfin did so; and MARAD determined that further NEPA review was unnecessary and that the potential environmental impacts of Delfin's project, as refined, fell within those considered in the existing final EIS and ROD.  AR_005401; AR_008268; AR_008263; AR_009403.

Petitioners do not dispute Delfin's and MARAD's compliance with Condition 15's procedures.  *See* Opening Br. 31-37.  Petitioners instead insist that MARAD had to press restart on the entire application process upon identifying "significant changes" to the project.  Not doing so, Petitioners contend, violated the Deepwater Port Act and the Administrative Procedure Act.  Opening Br. 31-32.

Petitioners' arguments misunderstand both the Deepwater Port Act and the record in this case.  Nothing in the Act requires MARAD to restart its entire

evaluation process when a project is refined post-ROD. Petitioners do not identify a single instance of project changes requiring a project sponsor to undergo the entire Deepwater Port Act application gauntlet again because of project refinements with overall beneficial effects.

1. Petitioners invoke various Deepwater Port Act statutory provisions and implementing regulations, but none requires an amended application. *See* Opening Br. 32-37 (citing 33 U.S.C. §§ 1503, 1504, 1505; 33 C.F.R. §§ 148.200, 148.207, 148.222, 148.715). Most concern what happens *before* a ROD issues. 33 U.S.C. § 1504(c) is about information an application must include to be deemed complete prior to a ROD. And 33 U.S.C. § 1505(a) is about the environmental review criteria used in evaluating a deepwater port application. 33 C.F.R. § 148.200 addresses the procedures for "processing an application." Even Petitioners characterize the steps in 33 U.S.C. §§ 1504(c) and 1505 as "begin[ning] when the applicant submits a completed application and end[ing]" when MARAD issues a ROD. Opening Br. 19-21.

Only one of Petitioners' cites, 33 U.S.C. § 1504(i)(5), contemplates an amended application *after* a ROD has issued. But Section 1504(i)(5) simply provides for expedited review under certain circumstances when an amended application is submitted. *See id.* § 1504(i)(5)(D). Section 1504(i) does not say under

23

what circumstances an amended application is required, and Delfin never submitted one.

It is no surprise that Petitioners are unable to support their position through the Deepwater Port Act's text, regulations, and case law. It would be Sisyphean to return to Square One any time a project sponsor improves its project. No complex construction project—deepwater ports included—can be completed in the identical form in which it is proposed. Projects must account for engineering advances and new financing opportunities—and this is all the more so for projects under the Deepwater Port Act, which mandates that deepwater ports be "constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment." 33 U.S.C. § 1503(c)(5). Even Section 1504(i)(5) does not require that amended applications be subjected to the same procedures as a new application. Like Delfin's Condition 15, it recognizes that MARAD may conclude that "additional environmental review is not required." *Id*. § 1504(i)(5)(C)(iii).

Petitioners complain that "Delfin never submitted an amended application" under Section 1504(i)(5). Opening Br. 35. But just as Petitioners point to nothing in the Deepwater Port Act to support subjecting project refinements to the Act's full panoply of procedural requirements, Petitioners also point to nothing in the Deepwater Port Act that requires funneling all project changes through Section

24

1504(i)(5). After all, Section 1504(i)(5) was only enacted in 2024 to address projects stalled by the COVID-19 pandemic. *See* 33 U.S.C. § 1504(i)(5)(A)(i). The provision is properly understood as a Congressional directive to accelerate review of certain pre-existing amended applications—not to command the submission of amended applications for post-ROD changes.

Petitioners likewise contend that their procedural rights were violated by MARAD not requiring an amended application to be published in the *Federal Register* for public review and comment. Opening Br. 36-37. But Petitioners' argument assumes their preferred conclusion. Because MARAD's decision to issue Delfin's license without an amended application complied with the Deepwater Port Act, MARAD did not deny Petitioners any notice and opportunity for public participation to which they were entitled. And that conclusion is even-more-true for Delfin's updated financial arrangements. As MARAD explains, the agency generally does not post—and the public therefore generally does not have an opportunity to comment on—ports' financial information. *See* MARAD Br. 42.

2. Lacking any viable statutory or regulatory support, Petitioners' "Delfin-had-to-submit-an-amended-application" argument instead relies heavily on MARAD's April 2024 letter. Petitioners appear to assume that the April 2024 letter denied Delfin a license for its proposed project and that denial somehow rendered

the existing ROD inoperative.  *See* Opening Br. 32-36.  Petitioners' assumption is incorrect.

Far from scrapping the ROD, the letter merely declined to grant a license "at this time" because of what the letter perceived as changes to the project that "resulted in a revised proposal that is not the same as that approved under the ROD." AR_007344.  At no point did MARAD purport to withdraw the ROD.  And as Delfin explained in its subsequent submissions, and as MARAD ultimately agreed, the environmental impacts of the changes were well within the scope of those assessed in the existing final EIS and ROD.  *See e.g.*, AR_008258; AR_008263.

