# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
July 7, 2026
Lyle W. Cayce
Clerk

No. 25-60282

Center for Biological Diversity; Sierra Club; Habitat Recovery Project,

*Petitioners*,

*versus*

United States Department of Transportation; United States Maritime Administration; Charles Makings, *Acting Administrator U.S. Maritime Administration*; Sean Duffy, *Secretary, U.S. Department of Transportation*,

*Respondents*.

Petition for Review of an Order of the
Maritime Administration
Agency No. USCG 2015-0472

Before Smith, Willett, and Ramirez, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Delfin LNG wants to build a deepwater port in the Gulf of America—a cluster of floating vessels, moored miles offshore, that would liquefy natural gas and load it onto tankers bound overseas. After years of environmental review, the Maritime Administration (MARAD), an arm of the Department of Transportation, approved the Project. Three environmental organizations now ask us to set that decision aside under the Deepwater Port Act, the

National Environmental Policy Act, and the Administrative Procedure Act. But before any of those statutes comes Article III's case-or-controversy requirement.

That requirement is no "empty formality."[1] It "confines the Judicial Branch to its proper, limited role in the constitutional framework of Government" and ensures that legal questions "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."[2] Federal courts do not sit to resolve every important public controversy. We may act only when a plaintiff has suffered, or faces, a concrete and particularized injury.

Petitioners have identified no member who has made that showing—no one who fishes near the port, boats beside it, works around it, or otherwise uses Project-affected waters or nearby areas in a way the Project would impair. Their concern for the Gulf may be heartfelt. But concern, without injury, is not standing.

Because Petitioners have not shown an injury in fact fairly traceable to MARAD's licensing decision, we lack power to reach the merits. We therefore DENY the petition for review.

---

[1] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 581 (1992) (Kennedy, J., concurring).

[2] *Id.*; *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

# I

This petition challenges MARAD's licensing of a deepwater LNG-export project.[3] In 2015, Delfin asked MARAD and the Coast Guard to approve a deepwater port in the Gulf of America,[4] supplied by onshore infrastructure in Louisiana. The Project would combine those onshore facilities with floating vessels moored offshore. There, natural gas would be chilled into LNG and loaded onto tankers for export.

The Deepwater Port Act (DPA) required MARAD to notify Texas and Louisiana—the adjacent States—that their governors could approve, disapprove, or conditionally approve the Project.[5] Neither governor responded. MARAD then published five Federal Register notices, held six public hearings in the two States, and invited public comment four times.[6] It

---

[3] Deepwater ports are "fixed or floating manmade structure[s] . . . located beyond State seaward boundaries . . . that are used or intended for use as a port or terminal for the transportation [or] storage . . . of oil or natural gas." 33 U.S.C. § 1502(9)(A).

Respondents are the Department of Transportation, the Secretary of Transportation, MARAD, and MARAD's acting administrator. We refer to them collectively as MARAD.

[4] On January 20, 2025, President Trump directed the Secretary of the Interior to rename the United States continental-shelf area formerly known as the Gulf of Mexico the "Gulf of America" and to update the Geographic Names Information System accordingly. Exec. Order No. 14172, § 4(b), 90 Fed. Reg. 8629, 8630 (Jan. 31, 2025). We use that federal designation but preserve "Gulf of Mexico" in quotations from the pre-renaming administrative record, environmental-impact statement, and briefing.

[5] *See* 33 U.S.C. § 1508(b).

[6] *See Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 42,612 (July 16, 2015); *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 45,720-02 (July 29, 2015); *Deepwater Port License Application: Delfin LNG*, 80 Fed. Reg. 80,455 (Dec. 24, 2015); *Deepwater Port License Application: Delfin LNG*, 81 Fed. Reg. 46,157-01 (July 15, 2016); *Deepwater Port License Application: Delfin LNG LLC; Delfin LNG Deepwater Port; Final Application Public Hearing and Final Environmental Impact Statement*, 81 Fed. Reg. 85,678-01 (Nov. 28, 2016).

also prepared a 2016 environmental impact statement (EIS) exceeding 1,800 pages and analyzing the Project's effects on the environment, socioeconomics, transportation, and air quality.

Based on that EIS, MARAD issued a 2017 record of decision approving Delfin's application and tentatively authorizing issuance of a license once Delfin satisfied several additional conditions, including financing agreements and worker certifications. No one sought review of the 2017 decision.

Over the ensuing years, Delfin changed the Project's financing, ownership, and design. Among other things, it changed financiers, reduced the number of floating vessels from four to three, and replaced water-based cooling with air-based cooling. In 2024, MARAD concluded that the 2017 record of decision no longer supported the modified Project and instructed Delfin to submit an amended application so that MARAD could undertake supplemental review. Delfin did not submit one, and MARAD did not prepare a supplemental EIS.