The April 2024 letter's chief concern was that Delfin "now propose[d]" to have critical equipment "owned, financed, and operated by third parties other than Delfin."  AR_007344.  But that simply was not true, and Delfin corrected the letter's misperception with detailed information "regarding Delfin LNG's continued ownership of the Project."  AR_007385.  As Delfin explained, although it planned to use "special-purpose entities for financing, construction and operation purposes," all would be under Delfin's ownership and control.  AR_007396.  Petitioners have offered no reason why MARAD's acceptance of Delfin's explanation was inconsistent with the Deepwater Port Act or otherwise arbitrary and capricious.  *See* AR_009403.

26

The April 2024 letter also claimed that the "equity and debt financing that was approved in the ROD . . . had changed significantly." AR_007345. The letter was specifically concerned that Delfin's original financing partners were no longer involved in financing the project. *See* AR_007344-7345; *see also* AR_008243 (September 2023 memorandum from MARAD's Office of Financial Approvals observing that "the partners identified by Delfin in the application evaluation process no longer appear to be involved with the project"). But the ROD allowed Delfin to satisfy its financial responsibility obligations by (1) "provid[ing] evidence of its completed and finalized financing agreements, guarantees and other agreements proposed to support the construction or operation of the Port" *or* (2) "[a]s an alternative," providing "draft financing agreements by *other* credit-worthy financial entities." AR_005323 (emphasis added).

Delfin chose the second route. In response to the April 2024 letter, Delfin submitted a package of financial materials including draft operation, construction, and decommissioning guarantee agreements with a new guarantor. *See* AR_009367-9382. After reviewing these draft agreements, MARAD deemed the new guarantor an adequate substitute, concluded that "the financial requirements under the Record of Decision [had been] met," AR_008219, and imposed—as a condition of the license—a requirement that Delfin finalize the new draft agreements or those of an approved alternative, AR_008219; AR_009351; *see also* MARAD Br. 37 n.2

27

(noting that, after license approval, MARAD approved alternative financial assurance coverage for Delfin's decommissioning costs).

MARAD acted well within its authority and expertise in assessing Delfin's financial responsibility and setting the license's financial conditions. *See, e.g.*, 33 U.S.C. § 1504(c), (e) (empowering the Secretary to assess financial responsibility and establish license conditions to ensure compliance with Deepwater Port Act); *see also Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 968 (D.C. Cir. 2000) (calling it "responsible agency decision making" for an agency to condition an authorization on compliance with measures the agency concludes are necessary to satisfy statutory criteria). Petitioners offer no basis to conclude otherwise. *See* Opening Br. 33-35.

The April 2024 letter's final concern related to "proposed design changes to the mooring system, power generation systems, and cooling system." AR_007345. But Delfin's 2025 environmental impact assessment demonstrated that these project updates were "designed to further prevent or minimize effects on the environment and use best available technology, consistent with the [Deepwater Port Act's] mandate, the ROD, and environmental review criteria." AR_007391. Taken together, the updates *reduced* air emissions and seabed disturbances while making the project more efficient. AR_007398-7399. The bottom line: "[O]verall

28

environmental impacts are reduced, mitigated or avoided by Delfin's project improvements." AR_007399.

MARAD agreed. After reviewing Delfin's assessments, MARAD issued a qualitative assessment finding that "Delfin's proposed project as refined is not likely to result in adverse environmental consequences that substantially differ from those associated with the originally evaluated project." AR_008254. Just the opposite, in fact. MARAD recognized that Delfin was *required* by the terms of both the Deepwater Port Act and the ROD to "design the project and continue to incorporate best available technology to prevent or minimize adverse impacts on the marine environment." AR_008253. Delfin's refinements fulfilled that condition by reducing "the size, scope, and impacts tied to the construction and operation of the project." *Id*. MARAD therefore "determined that Delfin's project as so refined meets the requirements of the Deepwater Port Act and its favorable 2017 ROD for license issuance." AR_008258.

Petitioners do not identify anything in MARAD's qualitative assessments to undermine the agency's conclusions. In fact, Petitioners ignore MARAD's assessments altogether. *See* Opening Br. 31-37. Perhaps because there is nothing to criticize. MARAD reasonably applied Condition 15's procedures to determine that further environmental review was unnecessary and that all environmental effects

29

of Delfin's proposed refinements fell within the existing ROD and supporting final EIS. *See* AR_005348; *infra* pp. 32-44.