The next year, President Trump issued an executive order directing MARAD to decide within thirty days whether the post-2017 modifications were "likely to result in adverse environmental consequences that substantially differ from those associated with the originally evaluated project so as to present a seriously different picture of the foreseeable adverse environmental consequences."[7] Unless the modifications presented "seriously different consequences," the order directed MARAD to issue the license within thirty days.[8] MARAD concluded that the changes

---

[7] *See* Exec. Order No. 14154, § 8(b), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025) (hyphenation omitted).

[8] *Id.* § 8(c), 90 Fed. Reg. at 8358.

reduced the Project's environmental effects and issued the license in March 2025.

Three organizations—the Center for Biological Diversity, Sierra Club, and Habitat Recovery Project—petitioned for review.[9] They contend that MARAD violated the DPA by declining to require an amended application, reconsider the statutory environmental criteria, and reopen public comment; violated the National Environmental Policy Act (NEPA) by declining to prepare a supplemental EIS; and violated the Administrative Procedure Act (APA) by issuing a license after previously determining that the 2017 record of decision no longer supported the modified Project. They seek vacatur of the licensing decision.

## II

Petitioners have not established associational standing. That jurisdictional failure ends the case before we reach the DPA, NEPA, or APA.

### A

A party invoking federal jurisdiction bears the burden of establishing Article III standing.[10] When several petitioners seek the same relief, one petitioner with standing is enough.[11]

Because Petitioners sue on behalf of their members, they must establish associational standing by showing that: "(1) their members would

---

[9] *See* 33 U.S.C. § 1516.

[10] *See Lujan*, 504 U.S. at 561; *see also* U.S. CONST. art. III, § 2, cl. 1 (confining jurisdiction to "Cases" or "Controversies"); *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).

[11] *Massachusetts*, 549 U.S. at 518.

independently have Article III standing to sue, (2) the interests they seek to protect are germane to their purposes, and (3) neither the claim asserted nor the relief requested requires the participation of individual members."[12] This case turns on the first requirement.

An organization's member has Article III standing only by showing an injury in fact that is fairly traceable to the challenged action and likely redressable by a favorable decision.[13] The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[14] Traceability, in turn, requires a causal connection between the asserted injury and the challenged action, rather than the independent conduct of a third party.[15]

In environmental cases like this one, "courts must carefully distinguish between injury to the petitioner and injury to the environment."[16] A bare procedural violation does not establish standing. But a litigant with a procedural right may obtain review when the alleged violation threatens a concrete interest and "the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."[17]

---

[12] *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (citation omitted).

[13] *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[14] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016).

[15] *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).

[16] *Id.* at 537 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

[17] *Massachusetts*, 549 U.S. at 518; *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 187–88 (5th Cir. 2024).

B

Petitioners advance both procedural and substantive theories of injury. They say that MARAD's asserted statutory violations produced an incomplete environmental analysis, foreclosed meaningful public participation, and thereby threatened their members' "health, recreational, business, professional and scientific interests." Such allegations can establish standing only when a member identifies a concrete, project-specific interest impaired by the challenged agency action.[18]

Petitioners rely on declarations from the Habitat Recovery Project member Eddie LeJuine; Sierra Club members Roddy Hughes, Aaron Rice, and John Allaire; and Center for Biological Diversity member Kristen Monsell. On the record before us, none carries Petitioners' jurisdictional burden.

At oral argument, Petitioners identified LeJuine, a commercial and recreational fisherman, as their strongest declarant. LeJuine lives in Hackberry, Louisiana, and says that the Project has impaired his health, enjoyment of property, livelihood, and interest in local wildlife. He says fishing has become "significantly harder" over the past few years "due to habitat destruction and increased industrialization" associated with the Project. He also recalls seeing "many sea turtles" in the past and attributes

---

[18] *Compare Citizens for Clean Air*, 98 F.4th at 187–88 (holding standing exists where members alleged use of project-affected areas and impairment of their aesthetic and recreational interests); *Sierra Club v. Glickman*, 156 F.3d 606, 613–16 (5th Cir. 1998) (similar); *Sabine River Auth. v. U.S. Dept' of Interior*, 951 F.2d 669, 673–677 (5th Cir. 1992) (similar), *with Ctr. for Biological Diversity*, 937 F.3d at 538–39, 542–43 (holding no standing where members' asserted use of the Gulf was geographically attenuated and insufficiently tied to the challenged permits); *Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 466–68 (5th Cir. 2011) (similar); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 698–702 (5th Cir. 2000) (similar).

their decline to "noise, water pollution, food-chain disruption, and vessel traffic."