## II. MARAD'S LICENSING DECISION COMPLIES WITH THE NATIONAL ENVIRONMENTAL POLICY ACT.

### A. MARAD Acted Within Its Broad Discretion In Declining To Prepare A Supplemental EIS.

1. Petitioners next fault MARAD for not preparing a supplemental EIS before issuing Delfin's license. Opening Br. 37. In Petitioners' view, Delfin's proposed project refinements, *id.* at 39; new information concerning the Rice's whale, *see id.* at 45; and the cumulative impacts of additional "fossil fuel infrastructure" proposed since Delfin's ROD, *id.* at 44, required supplemental review under NEPA. Petitioners are wrong across the board.

NEPA's "goal" is "to inform agency decisionmaking, not to paralyze it." *Seven Cnty.*, 605 U.S. at 173. To that end, agencies must supplement an EIS "when 'significant new circumstances or information' comes to light." *Citizens for Clean Air & Clean Water*, 98 F.4th at 192 (quoting 40 C.F.R. § 1502.9(c)(1)(i)-(ii) (2020)).[1] To determine whether supplementation was required under NEPA,

---

[1] The Council for Environmental Quality's NEPA regulations were rescinded after MARAD granted Delfin's license. *See* 90 Fed. Reg. 10610, 10610 (Feb. 25, 2025) (noting effective date of April 11, 2025). This Court can assume for sake of argument—as Petitioners, this Court, and other courts have—that MARAD's NEPA compliance should be determined in accordance with regulations in effect at the time MARAD issued Delfin's license, but in light of *Seven County*. *See* Opening Br. 23;

30

MARAD had to consider "the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original" EIS. *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984)). Unless MARAD determined that the new information is significant, no supplemental EIS—and no additional public comment period—was needed. *Citizens for Clean Air & Clean Water*, 98 F.4th at 192.

MARAD enjoyed extensive leeway in conducting its analysis. "[W]hen determining what information warrants EIS supplementation, courts generally defer to the agency's well-informed judgment." *Id.*; *see also* 40 C.F.R. § 1502.9(d), (e) (2024). This Court "asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180; *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989) (arbitrary and capricious standard applies to agency's decision not to supplement an EIS). In short, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Gas Transmission Nw., L.L.C. v. FERC*, 157 F.4th 674, 700-701 (5th Cir. 2025) (quoting *Seven Cnty.*, 605 U.S. at 185).

---

*see also e.g.*, *Gas Transmission Nw., L.L.C. v. FERC*, 157 F.4th 674, 691 n.6 (5th Cir. 2025); *Healthy Gulf v. FERC*, 132 F.4th 544, 549 n.1 (D.C. Cir. 2025).

MARAD fulfilled its NEPA obligations. It conducted a qualitative assessment and reasonably determined that neither Delfin's project refinements nor new environmental circumstances warranted a supplemental EIS. *See* AR_008268. Having "found the information and analysis in the 2023 and 2025 [environmental impact assessments] sufficient for its review and analysis," AR_008264, MARAD produced a reasoned and reasonable decision that "the impacts of the new design fall within the scope and range of impacts and alternatives analyzed in the [final] EIS and ROD" and "are not likely to result in adverse environmental consequences nor present a seriously different picture of the foreseeable adverse environmental consequences," AR_008263.

MARAD further determined—in consultation with both the U.S. Fish & Wildlife Service and the National Marine Fisheries Service—that "changes [that] have occurred for some of the [Endangered Species Act]-listed species and critical habitats" did not alter MARAD's conclusion "that the project may affect but is not likely to adversely affect [Endangered Species Act] listed species and critical habitat[s]." AR_008268 (capitalization altered). And because neither Delfin's design changes nor new environmental circumstances placed Port Delfin outside "the range and scope of impacts analyzed in the [final] EIS," MARAD reasonably concluded that Delfin's "[p]roject does not require the preparation of a supplemental EIS." *Id.*

Petitioners plainly disagree. *See* Opening Br. 37-46. "But neither 'the language nor the history of NEPA suggests that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions.' " *Seven Cnty.*, 605 U.S. at 192 (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983)). And Petitioners do not identify anything in MARAD's detailed qualitative analysis of either Delfin's project refinements or the new environmental circumstances as falling outside NEPA's "broad zone of reasonableness." *Gas Transmission Nw.*, 157 F.4th at 701 (explaining that courts assessing NEPA challenges "should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness") (quoting *Seven Cnty.*, 605 U.S. at 183); *see also* AR_008262-8268. Petitioners choose instead to pretend MARAD's qualitative assessments don't exist. "The ostrich is a noble animal, but not a proper model for an appellate advocate." *Gonzales-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011).