LeJuine's declaration establishes neither injury in fact nor traceability. We therefore need not separately address redressability.

The governing rule is familiar: a petitioner "must show that [he] use[s] the area affected by the challenged activity and not an area roughly in the vicinity of a project site."[19] The same requirement applies when the asserted injury is a deficient environmental review.[20] No bright-line distance resolves that inquiry. Geographic proximity matters, but the question is whether the declarant has shown "that [he] can expect to suffer whatever consequences the project may have."[21]

LeJuine's declaration does not make that showing. He says that he fishes commercially in Calcasieu Lake and along the coastline and recreationally twenty to thirty miles offshore. He also refers to an "influx of LNG facilities" and loss of wildlife "in the area." But he never locates his activities or alleged harms in relation to the Project's onshore or offshore components. Nor does he distinguish harm caused by this Project from harm caused by the region's broader industrial development. That omission is

---

[19] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (quotations omitted); *Ctr. for Biological Diversity*, 937 F.3d at 538 ("Without a geographic nexus, Petitioners' members cannot suffer an injury in fact.").

[20] *See Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 466 ("While deficiencies in the preparation of impact statements may cause sufficient injury for standing, this court requires that parties complaining of such deficiencies must have a sufficient 'geographical nexus' to the property in question."); *Sabine River Auth.*, 951 F.2d at 674 (standing to challenge an EIS requires a plaintiff's "geographic nexus to the site of the challenged project" (quotation omitted)).

[21] *See Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 467 (footnote and alterations omitted).

consequential. The connection between an alleged pollution source and an asserted injury is "a fact-specific inquiry that turns on many factors, including the size of the waterway, the proximity of the source and the injury, forces like water currents, and whether discharges will evaporate or become diluted."[22]

The Gulf's size makes those details indispensable, not technicalities. As we have recognized, "[t]he Gulf is huge," "covers about 600,000 square miles," and "contains more than 640 quadrillion gallons of water."[23] Unlike the declarant in *Citizens for Clean Air*, LeJuine does not say that he "'plan[s] to make use of *the specific sites*' where environmental effects would allegedly be felt."[24] Instead, he refers vaguely to his "community" and "area" without relating either to the Project's location or scope.

That omission defeats both injury in fact and traceability. To what extent is the Project responsible for his alleged injuries?[25] Where exactly are "the area[s]" that LeJuine refers to? How close are they to Delfin's LNG facilities?[26] In other words, LeJuine identifies neither a Project-affected area he uses nor a non-speculative causal chain connecting this license to the conditions he describes. And he does not explain how his requested relief—revoking Delfin's license—would redress conditions he attributes to long-running regional industrialization.[27] We "cannot simply presume pollution

---

[22] *Ctr. for Biological Diversity*, 937 F.3d at 545.

[23] *See id.* at 539.

[24] *See id.* at 538 (emphasis in original) (quoting *Summers*, 555 U.S. at 499).

[25] *See id.* at 537 (citation omitted) (requiring causation).

[26] *See id.* at 538 (requiring geographic nexus).

[27] *See Tex. Democratic Party*, 459 F.3d at 587 (citation omitted) (requiring redressability).

discharged in one place will affect would-be plaintiffs everywhere."[28] LeJuine therefore has not shown a concrete, particularized injury fairly traceable to MARAD's licensing decision. Habitat Recovery Project accordingly lacks standing.[29]

Hughes fares no better. A Sierra Club member and senior field manager, he says he "rel[ies] on the Club to represent [his] interests in protecting the environment." He lists broad concerns—that the Project will harm Rice's whales,[30] emit greenhouse gases, interfere with recreation, and undermine scientific study. "Sierra Club members," according to Hughes, are "directly impacted by the project." But he identifies no "personal stake" in the case, no personal use of a Project-affected area, no activity the Project will impair, and no concrete, particularized harm he will suffer.[31]

Generalized concern for wildlife, greenhouse-gas emissions, and environmental quality cannot itself establish standing.[32] And MARAD

---

[28] *See Ctr. for Biological Diversity*, 937 F.3d at 538 (first citing *Cent. & S. W. Servs., Inc.*, 220 F.3d at 700–01 (holding that a Sierra Club member failed to establish injury in fact because he offered no evidence that pollution from the challengedlandfill would reach the aquifer supplying his drinking water); and then citing *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996)).

[29] *See Shrimpers*, 968 F.3d at 424 (citation omitted).