2. Petitioners complain that the "design changes to the mooring system, power generation systems, and cooling systems" noted "in MARAD's April 2024 letter" required supplementation. Opening Br. 39 (quoting AR_007344-7345). But they do not specify any fault in MARAD's conclusion that any impacts resulting from refinements to the power-generation and cooling systems "fall within the range

and scope of impacts analyzed in the [final] EIS." AR_008266 (power generation system refinements); *see also* AR_008267 (cooling system refinements).[2]

Petitioners instead focus their criticism on Delfin's proposed revision to the mooring system. Delfin's original application evaluated two options for the disconnectable mooring system that will anchor the floating LNG vessels to the sea floor. *See* AR_002607-2612. One was a tower-yoke mooring system, which consists of a fixed platform on a rotating swivel, depicted below.[3]

---

[2] *Accord* AR_008256 (MARAD concluding that "updates to power generation systems are expected to decrease operational air emissions for certain pollutants. No impacts to other resource categories are expected from this update. These impacts fall within the range and scope of impacts analyzed in the 2016 [final] EIS); AR_008257 (MARAD explaining that the change to the cooling system will cause "a reduction in environmental impacts on water and sediment quality; commercial and recreational fisheries; and wildlife and protected species due to a reduction in seawater withdrawal as compared to those described in the 2016 [final] EIS. No impacts to other resource categories are expected from this update. These impacts fall within the range and scope of impacts analyzed in the 2016 [final] EIS."); AR_008389 (2025 environmental impact assessment finding "[n]o changes from the 2016 Final EIS impact determinations, conclusions, or recommendations" based on refinements to the power generation and cooling systems).

[3] Figure 2-10 was submitted as part of Delfin's 2015 deepwater port application at AR_002609.



Figure 2-10    Floating Liquefied Natural Gas Vessel on a Tower Yoke Mooring System

The tower-yoke system sits on four legs—meaning that its installation would require driving four piles (or columns) deep into the sea floor.  AR_008298.

The other disconnectable mooring system evaluated in Delfin's application was a swivel-and-yoke system, again shown below.[4]



Figure 1-3    SSY Mooring System Proposed

Unlike the tower-yoke system, the swivel-and-yoke system would be entirely submerged and would require only three piles into the sea floor.  AR_008298.

The tower-yoke system was originally chosen because the swivel-and-yoke system was relatively new and "unproven."  AR_002609.  But even at the time of Delfin's application, the swivel-and-yoke system was not "excluded," and Delfin indicated that it would continue to investigate its use.  AR_002612.  Indeed, as MARAD ultimately concluded, both the tower-yoke system and the swivel-and-yoke system fell within "the realm of alternatives considered in the [final] EIS."  AR_008265.

---

[4] Figure 1-3 is taken from the 2025 environmental impact assessment at AR_008298.

Over the ensuing years, the swivel-and-yoke system attained "an established track record for being a safe, reliable, and cost-effective mooring system." AR_008897. Delfin therefore proposed switching to the swivel-and-yoke system because doing so had operational advantages and reduced environmental impacts. *Id.*; *see also* AR_008194-8195 (explaining that "[t]his refinement takes advantage of a newer design, now proven in worldwide application, with a quicker disconnect time to facilitate hurricane avoidance, reduce seabed disturbances, and less construction time and underwater noise disturbance from driving fewer piles (three piles per mooring rather than four)").

Petitioners complain that the change in mooring systems will increase certain emissions during construction. Opening Br. 42 (citing AR_008205; AR_008387). To substantiate this concern, Petitioners characterize the 2025 environmental assessment as indicating an increase in "$PM_{10}/PM_{2.5}$, $NO_x$, CO, and $CO_2$ emissions during construction." *Id.* (citing AR_008205; AR_008387).

But as the assessment explains, the increase is not because the project fundamentally changed, but "due to including emissions that were previously unaccounted for and differences in calculation methodologies." AR_008387. Even then, these increases are expected to be "modest[] overall due to the reduction in the number of mooring systems (approximately 11% or less)," and Delfin's project refinements will significantly decrease sulfur dioxide and greenhouse-gas emissions

37

during construction of each mooring system. AR_008205; *see, e.g.*, AR_008264, 008293, 008356-57. MARAD accordingly concluded that any impact from the change in mooring systems would be consistent with the 2016 Final EIS. AR_008265. Petitioners give no reason for this Court not to "defer to [MARAD's] well-informed judgment" that these modest increases—made alongside changes that reduced other emissions—did not warrant a supplemental EIS. *Citizens for Clean Air & Clean Water*, 98 F.4th at 192.

Petitioners further argue that the new mooring system will create greater noise disturbance during construction because the intensity of impact noise from driving the three 96-inch diameter piles needed for each swivel-and-yoke system is somewhat greater than that from driving the four 78-inch piles needed for a tower-yoke system. Opening Br. 42 (citing AR_008255). But the reduced project scope required only three moorings instead of four, and only three piles per mooring rather than four, resulting in driving only nine piles instead of the sixteen envisioned in the original project design. AR_008255-56. MARAD thus reasonably concluded that this increase in noise intensity was offset by the swivel-and-yoke system requiring fewer total piles—corresponding to fewer pile-driving events and overall less habitat disruption and greenhouse gas emissions. AR_008265; *accord* AR_008255-8256; AR_008206 (explaining that although "each pile will be larger than in the design evaluated in the Final EIS . . . resulting in somewhat increased noise propagation

and a larger area within which noise thresholds are exceeded," "[t]hese increases are not expected to be substantial in light of the reduced duration of the construction period owing to the reduced project scope").