[30] The Rice's whale is "a highly imperiled cetacean with one of the world's smallest whale populations." *Citizens for Clean Air & Clean Water v. U.S. Dep't of Transp.*, 98 F.4th 178, 192 (5th Cir. 2024). "Sadly, scientists believe that no more than fifty Rice's whales remain in the natural world." *Id.* at 186.

[31] *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (quotation omitted) (requiring a "personal stake" in litigation to support standing).

[32] *See Summers*, 555 U.S. at 494 ("[G]eneralized harm to the forest or the environment will not alone support standing." (citing *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972)); *see also, e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466 (D.C. Cir. 2009) (holding that petitioners "lack[ed] standing on their substantive climate change theory" because "climate change is a harm that is shared by humanity at

considered those environmental concerns before issuing the license. It determined that the Project was unlikely to affect the Rice's whale because the LNG facilities are located "outside the core distribution area" of the species.[33] Delfin, moreover, made changes to the Project that MARAD concluded would reduce environmental externalities.

Furthermore, Hughes' assertion that Sierra Club members are "directly impacted" is a conclusion, not a showing of an Article III injury.[34]

Rice and Monsell also fall short.

Rice, a university scientist and Sierra Club member, and Monsell, a Center for Biological Diversity litigator, identify neither a personal use of a Project-affected area nor a concrete research or professional interest impaired by the challenged license. Their declarations describe environmental harm and interference with research in general terms, but they do not tie those concerns to a concrete and particularized injury of their own.[35]

Allaire's declaration is more detailed, but it reaches the same result. He says that the Project threatens his interests in hunting, birding, and fishing; that construction and pollution could worsen his chronic obstructive

---

large" and "too generalized to establish standing" even when plaintiffs had particularized interests in species and ecosystems vulnerable to its effects).

[33] *See also* Melissa S. Soldevilla et al., *Rice's Whales in the Northwestern Gulf of Mexico: Call Variation and Occurrence Beyond the Known Core Habitat*, 48 ENDANGERED SPECIES RSCH. 155, 155–74 (2022) (locating the "core Rice's whale habitat in the northeastern [Gulf of Mexico]").

[34] *See Nebraska*, 600 U.S. at 489 (quotation omitted); *see also Center for Biological Diversity*, 937 F.3d at 545 (rejecting a standing declaration where the declarant said only that affected communities were "directly affected" without explaining what that assertion meant).

[35] *See Spokeo*, 578 U.S. at 339.

pulmonary disease; that the Project may harm local species and habitat; and that onshore construction may affect his commute and expose him to air pollution.

Allaire has since sold the residence he owned when this petition was filed and bought another nearer the onshore facilities. We need not decide whether those transactions bear on mootness.[36] Even assuming that Allaire had—and still has—a sufficient geographic nexus, his declaration does not establish injury in fact or traceability.

Allaire does not connect his predicted harms to this Project rather than to industrial activity generally. He identifies no Project-specific emission, operation, construction effect, or other evidence that will cause the air-quality, wildlife, traffic, or recreational harms he anticipates. Nor does he explain how the Project is likely to worsen his pulmonary condition or otherwise cause him concrete harm. A speculative, undifferentiated risk of future harm is not enough.[37] And generalized allegations of environmental injury, without a project-specific connection to his own interests, do not establish standing.[38]

---

[36] Allaire's sale of his prior residence raise a question whether he retains a live personal stake in this petition. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (explaining that plaintiffs must maintain a personal interest throughout litigation); *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (explaining that an intervening event eliminating a plaintiff's personal stake can moot a case); *Yarls v. Burton*, 905 F.3d 905, 909 (5th Cir. 2018) (same); *cf. Dick v. Colo. Housing Enters., L.L.C.*, 872 F.3d 709, 711 (5th Cir. 2017) (recognizing that a property sale may moot claims premised on the sold property); *Christopher Vill., Ltd. P'ship v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999) (same). We need not resolve that question because Allaire has independently failed to establish injury in fact and traceability.

[37] *See Spokeo*, 578 U.S. at 339; *Shrimpers*, 968 F.3d at 424.

[38] *See Summers*, 555 U.S. at 494; *Ctr. for Biological Diversity*, 937 F.3d at 538.

No identified member has standing in his or her own right. Habitat Recovery Project relies on LeJuine; Sierra Club relies on Hughes, Rice, and Allaire; and Center for Biological Diversity relies on Monsell. None has shown a concrete, particularized injury fairly traceable to the challenged license. Petitioners therefore have not established associational standing.

* * *

Petitioners have not established an injury in fact fairly traceable to MARAD's licensing decision. Without standing, we lack power to reach the merits. We therefore DENY the petition for review.