Petitioners express particular concern that the increased noise will cause "physical injury to fish and elasmobranchs, such as the giant manta ray." Opening Br. 42. But the 2025 environmental impact assessment specifically evaluated impacts on the giant manta ray and concluded that "the temporary effects to habitat access would be so low as to be unmeasurable and, therefore, insignificant." AR_008353. Petitioners do not identify any flaw in MARAD's adoption of that assessment.

3. Beyond Delfin's design refinements, Petitioners assert that MARAD was required to supplement the final EIS to account for the cumulative impacts of new fossil-fuel infrastructure projects along the Gulf Coast as well as new information about the endangered Rice's whale. Opening Br. 44-45.

Petitioners' cumulative-impacts argument is foreclosed by *Seven County*. The Supreme Court there explained that "NEPA calls for the agency to focus on the environmental effects of the project itself, not on the potential environmental effects of future or geographically separate projects." 605 U.S. at 190. After all, "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects." *Id.* at 186-187 (quoting

39

42 U.S.C. § 4332(2)(C) (2018)).  So "when the effects of an agency action arise from a separate project—for example, a possible future project or one that is geographically distinct from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project."  *Id.* at 187.  The "*additional* large fossil fuel infrastructure projects" Petitioners point to, Opening Br. 44—which include onshore projects authorized by other agencies and proposed offshore projects yet to be approved or built—are precisely the kind of future or geographically separate projects that "break[] the chain of proximate causation between the project at hand and the environmental effects of the separate project," *Seven Cnty.*, 605 U.S. at 187.  In any event—as MARAD explains—even if the agency were required to analyze cumulative impacts under the now-rescinded NEPA regulations in place at the time of the EIS, MARAD adequately analyzed the cumulative effects.  MARAD Br. 56.

Petitioners' invocation of "significant new information" about the Rice's whale fares no better.  Opening Br. 45.  As Petitioners note, the Rice's whale "received a federally endangered designation" in 2019.  *Id.*  Before issuing Delfin's license, MARAD evaluated the potential impacts of the Delfin project on all newly "listed species and critical habitat[s]" and determined that none were likely to be adversely affected.  AR_008268.  "This review included the . . . Rice's whale."  AR_009343.  With respect to the Rice's whale in particular, MARAD reasonably

noted in 2023 that because Delfin's "[p]roject is located outside the core distribution area for the Rice's whale, it is unlikely that the species will be impacted by the construction, operation, or decommissioning of the Deepwater port." AR_007281. And as the 2025 environmental impact assessment explained, none of the Delfin project's infrastructure intersects the proposed critical habitat for the Rice's whale because the project is "60 miles … from the inner border of the [whale's] proposed critical habitat." AR_008317.

That was sufficient. As this Court explained in rejecting an identical challenge to another deepwater port off the Texas coast, MARAD reasonably determined that "the whale's occurrence near [the licensed project] would be 'extremely unlikely,' " in part because the "Rice's whale populations largely remain confined in the northeastern Gulf" off the coast of Florida, "far from the project site." *Citizens for Clean Air & Clean Water*, 98 F.4th at 192-193. The same is true here.

MARAD went further, in fact. In fulfillment of its Endangered Species Act Section 7 obligations, MARAD initiated consultation with the National Marine Fisheries Service on the Rice's whale. And MARAD conditioned Delfin's license on any "required mitigation that results from the completed consultation" with the Fisheries Service. AR_009360; *see also* AR_009307-9328; AR_008268. MARAD also retained discretion to "amend or rescind" Delfin's license "for consistency with the completed consultation, including appropriate mitigation measures."

41

AR_009360.  MARAD was allowed to condition its approval in that way.  *See City of Grapevine v. DOT*, 17 F.3d 1502, 1508-09 (D.C. Cir. 1994) (agency's approval was properly conditioned on completion of National Historic Preservation Act process).  MARAD thus engaged with the new information on the Rice's whale and reasonably found it did not amount to "substantial new circumstances or information" requiring a supplemental EIS.  40 C.F.R. § 1502.9(d)(1)(ii) (2024).

4.  Petitioners' remaining arguments attempt to impose absolute rules on when a supplemental EIS is required.  But those arguments have no basis in NEPA or its now-repealed implementing regulations and ignore the discretion afforded MARAD's supplementation determination.

Petitioners argue, for instance, that *any* projects with *any* design changes that may have environmental effects "require new and/or supplemental review."  Opening Br. 41.  That is false.  "[N]ot all 'new' information is 'significant.' "  *Citizens for Clean Air & Clean Water*, 98 F.4th at 192 (quoting *Marsh*, 490 U.S. at 373).  And it was for MARAD, not Petitioners, to determine whether a design change warranted supplementation upon "reevaluat[ing]" the final EIS.  40 C.F.R. § 1502.9(e) (2024) (providing that an "agency may reevaluate an environmental impact statement to determine that the agency does need to prepare a supplement under paragraph (d) of this section"); *id.* § 1502.9(d)(1)(i) (requiring supplementation if "substantial changes to the proposed action [are made] that are

42

relevant to environmental concerns"). MARAD's determination that the new information was not sufficiently substantial to require supplementation implicates "substantial agency expertise," and this Court should defer to MARAD's "informed discretion." *Marsh*, 490 U.S. at 376-377.

Petitioners also contend that any increased impacts not previously considered must be addressed through a supplemental EIS. Opening Br. 41. But their out-of-circuit authorities confirm that only "significant" new effects trigger the supplementation requirement. *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (quoting *Marsh*, 490 U.S. at 373-374); *accord Sierra Club v. FERC*, 68 F.4th 630, 651 (D.C. Cir. 2023), *vacated as moot by* 2023 WL 5537562 (D.C. Cir. 2023) (emphasizing that a supplemental EIS "is necessary not only when the nature of a project's environmental impacts is *significantly* different than anticipated, but also when the extent of those impacts is *significantly* greater than predicted") (emphases added). Petitioners' cases all therefore follow the same rule as this Court: "NEPA does not require agencies to needlessly repeat their environmental impact analyses every time [new information] comes to light." *Friends of Capital Crescent Trail*, 877 F.3d at 1060. "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh*, 490 U.S. at 373.

43

Petitioners cite (at 45) *Louisiana Wildlife Federation Inc. v. York* as holding that to warrant supplementation, "a party need not show that the project *will* have significant adverse impacts that [the agency] has not considered," but must "show only that the project *may* have *such impacts*." 761 F.2d 1044, 1052 (5th Cir. 1985) (per curiam) (emphases added). But MARAD declined supplementation because *any* possible impacts from Delfin's project refinements and the 2019 Rice's whale designation were insufficiently significant to warrant supplementation. *See supra*, pp. 32-42. Petitioners offer no reason to disturb MARAD's conclusion.

Petitioners also complain that the public was not notified or afforded the opportunity to comment on the issue of supplementation. Opening Br. 40. But public notice and comment is not part of the supplementation-assessment process. *See* 40 C.F.R. § 1502.9(e) (2024). That falls to the agency alone. *See id.* Finally, Petitioners repeat their contention that the April 2024 letter already "determined that the changes required 'a supplemental Environmental Assessment or Supplemental Environmental Impact Statement.' " Opening Br. 39 (quoting AR_007344-7345); *see also id*. at 41. But the April 2024 letter misunderstood the nature and scope of Delfin's project updates. *Supra* pp. 26-29. MARAD was free to arrive at a different conclusion after receiving accurate information.

44

**B.   Any Failure To Prepare A Supplemental EIS Was Harmless.**

Even if NEPA had required MARAD to conduct further analysis, MARAD's failure to do so was harmless. *See* MARAD Br. 61. Environmental review that "falls short in some respects . . . may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent some reason to believe that the agency might disapprove the project if it added more." *Gas Transmission Nw.*, 157 F.4th at 701 (quoting *Seven Cnty.*, 605 U.S. at 185); *see also* 5 U.S.C. § 706 (explaining that, in reviewing agency action, "due account shall be taken of the rule of prejudicial error"). There is no reason to believe that a supplemental EIS would have led to a different result here. The Administration's energy priorities favor Delfin's project, as evidenced by the President's executive order declaring that it is "the policy of the United States" to encourage greater domestic energy production, including "on the Outer Continental Shelf," to "meet the needs of our citizens and solidify the United States as a global energy leader long into the future." AR_007376. Moreover, MARAD agreed with Delfin's environmental impact assessments that Delfin's project refinements would *reduce* environmental impacts overall as compared to the existing ROD-approved plan. AR_008263-8267.

Petitioners' tepid assertion (at 48-49) that MARAD's licensing decision "could" have been influenced by a supplemental EIS does not undermine that conclusion. A "could have" threshold would neuter the harmless-error rule.

Although Petitioners need not conclusively prove that MARAD would have refused or differently conditioned the license for Port Delfin if a supplemental EIS were prepared, Petitioners do have to show there is some "reason to believe" that would have been the outcome. *Gas Transmission Nw.*, 157 F.4th at 701 (quoting *Seven Cnty.*, 605 U.S. at 185). Yet all the evidence demonstrates that Delfin's project was *better* positioned for a license grant in 2025 than when MARAD conducted its final EIS in 2016.

Petitioners contend that MARAD's failure to complete a supplemental EIS violates NEPA by preventing Petitioners and the agency decisionmakers from being fully informed about the revised port's environmental impacts. Opening Br. 50. That misunderstands both NEPA and the harmless-error rule. Although informing the public and agency decisionmaking may be one aspect of NEPA, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-526 (1987). The harmless-error rule ensures that NEPA's "modest procedural requirement" is not used to block or delay projects that "otherwise comply with all relevant substantive environmental laws." *Seven Cnty.*, 605 U.S. at 183. Delfin's project does, and further NEPA analysis would accomplish nothing except delayed construction of a deepwater port that MARAD has determined to be the environmentally preferred means of serving national and global energy needs consistent with its statutory mandate. *See* AR_005339-5340, AR_005356.

## III. MARAD'S LICENSING DECISION COMPLIES WITH THE ADMINISTRATIVE PROCEDURE ACT.

Petitioners' final challenge to MARAD's licensing decision is equally unsound. Petitioners contend that MARAD acted arbitrarily and capriciously by "ignoring" the April 2024 letter's "previous conclusion" that MARAD needed to complete a full "environmental analysis of project changes and issue a new ROD." Opening Br. 47 (citing AR_007345). But MARAD's April 2024 letter was mere "preliminary correspondence" between MARAD and Delfin and "did not embody the sort of authoritative agency policy or position that triggers the rule prohibiting agencies from 'ignoring or countermanding their earlier factual findings without reasoned explanations for doing so.' " *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 256 (D.C. Cir. 2024) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009)) (brackets omitted). As the Supreme Court has explained, it has "traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting," applying the change-in-position doctrine to an informal policy statement only when it " 'effectively' resembled [an] adjudication." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 n.5 (2025) (quoting *Department of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 18 (2020)). MARAD's informal April 2024 letter to Delfin does not clear that bar.

47

But even if the change-in-position doctrine did apply, MARAD did not "ignore" the letter or its concerns. The agency simply changed its views after reviewing Delfin's clarifying submissions: MARAD issued memoranda fully and reasonably explaining that "the information [Delfin] provided . . . addresse[d] the concerns raised in the April 17, 2024, letter." AR_009403; *see also El Puente*, 100 F.4th at 256 (even if change-in-position doctrine applied, agency satisfied it because recipient of agency letter "responded to the . . . initial letter by providing additional information" and "[t]he record . . . reflects that steps were taken to address [the initial letter's] concerns").

When an agency changes positions it must " 'display awareness that it *is* changing a position' and offer 'good reason for the new policy.' " *Fox Television*, 556 U.S. at 515. To satisfy this requirement, an agency must account for any relevant "serious reliance interests" and ensure that it has not misled regulated parties. *Wages & White Lion*, 604 U.S. at 570 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-222 (2016)). But the agency "does not need to show 'that the reasons for the new policy are *better* than the reasons for the old one,' " nor "must it 'provide a more detailed justification than what would suffice for a new policy created on a blank slate.' " *Id.* (quoting *Fox Television*, 556 U.S. at 515).

MARAD met that standard here. It adequately explained that Delfin's responsive submissions showed that many of the assumptions underlying the April

48

2024 letter were misplaced.  *See* AR_009403 (confirming that "the information [Delfin] provided . . . addresses the concerns raised in the April 17, 2024, letter"). With respect to the letter's concerns about project ownership and financing, AR_007344, MARAD's Office of Financial Approvals and Marine Insurance reviewed Delfin's updated financial submissions (*see* AR_008121-8144) and "concluded that Delfin had demonstrated compliance with the requirements laid out in the ROD," AR_008218.  And with respect to the letter's concerns about design changes, AR_007345, MARAD "conducted a qualitative assessment" and "determined that Delfin's project as so refined meets the requirements of the Deepwater Port Act and its favorable 2017 ROD for license issuance," AR_008254.

Again, Petitioners' brief does not so much as mention these documents.  But taken together, they "display awareness" of the difference between MARAD's April 2024 letter and subsequent licensing decision and "offer[ed] 'good reasons for the new policy.' "  *Wages & White Lion*, 604 U.S. at 570 (quoting *Fox Television*, 556 U.S. at 515).  "[A]gencies may change their minds . . . , even though those affected may be disappointed," *PSWF Corp. v. FCC*, 108 F.3d 354, 357 (D.C. Cir. 1997), because "[n]othing in the Administrative Procedure Act prohibits an agency from changing its mind, if that change aids it in its appointed task," *American Petroleum Inst. v. EPA*, 661 F.2d 340, 355 (5th Cir. Unit A 1981).

Nor does this case "raise any of the traditional concerns implicated by the change-in-position doctrine—such as the risk that the agency has 'misled regulated entities,' or the possibility that the agency has ignored 'serious reliance interests' in its decision-making process." *Cboe Global Markets, Inc. v. SEC*, 155 F.4th 704, 718 (D.C. Cir. 2025) (internal citation and brackets omitted). The "bar" for the type of reliance interest that agencies must account for prior to a policy change is "decades of industry reliance." *Wages & White Lion*, 604 U.S. at 585 (quoting *Encino Motorcars*, 579 U.S. at 222). To the extent Petitioners' reliance is even relevant, they have not identified anything they did in reliance on the April 2024 letter or any interest MARAD did not consider.

Petitioners complain that the memoranda addressing the April 2024 letter were not posted on the public docket and that the public was not given an "opportunity to comment." Opening Br. 47. But the explanation required by the change-in-position doctrine does not incorporate a notice-and-comment requirement. "Agencies use the same procedures when they amend or repeal a[n action] as they use to issue the [action] in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). MARAD did not engage in notice and comment before issuing the April 2024 letter; the agency therefore had no obligation to engage in notice and comment before retreating from it.

50

**IV.    THE REMEDY FOR ANY FLAW IN MARAD'S ANALYSIS IS REMAND WITHOUT VACATUR.**

Petitioners have not shown any flaw—much less a harmful flaw—in MARAD's licensing decision.  But even if this Court were to disagree, the appropriate remedy is remand to MARAD for further explanation.

Remand without vacatur is warranted when an agency error is fixable, meaning that "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."  *Texas Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).  This Court therefore remands without vacatur when the flaw in the agency's decision is procedural.  *Id.*  Vacatur, by contrast, is reserved for circumstances in which a challenged agency action would be unlawful regardless of the procedures used to reach it.  *See e.g.*, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (vacating where the challenged agency action "contradicts significant portions" of the agency's enabling statute, such that "[t]here is no possibility" the agency "could obviate th[o]se conflicts on remand"); *Southwestern Electric Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019) (vacating agency action that was "unlawful under the Act" based not on procedural failings but the agency's "own scientific conclusions").

Petitioners do not contend that issuance of Delfin's license was impermissible under substantive law.  Their challenge is entirely procedural, such that any errors are quintessentially fixable.  Petitioners contend that MARAD did not comply with

51

procedural steps imposed by the Deepwater Port Act (MARAD's putative failure to require Delfin to submit an amended application), NEPA (MARAD's putative failure to produce a supplemental EIS), and the Administrative Procedure Act (MARAD's putative failure to adequately explain a change in position). If this Court agrees with any of Petitioners' contentions, the proper course would be to remand to permit MARAD to take the required steps or provide the required explanation because MARAD lawfully could—and very likely would—reach the same result.

Petitioners rely on D.C. Circuit precedent tying the "decision whether to vacate" to "the 'seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.' " *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) (quoting *International Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)); *cf.* Opening Br. 50-51. But under *Allied-Signal*, "[a] strong showing of one factor may obviate the need to find a similar showing of the other." *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019); *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (probability that agency could justify decision on remand was "sufficiently high" that disruptive consequences of vacatur were "barely relevant"). This Court's cases reflect that principle, often remanding when an agency's error is fixable without considering the disruptive consequences

52

from vacatur. *See, e.g., National Ass'n of Private Fund Mgrs. v. SEC*, 151 F.4th 252, 273 (5th Cir. 2025); *Texas Ass'n of Mfrs.*, 989 F.3d at 389. This Court therefore need not do more than confirm that MARAD can fix any foot-fault on remand.

Petitioners' throw-away bid (at 51) to vacate Delfin's underlying ROD is jurisdictionally barred by the Deepwater Port Act. The Act's judicial-review provision authorizes suit over the "decision to issue, transfer, modify, renew, suspend, or revoke a license . . . not later than 60 days after any such decision is made." 33 U.S.C. § 1516. RODs fall within that jurisdictional grant, *see Citizens for Clean Air & Clean Water*, 98 F.4th at 186, because a ROD reflects MARAD's decision to issue a license once the conditions set forth in the ROD are satisfied, *see* AR_005302-5303. Indeed, as the ROD makes clear, the central question answered by a ROD is "whether to authorize the issuance of a License . . . , to deny the application or to authorize issuance of a License subject to certain conditions and criteria." AR_005306.

Any challenges to the ROD therefore had to have been brought by May 12, 2017—60 days after the ROD was issued. Aside from Petitioners' bare request to vacate the ROD, they have not—nor has anyone, ever—challenged the ROD for Port Delfin. Any attempt to do so now comes eight years too late.

## CONCLUSION

For the foregoing reasons, and those in the Government's brief, this Court should dismiss or deny the petition for review.

Respectfully submitted,

/s/ *Catherine E. Stetson*
CATHERINE E. STETSON
JAMES T. BANKS
JOANNE ROTONDI
SEAN MAROTTA
NATALIE SALMANOWITZ
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Intervenor*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on January 22, 2026.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Catherine E. Stetson*
Catherine E. Stetson

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,239 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.1.

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

/s/ *Catherine E. Stetson*
Catherine E. Stetson